# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| GENERAL MOTORS LLC, GENERAL MOTORS COMPANY, <br><br> Plaintiffs, <br><br> against <br><br> FCA US LLC, FIAT CHRYSLER AUTOMOBILES N.V., ALPHONS IACOBELLI, JEROME DURDEN, MICHAEL BROWN, <br><br> Defendants. | CASE NO. <br> _____ <br><br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

**Page**

COMPLAINT ..................................................................................4

INTRODUCTION ...........................................................................4

THE PARTIES ..............................................................................10

    A.    FCA Group ........................................................11

    B.    Corrupt FCA Officials......................................12

    C.    Significant Non-Parties and Other Entities .........................14

FCA-CONTROL ENTERPRISE......................................................18

FCA-NTC ENTERPRISE................................................................19

JURISDICTION AND VENUE ......................................................21

DETAILED ALLEGATIONS ........................................................23

I.    OPERATION CHRYSLER: FIAT ACQUIRES OPERATING
CONTROL OF CHRYSLER FOR NO CASH ...........................23

    A.    Financial Crisis Threatens U.S. Auto Industry .................23

    B.    Fiat and Marchionne Seek Entry into the U.S. Market Through
Chrysler ...........................................................24

    C.    Through Bankruptcy, FCA Obtains the Right to Purchase a
Majority of Chrysler's Shares from the UAW ...................31

II.    FCA FUNNELS MILLIONS TO CERTAIN UAW LEADERS
THROUGH THE NTC.................................................................31

III.    FIAT AND ITS SUCCESSORS CORRUPTED FORMER UAW
LEADERS TO SECURE SIGNIFICANT LABOR ADVANTAGES
FOR FCA FOR YEARS .............................................................36

IV.    FCA GROUP CONSPIRED WITH UAW LEADERS TO ATTEMPT
A TAKEOVER OF GM BY MERGER .......................................43

    A.    Marchionne Prepares on Behalf of FCA to Force a Takeover of GM by Merger ................................................................................... 44

    B.    President Williams Is a Willing Participant in the Takeover Conspiracy ..................................................................................... 47

    C.    FCA Ignites Operation Cylinder ........................................................ 49

V.    MARCHIONNE-DIRECTED FRAUD WAS NOT ISOLATED TO LABOR RELATIONS ............................................................................. 64

VI.    U.S. ATTORNEY IN DETROIT COMMENCES CRIMINAL INVESTIGATION AND STARTS TO REVEAL THE CORRUPTION ............................................................................................. 65

VII.    FCA GROUP AND ITS CO-CONSPIRATORS CONCEALED THE CONSPIRACY AND RESULTING DAMAGE, PREVENTING GM FROM DISCOVERING ITS EARLIER INJURY ...................................... 67

CAUSES OF ACTION ............................................................................. 78

REQUESTS FOR RELIEF ....................................................................... 94

## COMPLAINT

General Motors LLC and General Motors Company (individually or collectively, "GM" or "Company") for their Complaint, allege as follows:

### INTRODUCTION

1.     This lawsuit is categorically not against the nearly 50,000 hard-working women and men employed by GM who are members of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"). The UAW and its officials are not Defendants to this lawsuit. This lawsuit does not seek to alter or reduce in any respect the wages and other benefits of any UAW worker in the past or into the future. In fact, this lawsuit is intended to build a stronger future for GM's employees, the UAW, and the Company. That future depends on a collective bargaining process and labor relations grounded in integrity, good faith, and arm's-length negotiations, which the law requires and this lawsuit is intended to vindicate.

2.     This case is about an Italian company, Fiat Chrysler Automobiles N.V. ("FCA NV"), which managed to win the support of the U.S. government in obtaining operational control, for no cash, over an iconic U.S. auto company, Chrysler Group LLC. Shortly after this government approved acquisition, FCA Group[1] betrayed our

---

[1]   "FCA Group" means, collectively, FCA US LLC ("FCA"), its parent FCA NV, along with their predecessors, including FCA predecessors Chrysler LLC and Chrysler Group LLC ("Chrysler") and FCA NV predecessor Fiat S.p.A. ("Fiat").

government's and the U.S. auto industry's trust and embarked on a systemic and near decade-long conspiracy to bribe senior union officials to corrupt the collective bargaining process and labor relations.

3.     As revealed starting with the first indictment in July 2017, the United States Attorney for the Eastern District of Michigan has been conducting a wide-ranging investigation into corruption by and between FCA Group and certain former union leaders. This investigation has resulted in criminal charges against thirteen individuals with three FCA officials and four former UAW officials pleading guilty to a years-long bribery scheme. As has been repeatedly admitted, starting no later than July 2009, FCA paid millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees" primarily through the UAW-FCA joint training center (the National Training Center or "NTC") and, in return, received "benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW."[2] During the course of this audacious bribery scheme, two collective

---

Where appropriate and distinguishable, the Complaint refers to the particular entity or entities at issue.

[2]    7/13/18 Iacobelli Plea Agreement, at 7. The individual criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. Durden, et al.*, Case No. 2:17-cr-20406-PDB-RSW, unless specified otherwise.

bargaining agreements ("CBAs") were negotiated with FCA—in 2011 and 2015—both subject to corruption in those negotiations.

4.      Through this lawsuit, GM seeks recourse against FCA Group and its officials responsible for this long-running bribery scheme. While a full accounting of the damage inflicted on GM is unknowable at this time without discovering additional details of the scheme, GM estimates that it has incurred massive monetary damage in the form of higher costs that it seeks in relief. This damage is a direct, substantial, and foreseeable consequence of this bribery scheme orchestrated by FCA Group and the many acts of racketeering that fueled the scheme.

5.      The bribery scheme was authorized at the highest levels of FCA Group. According to criminal plea agreements by former FCA Group executives, senior FCA Group executives "knowingly and voluntarily joined a conspiracy in which Fiat Chrysler Automobiles US LLC and its executives agreed to pay and deliver, and willfully paid and delivered, more than $1.5 million in prohibited payments and things of value to officers and employees of the UAW."[3] These FCA Group bribes were authorized by its then CEO Sergio Marchionne (now deceased) to General Holiefield, the UAW Vice President and International Executive Board Member (now deceased) who oversaw the FCA business relationship. FCA executive

---

[3]   7/13/18 Iacobelli Plea Agreement, at 3; *see also* 5/25/18 Brown Plea Agreement, at 3; 8/8/17 Durden Plea Agreement, at 4.

Alphons Iacobelli has admitted to this scheme and currently is in prison for these illegal acts. Michael Brown, Director of Employee Relations at FCA and Co-Director of the NTC, likewise has admitted to this scheme. Marchionne authorized these bribes, and additional things of value to UAW officials, so that FCA could more effectively compete and thrive against GM and, as detailed below, ultimately attempt to force a merger with GM.

6.    The benefits, concessions, and advantages illegally purchased by FCA included at least a unique level of support from UAW leaders for FCA's World Class Manufacturing program ("WCM"), a streamlined internal worker grievance process, manipulation of certain contractual limits on Tier Two and temporary employees, other "side letter" agreements, and even a unique agreement to support FCA's "long-term business plan." As part of this bribery scheme, and to lock in the competitive efficacy of the purchased benefits, concessions, and advantages for FCA, GM was denied similar union commitments and support.

7.    In 2015, with cooperation of UAW leadership purchased through bribes, Marchionne schemed to use the collective bargaining process to harm GM by becoming the lead in negotiations and attempting to force a merger of the companies. For years, Marchionne had made clear to GM his desire to merge companies, voluntarily or through force. In the spring of 2015, Marchionne formally solicited GM for a merger and was rejected. In the ensuing months, with the

purchased support of certain former UAW officials including then President Dennis Williams, Marchionne proceeded to orchestrate a negotiation of the 2015 CBA designed, through the power of pattern bargaining, to cost GM billions. These negotiations were conveniently timed, as Williams and Marchionne were aware the federal government was actively investigating past FCA-UAW agreements and potentially other misconduct. Through a self-described "rich" FCA-UAW labor contract, Williams and certain corrupt UAW leaders could seek to convince government investigators that they had obtained significant FCA concessions, while Marchionne could impose unanticipated costs on GM in order to force a merger. While GM ultimately resisted the takeover scheme, in the process Marchionne and FCA Group negotiated a 2015 CBA that, as designed, directly damaged GM as a result of the pattern of racketeering.

8.     Thus, as described more fully in this lawsuit, FCA Group and its executives have engaged in a classic pattern of racketeering for the better part of a decade, including committing multiple violations of the Labor Management Relations Act of 1947 ("Taft-Hartley Act"), wire fraud, and mail fraud. GM seeks to recover its damages from FCA Group and its corrupt executives for the benefit of GM and its employees.

9.     In light of the government investigation, the UAW has recognized the need to engage in active reform to ensure it is free of corruption. UAW Acting

President Rory Gamble recently announced "widespread ethics reforms," designed to "make clear the UAW is committed to establishing the right mechanisms and safeguards to protect the union from corruption and malfeasance." GM agrees with the spirit of the announced reforms, which are a necessary step towards "regaining the trust of [the UAW's] members, and ensuring the misconduct that has recently come to light will never happen again."[4]

10.    FCA Group, on the other hand, refuses to come to terms with this stunning pattern of racketeering directed from its highest offices.  FCA Group had the NTC publicly claim that it was a "victim" rather than perpetrator of this fraud, only to have a federal court reject that claim and conclude the "NTC functioned as a willing co-conspirator with FCA."[5] As to Marchionne, who sat at the center of multiple fraudulent schemes as detailed below, FCA Group has chosen to embrace his wrongful conduct. Rather than acknowledge Marchionne's wrongdoing and implement necessary governance reform, in 2019 FCA Group's Chairman declared that Marchionne stood for "responsibility and openness" and that "we . . . owe"

---

[4]    UAW Press Release, *United Auto Workers Acting President Rory Gamble Enacts Immediate Nationwide Ethics Reforms* (Nov. 13, 2019), https://uaw.org/united-auto-workers-acting-president-rory-gamble-enacts-immediate-nationwide-ethics-reforms/.

[5]    *See United States v. Iacobelli*, No. CR 17-20406, 2019 WL 1508035, at *1 (E.D. Mich. Apr. 5, 2019).

Marchionne for helping make FCA Group what it is today.[6]  In contrast to the current UAW efforts to combat corruption, FCA Group has chosen to essentially ratify years of its own racketeering.

11.    The damages that GM recovers will be used for investment in the United States to grow jobs and for the benefit of its employees.

12.    In short, this lawsuit seeks a level and honest playing field for all stakeholders in the U.S. auto industry, including manufacturers, suppliers, the UAW, and employees critical to making this industry a worldwide success.

### THE PARTIES

**Plaintiffs**

13.    **General Motors LLC**: Plaintiff General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. General Motors LLC is a subsidiary of General Motors Holdings LLC, which is a wholly owned subsidiary of Plaintiff General Motors Company. General Motors LLC is the largest automaker in the U.S. and an iconic American brand that manufactures and sells automobiles in the U.S. under brands including

---

[6]    FCA, *Statement from FCA Chairman, John Elkann, on the One-Year Anniversary of the Loss of Sergio Marchionne* (July 24, 2019), https://www.fcagroup.com/en-US/media_center/fca_press_release/2019/july/Pages/statement_on_the_one_year_anniversary_of_the_loss_of_sergio_marchionne.aspx.

Chevrolet, Cadillac, Buick, and GMC. General Motors LLC is an employer in the automotive industry, which has a substantial effect on interstate commerce.

14. **General Motors Company**: Plaintiff General Motors Company (herein referred to as "GM Company" or "New GM") is a Delaware corporation with its principal place of business in Detroit, Michigan, and the ultimate parent of General Motors LLC.

15. "GM" is used herein to refer individually or collectively to General Motors LLC and General Motors Company.

**Defendants**

A. **FCA Group**

16. **FCA US LLC (formerly known as Chrysler Group LLC):** Defendant FCA US LLC ("FCA") is an automotive company based in Auburn Hills, Michigan, formerly known as Chrysler Group LLC, the successor of Chrysler LLC. "Chrysler" is used herein to refer individually or collectively to Chrysler Group LLC and Chrysler LLC. FCA is a wholly owned subsidiary of FCA NV, a publicly traded foreign entity listed on the New York Stock Exchange ("NYSE"). FCA manufactures and sells automobiles in the U.S. under brands such as Chrysler, Jeep, Dodge, and Ram. FCA is an employer in the automotive industry, which has a substantial effect on interstate commerce.

17.   **Fiat Chrysler Automobiles N.V. (formerly known as Fiat):**
Defendant Fiat Chrysler Automobiles N.V. ("FCA NV"), the successor of the Italian
automotive company formerly known as Fiat S.p.A. ("Fiat"), is the ultimate parent
company and owner of FCA US LLC. FCA NV is organized under the laws of the
Netherlands, as a Naamloze Venootschap, and its principal executive offices are in
London, England. Since October 2014, FCA NV's common stock has traded on the
NYSE under the ticker symbol FCAU, and it regularly files with the SEC annual
reports on Forms 20-F and furnishes Forms 6-K pursuant to Section 13(a) of the
Exchange Act. FCA NV is an automotive group that, both directly and through its
subsidiaries, designs, engineers, manufactures, distributes, and sells vehicles and
components; provides retail and dealer financing, leasing, and rental services; and
engages in media, publishing, and other business throughout the U.S., including in
Michigan.

### B.   Corrupt FCA Officials

18.   **Alphons Iacobelli:** Defendant Iacobelli is a resident of Michigan and
was employed as the Vice President of Employee Relations at FCA and as the Co-
Chairman of the NTC and its Joint Activities Board from 2008 to 2015. In this role,
Iacobelli was a senior official at Chrysler and FCA responsible for negotiating and
implementing labor agreements with the UAW and resolving disputes and
grievances that arose under the CBAs between Chrysler/FCA and UAW. Through

his position with Chrysler and FCA, Iacobelli had the authority and acted as an agent for Chrysler and FCA to direct the financial affairs of and approve payments made by the NTC. On January 22, 2018, Iacobelli pled guilty to subscribing a false tax return, pursuant to 26 U.S.C. § 7206(1), and conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was sentenced to 66 months in prison and a $10,000 fine and ordered to pay $835,523 in restitution. At all times relevant to this Complaint, Iacobelli was an agent of Chrysler and/or FCA.

19.     **Jerome Durden:** Defendant Durden is an individual currently residing in Michigan and was employed as a financial analyst at Chrysler and FCA in its corporate accounting department since 1985. In 2008, he was assigned by Chrysler to act as the Controller of the NTC and as Secretary of the NTC Joint Activities Board. He served in those roles until 2015. In his capacity as the Controller of the NTC, Durden, as an agent for Chrysler and FCA, had the authority to approve and did approve payments made by the NTC. In addition, Durden was selected by Holiefield to serve as Treasurer of the Board of Trustees of the Leave the Light on Foundation ("LTLOF") from 2009 through June 2015. On August 8, 2018, Durden pled guilty to failure to file tax returns, 26 U.S.C. § 7203, and conspiracy to defraud the U.S., 18 U.S.C. § 371, and was sentenced to 15 months in prison and ordered to pay $8,811 in restitution. At all times relevant to this Complaint, Durden was an agent of Chrysler and/or FCA.

20.     **Michael Brown:** Defendant Brown is an individual currently residing in Michigan and was employed as a Director for Employee Relations at Chrysler and FCA from 2009 to 2016. During that time, Brown was personally involved in the negotiation and administration of the national CBAs between Chrysler/FCA and UAW and had authority to sign letters and agreements on behalf of Chrysler/FCA with the UAW. Brown also represented Chrysler and FCA as a Co-Director of the NTC. On May 25, 2018, Brown pled guilty to misprision of a felony, pursuant to 18 U.S.C. § 4, and was sentenced to one year and one day in prison and a $10,000 fine. At all times relevant to this Complaint, Brown was an agent of Chrysler and/or FCA.

### C.     Significant Non-Parties and Other Entities

21.     **Sergio Marchionne ("Marchionne"):** Non-party Marchionne (deceased in 2018) served as the CEO of Fiat, and later FCA NV, from 2004 through his death in 2018. Marchionne also served as the Chairman and CEO of FCA from 2014–18, the Chairman (2011–14) and CEO (2009–14) of Chrysler, and the COO of FCA North America (2011–18). At all times relevant to this Complaint, and until his death, Marchionne was an agent of FCA Group.

22.     **NTC:** Non-party the NTC is a Michigan tax-exempt corporation with its principal place of business in Detroit, Michigan. The NTC was formed under the terms of prior CBAs between the UAW and Chrysler, whose obligations were

inherited by FCA following Chrysler's bankruptcy. The stated purpose of the NTC is to provide for the education, training, and retraining of UAW workers employed by FCA. The governing body of the NTC was known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the UAW's Chrysler Department served as Co-Chairmen of the NTC Joint Activities Board. The remainder of the Joint Activities Board was made up of senior officials from FCA and the UAW.

23.    **General Holiefield:** Non-party Holiefield (deceased in 2015) served as the UAW Vice President for the Chrysler Department from 2006 through 2014. As Vice President, Holiefield had primary responsibility for negotiating with Chrysler/FCA and for administering the CBAs between the UAW and Chrysler/FCA on behalf of tens of thousands of FCA employees represented by the UAW. From 2007 to 2014, Holiefield also served on the UAW Executive Board. During the Holiefield leadership years, executives of Chrysler/FCA violated the Labor Management Relations Act by bribing Holiefield and his staff. Millions of dollars from Chrysler/FCA were diverted through NTC and LTLOF to pay for Holiefield's personal expenses and to conceal over a million dollars in prohibited payments and things of value from Chrysler/FCA to Holiefield, his girlfriend (and later wife) Monica Morgan, and other UAW officials.

24.   **Dennis D. Williams:** Non-party Williams is an individual currently residing in California and served on the UAW's Executive Board, most recently as the UAW's President (2014 to June 2018) and previously as the UAW's Secretary-Treasurer (2010–14).

25.   **Norwood H. Jewell:** Non-party Jewell is an individual currently residing in Michigan and served on the UAW's Executive Board from 2011 to 2017, most recently as the UAW's Vice President of the FCA Department (2014–17) and previously as Regional Director (2010–14). Jewell also served as Co-Chairman of the NTC. On April 2, 2019, Jewell pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371.

26.   **Virdell King:** Non-party King is an individual residing in Michigan and was a senior official in the UAW Chrysler Department from 2008 until she retired in February 2016. In 2011 and 2015, King served on the UAW committee responsible for negotiating the CBAs between UAW and FCA. On August 29, 2017, King pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to prison and a $5,500 fine.

27.   **Nancy Johnson:** Non-party Johnson is an individual residing in Michigan and was the top administrative assistant to Jewell, then the UAW Vice President for the Chrysler department, from 2014 through 2016. In 2015, Johnson served on the UAW committee responsible for negotiating the CBAs between UAW

and FCA. On July 23, 2018, Johnson pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to one year and one day in prison and a $10,000 fine.

28. **Keith Mickens:** Non-party Mickens is an individual residing in Michigan and was a senior official in the UAW Chrysler Department from 2010 through 2015. In 2011, Mickens served on the UAW committee responsible for negotiating the CBA between the UAW and FCA. Mickens also served as Co-Director of the NTC and served on the NTC Joint Activities Board. On April 5, 2018, Mickens pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to one year and one day in prison and a $10,000 fine.

29. **Wilson's Diversifed Products:** Upon information and belief, non-party Wilson's Diversifed Products, LLC ("Wilson's Diversifed Products") is a Michigan limited liability company with a principal place of business in Detroit, Michigan. Upon information and belief, Wilson's Diversifed Products is owned and controlled by Morgan.

30. **Monica Morgan Photography:** Upon information and belief, non-party Monica Morgan Photography, LLC is a Michigan limited liability company with a principal place of business in Detroit, Michigan. Upon information and belief, Monica Morgan Photography is owned and controlled by Morgan.

31.    **Leave the Light on Foundation ("LTLOF"):** During much of the relevant time period, non-party LTLOF was a Michigan tax-exempt organization with a principal place of business in Detroit, Michigan, controlled by Holiefield. Numerous co-conspirators served as officers and directors of LTLOF, including Keith Mickens (Vice President and director), Jerome Durden (Treasurer and director), and Virdell King (director).

**FCA-CONTROL ENTERPRISE**
**(18 U.S.C. § 1962(b))**

32.    From July 2009 until at least 2017, FCA Group, through a pattern of racketeering activity, acquired and maintained an interest in and/or control of the UAW, and in particular its decisions and actions regarding CBAs, which FCA Group and the other Defendants operated as an 18 U.S.C. § 1962(b) RICO enterprise ("FCA-Control Enterprise"). In particular, as early as July 2009, FCA Group and the named Defendants, through operation of the NTC and other means, paid bribes and gave items of value as alleged herein directly to top UAW officers and officials in violation of the Taft-Hartley Act. Starting in approximately July 2009, Defendants gave these items of significant value to UAW officials with the purpose of acquiring and maintaining, directly and indirectly, an interest in and/or control of the FCA-Control Enterprise, particularly with respect to the UAW's negotiation and decision-making in determining CBA terms, supplemental agreements, and the application of such terms.

33.     Through these racketeering acts, FCA Group and the other named Defendants gained control of and exercised control over the essential functions of the FCA-Control Enterprise by compromising certain UAW leaders and causing these leaders to accede to specific requests from FCA but not other automakers. Specifically, Defendants used this control to influence the UAW's negotiation of certain CBAs and other agreements, and then to control the UAW's day-to-day actions in implementing these agreements as more fully alleged herein.

34.     Through this exercise of control of the FCA-Control Enterprise, direct damage was inflicted on GM, including but not limited to actions taken during the collective bargaining processes as more specifically alleged herein.

## FCA-NTC ENTERPRISE
## (18 U.S.C. § 1962(c))

35.     Through a pattern of racketeering from July 2009 to 2017, as alleged herein, Defendants also operated the NTC as an 18 U.S.C. § 1962(c) RICO enterprise ("FCA-NTC Enterprise"). The named Defendants operated the FCA-NTC Enterprise for the common purpose of directing funds from the NTC (and ultimately from FCA) to certain UAW leaders.  In particular, FCA Group and some of its top executives have admitted that they willingly, purposefully, and unlawfully used the NTC as a vehicle to bribe union officials, funneling millions of dollars through the NTC for the benefit of certain union leaders in violation of the Taft-Hartley Act. According to government prosecutors, the NTC "sits at the epicenter of a massive

conspiracy to corrupt the labor management process, as the conduit of choice for illegal payments" by FCA.[7]

36.    FCA funded the NTC pursuant to a formula set forth in the CBAs negotiated between FCA and the UAW. For years, Defendants directed and allowed certain UAW officials to misappropriate money from the NTC (money ultimately coming from FCA Group) in return for, among other things, "benefits, concessions, and advantages" related to the negotiation, implementation, and administration of multiple CBAs.

37.    Each Defendant played a distinct role within the operation of the FCA-NTC Enterprise. FCA Group and its employees coordinated to knowingly and affirmatively direct funds from the NTC to certain UAW leaders, who knew the funds were impermissible to receive from FCA. As described further below, the precise role of each individual FCA Group employee varied, but included encouraging certain UAW leaders to use NTC funds impermissibly, taking steps to conceal the payments to UAW leaders, and directly approving the impermissible payments. In addition, these FCA Group executives, acting within the scope of their

---

[7]    Response to the UAW-Chrysler Skill Dev. & Training Program's Mot. for Recognition of Crime Victim Status and for Restitution at 1, *In re Pet. of UAW-Chrysler Skill Dev. & Training Program, In the Matter of United States v. Iacobelli*, No. 2:18-mc-51223-PDB (E.D. Mich. Oct. 1, 2018).

employment at FCA Group and at the direction of senior management, made and directed these illicit payments to UAW leaders through the NTC.

38.     Through these actions, each of these Defendants made decisions on behalf of the FCA-NTC Enterprise, by determining what payment should be permitted to which UAW official, and/or carried out the decisions of the FCA-NTC Enterprise by making or approving such payments. These payments were part of a coordinated and systematic scheme stretching back nearly a decade. These Defendants thus operated the FCA-NTC Enterprise through numerous racketeering acts, as described herein.

## JURISDICTION AND VENUE

39.     Because GM brings claims under the RICO Act, this Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331. The Court has subject matter jurisdiction over GM's state law claims as a matter of supplemental jurisdiction under 28 U.S.C. § 1367.

40.     Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this district.

41.     In addition to the reasons identified below, the Court may exercise personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b), because the ends of justice require that this conspiracy be tried in a single court. This Court is

the only possible location for such a single trial given that the overwhelming majority of actions and effects occurred in this district, and there is no other district where all Defendants would be subject to personal jurisdiction without recourse to § 1965(b).

42.     The Court has personal jurisdiction over FCA and FCA NV for several additional reasons. FCA and FCA NV design, engineer, manufacture, distribute, and sell vehicles in the U.S. and Michigan under brands such as Chrysler, Jeep, Dodge, and Ram. As described herein, FCA and FCA NV engaged in and authorized a decade-long racketeering scheme occurring principally in Michigan, directed to harm GM, which is headquartered in Michigan. Thus, the Court has personal jurisdiction over FCA and FCA NV (a) under MCL § 600.715, because they have transacted business within the state of Michigan, and did or caused to be done things in the state or from which consequences were felt in this state, which give rise to the cause of action in this case; and (b) under 18 U.S.C. § 1965(a), because they have transacted affairs in this district. In addition, the Court has personal jurisdiction over FCA under MCL § 600.711 because it carries on a continuous and systematic part of its general business within Michigan such that it is essentially "at home" in Michigan. Indeed, FCA is headquartered in Michigan.

43.     The Court has personal jurisdiction over Iacobelli, Durden, and Brown for several additional reasons. First, the Court has jurisdiction over Iacobelli,

Durden, and Brown (a) under MCL § 600.705, because during the relevant time period, they transacted business within the state of Michigan, and did or caused to be done things in this state or from which consequences were felt in this state, which give rise to the causes of action in this case; (b) under 18 U.S.C. § 1965(a), because they have transacted affairs in this district; and (c) under MCL § 600.701, because they are residents of Michigan.

**DETAILED ALLEGATIONS**

I.  **OPERATION CHRYSLER: FIAT ACQUIRES OPERATING CONTROL OF CHRYSLER FOR NO CASH**

   A.   <u>**Financial Crisis Threatens U.S. Auto Industry**</u>

44.    In or about 2008, in the midst of the worst financial crisis since the Great Depression, the automotive industry faced a major crisis. The industry had been weakened by, among other things, rising gas prices, which drove consumers away from trucks and SUVs, and competition from foreign automakers with lower labor costs using non-unionized labor. Sales dramatically declined. By 2008, the situation had turned critical as a once-in-a-generation credit crunch nearly took down the world economy and wreaked havoc on the auto industry.

45.    Suffering several consecutive quarters of losses, in late 2008, the U.S. auto manufacturers turned to the government for assistance. The U.S. Department of the Treasury injected funds in General Motors Corporation ("Old GM") and

Chrysler through the Troubled Asset Relief Program ("TARP"), but it served only as a stopgap.

46.     Chrysler filed for Chapter 11 on April 30, 2009.  Old GM followed two months later.

47.     Because the UAW represented 99 percent of Old GM's unionized employees and the government's provision of any additional TARP funds was conditioned on a new CBA that, in part, needed to set forth labor costs competitive to Japanese transplants (*e.g.*, Toyota, Nissan, and Honda), UAW leadership could slow down and potentially block the entire transaction.

## B.     Fiat and Marchionne Seek Entry into the U.S. Market Through Chrysler

48.     At the same time in Europe, Fiat faced plummeting sales and a deepening economic crisis. In September 2008, Marchionne told his executive council, "Fiat needs to radically change its alliance strategy. We've done everything we can on our own. If we're going to survive this one, we need a partner."[8]

49.     Fiat needed an opportunity to enter the U.S. marketplace and recognized one in the financial crisis of the U.S. auto industry. Marchionne realized that the Old GM and Chrysler bankruptcies "were changing the game. All of the

---

[8]   JENNIFER CLARK, MONDO AGNELLI: FIAT, CHRYSLER, AND THE POWER OF A DYNASTY 244 (2012) ("MONDO AGNELLI").

issues that had plagued the industry—its overcapacity, its poor use of capital, its inefficiency, the crushingly high cost of investment for new models—were now going to become unsustainable."[9] A "deal with Chrysler [could] be seen as part of a series of 'strategic partnerships' [that Fiat had] sealed with other automakers in recent years."[10] Fiat's would-be "partner" was in the U.S., and the UAW was Fiat's bridge to establish a domestic footprint given the UAW's significance in the U.S. automotive market.

50.     Marchionne, on behalf of Fiat, sought that critical connection—an alliance with UAW leadership—to help further Fiat's bid to acquire Chrysler. Marchionne quickly made the head of the union's Chrysler Department, Holiefield, a strategic partner and soon thereafter "a true friend."[11] Former UAW leadership, and Holiefield in particular, became Marchionne's main counterparties in Fiat's business plan even while he explored a collaboration with Chrysler. "If the union would come around to the view that the Fiat-Chrysler partnership was the only way

---

[9]    *Id.*

[10]    Jeff Israely, *Fiat to Take 35% Stake in Chrysler*, TIME (Jan. 20, 2009), http://content.time.com/time/business/article/0,8599,1872719,00.html.

[11]    Sergio Marchionne, *Eulogy for General Holiefield* (Mar. 17, 2015), https://media.fcanorthamerica.com/pdf.do?id=16436 ("*Eulogy for General Holiefield*").

to keep the company from going bust, maybe it would throw its weight behind Fiat when it came time for talks to start at the Treasury."[12]

51.     In early 2009, Marchionne and his team met with Holiefield and former UAW President Ron Gettelfinger in advance of any formal talks with the government.[13] This meeting laid the groundwork for a UAW-Fiat alliance.

52.     While Marchionne was in active discussions with the UAW, on March 30, 2009, the government unexpectedly gave Fiat and Chrysler only 30 days to reach an agreement.[14]

53.     Fiat began demanding what it needed from a new Chrysler-UAW CBA. Marchionne wanted the UAW to commit to support World Class Manufacturing ("WCM"). WCM is a manufacturing system that, according to Marchionne, "aims to ensure that the FCA Group's facilities are flexible and competitive with the best in the world."[15] "It broke down the union's rigid job classification system with its

---

[12]  MONDO AGNELLI at 247.

[13]  *Id*.

[14]  The White House, *Remarks by the President on the American Automotive Industry* (Mar. 30, 2009), https://obamawhitehouse.archives.gov/the-press-office/remarks-president-american-automotive-industry-33009.

[15]  FCA, *Global Quality Through World Class Manufacturing*, https://www.fcagroup.com/enUS/media_center/insights/Pages/wcm_global_quality.aspx.

strict hierarchy and boundaries about who could do what."[16] In Marchionne's view, it "got rid of an excessive cost structure, and it created efficiency."[17] As led by Fiat, Chrysler and the UAW agreed to Marchionne's demand to implement WCM.

54.     Marchionne also wanted to use more temporary employees in place of hourly workers. While Holiefield publicly claimed that he "would have to take [his] family and leave town if [the UAW] agreed to that," he quickly came around to Marchionne's ideas.[18] UAW leadership agreed to lift any cap or restraint on Tier Two workers until 2015. Tier Two workers are less senior employees who have a lower wage structure than Tier One workers, have a different health plan, and are provided with a 401(k) plan instead of a defined benefit pension. They are therefore a less expensive labor source.

55.     "Marchionne's goal overall was to have as few constraints as possible in his ability to operate Chrysler when it came out of bankruptcy. He wanted to save Chrysler, take it public, pay everyone back, and move on."[19] After the acquisition of Chrysler, on behalf of FCA Group, Marchionne implemented a bribery scheme to achieve this goal and help revive Chrysler and, relatedly, harm GM.

---

[16]   MONDO AGNELLI at 259.

[17]   *Id.*

[18]   *Id.* at 258, 260.

[19]   *Id.* at 260.

56.     Holiefield thus formed a long-term "partnership with Marchionne to help revive the company."[20] As Marchionne relayed, Holiefield was a "true partner and a key force behind the transformation of [Chrysler]."[21]

57.     Starting as of July 2009, merely one month after Chrysler emerged from bankruptcy, Iacobelli and other FCA officials began to transfer hundreds of thousands of dollars of Chrysler funds to Holiefield. These payments were "viewed . . . as an investment in 'relationship building' with UAW Vice President Holiefield."[22] For example, Holiefield's charity, LTLOF, received hundreds of thousands of dollars in furtherance of FCA's anticipated "high value/high leverage programs" with the UAW.[23] These bribes, well known within FCA Group and among certain former UAW leaders, fueled the start of a wide-ranging and long-lasting conspiracy, described in detail below.

---

[20]  Joseph Szczesny, *Late UAW Vice President Leaves Tarnished Legacy*, WARDSAUTO (Aug. 4, 2017), https://www.wardsauto.com/industry/late-uaw-vice-president-leaves-tarnished-legacy.

[21]  *Eulogy for General Holiefield*.

[22]  7/26/17 Iacobelli Indictment, at 13.

[23]  *Id*. at 10.



Marchionne and Holiefield in November 2009[24]

58.     In addition to authorizing the bribes through the NTC, Marchionne

personally rewarded Holiefield for his assistance. For example, in February 2010,

Marchionne, acting in the interest and as an agent of FCA Group, gave Holiefield a

custom-made Terra Cielo Mare watch worth several thousand dollars in direct

violation of the Taft-Hartley Act. Showing his knowledge of wrongdoing,

Marchionne sought to conceal the bribe by "declar[ing] the goods at less than fifty

---

[24]     *See* Bill Pugliano, *Sergio Marchionne Discusses the Future of the Chrysler Brand*
(Nov. 4, 2009), https://www.gettyimages.com/detail/news-photo/sergio-
marchionne-chrysler-group-llc-chief-executive-news-photo/92709619?
adppopup=true.

bucks."[25] It was reported that Marchionne then lied about the gift when questioned about it by federal investigators several years later.[26]

59.    Upon information and belief, FCA paid for the Holiefield/Morgan wedding in Venice, Italy, and Marchionne approved of FCA Group's funding of the wedding.



Morgan and Holiefield Photo Posted on Morgan's Facebook Page[27]

---

[25]  7/13/18 Iacobelli Plea Agreement, at 8.

[26]  Robert Snell, *FCA Chief Failed to Disclose Gift to UAW, Sources Say*, THE DETROIT NEWS (Aug. 16, 2018), https://www.detroitnews.com/story/business/autos/chrysler/2018/08/16/sergio-marchionne-gave-expensive-watch-uaw-failed-tell-investigators-orruption/985477002/.

[27]  *See* Monica Morgan Photography, https://www.facebook.com/MonicaMorganPhotography.

**C.** **Through Bankruptcy, FCA Obtains the Right to Purchase a Majority of Chrysler's Shares from the UAW**

60.     In June 2009, Chrysler emerged from bankruptcy with Fiat owning 20 percent of its equity. This was a coup for Fiat as it had only contributed intellectual property and know-how, and no actual money. Fiat also obtained operating control over Chrysler and Marchionne became its CEO.

61.     Through the Chrysler bankruptcy, the UAW, through the UAW Trust, emerged as the majority owner of Chrysler, owning 55 percent of the equity. Additionally, the UAW Trust received a note payable for $4.6 billion at 9 percent interest and the right to appoint a director to Chrysler's Board. Fiat was given the right to purchase 40 percent of the UAW Trust's equity interest in Chrysler.

62.     From bankruptcy, the UAW Trust also became the largest shareholder of New GM, obtaining 17.5 percent of the equity, and receiving a $2.5 billion note, 260 million shares of preferred stock, warrants to purchase 45.5 million shares of New GM stock, and the right to appoint a director to GM's Board.

**II.** **FCA FUNNELS MILLIONS TO CERTAIN UAW LEADERS THROUGH THE NTC**

63.     In July 2009, FCA began a long-running intentional scheme of improper payments to certain UAW officials, funneled primarily through the NTC, made by FCA senior executives and agents (including with the knowledge and approval of Marchionne) to influence the collective bargaining process. FCA

31

officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited payments and things of value paid to officers and employees of the UAW."[28]

64. FCA and its executives, with the knowledge and approval of FCA NV, made these payments to, according to government prosecutors, keep UAW officials "fat, dumb, and happy" and to "buy labor peace."[29] Indeed, "FCA, through Iacobelli and its executives, was implementing a corporate policy to buy good relationships with UAW officials. As one FCA executive put it, FCA was making an 'investment,' by 'spending thousands here,' in the form of illegal payments to UAW officials through the NTC, in an effort to obtain benefits, concessions, and advantages for FCA in its relationship with the UAW."[30] And as Brown, FCA's Director of Employee Relations and NTC Co-Director admitted, "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials."[31] Thus,

---

[28] 5/25/18 Brown Plea Agreement, at 3.

[29] 7/26/17 Iacobelli Indictment, at 16; 10/31/18 Durden Gov't Sentencing Mem., at 2.

[30] 8/20/18 Iacobelli Gov't Sentencing Mem., at 8.

[31] *Id.*; 5/25/18 Brown Plea Agreement, at 4.

"Iacobelli, on behalf of FCA, gave millions of dollars to UAW officials and the union itself in order to corruptly purchase labor peace."[32]

65.    To minimize detection of the payments, FCA had the NTC provide the bribes to various UAW officials through a variety of deceptive means and methods. As more fully detailed in the pleas of these FCA and former UAW officials, the bribes violated the Taft-Hartley Act, 29 U.S.C. § 186, and were concealed through acts of mail and wire fraud, all constituting predicate acts of racketeering within the meaning of 18 U.S.C. §  1961(1).

66.    For instance, UAW Vice President Holiefield used his personal charity, LTLOF, as one means to conceal his receipt of FCA bribes. Between July 2009 and 2014, Holiefield and his hand-selected LTLOF board members (which included FCA executive Jerome Durden and UAW officials Keith Mickens and Virdell King) transferred "more than $386,400 in funds" from the NTC to LTLOF.[33] Holiefield and his team hid these transfers by improperly omitting them from the Form 990s the NTC and LTLOF filed with the IRS.  In turn, Holiefield, along with his girlfriend and later wife, Monica Morgan, used the purported charitable donations for personal expenditures.

---

[32]   8/20/18 Iacobelli Gov't Sentencing Mem., at 4.

[33]   8/8/17 Durden Plea Agreement, at 6.

67.     As the bribery scheme grew in complexity and depth, Holiefield and Morgan, with FCA Group's knowledge, used false front businesses, including Monica Morgan Photography, Wilson's Diversifed Products, and even a false hospice organization, in an attempt to launder funds from the NTC and LTLOF. Between July 2009 and 2011, LTLOF paid over $70,000 to Monica Morgan Photography, purportedly for photography lessons for underprivileged children. Yet Morgan only taught a handful of classes, cancelled most of them, and then spent the money on fancy clothes, nightclubs, and restaurants. On another occasion in 2013, the NTC paid Monica Morgan Photography $13,500, purportedly for services rendered but in fact so that Morgan and Holiefield could pay off the last installment on their new in-ground pool. Between January 2011 and July 2012, the NTC transferred more than $425,000 to Wilson's Diversifed Products, which Morgan and Holiefield promptly used for personal expenses, including closing costs on the purchase of a house. In 2012, Morgan then created yet another shell company to receive over $200,000 in NTC funds, along with a fake hospice to allow LTLOF to "donate" over $350,000 directly to Holiefield's and Morgan's pockets.

68.     During the course of the conspiracy, the NTC at times would directly pay the personal expenses of certain UAW officials. For example, through wire transfer, the NTC paid off Holiefield's mortgage on his personal residence in the amount of $262,219.71.

69. To further evade detection and broaden the conspiracy, in and around 2012, FCA executives began to encourage the use of credit cards, with statements sent through the U.S. mails and payments made in part using interstate wires, issued to UAW officials by the NTC so they could charge personal expenses ultimately paid for by FCA. "Iacobelli directed the NTC to follow 'liberal' credit card and expense policies to persuade union officials to take company-friendly positions."[34] Certain UAW officials used these credit cards, including Johnson, King, Mickens, and Jewell, charging, for example, $1,259.17 for luxury luggage; $2,182 for a Italian-made Beretta shotgun; $2,130 for Disney World theme park tickets; over $1,000 for a pair of Christian Louboutin designer shoes; and thousands of dollars in electronics and many more such personal items.

70. As revealed in the government's recent indictment of UAW official Vance Pearson, then UAW President Williams was directly involved in this conspiracy. As alleged by the government, Williams rented a villa in Palm Springs, California, ostensibly for the UAW's Region 5 Conference, from on or about December 25, 2014 to January 31, 2015. During that time, upon information and belief, Williams participated in or was aware of FCA Group funds being used (via NTC credit cards) for lavish dinners and golf outings for UAW officials in Palm

---

[34] 8/18/17 King Information, at 11.

Springs, including: $7,569.55 on January 9, 2015 at LG's Prime Steakhouse, $1,267.79 at Indian Canyons Golf Resort, $4,587.04 on January 18, 2015 at LG's Prime Steakhouse, $3,372.74 on January 23, 2015 at Spencer's Restaurant, $6,200.05 on January 24, 2015 at Palm Springs Steak & Chop Restaurant, and $4,147.74 on January 28, 2015 at Melvyn's Restaurant.[35] Likewise, as alleged by the government, Williams rented a villa in Cathedral City, California, ostensibly for the 2016 UAW Region 5 Conference, from on or about December 17, 2015 to March 31, 2016. During that time, upon information and belief, Williams participated in or was aware of FCA Group funds being used for personal purchases in Palm Springs including: $6,081.04 on February 3, 2016 at Melvyn's Restaurant, and $3,583.47 on February 12, 2016 at Palm Springs Steak & Chop Restaurant.[36]

## III. FIAT AND ITS SUCCESSORS CORRUPTED FORMER UAW LEADERS TO SECURE SIGNIFICANT LABOR ADVANTAGES FOR FCA FOR YEARS

71. Starting in July 2009, in return for FCA Group's bribes, certain corrupt members of UAW's leadership began providing Chrysler with labor peace and competitive advantages to propel Chrysler's performance without regard to the interests of UAW membership. Indeed, as discussed below, Defendants have admitted that the bribes to certain UAW leaders were made for this very purpose: to

---

[35] *See* 4/2/19 Jewell Plea Agreement, at 9–10.

[36] *Id*. at 12.

obtain "benefits, concessions, and advantages" not only in labor negotiations but also the implementation and administration of at least the post-2009 CBAs, in 2011 and 2015. At the same time, through its bribery, FCA ensured that while these special advantages were conferred on FCA, the same or similar advantages were not provided to at least GM despite it seeking similar programs and concessions. This CBA favoritism purchased through the bribes ultimately inflicted massive direct damage on GM in the form of higher costs.

72.   For example, at the time of the 2011 CBA, Chrysler and the UAW (through Iacobelli and Holiefield) documented their joint commitment to WCM, which was a "full fledged partnership." They agreed that it was "of critical importance that WCM be jointly implemented systematically and fully in order to operate successfully and thereby position [Chrysler] and the [UAW] firmly among the winners of the global automotive manufacturing community."[37] GM has been denied this commitment to the substantial equivalent of WCM.

73.   As described below, in 2014, in a Memorandum of Understanding ("MOU") negotiated outside of the collective bargaining process, the UAW again committed to support FCA's WCM program.

---

[37] Letter from A. Iacobelli, Chrysler Group LLC, to General Holiefield, International Union, UAW, World Class Employee Participation (Oct. 12, 2011).

74.    In October 2015, in a letter attached to the CBA, FCA and the UAW (through Jewell) once again agreed that "the need for unit flexibility to address fluctuating workloads is essential," and committed to "continue to support the full implementation of [WCM], New Hire Entry Level Wages and Benefits, and significant efficiency improvements." To that end, they committed to "the flexible utilization of [the] salary workforce," including: (a) that there may exist "[i]nefficient work rules and work practices . . . within the salary bargaining units," (b) "[t]he flexible use of the salary bargaining unit workforce can perform within classifications and departments, across classifications and departments, within units, across units, and within locals," and (c) "[t]he parties agree to discuss any opportunities to assign work across locals provided there is mutual agreement between the parties and a positive business case for keeping the work in-house."[38]

75.    As FCA Group had directed through its bribery to certain corrupt UAW officials, these unique advantages were not made available to GM. GM made repeated efforts to collaborate with UAW leaders on improvements to its Global Manufacturing System ("GMS"), an efficiency improvement program, that would have been on par with WCM. For example, during a meeting on August 13, 2014, officials in the UAW's GM Department acknowledged that WCM was a superior

---

[38] Letter from Glenn Shagena, FCA US LLC, to Norwood H. Jewell, International Union, UAW, Salary Bargaining Unit Flexibility (Oct. 22, 2015).

program, in part because Chrysler management (specifically Marchionne) and the UAW worked closely to ensure it was a joint effort. UAW leadership failed to disclose that union support for FCA's WCM was, in part, purchased through bribes. Moreover, UAW leadership and GM discussed that "[t]here needs to be an effort for the UAW and GM leadership to go through each element of GMS and together gain buy-in from the manufacturing managers and UAW members," and that "GMS cannot have the same success of WCM without the involvement of UAW members." As a result of FCA Group's years-long bribery scheme, these efforts with GM were not fully embraced.

76. Another advantage FCA Group purchased through bribery related to "Tier Two" employees. As of the 2007 CBA, Chrysler, GM, and Ford employed both "Tier One" and "Tier Two" employees. As described above, Tier Two workers are less expensive employees who have a lower wage structure than those in Tier One.

77. FCA and GM were initially subject to a 25 percent cap on Tier Two workers under the 2007 CBA. This cap was lifted under pre-bankruptcy addendums in 2009, but in their 2009 addendums both FCA and GM agreed to reinstate the cap six years later in the 2015 CBA. GM's 2011 CBA reiterated this commitment, stating that "the parties will mutually agree to a hiring limit based on the entry level percentage as of September 14, 2015" to "be no more than 25% and no less than

20% of the total UAW-GM hourly population." In recognition and anticipation of this 2015 Tier Two cap, GM thus kept its proportion of Tier Two workers below the anticipated 25 percent cap. By 2015, Tier Two workers comprised around 20 percent of the UAW membership at GM.

78.    Through the conspiracy, upon information and belief, certain corrupt UAW leaders assured FCA that they would not insist on reinstating the Tier Two cap in 2015. Upon information and belief, FCA had reached a "side letter" agreement that the cap would not be reinstated. From this private understanding purchased through the conspiracy that FCA would not be subject to a Tier Two cap, FCA hired Tier Two workers with abandon, possessing the incredibly valuable foreknowledge that it would not be penalized by any reinstatement of the cap. By 2015, Tier Two workers made up around 42 percent of the UAW membership at FCA—double the proportion of Tier Two workers at GM. This difference purchased through the bribery scheme provided FCA with a dramatic advantage with respect to average labor costs. Meanwhile, without this inside knowledge, GM managed to the cap and absorbed corresponding cost increases anticipating the 2015 cap reinstatement. In 2015, as FCA had been privately assured, the UAW did not insist on reinstating the Tier Two cap for FCA and, as negotiated through pattern, GM as well.

79.    Yet another advantage secured through FCA Group's bribery scheme related to temporary workers. Temporary workers were entitled to receive

substantially less compensation than Tier Two workers. While the Detroit automakers were limited in their CBAs on the number of temporary workers they could hire, GM learned that certain UAW leaders did not hold FCA to the contractual limits on the number of temporary workers. Pursuant to FCA Group's bribes and direction, these same UAW leaders enforced these temporary worker hiring limits on GM. This allowed FCA to use more lower-priced temporary workers, a practice secured through the bribery scheme, further lowering FCA's average hourly labor costs.

80.    The FCA Group bribery scheme also purchased efficiencies in handling potentially costly and disruptive labor grievances. UAW leadership has wide discretion in the filing and handling of worker grievances. The individuals charged with overseeing the UAW's grievance process—including Holiefield and then Jewell—accepted millions in bribes directed by Iacobelli, the official responsible for overseeing grievances at FCA. "Instead of zealously pursuing union grievances and health and safety issues, senior officials of the UAW sought to line their own pockets with money and things of value provided to them by Fiat Chrysler."[39] Through these bribes, FCA effectively exercised control of the UAW with respect to the grievance process. GM was denied any such corresponding benefit.

---

[39]  12/12/18 Johnson Gov't Sentencing Mem., at 8.

81. FCA Group purchased even more unique advantages through bribery, reflected in "side letter" agreements with UAW officials outside of the traditional bargaining process. For example, upon information and belief, in 2014, FCA and the UAW agreed to a formulary that would make better use of prescriptions that are widely available, significantly reducing FCA's health care costs. The formulary would have saved GM up to $20 million per year. Negotiators for GM repeatedly requested FCA's more cost-effective formulary during collective bargaining, but the UAW refused to agree, indicating the term would rankle UAW leadership.

82. Taken together, FCA Group's corruption, through operation of the FCA-Control and NTC Enterprises, helped buy a wage advantage to take FCA from worst to first among the Detroit-based automakers. In 2006, Chrysler had the highest hourly labor costs. Chrysler's workers were paid $75.86 in wages and benefits on average, and Old GM's workers were paid $70.51. Chrysler, Old GM, and Ford's labor costs exceeded non-unionized foreign automaker costs by approximately 50 to 80 percent prior to bankruptcy.

83. Through its corruption and bribes and operation of the RICO enterprises, FCA was able to gain a wage advantage over its competitors. By 2015, FCA slashed its labor costs to $47—in the range of non-unionized foreign automakers operating in the U.S.—and $8 less on average per hour than GM ($55). FCA's wage advantage continues to this day: its labor costs are on average $8 per

hour less than GM. As alleged herein, FCA directed key UAW officials to deny similar labor advantages to GM, inflicting significant additional costs on GM.



## IV.   FCA GROUP CONSPIRED WITH UAW LEADERS TO ATTEMPT A TAKEOVER OF GM BY MERGER

84.     Sergio Marchionne, an outspoken executive, held a longstanding view that the U.S. automotive market required consolidation to remain competitive. As he told *Automotive News* in 2008: "You need at least 5.5 million to 6 million cars (a year) to have a chance of making money. . . . Fiat is not even halfway there. And we are not alone in this. So we need to aggregate, one way or another."[40]

---

[40]   Gilles Castonguay, *Fiat Can't Survive Alone; Needs Partner: CEO*, REUTERS (Dec. 8, 2008), https://www.reuters.com/article/us-rb-fiat-ceo/fiat-cant-survive-alone-needs-partner-ceo-idUSTRE4B738Z20081208.

85.    As CEO of Fiat since 2004, Marchionne had long sought a merger with GM. After failing to effect a merger in 2005, Marchionne saw another opportunity after Fiat acquired Chrysler in 2009. "[A]fter fixing Chrysler, let's . . . take General Motors and merge them together. Once and for all, let's straighten out the car industry, creating an American giant that also allows a long-term future for Fiat."[41]

86.    In October 2012, when Fiat owned a significant portion of Chrysler (approximately 59 percent) and the UAW Trust owned the remainder, Marchionne wrote to GM's CEO on behalf of FCA Group proposing a "comprehensive" combination between Fiat, Chrysler, and GM. GM rebuffed this attempt at a combination. But Marchionne remained resolute in his quest to force an FCA Group-GM combination.

## A.    Marchionne Prepares on Behalf of FCA to Force a Takeover of GM by Merger

87.    By 2013, Chrysler had only two shareholders: (1) Fiat, which owned a controlling 58.5 percent stake; and (2) the UAW Trust, which owned the remaining 41.5 percent.

88.    In July 2012, Fiat elected to exercise its option to purchase a portion of the UAW Trust's stake in Chrysler, offering $139.7 million for 3.3 percent. Fiat and

---

[41] Tommaso Ebhardt, Sergio Marchionne 63–64 (2019) (translated from Italian).

the UAW Trust apparently disagreed over the price, and Fiat sued in Delaware Chancery Court. In October 2013, press reports indicated that "Fiat plan[ned] to urge the UAW to help it convince [the UAW Trust] to unload its [entire] 41.5% stake in Chrysler."[42]

89.    In December 2013, Fiat apparently "scripted" Holiefield at an UAW Executive Board meeting to support Fiat's goal of buying all of the UAW Trust's stake. Iacobelli emailed that Holiefield would "create a dialogue pursuant to our outline" at the meeting which, upon information and belief, involved having the UAW support a complete sale of its Chrysler interest to Fiat.[43] This scripting helps demonstrate the degree of Fiat's control over the UAW and its top officials.

90.    On January 1, 2014, Fiat announced an agreement to acquire the UAW Trust's entire stake in Chrysler for $4.35 billion. The transaction closed on January 21, 2014. Nearly half that amount, $1.9 billion, was financed through a special distribution by Chrysler with Chrysler agreeing to pay the UAW Trust another $700 million over four years.

---

[42]  Clark Schultz, *Fiat Leans on the UAW for Chrysler Sale,* SEEKING ALPHA (Oct. 17, 2013), https://seekingalpha.com/news/1334672-fiat-leans-on-the-uaw-for-chrysler-sale.

[43]  7/13/18 Iacobelli Plea Agreement, at 9–10.

91.     Although not a party to the foregoing transaction, the UAW itself entered an "enforceable" MOU with FCA promising to "actively assist in the achievement of FCA US's long-term business plan." Upon belief, while the agreement does not appear to have been published, it contains no termination date. In short, this agreement was an attempt by FCA and its co-conspirators to paper over—and provide an appearance of legitimacy to—what had previously been agreed to in their long-running bribery scheme. From FCA's Annual Report:

> FCA US and UAW executed and delivered a contractually binding and legally enforceable Memorandum of Understanding ("MOU") to **supplement** FCA US's existing collective bargaining agreement. Under the MOU, the UAW committed to (i) **use the best efforts to cooperate in the continued roll-out of FCA US's World Class Manufacturing ("WCM") programs**, (ii) to actively participate in benchmarking efforts associated with implementation of WCM programs across all FCA's manufacturing sites to ensure objective competitive assessments of operational performance and provide a framework for the proper application of WCM principles, and (iii) **to actively assist in the achievement of FCA US's long-term business plan**. (Emphasis added.)[44]

92.     Undoubtedly, this MOU conferred a competitive advantage upon FCA outside of the standard collective bargaining process. As stated by FCA in its Annual Report, the UAW's commitments under the MOU were of a "unique nature."

---

[44]  FCA, 2014 ANNUAL REPORT, at 178, https://www.fcagroup.com/en-US/investors/financial_regulatory/financial_reports/files/FCA_2014_Annual_Report.pdf.

Through its bribery, control of the UAW and operation of the NTC, FCA ensured that UAW leadership conferred these unique advantages only on FCA and not, as alleged herein, on GM.

93.     Fiat and Chrysler merged into FCA on October 12, 2014, with Marchionne at the helm of the combined entity.[45]

94.     After taking full control of Chrysler, and having secured control of the FCA-Control Enterprise and the UAW's full cooperation, Marchionne set his sights on forcing a merger with GM.

### B.     President Williams Is a Willing Participant in the Takeover Conspiracy

95.     In 2014, with certain UAW officials' cooperation secured through corruption, Marchionne turned for support to the new UAW President, longtime friend and merger "wingman," Dennis Williams. Marchionne and Williams had known each other since the 2000s, when Williams negotiated contracts at a Fiat-

---

[45]  GM does not allege there was a violation of any securities law or requirement in connection with the sale and purchase of the Chrysler securities. As GM understands the facts, the ultimate selling price and terms that Fiat paid for the Chrysler shares were set following a court opinion concerning the terms of the purchase and certain third parties not impacted by the bribery scrutinized and approved the securities aspect of the transaction.

affiliated truck and tractor company. Williams has affirmed that he tries "not to second-guess Sergio," and that the pair have a "very good relationship."[46]

96.    Williams was a willing participant in Marchionne's bribery and takeover scheme, especially given the UAW's finances. In 2013, the UAW's financial circumstances were so dire that it sold $47 million in assets and "raid[ed] its strike fund to pay operating expenses."[47]

97.    When Williams took office, he promptly encouraged further corruption. Among other criminal acts detailed herein, Williams specifically directed his lieutenants and other corrupt officials to accelerate their fraud, and use NTC funds and credit cards for travel, dining, and other illegal purposes to improve the UAW's budget (which the officials then used for their own purposes rather than for the benefit of membership). As Johnson admitted, "[t]his directive was issued in order to reduce costs to the UAW budget from such expenditures because the UAW's

---

[46]  Michael Martinez, *UAW President: Union Monitoring FCA-GM Merger Reports*, THE DETROIT NEWS (June 18, 2015), https://www.detroitnews.com/story/business/autos/2015/06/18/uaw-monitoring-fca-gm-talks/28925955/.

[47]  Tom Krisher, Associated Press, *Detroit Automakers Worry About UAW Money Struggles,* YAHOO FINANCE (Feb. 22, 2014), https://finance.yahoo.com/news/detroit-automakers-worry-uaw-money-144156521.html; Associated Press, *UAW Votes to Raise Dues for First Time in 47 Years,* CNBC (June 3, 2014), https://www.cnbc.com/2014/06/03/united-auto-workers-votes-to-raise-dues-for-first-time-in-47-years.html.

budget was under pressure."[48] Notably, the bribes from FCA to certain UAW officials continued after Williams assumed the UAW Presidency.

98.     By the time of the 2015 CBA negotiations, Williams was conspiring with Marchionne.

### C.     FCA Ignites Operation Cylinder

99.     By 2014, FCA Group had been rejected repeatedly by GM regarding a merger between the two companies. But in early 2015, having successfully consolidated control over Chrysler and positioned FCA NV for merger, FCA believed it was in a much stronger position to force a GM merger.

100.     With Marchionne as the lead, FCA schemed that it could effectively take over GM through a merger (code-named "Operation Cylinder"), have Marchionne remain CEO of the combined companies, and oversee the largest auto company in the world.[49] In part for this very reason, Marchionne, on FCA Group's behalf, had authorized the bribery of UAW leaders, whose support was essential to the success of Operation Cylinder given that, among other reasons, the UAW could

---

[48]  7/23/18 Johnson Plea Agreement, at 9.

[49]  Tommaso Ebhardt, *The Crisis Fiat Faced As It Lost an Indispensable Leader*, BLOOMBERG BUSINESSWEEK (Apr. 23, 2019), https://www.bloomberg.com/news/articles/2019-04-23/the-crisis-fiat-faced-as-it-lost-an-indispensable-leader.

effectively block a merger under certain terms in the CBA. That the UAW wielded this veto potential over any merger was well known to Marchionne and Williams.

101.   FCA Group initiated its takeover plans in March 2015, when Marchionne, on behalf of parent company FCA NV, wrote to GM's Board and management, formally proposing the merger between GM and FCA NV.

102.   GM rejected the offer on April 14, 2015, after vetting the proposal with management, its advisors, and its Board.

103.   Undeterred, two weeks later, Marchionne went public with an unusual published PowerPoint that he entitled "*Confessions of a Capital Junkie*: An insider perspective on the cure for the industry's value-destroying addiction to capital." In it, Marchionne promoted the benefits of consolidation as "too large to ignore." The deck claimed nearly $5 billion in savings with such a GM/FCA merger based on reduction in investments and R&D, "with no impact on number employed."[50]

104.   In the spring of 2015, as the collective bargaining process ramped up, Marchionne pursued a full-court press media strategy to achieve Operation Cylinder. He geared his strategy to apply maximum pressure at key intervals in labor negotiations, which were well underway.

---

[50]   FCA, *Confessions of a Capital Junkie: An Insider Perspective on the Cure for the Industry's Value-Destroying Addiction to Capital* (Apr. 29, 2015), available at https://www.autonews.com/assets/PDF/CA99316430.PDF.

105.   In June 2015, Iacobelli abruptly resigned from FCA and Marchionne stepped in, assuming a role not typically undertaken by a CEO: leading labor negotiations with the UAW and his purchased co-conspirators Williams and Jewell.

106.   On June 18, 2015, GM CEO Mary Barra, GM President Daniel Ammann, GM CFO Chuck Stevens, and GM's lead labor negotiator Cathy Clegg attended a meeting with UAW President Williams and Vice President Cindy Estrada, who relayed and championed Marchionne's merger proposition. Working at Marchionne's behest as a result of the bribery scheme, Williams used his position to press for GM's position on the proposed merger. GM made clear to Williams that it was not interested in merging with FCA NV.

107.   The next day, the GM Board was informed of the Williams meeting. They were informed that Marchionne had been in direct talks with Williams about a merger and apparently had tapped Williams as FCA Group's messenger. And that the day before, Williams relayed that Marchionne had told him the GM Board had not seriously considered the FCA Group merger proposal—an untrue statement.

108.   In addition to the bought and paid-for UAW officials, Marchionne enlisted hedge funds and activist investors to support pursuing Operation Cylinder. The *Wall Street Journal* reported that Marchionne viewed activist partners "as a

means to force consolidation on the fragmented auto industry." [51] FCA had reportedly lined up initial commitments to finance a $60 billion cash offer for GM. Days before the ceremony that opened negotiations, Marchionne told the *Financial Post* that the company's modeling suggested an FCA NV-GM merger was "the most logical combination in the entire industry."[52]

109.   On July 13, 2015, bargaining officially commenced with the tradition of "handshakes" between UAW leadership and the three Detroit automakers.

110.   Hugging Williams at the FCA-UAW "handshake" ceremony, Marchionne signaled that consolidation using the UAW as the hammer was his goal in the negotiations, exclaiming that, "[w]hatever happens in terms of consolidation, it would never be done without the consent and support of the UAW. It's that

---

[51]   Eric Sylvers & John D. Stoll, *Chrysler Boss Recruits Activists to Prod GM Into a Merger*, WALL STREET JOURNAL (June 18, 2015), https://www.wsj.com/articles/chrysler-boss-recruits-activists-to-prod-gm-into-a-merger-1433806966.

[52]   Kristine Owram, *Fiat Chrysler, GM Merger Is Most Logical Combination in the Entire Auto Industry: Sergio Marchionne*, FINANCIAL POST (July 10, 2015), https://business.financialpost.com/news/fiat-chrysler-gm-merger-is-most-logical-combination-in-the-entire-auto-industry-sergio-marchionne.

simple."[53] Williams, Jewell, and other UAW officials celebrated that night with an $8,000+ meal at the London Chop House—paid for by FCA through the NTC.[54]



Marchionne Hugging Williams at "Handshake" Ceremony[55]

111.   As noted, Marchionne had purchased the support of the UAW to support a merger with GM because of the UAW's ability to object to such a merger. FCA and GM had signed documents stating that they would "not . . . partially or wholly sell, spin-off, split-off, consolidate or otherwise dispose of in any form, any

---

[53]   Daniel Howes, *Marchionne's Merger Quest Not Over*, THE DETROIT NEWS (July 27, 2015), https://www.detroitnews.com/story/business/columnists/daniel-howes/2015/07/27/howes-marchionnes-merger-mania-lives-despite-gm/30766303/.

[54]   12/12/18 Johnson Gov't Sentencing Mem., at 4–5.

[55]   *See* Alexa St. John, *Marchionne Didn't Disclose Expensive Watch Given to UAW Leader, Report Says,* AUTOMOTIVE NEWS (Aug. 16, 2018), https://www.autonews.com/article/20180816/OEM/180819869/marchionne-didn-t-disclose-expensive-watch-given-to-uaw-leader-report-says.

. . . asset or business unit of any type, constituting a bargain unit under the Agreement."[56]

112.   Between July and mid-September 2015, GM bargained with the UAW through its subcommittees. The GM Board gave its negotiators authority to negotiate within a particular range.

113.   Based on GM's calculations, the UAW's "Presidential Demand" reflected a CBA with a total cost increase of just under a billion dollars over the 2011 CBA.

114.   Over the next couple of weeks, GM and the UAW continued to negotiate with various proposals and counter-proposals. GM made offers of increasing total cost, while the UAW was progressing down from its opening demand.

115.   Prior to September 13, 2015 and before selecting the target, the UAW had made various concessions, as had GM. The total incremental costs for the new potential deal were over 20 percent less than the UAW's initial demand of nearly $1 billion. The UAW's principal negotiators represented to GM that they could "sell it"—that is, the deal that was on the table—to the UAW's members.

---

[56]   Letter from Glenn Shagena, FCA US LLC, to Norwood H. Jewell, International Union, UAW, Plant Closing and Sale Moratorium (Oct. 22, 2015); *see also* Letter from Catherine L. Clegg, General Motors LLC, to Cynthia Estrada, International Union, UAW, Plant Closing and Sale Moratorium (Oct. 25, 2015).

116.   During bargaining, Marchionne continued to agitate in the press for a merger between GM and FCA NV. Marchionne signaled that he would do what it would take to force a GM merger, telling *Automotive News* in an interview published August 30, 2015: "***It would be unconscionable not to force a partner.***" When asked if that meant FCA NV would make a hostile bid, Marchionne explained, "Not hostile, [but] [t]here are varying degrees of hugs. I can hug you nicely, I can hug you tightly, I can hug you like a bear, I can really hug you. ***Everything starts with physical contact. Then it can degrade, but it starts with physical contact***."[57]

117.   A key to Marchionne's Operation Cylinder scheme was a practice known as pattern bargaining, a strategy in which unionized workers across an industry attempt to bargain uniform terms in their contracts. The UAW describes pattern bargaining as "a core part of [its] bargaining strategy"[58] and a "powerful strategic tool."[59] Pattern bargaining is a potent force multiplier: through it, Marchionne needed only certain corrupt UAW leaders' support to impose anti-

---

[57] Larry P. Vellequette, *Marchionne Puts the Squeeze on GM; GM's Response: 'Why Bail Out FCA?'*, AUTOMOTIVE NEWS (Aug. 30, 2015), https://www.autonews.com/article/20150830/INDUSTRY_ON_TRIAL/308319981/marchionne-puts-the-squeeze-on-gm-gm-s-response-why-bail-out-fca (emphasis added).

[58] UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

[59] Letter from Rory Gamble, Vice President, UAW, to UAW National Ford Department, Negotiations Update (Oct. 18, 2019).

competitive conditions aimed at GM. As part of his and Marchionne's criminal scheme, Williams weaponized pattern bargaining, not to protect the interests of the UAW's workers, but to advance FCA Group's interests by promoting Marchionne's merger.

118. Approximately every four years, each Detroit-based automaker negotiates a CBA with the UAW. To increase its leverage in the industry, the UAW has ensured that each CBA expires at the same time, resulting in simultaneous negotiation. The UAW begins negotiations with each automaker through subcommittees in July.

119. Months later, and shortly before contract expiration, the UAW selects one of the automakers as a "lead" or "target" company, with which the UAW negotiates a CBA. Then, the UAW exerts pressure on the other two companies to use the first agreement as a "pattern" for negotiations. The UAW has particularly strong leverage to do so.

120. Williams has publicly admitted to forcing automakers into a pattern: "We believe in pattern bargaining. The companies ought to compete on a product, quality, engineering and process and not on the backs of workers. That philosophy

has been embedded for us since Walter Reuther and is embedded with Dennis Williams."[60]

121.   Because pattern bargaining is such a powerful tool, it must be premised on good faith, arm's-length negotiations. Otherwise, as here, corrupt actors can use the strategy to force harmful terms upon competitors.

122.   While the government had imposed a "no-strike" rule at the automakers beginning in 2009, by the time of the 2015 negotiations, the provision was no longer in effect, making the 2015 target position particularly significant.

123.   The UAW typically selects the largest and best performing automaker as the target. This practice allows the union to maximize gains by locking in terms, such as wages and signing bonuses, which can then be imposed on the other automakers through pattern bargaining. It follows that the least profitable automaker is generally the least likely target, as low profit margins make it more difficult for the union to secure favorable precedential terms.

124.   Based on past practices and having conducted a detailed analysis of the negotiation dynamics, GM reasonably believed that it would be the target in 2015. Industry analysts also did not believe that FCA was a viable target. FCA was "the smallest of the three companies, with the lowest profit margins and the highest

---

[60] *UAW President Dennis Williams Roundtable* (June 18, 2015), available at https://www.youtube.com/watch?v=bfS3EzxDXqI.

percentage of lower-paid entry-level workers seeking higher wages," which would "make it more difficult for the UAW to win big pay raises for its workers and big signing bonuses."[61]

125.   On September 13, 2015, the UAW unexpectedly announced that it had chosen FCA as the "target," a position secured through the years-long bribery scheme between FCA Group and UAW leaders.

126.   Informed industry analysts were not expecting UAW's selection of FCA as the lead. According to the *Detroit Free Press*, the decision "surprised analysts and industry watchers across the nation." CBS Detroit reported that "just about every analyst said that Fiat Chrysler was the least likely to be the lead company."[62]

127.   Likewise, after selecting FCA as the lead, Williams told a GM executive that he would explain why he selected FCA when he retired. Williams never provided such an explanation.

---

[61]   Alisa Priddle & Brent Snavely, *Fiat Chrysler Is Surprise Lead Company in UAW Talks*, DETROIT FREE PRESS (Sept. 13, 2015), https://www.freep.com/story/money/cars/general-motors/2015/09/13/fiat-chrysler-lead-company-uaw-contract-talks/72091592/.

[62]   *Id.*; *UAW Chooses Fiat Chrysler As Target in Contract Talks*, CBS DETROIT (Sept. 13, 2015), https://detroit.cbslocal.com/2015/09/13/uaw-chooses-fiat-chrysler-as-target-in-contract-talks/.

128.   On September 15, 2015, just two days after FCA was selected as lead, FCA and the UAW reported that an agreement had been reached that, in Marchionne's words, was a "transformational deal."[63]

129.   Marchionne explained that the "economics of the deal are almost irrelevant" because the costs "pale in comparison given the magnitude of the potential synergies and benefits" of a combination, and cemented a "philosophical approach that [FCA] wants to use going forward." Upon belief, Marchionne was referring to using the collective bargaining process to pressure a merger between FCA and GM.[64]

---

[63] Alisa Priddle, *Marchionne: Deal Can Bring Workers 'Significant Benefits,'* DETROIT FREE PRESS (Sept. 16, 2015), https://www.freep.com/story/money/cars/chrysler/2015/09/16/marchionne-health-care-2-tier-wages-part-uaw-pact/32501757/.

[64] *2015 UAW FCA Agreement Announcement* (Sept. 15, 2015), available at https://www.youtube.com/watch?v=YX8wWGi28rs.



Marchionne Hugging Williams After Announcement of Tentative Deal[65]

130.   The UAW bargaining team, with Jewell's authorization, celebrated the deal with a $6,912.81 dinner at the London Chop House in Detroit—paid for by the NTC with funds knowingly supplied by FCA—the very entity with which Jewell, Williams, and team had been negotiating.[66] The spigot of FCA payoffs to certain UAW leaders continued to flow.

---

[65] *See* Editorial, *UAW, Chrysler Deal Addresses Key Issues,* THE DETROIT NEWS (Sept. 19, 2015), https://www.detroitnews.com/story/opinion/editorials/2015/09/19/editorial-wages-union-deal/72481834/.

[66] 12/12/18 Johnson Gov't Sentencing Mem., at 5.

131.   On September 30, 2015, the UAW's FCA workforce rejected the tentative agreement negotiated by the FCA and UAW leaders.[67] Various press reports attributed the rejection to distrust of the union's leadership by its members.

132.   On October 8, 2015, FCA and the UAW announced a new tentative agreement. The FCA-UAW CBA deal terms were structured to force enormous costs on GM. GM's analysis of the final FCA-UAW CBA showed that, as a pattern for a GM agreement, it would be vastly more expensive than the agreement GM had negotiated prior to FCA's selection as lead. In contrast to UAW's "Presidential Demand" to GM during the original negotiations (under $1 billion), the pattern from the FCA-UAW agreement was forecast to cost GM more than double the entire "Presidential Demand."

133.   On October 22, 2015, UAW members ratified the new FCA deal with 77 percent approval. Williams bragged that the deal was one of the "richest ever negotiated," saying "the recent bargaining process that took place on behalf of our members at FCA is a testament to the UAW's democratic values and commitment

---

[67]   During bargaining, the UAW negotiates "tentative" agreements with each automaker. These tentative agreements are then proposed to UAW members, who vote to approve ("ratify") or reject the deal. Agreements are not legally effective until ratification by UAW membership. If a majority of UAW members vote to reject a tentative agreement, another agreement must then be negotiated and proposed to UAW membership for ratification. In voting to reject a tentative agreement, members do not provide a reason for the rejection.

to our members."[68] No one outside of FCA Group and certain UAW leaders knew that the deal was a product of a long-running, insidious fraud.

134.   At the time Williams approved of the FCA terms, UAW leaders, including Williams, and FCA Group leaders knew the federal government was actively investigating past FCA-UAW CBAs and labor agreements, and potentially other embezzlement of union funds. GM had no such knowledge. Through this "rich" FCA-UAW labor contract, Williams and corrupt UAW leaders were able to claim to the public, UAW members, and government investigators that UAW leadership had obtained significant FCA concessions that could then be used in pattern negotiation.  Marchionne, in turn, structured and agreed to these CBA terms to force unanticipated higher costs on GM, which had a higher degree of more costly Tier One workers, and further his takeover scheme.

135.   GM, selected as the next target, reached a tentative deal with the UAW on October 25, 2015, based on the fraudulently tainted FCA-UAW pattern. Although GM tried to resist the use of the FCA agreement as a pattern, the threatened risk of a strike proved too great. As Defendants had no doubt calculated in their corrupt

---

[68]   Christina Rogers, *UAW Ratifies a Richer Deal With Fiat Chrysler*, WALL STREET JOURNAL (Oct. 22, 2015), https://www.wsj.com/articles/uaw-workers-ratify-deal-with-fiat-chrysler-1445526840.

dealings, the economic force of pattern bargaining and threat of strike forced GM to largely concede FCA's agreement as a pattern.

136.  The 2015 GM-UAW CBA was ratified by UAW membership on November 20, 2015, and was effective as of November 23, 2015.

137.  Ultimately, although GM was able to reduce the immediate cost impact of the FCA pattern by about $400 million, the final CBA between GM and the UAW cost approximately $1.9 billion in incremental labor charges over four years—over $1 billion more than the deal GM believed it had reached with the UAW before the UAW's selection of FCA as the lead.

138.  Although GM was able to successfully resist the FCA-UAW leadership takeover scheme, substantial damage from the racketeering scheme had been inflicted: direct injuries to GM that continue to reverberate and compound to this day, including higher costs and lost investment initiatives.

139.  Failing to consummate Operation Cylinder was a regret Marchionne took to the grave. An excerpt from a biography of Marchionne states that an FCA NV-GM merger was "one uncompleted project that Marchionne probably regretted to the end of his life."[69]

---

[69]  Tommaso Ebhardt, *The Crisis Fiat Faced As It Lost an Indispensable Leader*, BLOOMBERG BUSINESSWEEK (Apr. 23, 2019), https://www.bloomberg.com/news/articles/2019-04-23/the-crisis-fiat-faced-as-it-lost-an-indispensable-leader.

## V.   MARCHIONNE-DIRECTED FRAUD WAS NOT ISOLATED TO LABOR RELATIONS

140.   Marchionne's fraudulent conduct was not isolated to securing illicit competitive advantages in labor relations.

141.   While not part of the scheme aimed at GM or the pattern of racketeering associated with the enterprises alleged herein, starting in February 2011, FCA began to systematically overstate its month-end sales figures, ultimately using the fraud to claim a record-breaking 71-month streak in year-over-year improvements.

142.   Reid Bigland, FCA's Senior Vice President of Sales and the executive in charge of the scheme, alleged that Marchionne was intimately involved with the reporting methodology: "[Bigland] reported directly to the Global Fiat Chrysler CEO, Sergio Marchionne. . . . [FCA's] most senior executive and leadership levels, including Marchionne . . . were well aware of the methodology[.]" Indeed, he alleges that he "administered the protocol in accordance and best practices he received from . . . the Global CEO[.]"[70]

143.   In July 2016, FCA was forced to admit its inflated sales scheme, restate its sales, and acknowledge that the SEC and Department of Justice had launched investigations into its reporting. On September 27, 2019, the SEC charged FCA with

---

[70]   First Am. Compl. at 3, 12, *Bigland v. FCA N. Am. Holdings, LLC, et al,* No. 2:19-cv-11659-GAD-SDD (E.D. Mich. June 12, 2019).

misleading investors about the number of new vehicles sold each month to customers in the U.S.  FCA agreed to pay $40 million to settle the charges.[71]

144.   "The SEC's order finds that FCA US inflated new vehicle sales results by paying dealers to report fake vehicle sales and maintaining a database of actual but unreported sales, which employees often referred to as a 'cookie jar.'  In months when the growth streak would have ended or when FCA US fell short of other targets, FCA US dipped into the 'cookie jar' and reported old sales as if they had just occurred."[72]

## VI.   U.S. ATTORNEY IN DETROIT COMMENCES CRIMINAL INVESTIGATION AND STARTS TO REVEAL THE CORRUPTION

145.   In July 2017, the government began unsealing indictments showing a years-long pattern of corruption and racketeering activity between FCA Group and certain UAW leaders. As GM later learned, the government's investigation had been underway for years before the indictments were released. Defendants were therefore aware of the investigation and yet continued to conceal their criminal conduct.

146.   The government has publicly charged and implicated over a dozen FCA and UAW officials, including the key officials responsible for managing FCA-UAW

---

[71] U.S. Sec. and Exchange Comm. Press Release, *Automaker to Pay $40 Million for Misleading Investors* (Sept. 27, 2019), https://www.sec.gov/news/press-release/2019-196.

[72] *Id.*

labor relations, administering the NTC, and 2015 collective bargaining negotiations. The charges illustrate the pervasive and deeply rooted "culture of corruption," as the government used that description, that prevailed among FCA Group and certain UAW leaders during their criminal scheme.

147.   One by one, each of the FCA and UAW co-conspirators entered guilty pleas admitting to a brazen scheme to enrich themselves and corrupt the collective bargaining process through the FCA Control and FCA-NTC Enterprises. Every official charged to date in the corruption scheme has pled guilty.

148.   In those pleas, the co-conspirators admit to a dizzying number of racketeering acts, including millions in illegal "payments [that] were made in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW. ***That is exactly why they were made***."[73] These acts were designed to and did pervert the collective bargaining process to the direct injury of GM.

---

[73]   8/13/18 Iacobelli Sentencing Mem., at 13 (emphasis added).

## VII.  FCA GROUP AND ITS CO-CONSPIRATORS CONCEALED THE CONSPIRACY AND RESULTING DAMAGE, PREVENTING GM FROM DISCOVERING ITS EARLIER INJURY

149.   GM reasonably but incorrectly believed that FCA Group acted in good faith and negotiated agreements with UAW leadership at arm's length, including in 2011 and 2015, consistent with FCA and UAW leadership's obligations under the Taft-Hartley Act and the UAW Constitution. For example, Williams described the 2015 CBA as a "balanced" agreement that was "a testament to the UAW's democratic values and commitment to our members."[74] Similarly, UAW leaders held up the 2011 CBA as proof that "cooperation and collective bargaining work."[75] In fact, the UAW recognized the importance of good faith pattern bargaining— including on October 25, 2015, the day the UAW and GM reached a tentative agreement—as it "levels the playing field so that companies compete based on the quality of their product or services and not how much they pay . . . their workers."

---

[74] Christina Rogers, *UAW Ratifies a Richer Deal With Fiat Chrysler*, WALL STREET JOURNAL (Oct. 22, 2015), https://www.wsj.com/articles/uaw-workers-ratify-deal-with-fiat-chrysler-1445526840.

[75] Joseph Szczesny, *Chrysler Agreement with UAW to Add 2,100 New Jobs*, DAILY TRIBUNE (Oct. 12, 2011), https://www.dailytribune.com/sports/chrysler-agreement-with-uaw-to-add-new-jobs/article_bc6b64af-c7b8-5518-874d-7d0a6caea35c.html.

In this way, the UAW assured, "one company cannot gain a competitive advantage over other companies with wages."[76]

150.   GM had no way to know that FCA Group had conspired through bribes to key UAW officials to ensure FCA received illicit competitive advantages to GM's harm, including, as described herein, a private agreement dated as early as 2010 to avoid reinstating the 2015 cap on FCA Tier Two workers, a secret agreement to allow FCA to avoid the contractual limits on the number of temporary workers, concessions to FCA regarding the adjudication of internal worker grievances, and repeated commitments from UAW leadership to support FCA's "World Class Manufacturing" programs while rejecting GM's corollary programs.

151.   Defendants' bribery scheme was inherently self-concealing, as secrecy was essential to perpetuate the scheme. Had Defendants' violations of the Taft-Hartley Act been exposed, Defendants would have been investigated and prosecuted criminally, bringing the scheme to an end. In addition, Defendants conspired to conceal their bribery scheme from GM (and the world), adopting extraordinary measures to obscure the unlawful transactions, the pattern of racketeering, and the resulting injury to GM. As described herein and as admitted in the criminal plea agreements, Defendants and their co-conspirators took numerous active steps to

---

[76]   UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

evade suspicion and prevent inquiry into their illegal scheme, including through misstatements, false testimony, tax fraud, and other contrivances designed to suppress evidence of wrongdoing. As demonstrated by the length of the scheme, Defendants' efforts successfully concealed the scheme and precluded suspicion of Defendants' conduct. For example:

(a) FCA officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited payments and things of value paid to officers and employees of the UAW";[77]

(b) The co-conspirators used false-front companies and charitable organizations run by members of the UAW to secretly funnel money to other members of the conspiracy for personal use. For example, between July 2009 and 2015, "Durden conspired and agreed with Alphons Iacobelli, General Holiefield, Monica Morgan, . . . and other individuals and entities, to defraud the United States by using two tax-exempt organizations [the NTC

---

[77] 5/25/18 Brown Plea Agreement, at 3.

and the LTLOF] to improperly divert millions of dollars in unreported income to his co-conspirators, himself and others";[78]

(c)     Iacobelli, Durden, Morgan, and their co-conspirators used the LTLOF to "conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield";[79]

(d)     Iacobelli (on March 19, 2015), Durden (in February 2011, November 2011, and May 2012–15), and Morgan (on November 3, 2014) filed false tax returns that failed to disclose hundreds of thousands of dollars in illegal payments;

(e)     Between July 2009 and 2015, Durden agreed and conspired with Iacobelli, Holiefield, Morgan, Mickens, the NTC, the LTLOF, and other individuals and entities "to impede, impair, obstruct, and defeat the Internal Revenue Service from ascertaining, computing, assessing, and collecting taxes," thereby "conceal[ing] hundreds of thousands of dollars in illegal payments made by and on behalf of FCA to UAW officers and representatives";[80]

---

[78]   8/8/17 Durden Plea Agreement, at 3.

[79]   7/26/17 Iacobelli Indictment, at 9.

[80]   6/13/17 Durden Information, at 6.

(f)    In February 2010, Marchionne concealed his gift of a custom-made Terra Cielo Mare watch to Holiefield by "declar[ing] the goods at less than fifty bucks."[81] Marchionne then falsely denied the gift when questioned about it by federal investigators;

(g)    "In May of 2011, [Iacobelli] sent an email to [Durden] cautioning Durden not to put the details of certain expenditures made for the benefit of [Holiefield] in writing";[82]

(h)    On December 16, 2015, Brown "provided misleading and incomplete [grand jury] testimony in a deliberate effort to conceal the conspiracy to violate the Labor Management Relations Act by FCA, FCA executives acting in the interest of FCA, the UAW and UAW officials."[83]

(i)    From 2014 to 2016, Jewell "knowingly and voluntarily joined this conspiracy to receive things of value from persons acting in the interest of FCA . . . knowing that the prohibited payments of things of value, which were delivered through and concealed by the [NTC], were willfully made with the intent to benefit" Jewell

---

[81]  7/13/18 Iacobelli Plea Agreement, at 8.

[82]  7/26/17 Iacobelli Indictment, at 20.

[83]  5/25/18 Brown Plea Agreement, at 5.

and other officials.[84] Further, Jewell entered into a "'culture of corruption' that existed between Alphons Iacobelli and other FCA officials and former UAW Vice President General Holiefield and other members of his staff," involving "corruption [that] was ongoing and intentionally concealed . . . ."[85]

152.   It was not until July 2017, when the government announced indictments of Iacobelli, Morgan, and Durden, with charges following against King, Johnson, Mickens, Brown, and Jewell, that information was revealed that FCA had made illegal payments to certain UAW officials. GM diligently monitored the criminal proceedings and other sources of available information, but GM did not have sufficient information to indicate whether it might have been injured by Defendants' activity or whether it might potentially have a cause of action. At the same time, Defendants and their co-conspirators continued to take active steps to conceal their illegal scheme and its effect on GM.

153.   In 2017 and 2018, in a series of letters and public statements, FCA, Marchionne, and Williams warranted that their illegal scheme had "nothing whatsoever to do with the collective bargaining process," but rather involved other

---

[84]   4/2/19 Jewell Plea Agreement, at 3–4.

[85]   *Id.* at 13.

"bad actors." As has now been revealed, these statements were false, and were designed to evade suspicion and prevent inquiry into Defendants' illegal conduct:

    (a)    On July 26, 2017, the same day that Iacobelli and Morgan were indicted, Williams published a letter to UAW members stating: "The current UAW leadership had absolutely no knowledge of the alleged fraudulent activities detailed by this indictment until they were brought to our attention by the government. . . . *[T]he allegations in the indictment in no way call into question the collective bargaining contracts negotiated by our union during this period*."[86] In fact, Williams himself was directly involved in the corruption scheme, which was designed to and did corrupt the collective bargaining process.

    (b)    On July 26, 2017, FCA published a statement claiming that it was a "victim[] of malfeasance by certain of [its] employees that held roles at the [NTC], an independent entity. These egregious acts were neither known to nor sanctioned by FCA."[87] In fact,

---

[86] Dennis Williams, *Letter Regarding DOJ Investigation* (July 26, 2017), https://uaw.org/letter-regarding-doj-investigation/.

[87] FCA, *Statement in Response to Department of Justice Investigation* (July 26, 2017), https://media.fcanorthamerica.com/newsrelease.do?id=18478&mid=.

FCA was aware of the illegal payments made by its executives, who were implementing FCA's "corporate policy" of bribing key officials in order to corrupt the collective bargaining process and secure illicit competitive advantages. A federal court has found that FCA acted as an active co-conspirator with the NTC and others in this bribery scheme.

(c)   Following a day later in what appear to be coordinated statements, Marchionne published a letter that piggy-backed on Williams' false statements: "I join Dennis Williams, the UAW President, in expressing my disgust at the conduct alleged in the indictment which constitutes the most egregious breach of trust by the individuals involved. I also join Dennis in confirming that ***this conduct had nothing whatsoever to do with the collective bargaining process, but rather involved two bad actors*** . . . ."[88] Marchionne claimed that the wrongdoing was "neither known nor sanctioned by FCA." In reality, Marchionne and Williams

---

[88]   Michael Martinez, *Marchionne Expresses 'Disgust' Over FCA-UAW Executive Conspiracy,* AUTOMOTIVE NEWS (July 27, 2017), https://www.autonews.com/article/20170727/OEM02/170729763/marchionne-expresses-disgust-over-fca-uaw-executive-conspiracy.

themselves participated in and directed the scheme to corrupt the collective bargaining process.

(d)     On August 1, 2017, Williams published a letter to UAW members stating: "You should also know that no matter what anyone says, *it was NOT possible for General Holiefield to compromise or otherwise affect the national negotiations that resulted in new collective bargaining agreements*, including the 2011 collective bargaining agreement between the UAW and Chrysler."[89]

(e)     On January 26, 2018, days after Iacobelli pled guilty, Williams published a letter to UAW members stating: "*[T]here is simply no truth to the claim that this misconduct compromised the negotiation of our collective bargaining agreement or had any impact on union funds. . . . [T]he fact is [Iacobelli's and corrupted UAW officials'] misdeeds did not affect your*

---

[89]  *Letter to UAW Members from UAW President Dennis Williams* (Aug. 1, 2017), https://uaw.org/letter-to-uaw-members/ (emphasis added).

*collective bargaining agreement and no union funds were stolen or lost.*"[90]

    (f)    On May 24, 2018, during a Press Roundtable discussion, Williams sought to distance himself and UAW leaders from the criminal investigation, stating that "a few people in the UAW is not reflective of the leadership."[91]

    (g)    On August 27, 2018, FCA released a statement that it "firmly restates that it is a victim of illegal conduct by Al Iacobelli and certain other rogue individuals who formerly held leadership roles at the [NTC] . . . *the conduct of these individuals . . . had no impact on the collective bargaining process.*"[92]

154. Due to the co-conspirators' concealment of and misrepresentations regarding their criminal bribery activity and its effect on the collective bargaining process, it was not until Iacobelli pled guilty on January 22, 2018, and his plea

---

[90] *Letter from UAW President Dennis Williams to Members Regarding DOJ Case* (Jan. 26, 2018), https://uaw.org/letter-uaw-president-dennis-williams-members-regarding-doj-case/ (emphasis added).

[91] *UAW President Dennis Williams Roundtable* (May 24, 2018), https://uaw.org/final-media-roundtable-uaw-president-dennis-williams/.

[92] *See* Tresa Baldas, *Ex-Fiat Chrysler Exec Alphons Iacobelli Gets 5 1/2 Years in UAW Scandal,* DETROIT FREE PRESS (Aug. 27, 2018), https://www.freep.com/story/money/cars/chrysler/2018/08/27/fca-alphons-iacobelli-uaw-sentencing/1108849002/ (emphasis added).

agreement was released thereafter, that GM uncovered meaningful details regarding Defendants' scheme and its potential impact on GM. Iacobelli's guilty plea revealed for the first time that FCA's illegal payments to UAW officials were made "in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW."[93] Thereafter, it took substantial research and analysis to begin to discern the manner and extent to which GM was injured by Defendants' illegal conduct.

155. GM did not and could not have reasonably discovered this information earlier despite due diligence. Defendants' public statements, filings, and agreements—which GM reviewed—gave no indication of their illegal activity, much less its impact on the collective bargaining process and GM. To the contrary, as described above, Defendants concealed their scheme from detection through various artifices and outright lies to GM and the public intended to deceive GM and deter inquiry.

---

[93] 7/13/18 Iacobelli Plea Agreement, at 7. (Iacobelli pled guilty on January 22, 2018, and his plea agreement was filed the next day. Due to a scrivener's error, a corrected version was filed on July 13, 2018.)

## CAUSES OF ACTION

### First Cause of Action

Violations of the RICO Act—18 U.S.C. § 1962(b)

Against All Defendants

156.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

157.   This claim arises under 18 U.S.C. § 1962(b), which makes it "unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

158.   At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3).

159.   The FCA-Control Enterprise, which constitutes the UAW as a legal entity, is an enterprise within the meaning of 18 U.S.C. 1961(4).

160.   In violation of § 1962(b), Defendants acquired control over the FCA-Control Enterprise through a pattern of racketeering activity.

161.   Defendants gained control over the FCA-Control Enterprise through at least the acts of racketeering activity identified below. The multiple acts of racketeering activity that Defendants committed and/or conspired to, or aided and

abetted in the commission of, were related to each other, were long-running, and therefore constitute a "pattern of racketeering activity."

162.   By gaining control over the FCA-Control Enterprise through this pattern of racketeering activity, Defendants directly damaged GM by having the UAW take positions and enter into contracts and understandings that directly harmed GM as alleged herein, and by directing the implementation of various aspects of the CBAs as described above.

163.   Defendants are accordingly liable to GM for three times its actual damages as proved at trial plus interest, punitive damages, and attorney's fees.

## Second Cause of Action

Violations of the RICO Act—18 U.S.C. § 1962(c)

Against All Defendants

164.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

165.   This claim arises under 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

166.   At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3), because each Defendant was "capable of holding a legal or beneficial interest in property."

167.   The FCA-NTC Enterprise was operated as an enterprise by Defendants since at least July 2009 for the common purpose of directing funds away from the NTC (and ultimately from FCA Group) and others for the benefit of certain UAW officials in return for benefits, concessions, and advantages to FCA as alleged herein. This purpose was achieved through a variety of related fraudulent schemes.

168.   Defendants conducted and participated in the affairs of the FCA-NTC Enterprise through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), consisting of numerous and repeated uses of the interstate mails, wire communications, and Taft-Hartley violations associated with the NTC, to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c), and through violations of 28 U.S.C. § 186.

169.   The NTC was used as a tool to carry out the elements of the illegal schemes and pattern of racketeering of Defendants. The FCA-NTC Enterprise had an ascertainable structure and purposes beyond the scope and commission of the predicate acts and conspiracy to commit such acts. The FCA-NTC Enterprise is separate and distinct from Defendants. The FCA-NTC Enterprise engaged in, and its activities affected, interstate and foreign commerce by, among other things,

representing and training workers for national automakers and training workers to participate in an industry that engages in substantial interstate and international trade through its supply chains and systems of distribution.

170.   Defendants, through their agents and their co-conspirators conducting the affairs of the FCA-NTC Enterprise, had the common purpose to secure funds and obtain competitive advantages as more specifically alleged herein. Defendants, through their agents and co-conspirators, did so by, among other things: illegally manipulating the collective bargaining process, and diverting funds from the NTC for the benefit of certain UAW officials. Defendants carried out these schemes using the interstate mails and wires in violation of 18 U.S.C. §§ 1341 and 1343 and 29 U.S.C. § 186.

171.   Each Defendant participated in the operation and managed the affairs of the FCA-NTC Enterprise as described herein by making decisions on behalf of the enterprise and/or carrying out the decisions of the enterprises, including by directing, authorizing, or concealing improper payments and/or by impacting the collective bargaining process. Each Defendant committed at least two acts of racketeering activity as identified below. The multiple acts of racketeering activity which Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, and were long-running, and therefore constitute a "pattern of racketeering activity."

172.   As described herein and detailed in the co-conspirators' criminal charges, guilty pleas, and sentencing memoranda, Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

173.   FCA:

(a)   Beginning in July 2009, FCA began a long-running scheme of improper payments to UAW officials, funneled through the NTC, made by FCA senior executives and agents including with the knowledge and approval of Marchionne. All such payments were made willfully and with the intent to benefit the UAW and its officials to influence the collective bargaining process, as alleged herein. FCA and its agents used and directed the use of the mails and wires to further this fraudulent scheme in violation of 18 U.S.C. §§ 1341 and 1343. Examples of such improper payments and uses of the mails and wires made by agents acting in the interest of FCA are set forth below.

(b)   In July 2009, Durden, Iacobelli, and others caused the transfer of $15,000 in funds from NTC to the LTLOF, an entity controlled by Holiefield, in violation of 29 U.S.C. § 186.

(c)     In 2010, Marchionne provided a watch worth several thousand dollars to Holiefield with a hand-written note that stated, "Dear General, I declared the goods at less than fifty bucks. That should remove any potential conflict," in violation of 29 U.S.C. § 186.

(d)     On at least one occasion between October 2010 and September 2011, Durden, Iacobelli, and others caused the transfer of more than $421,960 in funds from NTC to Morgan for the purchase of personal items, in violation of 29 U.S.C. § 186.

(e)     In May 2011, Iacobelli sent an email to Durden cautioning Durden not to put the details of certain expenditures made for the benefit of Holiefield in writing. This email was in furtherance of Defendants' fraudulent schemes and was sent via the interstate wires in violation of 18 U.S.C. § 1343.

(f)     On multiple occasions between May 2011 and October 2013, Iacobelli, Durden, and others authorized the payment of over $350,000 in personal expenses for Holiefield and Morgan, in violation of 29 U.S.C. § 186.

(g)     On at least one occasion in June 2014, Durden, Iacobelli, and others caused the transfer of more than $262,000 in funds from

NTC to pay off the mortgage of Holiefield and Morgan, in violation of 29 U.S.C. § 186.

(h)     In 2014, 2015, and 2016, FCA and its agents knowingly approved the use of tens of thousands of dollars of NTC funds to pay for expenditures in Palm Springs for the benefit of the UAW and its officials, in violation of 29 U.S.C. § 186.

(i)     With FCA's knowledge and encouragement, Jewell repeatedly used a credit card and funds provided to him as Co-Chairman of the NTC to make extravagant purchases for the benefit of himself and other high-ranking UAW officials, in violation of 29 U.S.C. § 186. Such purchases included $8,926.93 for a two-month stay at a villa in Palm Springs, California in January and February 2016; $6,681.12 for golf, golf club rentals, golf balls, meals, beer, and liquor at the Indian Canyons Golf Resort in Palm Springs; $1,259.17 for luxury luggage; $2,182 for an Italian-made Beretta shotgun; and $468.86 for cigars at Wild Bill's Tobacco store. These purchases also included $2,130 of Disney World theme park tickets for his friend and his friend's family; multiple tickets to Universal Studios theme park for his friends at a cost of $217.26 each; and numerous extravagant dinners for

himself and other UAW officials (such as a $7,500 meal at LG's Prime Steakhouse in Palm Springs, California; a $6,200 meal and $6,900 meal at Palm Springs Steak and Chop Restaurant, and a $7,694 meal at London Chop House in Detroit).

(j) FCA knowingly approved the use of FCA funds for the personal benefit of Mickens, including allowing Mickens to spend thousands of dollars at Best Buy stores purchasing items for his personal use, in violation of 29 U.S.C. § 186.

174. FCA NV:

(a) Beginning in July 2009, acting through its agent Marchionne, FCA NV engaged in a pattern of making and approving payments and the provision of things of value to UAW leaders, as described above. Marchionne himself gave improper things of value to UAW leaders, such as in February 2010, when Marchionne provided a custom-made watch worth several thousand dollars to Holiefield. In addition, Marchionne, as the CEO of FCA NV, and to achieve the ultimate goal of a combination between GM and FCA NV, instructed high-ranking FCA executives, including Iacobelli, to make more than $1.5 million in prohibited payments and things of value directly and

indirectly to top UAW officials. Marchionne made these payments, and approved other such payments, within the scope of his employment with and for the benefit of FCA NV. Each of these payments made and approved by Marchionne were in violation of 29 U.S.C. § 186.

(b)     Further, Marchionne aided and abetted numerous violations of 29 U.S.C. § 186 by directing Iacobelli and other FCA executives to make payments totaling over $1.5 million to UAW officials in violation of § 186. Marchionne did so within the scope of his employment with and for the benefit of FCA NV. Marchionne affirmatively assisted in these violations through this direction and through his oversight and approval of these payments, all in violation of § 186 and with the specific intent that payments be made in violation of § 186.

175.   Alphons Iacobelli:

(a)     In July 2009, Iacobelli and others acting in the interest of FCA and using funds provided to NTC by FCA caused the transfer of $15,000 in funds from NTC to LTLOF, an entity controlled by Holiefield, for the benefit of Holiefield in violation of 29 U.S.C. § 186.

(b)     In May 2011, Iacobelli authorized the expenditure of more than $2,100 of NTC funds for Morgan, for the benefit of Holiefield, and knowing that FCA would ultimately pay for these tickets, in violation of 29 U.S.C. § 186.

(c)     In 2011 and 2012, Iacobelli authorized and directed the expenditure of more than $435,000 to Wilson's Diversified Products, which was owned and/or controlled by Holiefield and Morgan, to pay for personal purchases by UAW officials, including Holiefield. Iacobelli authorized and directed this payment for the benefit of Holiefield, and knowing that FCA would ultimately pay for this expenditure, in violation of 29 U.S.C. § 186.

(d)     Between 2012 and June 2015, Iacobelli authorized the expenditure of more than $450,000 of NTC funds to pay for personal purchases by UAW officials, including Holiefield. Iacobelli authorized and directed these payments for the benefit of the UAW and its officials, and knowing that these expenditures were ultimately paid by FCA, in violation of 29 U.S.C. § 186.

(e)     On at least one occasion in June 2014, and with the intent to benefit the UAW and its officials in order to influence the UAW in its relations with FCA, Durden, Iacobelli and others acting in the interest of FCA and using funds provided to NTC by FCA, caused the transfer of more than $262,000 in funds from NTC to pay off the mortgage of Holiefield and Morgan, in violation of 29 U.S.C. § 186.

176.   Jerome Durden:

(a)     In July 2009, Durden and others acting in the interest of FCA and using funds provided to NTC by FCA caused the transfer of $15,000 in funds from NTC to LTLOF, an entity controlled by Holiefield, for the benefit of Holiefield in violation of 29 U.S.C. § 186.

(b)     On at least one occasion between October 2010 and September 2011, and with the intent of benefitting the UAW in order to influence the UAW in its relations with FCA, Durden, Iacobelli, and others acting in the interest of FCA and using funds provided to NTC by FCA, caused the transfer of more than $421,960 in funds from NTC to Morgan, in violation of 29 U.S.C. § 186.

(c)     Durden signed and caused to be filed numerous false IRS Form 990s for the NTC. These filings, which failed to identify hundreds of thousands of dollars in funds being transferred to UAW officials and entities associated with them—including $195,015 in 2010, $543,960 in 2011, $335,852 in 2012, $145,054 in 2013, and $262,000 in 2014—were necessary to perpetrate the scheme and avoid its detection by GM. These Form 990s were filed using either the interstate wires or mails, in violation of 18 U.S.C. § 1341 and/or § 1343 on at least February 25, 2011; November 1, 2011; May 15, 2012; May 14, 2013; May 13, 2014; and May 11, 2015.

177. Michael Brown:

(a)     Brown authorized numerous payments, totaling hundreds of thousands of dollars to the UAW, in the guise of reimbursements for 100 percent of the salaries and benefits the UAW paid to individuals placed on "special assignment" status and members of the UAW International Staff, knowing that many of those individuals did no work for the NTC. Each of these payments was approved as a gift to high-level UAW officials, each in violation of 29 U.S.C. § 186.

178. GM's injuries were directly and proximately caused by Defendants' racketeering activities. For example, as alleged herein, FCA Group's illicit payments to certain UAW officials, entailing a pattern of racketeering including Taft-Hartley violations, inflicted billions of dollars of damages on GM, including: (a) injuries resulting from unique competitive advantages provided FCA but denied GM from July 2009 through 2015, including in connection with WCM, the grievance process, the proportion of Tier Two workers, and limits on temporary workers; and (b) over $1 billion in connection with the ratified 2015 GM-UAW CBA, lost investment initiatives, and other direct harms.

179. Defendants are accordingly liable to GM for three times its actual damages as proved at trial plus interest, punitive damages, and attorney's fees.

### **Third Cause of Action**

Violations of the RICO Act—18 U.S.C. § 1962(d)

Against All Defendants

180. Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

181. This claim arises under 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

182. Defendants further conspired and agreed to violate 18 U.S.C. § 1962(c) and § 1962(b) in violation of 18 U.S.C. § 1962(d) by knowingly agreeing to adopt

the goal of further facilitating the operation of the aforementioned NTC Enterprise, and by taking and maintaining control of the FCA-Control Enterprise through a pattern of racketeering and by agreeing to the commission of multiple predicate acts and overt acts.

183.   All Defendants have participated as co-conspirators in these offenses and have performed acts in furtherance of the conspiracy.

184.   Defendants agreed, whether expressly or tacitly, that some person would commit at least two predicate acts in the course of participating in the affairs or operations of these enterprises.

185.   Each Defendant and other co-conspirator was aware of the essential scope and nature of the scheme to corruptly operate the FCA-NTC Enterprise and take and maintain control of the FCA-Control Enterprise.

186.   There was no plausible lawful rationale for the manner in which Defendants and their co-conspirators participated in the affairs of the NTC and the UAW.

187.   GM's injuries were directly and proximately caused by the unlawful agreement among these co-conspirators.

188.   Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorney's fees.

189.   Defendants are accordingly liable to Plaintiffs for three times their actual damages as proved at trial, punitive damages, plus interest and attorney's fees.

**Fourth Cause of Action**

Unfair Competition

Against FCA and FCA NV

190.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

191.   GM, throughout the relevant time period, competed with FCA and FCA NV in the automobile industry.

192.   As alleged herein, FCA and FCA NV engaged in conduct that is unfair, unethical, fraudulent, or deceptive. For example, Defendants' fraudulent and long-running scheme to influence relations with the UAW violated the integrity of the collective bargaining process, resulting in unfair advantages conferred on FCA and FCA NV to GM's direct detriment. FCA and FCA NV also used the relationship established through the fraudulent scheme to obtain the lead target position in 2015 collective bargaining negotiations and to negotiate an agreement designed to harm GM. As a result, as more specifically alleged herein, GM sustained tremendous economic loss.

193.   As a result of Defendants' unfair, unethical, fraudulent, or deceptive activities, both GM and the public were deceived and harmed. GM also is entitled to exemplary damages for such conduct.

92

## Fifth Cause of Action

Civil Conspiracy

Against All Defendants

194.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

195.   As described above, FCA and FCA NV engaged in unfair competition.

196.   This tort was committed through concerted action by two or more persons to accomplish a criminal or unlawful purpose and/or to accomplish a lawful purpose by criminal or unlawful means.

197.   Specifically, as described above, Defendants conspired with FCA and FCA NV to unfairly compete with GM by bribing UAW officials in order to corrupt the collective bargaining process and obtain unfair competitive advantages.

198.   As a result of this conspiracy, GM has been directly harmed.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.      Damages, under RICO and the state law claims, in an amount to be determined at trial, including but not limited to the billions of dollars in damages GM suffered as a result of Defendants' bribery scheme, pattern of racketeering, and other unlawful acts;

B.      An award of punitive and/or exemplary damages as Defendants have acted with malice and willful disregard for GM's rights;

C.      An award of costs and fees incurred in pursuing this litigation, including attorney's costs, fees, and the fees and costs of experts;

D.      Equitable relief, including restitution; and

E.      Any other relief the Court deems just, fair, necessary, or equitable.

Dated: November 20, 2019                    Respectfully submitted,

                                            **HONIGMAN LLP**

                                            By: s/Jeffrey K. Lamb
                                            Jeffrey K. Lamb (P76738)
                                            J. Michael Huget (P39150)
                                            Shirin S. Goyal (P82528)
                                            2290 First National Building
                                            660 Woodward Avenue
                                            Detroit, MI 48226
                                            Telephone:  (313) 465-7000
                                            jlamb@honigman.com
                                            mhuget@honigman.com
                                            sgoyal@honigman.com

                                            **KIRKLAND & ELLIS LLP**

                                            By: s/Hariklia Karis
                                            Hariklia Karis, P.C.
                                            Jeffrey Willian, P.C.
                                            Casey R. Fronk
                                            Casey McGushin
                                            300 North LaSalle
                                            Chicago, IL 60654
                                            Telephone:  (312) 862-2000
                                            hariklia.karis@kirkland.com
                                            jeffrey.willian@kirkland.com
                                            casey.fronk@kirkland.com
                                            casey.mcgushin@kirkland.com

                                            Austin Norris
                                            Maisie Allison
                                            333 South Hope Street
                                            Los Angeles, CA 90071
                                            Telephone:  (213) 680-8400
                                            austin.norris@kirkland.com
                                            maisie.allison@kirkland.com

                                            *Attorneys for Plaintiffs General Motors LLC
                                            and General Motors Company*

95