IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——————————————————— x

GENERAL MOTORS LLC; GENERAL
MOTORS CO.,

      Plaintiffs,

v.

FCA US LLC; FIAT CHRYSLER
AUTOMOBILES N.V.; ALPHONS
IACOBELLI; JEROME DURDEN; MICHAEL
BROWN,

      Defendants.

——————————————————— x

No. 2:19-cv-13429

Honorable Paul D. Borman
District Court Judge

Honorable David R. Grand
Magistrate Judge

## FCA US LLC'S MOTION TO DISMISS THE COMPLAINT

Thomas W. Cranmer (P25252)
Matthew P. Allen (P57914)
MILLER, CANFIELD, PADDOCK
   & STONE, PLC
840 West Long Lake Road
Suite 150
Troy, Michigan 48098-6358
Tel:  (248) 879-2000
*cranmer@millercanfield.com*
*allen@millercanfield.com*

Steven L. Holley (N.Y. 1917830)
Matthew J. Porpora (N.Y. 4402798)
Jacob E. Cohen (N.Y. 4787271)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Tel:  (212) 558-4000
*holleys@sullcrom.com*
*porporam@sullcrom.com*
*cohenja@sullcrom.com*

*Counsel for FCA US LLC*

January 24, 2020

Pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure, Defendant FCA USA LLC ("FCA"), by and through its attorneys, Sullivan & Cromwell LLP and Miller, Canfield, Paddock and Stone, PLC, moves this Court to dismiss with prejudice the Complaint of Plaintiffs General Motors LLC and General Motors Co. (collectively, "GM") on the ground that GM has failed to state a claim upon which relief may be granted.  In support of this motion, FCA states as follows:

1.     On November 20, 2019, GM filed a Complaint in this action seeking to piggyback off indictments and plea agreements alleging that certain former UAW employees received goods and services with assistance from certain former FCA employees, which GM contends resulted in "benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW."  (Compl. ¶ 3.)[1]

---

[1]  FCA denies that it either directed or approved any alleged prohibited payments. FCA acknowledges that certain former UAW employees and certain former FCA employees improperly used funds belonging to the National Training Center ("NTC") to purchase luxury items for their own personal use (such as in-ground home swimming pools, jewel-encrusted Montblanc fountain pens, a shotgun, and Christian Louboutin shoes), and that those individuals have been indicted and pled guilty as a result of their misconduct.  For purposes of this motion, it makes no difference whether the alleged prohibited payments were made directly by FCA to the UAW, as GM contends, or were instead facilitated by former FCA employees acting in violation of clear company policies, as the facts will show, because GM's claims fail either way.  Consistent with Rule 12(b)(6), references to "alleged prohibited payments" in this motion are based on the allegations of the Complaint,

2.      GM alleges that concessions FCA purportedly obtained from the UAW not only caused harm to rank-and-file FCA employees, but also—as a result of a complex and speculative sequence of events—caused GM to incur "higher costs" and allowed FCA to "more effectively compete and thrive against GM." (Compl. ¶¶ 4, 5.)  On that basis, GM asserts five causes of action:  (1) violation of Section 1962(b) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) violation of RICO Section 1962(c); (3) violation of RICO Section 1962(d); (4) unfair competition; and (v) civil conspiracy.

3.      As explained more fully in the accompanying Memorandum of Law, GM's claims against FCA should be dismissed with prejudice for the following reasons:

a.      *First*, GM fails to adequately plead that the predicate acts of racketeering activity allegedly engaged in by FCA were the "but for" and "proximate" cause of GM's claimed injuries, as required to state a RICO claim. GM's first causation theory is that FCA sought to force a merger with GM by making *concessions to the UAW* during negotiation of the 2015 collective bargaining agreement ("CBA")—which harmed FCA itself—knowing that the UAW would extract those same concessions from GM through so-called "pattern bargaining"

---

and do not constitute an admission by FCA that it made any such payments to the UAW.

(Compl. ¶¶ 117, 134).  This theory defies economic logic and concededly did not depend upon the alleged prohibited payments.  As to its second causation theory, GM fails to adequately allege that it was "[t]he direct victim of th[e] [alleged] conduct"—meaning the person incurring "the first step" of harm in the causal chain. *Hemi Grp., LLC* v. *City of N.Y.*, 559 U.S. 1, 10 (2010).  Instead, GM alleges that it incurred higher labor costs as an indirect byproduct of alleged prohibited payments to certain former UAW employees, which purportedly were made in exchange for labor concessions that harmed FCA's rank-and-file employees (the first victims), which the Individual Defendants—Alphons Iacobelli, Jerome Durden, and Michael Brown—concealed in order to defraud the Internal Revenue Service ("IRS") (the second victim).

        b.    *Second*, all the alleged predicate acts of racketeering activity are based upon allegations that FCA committed unfair labor practices under the National Labor Relations Act, which can be adjudicated only by the National Labor Relations Board.  Additionally, the mail and wire fraud predicate offenses fail because GM does not attempt to plead that FCA made any misrepresentations with fraudulent intent.

        c.    *Third*, GM's RICO claim under Section 1962(b) fails for the additional reason that GM does not plausibly allege that FCA acquired an interest in, or maintained control of, the UAW.

-3-

d. *Fourth*, GM's RICO conspiracy claim should be dismissed because GM fails to allege an underlying RICO violation, and because a corporation cannot conspire with its own employees.

e. *Fifth*, GM's RICO claims based on injuries allegedly incurred before November 20, 2015 are time-barred under RICO's four-year statute of limitations, because GM knew or should have known that its labor costs were higher than FCA's long before November 20, 2015.

f. *Sixth*, because GM's federal RICO claims fail, the Court should decline to exercise supplemental jurisdiction over GM's state law claims, which are legally deficient in any event for the reasons explained in the accompanying Memorandum of Law.

4. As Local Rule 7.1(a) requires, FCA's counsel conferred with GM's counsel on January 9, 2020 to seek concurrence in the relief sought by this motion, but GM declined to agree to dismiss its Complaint voluntarily.

WHEREFORE, FCA respectfully requests that this Court grant its motion and enter an order dismissing the Complaint with prejudice.

Respectfully submitted,

/s/ Steven L. Holley

| | |
|---|---|
| Thomas W. Cranmer (P25252) | Steven L. Holley (N.Y. 1917830) |
| Matthew P. Allen (P57914) | Matthew J. Porpora (N.Y. 4402798) |
| MILLER, CANFIELD, PADDOCK | Jacob E. Cohen (N.Y. 4787271) |
|    & STONE, PLC | SULLIVAN & CROMWELL LLP |

*Counsel for Defendant FCA US LLC*

January 24, 2020

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————————— x

GENERAL MOTORS LLC; GENERAL
MOTORS CO.,

      Plaintiffs,

v.

FCA US LLC; FIAT CHRYSLER
AUTOMOBILES N.V.; ALPHONS
IACOBELLI; JEROME DURDEN; MICHAEL
BROWN,

      Defendants.

———————————————————— x

No. 2:19-cv-13429

Honorable Paul D. Borman
District Court Judge

Honorable David R. Grand
Magistrate Judge

## FCA US LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

Thomas W. Cranmer (P25252)
Matthew P. Allen (P57914)
MILLER, CANFIELD, PADDOCK
   & STONE, PLC
840 West Long Lake Road
Suite 150
Troy, Michigan 48098-6358
Tel:  (248) 879-2000
*cranmer@millercanfield.com*
*allen@millercanfield.com*

Steven L. Holley (N.Y. 1917830)
Matthew J. Porpora (N.Y. 4402798)
Jacob E. Cohen (N.Y. 4787271)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Tel:  (212) 558-4000
*holleys@sullcrom.com*
*porporam@sullcrom.com*
*cohenja@sullcrom.com*

*Counsel for FCA US LLC*

January 24, 2020

# TABLE OF CONTENTS

*Page*

**Preliminary Statement** ........................................................ 1

**Allegations of the Complaint** ............................................. 6

    A.    Between 2009 and 2015, FCA allegedly made prohibited payments to obtain concessions from the UAW that the UAW declined to provide to GM ................................. 6

    B.    In 2015, FCA allegedly sought to force a merger with GM by agreeing to a CBA that harmed both FCA and GM ........................... 7

    C.    GM's claims ................................................ 9

**Legal Standard** ............................................................... 9

**Argument** ..................................................................... 11

**I.**    **GM's RICO claims should be dismissed because GM does not plausibly allege that it suffered an injury "by reason of" FCA's alleged conduct** ............................................. 11

    A.    GM concedes that the alleged prohibited payments were not the "but for" cause of harm that GM allegedly suffered as a result of the 2015 CBA negotiations .......................... 11

    B.    GM does not adequately plead proximate causation ........ 14

        1.    GM was not the "direct victim" of any harm caused by the alleged prohibited payments ........................... 15

        2.    All three *Holmes* factors confirm that GM's alleged harm is far too remote to support a RICO claim ..................... 20

**II.**    **GM's RICO claims under Sections 1962(b) and 1962(c) should be dismissed because GM fails to adequately allege predicate acts of "racketeering activity"** ....................................... 26

A.   The NLRB has exclusive jurisdiction over the alleged predicate offenses ............................................................................ 26

B.   GM fails to plead mail and wire fraud predicate offenses ............... 28

**III.   GM fails to adequately allege that FCA acquired an interest in the UAW through a pattern of racketeering activity in violation of Section 1962(b)** ........................................................................ 30

A.   GM does not, and cannot, plausibly allege that FCA acquired an "interest" in or "control" of the UAW ......................................... 30

B.   GM fails to allege a separate "acquisition or maintenance" injury .................................................................................... 32

**IV.   GM fails to state a RICO conspiracy claim** ............................................. 33

**V.   RICO's four-year statute of limitations bars GM's claims premised on conduct occurring before November 20, 2015** .................. 34

A.   GM knew or should have known of its injuries long before November 20, 2015 ..................................................................... 35

B.   GM cannot rely on predicate acts within the limitations period to resurrect its time-barred claims ...................................... 38

C.   The doctrine of equitable tolling based on fraudulent concealment cannot toll GM's claims .............................................. 38

**VI.   The state law claims for unfair competition and civil conspiracy should be dismissed** .................................................................... 42

**Conclusion** ....................................................................................... 44

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*859 Boutique Fitness, LLC* v. *CycleBar Franchising, LLC*,
  699 F. App'x 457 (6th Cir. 2017) ...................................................................... 29

*Aces High Coal Sales, Inc.* v. *Cmty. Bank & Tr. of W. Ga.*,
  768 F. App'x 446 (6th Cir. 2019) .............................................................. 32, 33

*Adams* v. *Cty. of Erie*,
  No. 07-cv-316, 2009 WL 3087214 (W.D. Pa. Sept. 23, 2009) ......................... 32

*Adkins* v. *Mireles*,
  526 F.3d 531 (9th Cir. 2008) ............................................................................ 27

*Advocacy Org. for Patients & Providers* v. *Auto Club Ins. Ass'n*,
  176 F.3d 315 (6th Cir. 1999) ................................................................ 30, 31, 33

*Alix* v. *McKinsey & Co.*,
  404 F. Supp. 3d 827 (S.D.N.Y. 2019) ........................................... 12, 18, 22, 25

*Álvarez-Maurás* v. *Banco Popular of P.R.*,
  919 F.3d 617 (1st Cir. 2019) ............................................................................ 36

*Anza* v. *Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ................................................................................. *passim*

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 10

*Assoc. Bodywork & Massage Prof'ls* v. *Am. Massage Therapy Ass'n*,
  897 F. Supp. 1116 (N.D. Ill. 1995) .................................................................. 18

*Atl. Gypsum Co.* v. *Lloyds Int'l Corp.*,
  753 F. Supp. 505 (S.D.N.Y. 1990) ................................................................... 13

*Baker* v. *IBP, Inc.*,
  357 F.3d 685 (7th Cir. 2004) ........................................................................... 22

*Barr Labs., Inc.* v. *Quantum Pharmics, Inc.*,
  827 F. Supp. 111 (E.D.N.Y. 1993) ...................................................... 19, 21, 25

*Bowerman* v. *UAW*,
  646 F.3d 360 (6th Cir. 2011) ............................................................ 41

*Bridge* v. *Phoenix Bond & Indemnity Co.*,
  553 U.S. 639 (2008) .................................................................. 24, 25

*Campbell* v. *Upjohn Co.*,
  676 F.2d 1122 (6th Cir. 1982) ..................................................... 41, 42

*Cancer Found., Inc.* v. *Cerberus Capital Mgmt., LP*,
  559 F.3d 671 (7th Cir. 2009) .............................................................. 34

*Cascade Yarns, Inc.* v. *Knitting Fever, Inc.*,
  No. 10-cv-861, 2012 WL 2565067 (W.D. Wash. June 29, 2012) ............. 18, 19

*City of Cleveland* v. *Ameriquest Mort. Sec., Inc.*,
  615 F.3d 496 (6th Cir. 2010) ........................................... 21, 22, 24

*City of Monroe Employees Ret. Sys.* v. *Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) .............................................................. 37

*Clair* v. *Bank of Am., N.A.*,
  No. 16-cv-2263, 2016 WL 6092715 (W.D. Tenn. Oct. 19, 2016) ................... 38

*Club One Casino, Inc.* v. *Sarantos*,
  No. 17-cv-818, 2018 WL 4719112 (E.D. Cal. Sept. 28, 2018) ................ 19, 24

*Combs* v. *Int'l Ins. Co.*,
  354 F.3d 568 (6th Cir. 2004) .............................................................. 43

*Cont'l 332 Fund, LLC* v. *Albertelli*,
  317 F. Supp. 3d 1124 (M.D. Fla. 2018) ............................................... 32

*Copeland* v. *Penske Logistics LLC*,
  675 F.3d 1040 (7th Cir. 2012) ..................................................... 27, 28

*Crawford's Auto Ctr., Inc.* v. *State Farm Mut. Auto. Ins. Co.*,
  945 F. 3d 1150 (11th Cir. 2019) ........................................................ 29

*Crown Chevrolet* v. *Gen. Motors, LLC*,
  637 F. App'x 446 (9th Cir. 2016) ...................................................... 37

*DDR Const. Servs., Inc.* v. *Siemens Indus., Inc.*,
    770 F. Supp. 2d 627 (S.D.N.Y. 2011) ............................................................... 17

*DeShetler* v. *FCA US LLC*,
    No. 18-cv-078, 2018 WL 6257377 (N.D. Ohio Nov. 30, 2018) .......... 28, 39, 44

*DeShetler* v. *FCA US, LLC*,
    ___ F. App'x ___, 2019 WL 5095761 (6th Cir. Oct. 11, 2019) ................ 37, 38

*Dimov* v. *EMC Mortg. Corp.*,
    No. 09-cv-211, 2010 WL 2506717 (E.D. Tenn. June 17, 2010) ...................... 33

*Donley* v. *Seterus, Inc.*,
    No. 15-cv-13596, 2016 WL 4138235 (E.D. Mich. Aug. 4, 2016) ................... 29

*Dow Chem. Co.* v. *Exxon Corp.*,
    30 F. Supp. 2d 673 (D. Del. 1998) ................................................. 19, 21, 25, 26

*Empire Merchants, LLC* v. *Reliable Churchill LLLP*,
    902 F.3d 132 (2d Cir. 2018) ..................................................................... *passim*

*Fillinger* v. *Lerner Sampson & Rothfuss*,
    624 F. App'x 338 (6th Cir. 2015) ..................................................................... 38

*Fla. Carpenters Reg'l Council Pension Plan* v. *Eaton Corp.*,
    964 F. Supp. 2d 875 (N.D. Ohio 2013) ........................................................... 13

*Flood* v. *Makowski*,
    No. 03-cv-1803, 2004 WL 1908221 (M.D. Pa. Aug. 24, 2004) ...................... 31

*Frank* v. *Linkner*,
    500 Mich. 133 (2017) ....................................................................................... 43

*G&G TIC, LLC* v. *Ala. Controls, Inc.*,
    324 F. App'x 795 (11th Cir. 2009) ................................................................... 18

*Gifford* v. *Meda*,
    No. 09-cv-13486, 2010 WL 1875096 (E.D. Mich. May 10, 2010) ................. 29

*Greenhill* v. *Vartanian*,
    917 F.3d 984 (7th Cir. 2019) ........................................................................... 40

*Griffin* v. *NBD Bank*,
43 F. Supp. 2d 780 (W.D. Mich. 1999) ............................................................ 32

*Groth-Hill Land Co.* v. *Gen. Motors LLC*,
No. 13-cv-1362, 2013 WL 3853160 (N.D. Cal. July 23, 2013) ...................... 40

*Grubbs* v. *Sheakley Grp., Inc.*,
807 F.3d 785 (6th Cir. 2015) ................................................................... 29, 33

*Gruber* v. *Gilbertson*,
No. 16-cv-9727, 2019 WL 4458956 (S.D.N.Y. Sept. 17, 2019) ..................... 11

*GSC Partners CDO Fund* v. *Washington*,
368 F.3d 228 (3d Cir. 2004) ............................................................................ 14

*Haygood* v. *Gen. Motors, LLC*,
No. 18-cv-10375, 2018 WL 3329574 (E.D. Mich. July 6, 2018) ................... 42

*Hemi Grp., LLC* v. *City of N.Y.*,
559 U.S. 1 (2010) ..................................................................................... *passim*

*Hill* v. *Dep't of Labor*,
65 F.3d 1331 (6th Cir. 1995) ........................................................................... 39

*Holmes* v. *Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992) .................................................................. 17, 20, 23, 26

*In re Am. Honda Motor Co., Inc. Dealerships Relations Litig.*,
941 F. Supp. 528 (D. Md. 1996) ..................................................................... 32

*In re Refrigerant Compressors Antitrust Litig.*,
795 F. Supp. 2d 647 (E.D. Mich. 2011) .................................................... 40, 41

*In re UBS AG Sec. Litig.*,
No. 07-cv-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ................... 14

*Klehr* v. *A.O. Smith Corp.*,
521 U.S. 179 (1997) ........................................................................................ 38

*Kresch* v. *Miller*,
No. 18-cv-10025, 2019 WL 3412901 (E.D. Mich. July 29, 2019) ........ 5, 34, 35

*Lefkowitz* v. *Ackerman*,
No. 16-cv-0624, 2017 WL 4237068 (S.D. Ohio Sept. 25, 2017) .................... 22

*Levy* v. *BASF Metals Ltd.*,
917 F.3d 106 (2d Cir. 2019) .............................................................. 34

*Limestone Dev. Corp.* v. *Vill. of Lemont*,
520 F.3d 797 (7th Cir. 2008) ............................................................ 10

*Mahindra & Mahindra Ltd.* v. *FCA US, LLC*,
No. 18-cv-12645, 2019 WL 3294114 (E.D. Mich. Apr. 2, 2019) .................... 43

*Maio* v. *Aetna, Inc.*,
221 F.3d 472 (3d Cir. 2000) ............................................................. 14

*Martin* v. *Lake Cty. Sewer Co.*,
269 F.3d 673 (6th Cir. 2001) ............................................................ 27

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................. 13, 14

*Matteo Gutter Sys., Inc.* v. *Millenia Hous. Mgmt. Ltd.*,
No. 09-cv-1330, 2009 WL 10719997 (N.D. Ohio Nov. 25, 2009) ................. 10

*McNulty* v. *Home City Ice Co.*,
No. 08-cv-13178, 2016 WL 4408826 (E.D. Mich. Aug. 17, 2016) ................ 14

*Mekani* v. *Homecomings Fin., LLC*,
752 F. Supp. 2d 785 (E.D. Mich. 2010) .............................................. 44

*Miranda* v. *Ponce Fed. Bank*,
948 F.2d 41 (1st Cir. 1991) ......................................................... 10, 11

*Molotky* v. *Wells Fargo Bank, N.A.*,
No. 15-cv-769, 2018 WL 2197736 (W.D. Mich. Apr. 13, 2018) .................... 29

*Neal* v. *Second Sole of Youngstown, Inc.*,
No. 17-cv-1625, 2018 WL 340142 (N.D. Ohio Jan. 9, 2018) .......................... *1*

*New Castle Cty.* v. *Halliburton NUS Corp.*,
111 F.3d 1116 (3d Cir. 1997) .......................................................... 41

*Ocean Exploration Co.* v. *Phillips Petroleum Co.*,
   352 F. App'x 945 (5th Cir. 2009) ..................................................... 19

*P & M Servs., Inc.* v. *Gubb*,
   No. 07-cv-12816, 2008 WL 4185903 (E.D. Mich. Sept. 8, 2008) ...................43

*Perlman* v. *Zell*,
   185 F.3d 850 (7th Cir. 1999) ................................................... 29, 30

*Perry* v. *Am. Tobacco Co.*,
   324 F.3d 845 (6th Cir. 2003) ........................................................ 19

*Pik-Coal Co.* v. *Big Rivers Elec. Corp.*,
   200 F.3d 884 (6th Cir. 2000) ........................................................ 18

*Pletos* v. *Makower Abbate Guerra Wegner Vollmer, PLLC*,
   No. 16-cv-13175, 2017 WL 3727173 (E.D. Mich. Aug. 30, 2017) ................. 42

*Powers* v. *Merck & Co.*,
   773 F. App'x 304 (6th Cir. 2019) ................................................... 20

*Precious Creation, Inc.* v. *Mercantile Bank Mortg. Co.*,
   731 F. App'x 498 (6th Cir. 2018) ......................................... 38, 39, 40

*Prudential Ins. Co. of Am.* v. *U.S. Gypsum Co.*,
   359 F.3d 226 (3d Cir. 2004) ........................................................ 42

*Rezner* v. *Bayerische Hypo-Und Vereinsbank AG*,
   630 F.3d 866 (9th Cir. 2010) ....................................................... 22

*RJR Nabisco, Inc.* v. *European Cmty.*,
   136 S. Ct. 2090 (2016) ............................................................. 26

*Rosemount Cogeneration Joint Venture* v. *N. States Power Co.*,
   No. 90-cv-279, 1991 WL 13729 (D. Minn. Jan. 18, 1991) ........................ 32

*Rosenson* v. *Mordowitz*,
   No. 11-cv-6145, 2012 WL 3631308 (S.D.N.Y. Aug. 23, 2012) ..................... 10

*Ross* v. *Lloyds Banking Grp., PLC*,
   546 F. App'x 5 (2d Cir. 2013) ...................................................... 13

*Rotella* v. *Wood*,
528 U.S. 549 (2000) ............................................................... 34, 36, 39

*San Diego Bldg. Trades Council* v. *Garmon*,
359 U.S. 236 (1959) ...................................................................... 26, 27

*Scrappost, LLC* v. *Peony Online, Inc.*,
No. 14-cv-14761, 2017 WL 697028 (E.D. Mich. Feb. 22, 2017) .................... 43

*Slay's Restoration, LLC* v. *Wright Nat'l Flood Ins. Co.*,
884 F.3d 489 (4th Cir. 2018) ............................................ 14, 17, 19

*Staehr* v. *Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008) ............................................................ 37

*Stolow* v. *Greg Manning Auctions Inc.*,
258 F. Supp. 2d 236 (S.D.N.Y. 2003) ............................................... 31

*Swanigan* v. *FCA US, LLC*,
No. 18-cv-10319, 2018 WL 4030815 (E.D. Mich. Aug. 23, 2018) ................ 28

*Swanigan* v. *FCA US LLC*,
938 F.3d 779 (6th Cir. 2019) .................................................... 21, 28

*Sybersound Records, Inc.* v. *UAV Corp.*,
517 F.3d 1137 (9th Cir. 2008) .................................................... 18, 23

*Talbot* v. *Robert Matthews Distrib. Co.*,
961 F.2d 654 (7th Cir. 1992) ........................................................ 27

*Talbot* v. *U.S. Bank, N.A.*,
No. 19-cv-10214, 2019 WL 4166921 (E.D. Mich. Sept. 3, 2019) .................. 10

*Trentadue* v. *Buckler Lawn Sprinkler*,
479 Mich. 378 (2007) ................................................................... 43

*Tristar Inv'rs, Inc.* v. *Am. Tower Corp.*,
No. 12-cv-499, 2014 WL 1327663 (N.D. Tex. Apr. 3, 2014) ......................... 18

*Trollinger* v. *Tyson Foods, Inc.*,
370 F.3d 602 (6th Cir. 2004) ............................................ 26, 27, 28

*UFCW Local 1099* v. *City of Sidney*,
   364 F.3d 738 (6th Cir. 2004) ........................................................................ 33

*Union Comm. Servs. Ltd.* v. *FCA Int'l Operations LLC*,
   No. 16-cv-10925, 2016 WL 6650399 (E.D. Mich. Nov. 10, 2016) ................. 12

*United States* v. *Petlechkov*,
   922 F.3d 762 (6th Cir. 2019) ........................................................................ 28

*Upton* v. *City of Royal Oak*,
   492 F. App'x 492 (6th Cir. 2012) ................................................................ 44

*Villarreal* v. *R.J. Reynolds Tobacco Co.*,
   839 F.3d 958 (11th Cir. 2016) ...................................................................... 41

*Wallace* v. *Kato*,
   549 U.S. 384 (2007) ...................................................................................... 41

*Whaley* v. *Auto Club Ins. Ass'n*,
   891 F. Supp. 1237 (E.D. Mich. 1995) ......................................................... 31

*Wiggins* v. *Argent Mortg. Co.*,
   945 F. Supp. 2d 817 (E.D. Mich. 2013) ....................................................... 44

*Wood* v. *Gen. Motors Corp.*,
   No. 08-cv-5224, 2015 WL 1396437 (E.D.N.Y. Mar. 25, 2015) ..................... 10

*Yagman* v. *Gen. Motors Co.*,
   No. 14-cv-4696, 2014 WL 12562853 (C.D. Cal. July 3, 2014) ...................... 29

*Yuhasz* v. *Brush Wellman, Inc.*,
   341 F.3d 559 (6th Cir. 2003) ........................................................................ 20

**Statutes**

18 U.S.C. § 1962(b) ....................................................................... *passim*

18 U.S.C. § 1962(c) ....................................................................... *passim*

18 U.S.C. § 1962(d) ............................................................................... 9

18 U.S.C. § 1964(c) ............................................................................. 11

Fed. R. Civ. P. 9(b) ...................................................................... 29, 38

Fed. R. Civ. P. 12(b)(6) ................................................................. 1, 9, 20

**Other Authority**

Hon. Jed. S. Rakoff & Howard W. Goldstein,
     RICO: Civ. & Crim. Law & Strategy § 1.06 (rev'd ed. 2019) .................... 31

## STATEMENT OF ISSUES PRESENTED

1.      The Racketeer Influenced and Corrupt Organizations Act ("RICO") authorizes civil actions only by "[t]he direct victim of th[e] [alleged] conduct"— meaning that persons who claim to have incurred harm "beyond the first step" in the causal chain cannot assert a RICO claim. *Hemi Grp., LLC* v. *City of N.Y.*, 559 U.S. 1, 10 (2010). Here, GM alleges that it incurred higher labor costs as an indirect byproduct of alleged prohibited payments to certain former employees of the United Auto Workers ("UAW") that were facilitated by certain former employees of FCA, purportedly in exchange for labor concessions that harmed FCA's rank-and-file employees (the first victims), which the Individual Defendants concealed in order to defraud the Internal Revenue Service ("IRS") (the second victim).[1] Should the Court dismiss all of GM's RICO claims because they fail to satisfy RICO's direct-causation requirement?

2.      Should the Court dismiss GM's claim under RICO Section 1962(b) and Section 1962(c) because GM does not adequately plead that FCA engaged in predicate acts of racketeering activity?

---

[1] Plaintiffs General Motors LLC and General Motors Co. are referred to collectively as "GM"; Defendant FCA US LLC is referred to as "FCA" and Defendant Fiat Chrysler Automobiles N.V. is referred to as "FCA NV"; and Defendants Alphons Iacobelli, Jerome Durden, and Michael Brown are referred to as the "Individual Defendants."

3.      Should the Court dismiss GM's claim under RICO Section 1962(b) because GM does not adequately plead that FCA acquired an interest in, or maintained control over, the UAW through a pattern of racketeering activity?

4.      Should the Court dismiss GM's RICO conspiracy claim because GM fails to state an underlying RICO claim, and because a corporate entity cannot conspire with its own employees?

5.      Should the Court dismiss GM's RICO claims based on injuries GM allegedly sustained before November 20, 2015, because such claims are time-barred under RICO's four-year statute of limitations?

6.      Should the Court dismiss GM's Michigan common law claims for unfair competition and civil conspiracy because, among other reasons, an unfair competition claim does not exist outside the product confusion context and a civil conspiracy claim cannot be maintained absent an actionable underlying tort claim?

## STATEMENT OF CONTROLLING
## OR MOST APPROPRIATE AUTHORITIES

The controlling or most appropriate authorities for the relief that Defendants

seeks include:

1.      Fed. R. Civ. P. 12(b)(6)

**The Complaint fails to adequately plead direct causation as required by RICO:**

2.      18 U.S.C. § 1964(c)

3.      *Anza* v. *Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)

4.      *City of Cleveland* v. *Ameriquest Mort. Sec., Inc.*, 615 F.3d 496 (6th Cir. 2010)

5.      *Empire Merchants, LLC* v. *Reliable Churchill LLLP*, 902 F.3d 132 (2d Cir. 2018)

6.      *Hemi Grp., LLC* v. *City of N.Y.*, 559 U.S. 1 (2010)

7.      *Holmes* v. *Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992)

8.      *Perry* v. *Am. Tobacco Co.*, 324 F.3d 845 (6th Cir. 2003)

9.      *Slay's Restoration, LLC* v. *Wright Nat'l Flood Ins. Co.*, 884 F.3d 489 (4th Cir. 2018)

10.     *Sybersound Records, Inc.* v. *UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008)

**GM fails to plead the substantive elements of its RICO claims:**

11.     18 U.S.C. § 1962

12.     *Aces High Coal Sales, Inc.* v. *Cmty. Bank & Tr. of W. Ga.*, 768 F. App'x 446 (6th Cir. 2019)

13.     *Adkins* v. *Mireles*, 526 F.3d 531 (9th Cir. 2008)

14.     *Advocacy Org. for Patients & Providers* v. *Auto Club Ins. Ass'n*, 176 F.3d 315 (6th Cir. 1999)

15. *In re Am. Honda Motor Co., Inc. Dealerships Relations Litig.*, 941 F. Supp. 528 (D. Md. 1996)

16. *Trollinger* v. *Tyson Foods, Inc.*, 370 F.3d 602 (6th Cir. 2004)

17. *Whaley* v. *Auto Club Ins. Ass'n*, 891 F. Supp. 1237 (E.D. Mich. 1995)

18. *Yagman* v. *Gen. Motors Co.*, 2014 WL 12562853 (C.D. Cal. July 3, 2014)

**GM's RICO claims based on conduct that occurred prior to November 20, 2015 are time barred:**

19. *Cancer Found., Inc.* v. *Cerberus Capital Mgmt., LP*, 559 F.3d 671 (7th Cir. 2009)

20. *Crown Chevrolet* v. *Gen. Motors, LLC*, 637 F. App'x 446 (9th Cir. 2016)

21. *DeShetler* v. *FCA US, LLC*, ___ F. App'x ___, 2019 WL 5095761 (6th Cir. Oct. 11, 2019)

22. *Hill* v. *Dep't of Labor*, 65 F.3d 1331 (6th Cir. 1995)

23. *Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179 (1997)

24. *Rotella* v. *Wood*, 528 U.S. 549 (2000)

25. *Precious Creation, Inc.* v. *Mercantile Bank Mortg. Co.*, 731 F. App'x 498 (6th Cir. 2018)

**GM fails to state a claim for unfair competition and civil conspiracy:**

26. *Haygood* v. *Gen. Motors, LLC*, 2018 WL 3329574 (E.D. Mich. July 6, 2018) (Borman, J.)

27. *Mahindra & Mahindra Ltd.* v. *FCA US, LLC*, 2019 WL 3294114 (E.D. Mich. Apr. 2, 2019)

28. *Wiggins* v. *Argent Mortg. Co.*, 945 F. Supp. 2d 817 (E.D. Mich. 2013) (Borman, J.)

# PRELIMINARY STATEMENT

GM brought this action under RICO, a statute enacted "to pursue the Mafia" by "tying the big bosses to the crimes of their underlings by claiming they were all part of a 'criminal enterprise.'" *Neal* v. *Second Sole of Youngstown, Inc.*, 2018 WL 340142, at *2 (N.D. Ohio Jan. 9, 2018). GM's claims, however, bear no resemblance to what Congress had in mind in enacting RICO.

Rather than plausibly alleging that the UAW is a criminal enterprise controlled by FCA, GM focuses on goods and services obtained by certain former UAW employees with assistance from certain former FCA employees, which allegedly constituted "prohibited payments" under Section 302 of the Labor Management Relations Act.[2] But no matter how often GM refers to indictments and plea agreements, there is nothing in the Complaint that ties the alleged prohibited payments to negotiation of collective bargaining agreements between GM and the

---

[2] FCA denies that it either directed or approved any alleged prohibited payments. FCA acknowledges that certain former UAW employees and certain former FCA employees improperly used funds belonging to the National Training Center ("NTC") to purchase luxury items for their own personal use (such as in-ground home swimming pools, jewel-encrusted Montblanc fountain pens, a shotgun, and Christian Louboutin shoes), and that those individuals have been indicted and pled guilty as a result of their misconduct. For purposes of this brief, it makes no difference whether the alleged prohibited payments were made directly by FCA to the UAW, as GM contends, or were instead facilitated by former FCA employees acting in violation of clear company policies, as the facts will show, because GM's claims fail either way. Consistent with Rule 12(b)(6), references to "alleged prohibited payments" in this brief are based on the allegations of the Complaint, and do not constitute an admission by FCA that it made any such payments to the UAW.

UAW—much less the outcome of such negotiations, which supposedly put GM at some competitive disadvantage vis-à-vis FCA.  In other words, GM's own complaint establishes only that it is at most a mere bystander with regard to the alleged prohibited payments.  That alone is fatal to GM's claims.

The Supreme Court has directed courts to be skeptical of RICO "claims brought by economic competitors, which, if left unchecked, could blur the line between RICO and the antitrust laws."  *Anza* v. *Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006).  As GM has observed when finding itself a frequent defendant in RICO cases, "[b]ecause a RICO claim is the *litigation equivalent of a thermonuclear device*, a court must carefully examine a RICO plaintiff's allegations to assure they are not based on bald assertions and unsubstantiated conclusions."  GM Brief in *Chaney* v. *Berkshire Hathaway Inc., et al.*, No. 17-cv-989, ECF#60 at 4, 2017 WL 11140611 (D. Ariz.) (internal quotation omitted; emphasis added).

Such skepticism is warranted here, where GM contends that "$1.5 million" in alleged prohibited payments somehow "inflicted billions of dollars of damages on GM" in the form of higher labor costs.  (Compl. ¶¶ 5, 178.)  Nowhere in GM's 95-page Complaint does GM allege a single fact that supports that implausible proposition.  Instead, the Complaint strings together quotes from indictments and plea agreements (which nowhere mention GM or hint at conduct that was directed toward or even contemplated GM), and makes hyperbolic assertions about matters

that GM concedes have no connection whatsoever to its claims (such as Fiat S.p.A.'s investment in New Chrysler during the financial crisis, Fiat's purchase of securities from the UAW Retiree Medical Benefits Trust, and FCA's settlement of U.S. Securities & Exchange Commission claims concerning monthly sales reporting). Casting such aspersions does nothing to remedy the fatal flaws in GM's claims.

The Complaint should be dismissed for the following independent reasons.

*First*, GM fails to adequately plead that the alleged predicate acts of racketeering activity were the "but for" and "proximate" cause of GM's purported injuries. GM's first causation theory is that, in an effort to force a merger with GM, FCA made *concessions to the UAW* during negotiation of the 2015 collective bargaining agreement ("CBA")—thereby harming FCA—knowing the UAW would extract those same concessions from GM through "pattern bargaining," causing GM to incur "unanticipated higher costs." (Compl. ¶¶ 117, 134.) This theory makes no sense as a matter of basic economics. Why would FCA intentionally negotiate an unfavorable CBA for itself, thereby pushing GM into a similarly unfavorable CBA, all in the hopes of forcing a merger with GM in which FCA would run the merged company saddled with those unfavorable CBAs? A purported strategy that defies economic logic need not be accepted as true at the pleading stage.

GM's second causation theory fares no better. GM alleges in conclusory terms that FCA made prohibited payments to the UAW to obtain "special

advantages" that "were not provided" to GM, which allowed FCA to "lower[] [its] average hourly labor costs" and "more effectively compete and thrive against GM." (Compl. ¶¶ 5-6, 71, 79.)   Putting aside that FCA itself did not make the alleged prohibited payments, and that this second claim flatly contradicts GM's first claim, GM comes nowhere close to establishing the requisite *direct relationship* between FCA's alleged actions and GM's purported injury.  *See Hemi Grp., LLC* v. *City of N.Y.*, 559 U.S. 1, 10 (2010) (alleged RICO injury cannot go beyond "the first step" in causal chain).  GM's alleged injury is, at best, an indirect byproduct of alleged prohibited payments that GM says harmed the "UAW membership" at the first step, and then harmed the IRS at the second step.  (Compl. ¶¶ 65-66, 71.)  The Supreme Court has expressly rejected a RICO causation theory premised on "claiming that the defendant's aim was to increase market share at a competitor's expense," which is precisely what GM is trying to do here.  *Anza*, 547 U.S. at 460.

*Second*, GM fails to adequately plead the predicate acts of racketeering activity that are an essential element of its RICO claims under Sections 1962(b) and (c).  GM's predicate acts of racketeering activity are all based on allegations that FCA committed unfair labor practices under the National Labor Relations Act, which can be adjudicated only by the National Labor Relations Board ("NLRB").  Moreover, GM does not attempt to plead that FCA made any misrepresentations with fraudulent intent—necessary ingredients for its mail and wire fraud claims.

*Third*, GM's RICO claim under Section 1962(b) fails for the additional reason that GM does not plausibly allege that FCA acquired an interest in, or maintained control over, the UAW.  GM's contention that FCA influenced certain UAW decisions by virtue of the alleged prohibited payments does not establish that FCA acquired power over the UAW's day-to-day operations—a requirement akin to owning enough stock to affect the composition of a corporation's board of directors.

*Fourth*, GM's RICO conspiracy claim should be dismissed because GM fails to allege an underlying RICO violation, and because a corporation cannot conspire with its own employees.

*Fifth*, GM's RICO claims based on injuries allegedly incurred before November 20, 2015 are time-barred.  RICO's four-year statute of limitations "begins to run when [GM] knew or should have known of [its] injury," and is "not delayed until [GM] discovers the alleged pattern of racketeering activity."  *Kresch* v. *Miller*, 2019 WL 3412901, at \*11 (E.D. Mich. July 29, 2019).  GM knew or should have known that its labor costs were higher than FCA's long before November 20, 2015, and it is irrelevant that GM did not come up with its specious theory that those higher labor costs were the product of the alleged prohibited payments until the indictments and plea agreements were made public beginning in mid-2017.

*Sixth*, because GM's federal RICO claims fail, the Court should decline to exercise supplemental jurisdiction over GM's state law claims, which are, in any

event, legally deficient.

## ALLEGATIONS OF THE COMPLAINT

GM brought this action on November 20, 2019, alleging that prohibited payments to former UAW employees were part of an alleged "scheme" by FCA to "more effectively compete and thrive against GM and . . . ultimately attempt to force a merger with GM."  (Compl. ¶ 5.)

GM posits two self-contradictory theories about how FCA allegedly sought to injure GM.

### A.     Between 2009 and 2015, FCA allegedly made prohibited payments to obtain concessions from the UAW that the UAW declined to provide to GM.

GM alleges that FCA "illegally purchased" the following "benefits, concessions, and advantages" from the UAW, "without regard to the interests of UAW membership" (Compl. ¶¶ 6, 71):

- **World Class Manufacturing:** The UAW allegedly "commit[ted]" to FCA's "World Class Manufacturing program," which ensures that FCA's "facilities are flexible and competitive with the best in the world."  (*Id.* ¶¶ 53, 72.)

- **Tier-Two Workers:** FCA allegedly "had been privately assured" that the UAW did not intend in 2015 to reinstate for FCA a cap on less expensive "Tier Two" employees that had been lifted in 2009 for both FCA and GM. (Compl. ¶¶ 77-78.)  Thus, while GM alleges that it "managed to the cap and absorbed corresponding cost increases," FCA allegedly "hired Tier Two workers with abandon."  (*Id.* ¶ 78.)

- **Temporary Workers:** The UAW allegedly permitted FCA to use "more lower-priced temporary workers" than GM because "certain UAW leaders did not hold FCA to the contractual limits on the number of temporary workers,"

but "enforced these temporary worker hiring limits on GM."  (*Id.* ¶ 79.)

- **Employee Grievances:** Senior UAW officials allegedly did not "zealously pursu[e] union grievances and health and safety issues" for FCA employees, but "GM was denied any such corresponding benefit."  (*Id.* ¶ 80.)[3]

GM asserts, with no factual support, that "FCA ensured that while these special advantages were conferred on FCA, the same or similar advantages were not provided to at least GM despite it seeking similar programs and concessions." (Compl. ¶¶ 71, 91.)  GM further alleges that the Individual Defendants "concealed" the alleged prohibited payments by "misappropriat[ing] money from" the NTC and "improperly omitting" the payments from IRS tax forms.  (*Id.* ¶¶ 36, 65-66 (emphasis added).)  Thus, according to GM, the alleged improper payments not only injured FCA's employees, they "defraud[ed] the United States."  (*Id.* ¶ 151.)

### B.    In 2015, FCA allegedly sought to force a merger with GM by agreeing to a CBA that harmed both FCA and GM.

GM alleges that, "with the purchased support of certain former UAW officials," FCA's CEO, Sergio Marchionne, "orchestrate[d] a negotiation of the

---

[3]   GM repeatedly insinuates that FCA and the UAW entered into secret letter agreements and memoranda of understanding that were "negotiated outside of the collective bargaining process."  (*E.g.*, Compl. ¶¶ 73, 81, 92.)  But these kinds of agreements are neither secret nor unique to FCA.  The FCA-UAW CBAs, which are publicly available on the UAW's website, expressly included letter agreements and memoranda of understanding (*see* "Letters, Memoranda, and Agreements" appended to the 2015 CBA, available at uaw.org/uaw-auto-bargaining/fca-us/), and GM itself routinely negotiates similar letter agreements and memoranda of understanding with the UAW.  (*See* GM 2015 CBA at viii-vxi, available at uaw.org/uaw-auto-bargaining/generalmotors/.)

2015 CBA designed, through the power of pattern bargaining, to cost GM billions" in an attempt to "force a merger of the companies." (*Id.* ¶ 7.)

Every four years, the UAW negotiates a new CBA with each of the three Detroit-based automakers: FCA, Ford, and GM. (*Id.* ¶ 118.) GM claims that, after months of preliminary negotiations with each automaker, the UAW selects one of the automakers as a "lead" or "target" company with which the UAW negotiates a CBA. (*Id.* ¶ 119.) The UAW then "exerts pressure on the other two companies to use the first agreement as a 'pattern' for negotiations." (*Id.*)

GM appears to think it had a preordained right to be the lead company in CBA negotiations, alleging that it "believed that it would be the target in 2015," but the UAW "unexpectedly" chose FCA instead. (*Id.* ¶¶ 124-25.) GM alleges that FCA made significant concessions to the UAW, and ultimately agreed to a CBA—after UAW rank-and-file members rejected the first one agreed to by FCA and the UAW—that the UAW considered to be the "richest" (*i.e.*, most economically advantageous to the UAW) "ever negotiated." (*Id.* ¶ 133.) According to GM, Mr. Marchionne agreed to such unfavorable CBA terms because he knew the UAW would then extract similarly unfavorable terms from GM via "pattern bargaining," thereby "forc[ing] unanticipated higher costs on GM," which would "further [Mr. Marchionne's] takeover scheme" in some unspecified manner. (*Id.* ¶ 134.)

GM does not advance any theory as to (i) why FCA would have needed to

resort to bribes to entice the UAW to accept the most union-favorable CBA "ever negotiated" (*id.* ¶ 133), (ii) why having higher labor costs would make GM more amenable to merging with FCA, or (iii) why Mr. Marchionne would want to saddle FCA and GM with unfavorable CBAs if his ultimate goal was to run the merged company (presumably on a profitable basis).

### C.    GM's claims

Based on these allegations, GM asserts RICO, unfair competition, and civil conspiracy claims, and seeks "billions of dollars of damages." (*Id.* ¶ 178.)  In particular, GM asserts three RICO claims.  *First*, GM alleges that FCA gained "control over the essential functions of" the UAW through an alleged pattern of racketeering activity, in violation of RICO Section 1962(b).  (*Id.* ¶ 33.)  Seemingly to downplay the implausibility of that allegation, GM rechristens the UAW as the "FCA-Control Enterprise." (*Id.* ¶ 32.)  *Second*, GM alleges that FCA conducted the affairs of the NTC—which GM dubs the "FCA-NTC Enterprise"—through a pattern of racketeering activity, in violation of RICO Section 1962(c).  (*Id.* ¶ 35.)  *Third*, GM alleges that FCA and the Individual Defendants—all of whom were employed by FCA at the relevant time—"conspired and agreed to violate" RICO Sections 1962(b) and (c), in violation of RICO Section 1962(d).  (*Id.* ¶ 182.)

## LEGAL STANDARD

To withstand dismissal under Rule 12(b)(6), GM must plead enough facts to

"state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). "[L]abels and conclusions" or "'naked assertion[s]' devoid of 'further factual enhancement'" do not suffice. *Id.*[4]

Courts apply heightened scrutiny to civil RICO claims, and "strive to flush out frivolous RICO allegations at an early stage of the litigation." *Rosenson* v. *Mordowitz*, 2012 WL 3631308, at *5 (S.D.N.Y. Aug. 23, 2012). This is so for two reasons. *First*, "[c]ourts look with particular scrutiny at claims for a civil RICO, given the statute's damaging effects on the reputations of individuals alleged to be engaged in RICO enterprises and conspiracies." *Wood* v. *Gen. Motors Corp.*, 2015 WL 1396437, at *4 (E.D.N.Y. Mar. 25, 2015); *see Matteo Gutter Sys., Inc.* v. *Millenia Hous. Mgmt. Ltd.*, 2009 WL 10719997, at *3 (N.D. Ohio Nov. 25, 2009) (same). *Second*, "RICO cases, like antitrust cases, are 'big' cases and the defendant should not be put to the expense of big-case discovery on the basis of a threadbare claim." *Limestone Dev. Corp.* v. *Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008) (Posner, J.). As the First Circuit put it, "[c]ivil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device," and courts must take "particular care" to "prevent[] abusive or vexatious treatment of defendants."

---

[4] In deciding this motion, the Court may properly consider (i) "documents referenced in the pleadings that are 'integral to the claims,'" (ii) "documents that are not mentioned specifically but which govern the plaintiff's rights and are necessarily incorporated by reference," and (iii) "matters of public record." *Talbot* v. *U.S. Bank, N.A.*, 2019 WL 4166921, at *4 (E.D. Mich. Sept. 3, 2019).

*Miranda* v. *Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991).

Given these exacting standards, "plaintiffs wielding RICO almost always miss the mark." *Gruber* v. *Gilbertson*, 2019 WL 4458956, at *5 (S.D.N.Y. Sept. 17, 2019). That is certainly true of GM's RICO claims in this case.

## ARGUMENT

**I.** **GM's RICO claims should be dismissed because GM does not plausibly allege that it suffered an injury "by reason of" FCA's alleged conduct.**

A civil plaintiff can bring a claim under RICO only if it is "injured in [its] business or property by reason of a violation." 18 U.S.C. § 1964(c). This means that a plaintiff must "show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi*, 559 U.S. at 9 (internal quotations omitted). GM's Complaint flunks both requirements.

### A. GM concedes that the alleged prohibited payments were not the "but for" cause of harm that GM allegedly suffered as a result of the 2015 CBA negotiations.

GM does not contend that the alleged prohibited payments had anything to do with its claim that FCA sought to force a merger with GM by increasing GM's labor costs. Instead, according to the Complaint, in an attempt to "apply maximum pressure" on GM, FCA made unspecified *concessions to the UAW* during the 2015 CBA negotiations, knowing that the UAW would extract the same concessions from GM as a result of "pattern bargaining," in the hopes that FCA would end up running a combined GM-FCA that was hamstrung by unfavorable CBAs. (Compl. ¶¶ 104,

132-38.)[5]

*First*, GM alleges that the UAW "obtained significant FCA concessions" as part of a "rich" CBA that was economically advantageous to the UAW. (*Id.* ¶ 134.) In fact, according to the Complaint, the 2015 CBA with FCA was the "the richest ever negotiated" by the UAW. (*Id.* ¶¶ 133-34.) GM does not, and cannot, contend that the UAW's acceptance of the most union friendly CBA "ever negotiated"—one the UAW could use as the model for similarly favorable CBAs with GM and Ford— was a product of the alleged prohibited payments. *See Anza*, 547 U.S. at 458-59 ("[Defendant's] lowering of prices in no sense required it to defraud the state tax authority."); *Alix* v. *McKinsey & Co.*, 404 F. Supp. 3d 827, 837 (S.D.N.Y. 2019) (no alleged "connection between Defendants' alleged pay-to-play conduct and [plaintiff's] losses"); *Union Comm. Servs. Ltd.* v. *FCA Int'l Operations LLC*, 2016 WL 6650399, at *5 (E.D. Mich. Nov. 10, 2016) (dismissing RICO claim where "Plaintiff has not offered any allegations" that the allegedly "brib[ed]" Angolan government officials "were in a position to influence the market structure").[6]

---

[5] GM also alleges that FCA "pursued a full-court press media strategy" and "enlisted hedge funds and activist investors to support" its efforts to merge with GM, which had no connection to the alleged prohibited payments. (*Id.* ¶¶ 104, 108, 116.)

[6] GM further alleges that "[a]t the time" of the 2015 negotiations, FCA and UAW "leaders knew the federal government was actively investigating past FCA-UAW CBAs," and therefore the UAW did not make any concessions to FCA, let alone any concessions tainted by the alleged prohibited payments. (Compl. ¶ 134.) If true, this also undermines GM's theory that the UAW's negotiating positions were a

*Second*, GM's allegations make no economic sense, and courts need not accept as true allegations that "def[y] economic reason." *Atl. Gypsum Co.* v. *Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (Mukasey, J.) (dismissing RICO claim); *see Fla. Carpenters Reg'l Council Pension Plan* v. *Eaton Corp.*, 964 F. Supp. 2d 875, 889 (N.D. Ohio 2013) ("plaintiffs' view of the facts 'defies economic reason'"). It is ridiculous for GM to contend that FCA made large concessions to the UAW *that harmed FCA itself* without any corresponding benefit. Even if FCA assumed those concessions would also harm GM, nothing in the Complaint explains why increased labor costs would make GM more amenable to merging with FCA, or why FCA would want to saddle both FCA and GM with unfavorable long term CBAs if it hoped to run the merged company. This is the same type of "illogical reasoning" rejected in *Atlantic Gypsum*, where the plaintiff alleged that the defendants sought to "gain 'control' of [a] venture" by "advanc[ing] money to the venture with the intention of driving it into the ground so that they could control the failed venture and then wait in line with other creditors in a bankruptcy proceeding." 753 F. Supp at 512-14. Courts routinely reject claims that are economically irrational.[7]

---

product of the alleged prohibited payments.

[7] *See Ross* v. *Lloyds Banking Grp., PLC*, 546 F. App'x 5, 8 (2d Cir. 2013) ("[I]t would hardly make economic sense for [Lloyds] to consummate an acquisition detrimental to [itself].");  *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475

### B.    GM does not adequately plead proximate causation.

To establish proximate causation, a plaintiff must plausibly allege a "'direct causal connection' between the predicate offense and the alleged harm." *Hemi*, 559 U.S. at 10-11.  The critical question is whether the plaintiff is the "direct victim." *Id.* at 9-10; *see Slay's Restoration, LLC* v. *Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 494 (4th Cir. 2018) ("RICO causation requires a proximity of statutory violation and injury such that the injury is sequentially the direct result—generally at 'the first step' in the chain of causation.").[8]  "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi*, 559 U.S. at 9.  This strict proximate cause requirement "helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff." *Maio* v. *Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000).

There is no "zone of injury" concept in civil RICO claims.  Thus, a RICO

---

U.S. 574, 595 (1986) (no "plausible motive to engage in predatory pricing" scheme that would "generate losses for petitioners with no corresponding gains"); *GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228, 244 (3d Cir. 2004) ("There is simply nothing to suggest that [defendant] was on a suicide mission in this acquisition."); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *12 (S.D.N.Y. Sept. 28, 2012) ("argument that [UBS] had a motive to invest in overvalued mortgage-related securities defies not only economic reason but also common sense").

[8]  "[C]ausation must be established as to each defendant's alleged predicate acts—it is not sufficient for [plaintiff] to show that the 'scheme' proximately caused his injuries." *McNulty* v. *Home City Ice Co.*, 2016 WL 4408826, at *14 (E.D. Mich. Aug. 17, 2016).

plaintiff cannot establish proximate cause by "alleging that the fraudulent scheme embraced all those indirectly harmed by the alleged conduct." *Hemi*, 559 U.S. at 13. Nor can a RICO plaintiff "circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense," which is precisely what GM seeks to do here. *Anza*, 547 U.S. at 460.

### 1. GM was not the "direct victim" of any harm caused by the alleged prohibited payments.

GM was not "directly harmed" by the alleged prohibited payments. *Hemi*, 559 U.S. at 13. At best, GM was third in line. According to GM, as a result of the alleged prohibited payments, FCA obtained "special advantages" from the UAW that allowed FCA to "lower[] [its] average hourly labor costs," at the direct expense of FCA's hourly workers (victim one). (Compl. ¶¶ 71, 79.) GM then alleges that former FCA employees and former UAW employees "concealed" the alleged prohibited payments by omitting them from tax forms filed with the IRS, thereby defrauding the U.S. government (victim two). (Compl. ¶¶ 65-66.)

As GM's own allegations make clear, the "first-step" harm was incurred, if at all, not by GM, but by rank-and-file UAW members employed by FCA: "in return for FCA Group's bribes, certain corrupt members of UAW's leadership began providing [FCA] with labor peace . . . *without regard to the interests of UAW membership*." (Compl. ¶ 71 (emphasis added).) In particular, GM alleges that, as a result of the alleged prohibited payments, FCA obtained greater flexibility to use

-15-

"temporary workers" and "Tier Two workers," which are "less expensive employees who have a lower wage structure." (*Id.* ¶¶ 76, 79.)  FCA's use of more "lower-priced" workers, if true, harmed UAW members, who were paid less than they would have been otherwise.  (*Id.*)  GM also alleges that the prohibited payments caused the UAW to compromise the "handling of worker grievances," with the result that the UAW allegedly no longer "zealously pursu[ed] union grievances and health and safety issues." (*Id.* ¶ 80.)  Again, such behavior by the UAW, if it occurred, harmed UAW members, who presumably would have prevailed on more grievances and health and safety issues had they been pursued more zealously.  Lastly, instead of using NTC funds for their intended purpose of "training" "UAW workers employed by FCA," GM alleges that UAW employees used "NTC funds" for "travel" and "dining," "*rather than for the benefit of membership*." (*Id.* ¶¶ 22, 97 (emphasis added).)

Next, GM alleges that the second victim in the chain of causation was the IRS.  GM alleges that the prohibited payments "were concealed through acts of mail and wire fraud," including by "improperly omitting them from [tax forms] *filed with the IRS*." (*Id.* ¶¶ 65-66 (emphasis added).)   To "conceal the scheme," the "co-conspirators" "*defraud[ed] the United States* by using two-tax exempt organizations" (the NTC and a charitable foundation) "to improperly divert millions of dollars in unreported income." (*Id.* ¶ 151 (emphasis added); *see also id.* ¶ 176

(Defendant Jerome Durden "filed numerous false IRS Form 990s for the NTC").)

"[M]erely because defendants' predicate acts created a situation in which [plaintiff] sustained injury does not satisfy RICO's [causation] requirement." *DDR Const. Servs., Inc.* v. *Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 653 (S.D.N.Y. 2011). As the Supreme Court has stated, a RICO claim will not lie where the alleged "harm flow[s] merely from the misfortunes visited upon a third person by the defendant's acts." *Holmes* v. *Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).

As the cases below demonstrate, GM's causation theory exemplifies the sort of remote injury "contingent on or derivative of harm suffered by a different party" that courts from coast to coast have rejected. *Slay's*, 884 F.3d at 494. Courts are especially vigilant in enforcing this direct-causation requirement in RICO cases "brought by economic competitors," which, "if left unchecked, could blur the line between RICO and the antitrust laws," *Empire Merchants, LLC* v. *Reliable Churchill LLLP*, 902 F.3d 132, 144 (2d Cir. 2018):

- *Anza*, 547 U.S. 451: A steel mill supply company could not sue a competitor under RICO for lost sales where defendant defrauded New York State (the direct victim) by not charging New York sales tax on sales to customers, thereby enabling defendant to undercut plaintiff's prices. *Id.* at 454, 458-61 (reversing denial of motion to dismiss).

- *Empire Merchants*, 902 F.3d 132: New York's exclusive distributor of Grey Goose vodka, among other alcohol brands, could not sue a Maryland competitor under RICO for lost sales where defendant defrauded New York tax authorities (the direct victim) by smuggling liquor into New York without paying excise taxes, thereby enabling the bootlegged alcohol to be sold at a discount. *Id.* at 135-37, 143-44 (affirming dismissal).

- *G&G TIC, LLC* v. *Ala. Controls, Inc.*, 324 F. App'x 795 (11th Cir. 2009): Manufacturer of air conditioners could not sue competitor under RICO for lost sales where defendant defrauded the Fort Benning military base (the direct victim) by obtaining contracts through a bid-rigging scheme. *Id.* at 797-98 (affirming dismissal).

- *Sybersound Records, Inc.* v. *UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008): Karaoke record producer could not sue competitor under RICO for lost sales where defendant defrauded musicians (the direct victims) by not paying royalties on copyrighted musical works, thereby enabling defendant to undercut plaintiff's prices. *Id.* at 1147-49 (affirming dismissal).

- *Pik-Coal Co.* v. *Big Rivers Elec. Corp.*, 200 F.3d 884 (6th Cir. 2000): Coal broker could not sue coal company under RICO for lost sales commissions on contract with different coal company that was the low bidder on a coal supply contract, where defendant bribed employees of a power plant (the direct victim) to obtain the contract. *Id.* at 890-91 (affirming dismissal).

- *Alix*, 404 F. Supp. 3d 827: Bankruptcy consulting firm could not sue competitor under RICO for lost business where defendant "filed fraudulent" certifications with courts (the direct victims) to obtain "court approval to do work that otherwise would have been secured by [plaintiff]." *Id.* at 829-30, 838-39 (dismissing complaint).

- *Tristar Inv'rs, Inc.* v. *Am. Tower Corp.*, 2014 WL 1327663 (N.D. Tex. Apr. 3, 2014): Operator of cell phone towers could not sue competitor under RICO for allegedly increasing its costs where defendant misled landowners (the direct victims) "to obtain easements on properties under [plaintiff's] towers, which [defendant] could then use as leverage to demand a buyout of those easements from [plaintiff]." *Id.* at *12 (granting summary judgment).

- *Assoc. Bodywork & Massage Prof'ls* v. *Am. Massage Therapy Ass'n*, 897 F. Supp. 1116 (N.D. Ill. 1995): Massage therapy firm could not sue competitor under RICO for lost sales where competitor lied to state legislatures (the direct victim) to induce enactment of massage therapy regulations, which effectively excluded plaintiff from the market. *Id.* at 1121 (dismissing complaint).[9]

---

[9] These cases are merely representative; there are many decisions dismissing RICO claims by economic competitors on proximate cause grounds. *E.g.*, *Cascade Yarns,*

Significantly, it would not matter if the harm allegedly suffered by GM were the "foreseeable consequence" of FCA's alleged conduct (Compl. ¶ 4) or that GM supposedly was the intended victim of the alleged prohibited payments (*id.* ¶ 5). The Supreme Court has rejected the argument that "RICO's proximate cause requirement turn[s] on foreseeability," holding instead that "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm." *Hemi*, 559 U.S. at 12. And the Sixth Circuit has "rejected the argument that the intentional nature of plaintiffs' claims alters the remoteness inquiry"—"specific intent to harm does not magically create standing or cause . . . injuries to be direct." *Perry* v. *Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir. 2003); *see also Empire Merchants*, 902 F.3d at 144-45 (dismissing RICO claim even though plaintiff "was the 'foreseeable[] and intended target' of the defendants' racketeering"); *Slay's*, 884 F.3d at 493.[10]

Lastly, GM cannot avoid dismissal by hoping that "discover[y]" of "additional details" might support the notion that it was directly injured by the alleged prohibited

---

*Inc.* v. *Knitting Fever, Inc.*, 2012 WL 2565067, at *3 (W.D. Wash. June 29, 2012); *Barr Labs., Inc.* v. *Quantum Pharmics, Inc.*, 827 F. Supp. 111, 114-16 (E.D.N.Y. 1993); *Dow Chem. Co.* v. *Exxon Corp.*, 30 F. Supp. 2d 673, 694-96 (D. Del. 1998); *Ocean Exploration Co.* v. *Phillips Petroleum Co.*, 352 F. App'x 945, 951-52 (5th Cir. 2009); *Club One Casino, Inc.* v. *Sarantos*, 2018 WL 4719112, at *4 (E.D. Cal. Sept. 28, 2018) (collecting cases).

[10] Likewise, the fact that GM's alleged injury (higher wage costs) "is *distinct* from" the injury allegedly inflicted on UAW members or the IRS is irrelevant to whether GM's alleged injury "was *directly caused* by the defendant's racketeering." *Empire Merchants*, 902 F.3d at 146 (emphasis in original).

payments. (Compl. ¶ 4.) No amount of discovery can alter the fact that, under its own theory of the case, GM's injuries are entirely derivative of, and contingent upon, injuries allegedly incurred by rank-and-file members of the UAW and by the IRS. GM "may not use the discovery process to obtain [the facts necessary to state a claim] after filing suit." *Powers* v. *Merck & Co.*, 773 F. App'x 304, 306 (6th Cir. 2019). As the Sixth Circuit has held, "the very purpose of Fed. R. Civ. P. 12(b)(6) 'is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery.'" *Yuhasz* v. *Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). This is particularly true in the RICO context, where courts should "not allow RICO plaintiffs leeway to continue on with their case in an attempt to prove an entirely remote causal link." *Empire Merchants*, 902 F.3d at 144.

### 2. All three *Holmes* factors confirm that GM's alleged harm is far too remote to support a RICO claim.

In *Holmes*, the Supreme Court identified three rationales underlying the direct-relationship requirement of RICO's proximate cause element:

1. the fact that "directly injured victims can generally be counted on to vindicate the law," obviating the "need to grapple with" complicated causation and damages issues "attendant upon suits by plaintiffs injured more remotely";

2. the factual difficulty of "ascertain[ing] the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors"; and

3. the complexity of "apportioning damages among plaintiffs removed at different levels of injury . . . to obviate the risk of multiple recoveries."

503 U.S. at 269.  These three factors further demonstrate GM's failure to allege proximate causation here.

**Factor 1.  More Immediate Victims Have Incentive To Sue.**  As in *Anza* and countless other cases dismissing RICO claims, "the immediate victims of [the] alleged RICO violation can be expected to vindicate the laws by pursuing their own claims."  547 U.S. at 460.  In fact, there have been no fewer than five actions brought by FCA employees "aris[ing] out of the infamous bribery scandal."  *Swanigan* v. *FCA US LLC*, 938 F.3d 779, 782 (6th Cir. 2019); *see infra* at n.17.  It does not matter that these actions have been dismissed; but even if that were relevant, there is more.[11] Three FCA employees "have filed allegations of unfair labor practices with the [NLRB] against both FCA and UAW," which "is the appropriate forum to adjudicate such claims."  *Swanigan*, 938 F.3d at 786.  And as GM's Complaint describes in detail, the U.S. Department of Justice has been diligently investigating and prosecuting both the alleged prohibited payments and tax fraud.

A RICO claim brought by a party alleging remote injury (GM) is not

---

[11]  The Supreme Court emphasized in *Hemi* that it is irrelevant whether the more immediate victim "could bring a RICO action for any lost tax revenue"; rather, the question is whether such party "would have concrete incentives to try."  559 U.S. at 12.  Accordingly, "[t]he fact that the direct victim . . . may not be able to assert a RICO claim against [defendant] does not justify allowing an indirect victim, such as [plaintiff], to bring suit."  *Dow Chem*, 30 F. Supp. 2d at 696 n.36; *see Barr Labs.*, 827 F. Supp. at 116 n.5 (same); *City of Cleveland* v. *Ameriquest Mort. Sec., Inc.*, 615 F.3d 496, 506 (6th Cir. 2010) (affirming dismissal because more direct victims had "*potential* claims" against defendants (emphasis added)).

appropriate when parties alleging more direct injury have already sued.  *See Anza*, 547 U.S. at 460 ("Ideal accuses the Anzas of defrauding the State of New York out of a substantial amount of money.  If the allegations are true, the State can be expected to pursue appropriate remedies."); *Cleveland*, 615 F.3d at 506 ("Cleveland's claim fails because . . . more immediate victims can sue to the extent that the Defendants violated any laws"); *Empire Merchants*, 902 F.3d at 144 ("New York State was a more direct victim of the smuggling operation" and adjudicating its "claims would also be more 'straightforward' than adjudicating [plaintiff's].").[12]

**Factor 2.   GM's Alleged Damages Are Speculative and Would Be Difficult To Quantify.**  Judge Easterbrook was right when he observed that any attempt to prove that a defendant "pays lower wages than some competitors . . . would be very hard to attribute to particular" RICO predicate offenses.  *Baker* v. *IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004).  Ascertaining the amount of harm that FCA's alleged conduct purportedly inflicted on GM would be not only difficult but inherently speculative.   GM cannot simply point to the "labor cost disparity" between FCA and GM, and then contend that the entire difference represents damages to GM.  (Compl. ¶ 83.)  Instead, the Court would first need to decide what

---

[12] *See also Rezner* v. *Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 873-74 (9th Cir. 2010) ("Here, the direct victim of HVB's fraudulent conduct—the United States—did in fact sue by entering into a deferred prosecution agreement with HVB."); *Lefkowitz* v. *Ackerman*, 2017 WL 4237068, at *7 (S.D. Ohio Sept. 25, 2017) (same); *Alix*, 404 F. Supp. 3d at 838 (same).

FCA's labor costs would have been absent the alleged impact of the prohibited payments. For a company with tens of thousands of unionized workers, and many factors affecting the negotiation of a given CBA, that would be an extremely complex and inherently indeterminate undertaking. Complicating matters further, the Court would need to decide what GM's labor costs would have been had it negotiated different CBAs than the ones it actually negotiated, which would be "speculative in the extreme." *Empire Merchants*, 902 F.3d at 143. Indeed, these are exactly the type of "intricate, uncertain inquiries" that the Supreme Court stated in *Anza* should not be allowed to "overrun[] RICO litigation":

> A court considering the claim would need to begin by calculating the portion of National's price drop attributable to the alleged pattern of racketeering activity. It next would have to calculate the portion of Ideal's lost sales attributable to the relevant part of the price drop. The element of proximate causation recognized in *Holmes* is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation.

547 U.S. at 459-60.

Any disparity in average hourly wages between FCA and GM could be due to a wide variety of reasons, such as number of hours worked by employees or the seniority level of employees. Teasing out the amount of harm to GM directly attributable to the alleged prohibited payments—assuming GM could ever surmount its proximate cause obstacles—would require "a speculative and complicated analysis." *Sybersound*, 517 F.3d at 1148; *see Empire Merchants*, 902 F.3d at 143

-23-

("sorting out Empire's counterfactual sales . . . would thus prove 'speculative in the extreme'"); *Cleveland*, 615 F.3d at 506 (same); *Club One Casino*, 2018 WL 4719112, at *4 (damages based on "lost market share in the area in which the two [companies] compete" is "too speculative"; collecting cases).

The Supreme Court's decision in *Bridge* v. *Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008)—the only RICO case where the Supreme Court found proximate cause adequately pled—underscores the remote and speculative nature of GM's damages theory here. That case involved competitors who bid on auctioned tax liens. But the auctions had a unique feature: because the tax liens were so profitable, there were always "multiple bidders willing to accept the lowest" price at the auction, and thus the county mechanically allocated liens "on a rotational basis" among the tying bidders. *Id.* at 642-43. Defendants, however, manipulated the "rotational" system by submitting multiple bids, guaranteeing them more successful bids than they would otherwise have gotten. *Id.* at 643-44. Given the "zero-sum" nature of the auction, "each time a fraud-induced bid was awarded, a particular legitimate bidder was necessarily passed over." *Hemi*, 559 U.S. at 14 (discussing *Bridge*). The Supreme Court found that the RICO proximate cause requirement was adequately pled because there were "no independent factors that account[ed] for [plaintiffs'] injury," given the mechanical application of the rotation system. *Bridge*, 553 U.S. at 658. And significantly, "[t]he losing bidders . . . 'were the *only* parties

-24-

injured by [defendant's] misrepresentations.'  The county was not injured; it received the same revenue regardless of which bidder prevailed." *Hemi*, 559 U.S. at 14-15 (quoting *Bridge*).  Hence, unlike here, "no more immediate victim [was] better situated to sue." *Bridge*, 553 U.S. at 658.  In sum, "*Bridge* involved an unusual degree of predictability over a markedly direct causal chain that only serves to highlight the relative complexities and indirectness of the causal chain alleged in this case." *Alix*, 404 F. Supp. 3d at 839.

**Factor 3.  Risk of Multiple Recoveries.**  Allowing GM's RICO claims to proceed would raise the significant possibility of multiple recoveries.  Setting aside that the NLRB and DOJ investigations are ongoing and pose a direct risk of multiple recoveries, GM itself asserts that, if its theory is correct, "*all* stakeholders in the U.S. auto industry, including manufacturers, suppliers, the UAW, and employees" could theoretically bring a RICO claim for treble damages against FCA based on the conduct described in the Complaint.  (Compl. ¶ 12 (emphasis added).)

To compute damages in this case, "the court would be required to anticipate all potential plaintiffs who sustained indirect injuries in order to prevent multiple recoveries." *Barr Labs.*, 827 F. Supp. at 116.  And if GM is right, that is a very large and diverse group of potential plaintiffs.  "Allowing [GM] to proceed in this action would expose [FCA] to multiple recoveries in RICO actions brought by other competitors who sustained indirect injuries," and "[t]he sheer variety and number of

potential plaintiffs would render the calculation of possible respective recoveries incredibly complex." *Dow*, 30 F. Supp. 2d at 696. "[T]he need to grapple with these problems is simply unjustified." *Holmes*, 503 U.S. at 269.

## II. GM's RICO claims under Sections 1962(b) and 1962(c) should be dismissed because GM fails to adequately allege predicate acts of "racketeering activity."

To state a claim under Sections 1962(b) and 1962(c), GM must plausibly allege that FCA committed "predicate offense[s]" that are "part of a 'pattern of racketeering activity'—a series of related predicates that together demonstrate the existence or threat of continued criminal activity." *RJR Nabisco, Inc.* v. *European Cmty.*, 136 S. Ct. 2090, 2096-97 (2016). GM alleges that the prohibited payments fall into two categories of predicate offenses: (i) the prohibited payments provision of the Labor Management Relation Act; and (ii) federal mail and wire fraud statutes. (Compl. ¶¶ 65, 170.) But the NLRB has exclusive jurisdiction over all the claims here, and GM fails to allege essential elements of its mail and wire fraud claims.

### A. The NLRB has exclusive jurisdiction over the alleged predicate offenses.

The NLRB has "exclusive" jurisdiction over any conduct that "arguably" constitutes an "unfair labor practice." *San Diego Bldg. Trades Council* v. *Garmon*, 359 U.S. 236, 245 (1959). The Sixth Circuit has held that, under the *Garmon* rule, a federal court may "adjudicat[e] a RICO action based upon conduct that is arguably protected or prohibited by the NLRA if under the circumstances (1) RICO operates

as an independent federal remedy and (2) the labor questions in the case amount to no more than collateral issues." *Trollinger* v. *Tyson Foods, Inc.*, 370 F.3d 602, 610 (6th Cir. 2004). "[W]hen a RICO action depends upon a federal-law predicate offense and a violation of that predicate law may be found only if the defendant's conduct violates the NLRA, the federal district courts lack jurisdiction under *Garmon* because the NLRA issues in the case would be anything but collateral." *Id.* at 610-11.

GM's allegation that FCA negotiated CBAs in bad faith by making prohibited payments to the UAW is not merely a "collateral issue[]." *Id.* To the contrary, "[e]nsuring that employers and employees bargain with each other in good faith is of central importance under the [NLRA].'" *Talbot* v. *Robert Matthews Distrib. Co.*, 961 F.2d 654, 661 (7th Cir. 1992). Accordingly, numerous courts have held that claims predicated on bad faith bargaining between an employer and a union fall within the NLRB's exclusive jurisdiction. *See Adkins* v. *Mireles*, 526 F.3d 531, 542 (9th Cir. 2008) ("Appellants' RICO claims rest on their allegation that the Union had bargained in bad faith . . . and a consistent body of labor law requires that the NLRB has exclusive jurisdiction to regulate [that] activity.").[13]

---

[13] *See Martin* v. *Lake Cty. Sewer Co.*, 269 F.3d 673, 680 (6th Cir. 2001) (dismissing a "claim alleg[ing] bad-faith bargaining" because such a claim is "an unfair labor practice claim over which the NLRB has exclusive jurisdiction"); *Copeland* v. *Penske Logistics LLC*, 675 F.3d 1040, 1043-44 (7th Cir. 2012) ("a contention that a

Indeed, courts in the Sixth Circuit already have held that claims based on the very same alleged prohibited payments are "unfair labor practice claim[s] over which the NLRB has exclusive jurisdiction." *DeShetler* v. *FCA US LLC*, 2018 WL 6257377, at *10 (N.D. Ohio Nov. 30, 2018); *see Swanigan* v. *FCA US, LLC*, 2018 WL 4030815, at *4 (E.D. Mich. Aug. 23, 2018) (same). Moreover, some FCA employees have "filed allegations of unfair labor practices with the [NLRB] against both FCA and UAW" based on the precise conduct GM alleges in its Complaint. *Swanigan*, 938 F.3d at 786.

Accordingly, the Complaint should be dismissed because GM's RICO claims "represent nothing more than an NLRA claim masquerading as a RICO one." *Trollinger*, 370 F.3d at 611.

### B.     GM fails to plead mail and wire fraud predicate offenses.

Federal mail and wire fraud laws require proof that the defendant "devised a scheme to defraud, used the mails [or wires] in furtherance of that scheme, and intended to deprive the victim of money or property." *United States* v. *Petlechkov*, 922 F.3d 762, 766 (6th Cir. 2019). "A fraudulent scheme must include a *material misrepresentation*, which is a misrepresentation that could influence the decision of a 'person[] of ordinary prudence and comprehension.'" *Id.*

---

union did not bargain hard enough" or "fail[ed] to bargain in good faith . . . asserts a pure unfair labor practice, within the [NLRB's] primary jurisdiction").

GM does not even attempt to allege that FCA made a material misrepresentation, let alone with the particularity required by Rule 9(b)—namely, "(1) what the fraudulent statements were, (2) who made them, (3) when and where the statements were made, and (4) why the statements were fraudulent." *859 Boutique Fitness, LLC* v. *CycleBar Franchising, LLC*, 699 F. App'x 457, 462 (6th Cir. 2017).[14]  Courts routinely dismiss RICO claims based on mail and wire fraud where, as here, "[t]he Complaint contains no details whatsoever regarding the alleged misrepresentations." *Yagman* v. *Gen. Motors Co.*, 2014 WL 12562853, at *1 (C.D. Cal. July 3, 2014); *see Donley* v. *Seterus, Inc.*, 2016 WL 4138235, at *3 (E.D. Mich. Aug. 4, 2016) ("no allegations in the Complaint that defendant Fannie Mae made any misrepresentations"); *Molotky* v. *Wells Fargo Bank, N.A.*, 2018 WL 2197736, at *7 (W.D. Mich. Apr. 13, 2018) (same); *Crawford's Auto Ctr., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 945 F. 3d 1150, 1159 (11th Cir. 2019) ("allegations amounted to nothing more than 'vague allusions' to misrepresentations").

GM's mail and wire fraud claims also fail because GM does not allege that FCA made any misrepresentations with "fraudulent intent." *Donley*, 2016 WL 4138235, at *3; *see Gifford* v. *Meda*, 2010 WL 1875096, at *20 (E.D. Mich. May 10, 2010) (Borman, J.) (same; dismissing RICO claim); *Perlman* v. *Zell*, 185 F.3d

---

[14]  "[P]redicate acts of mail or wire fraud must be pled with particularity" under Rule 9(b).  *Grubbs* v. *Sheakley Grp., Inc.*, 807 F.3d 785, 804 n.5 (6th Cir. 2015).

850, 854 (7th Cir. 1999) ("The word 'fraud' in the mail-fraud statute means deliberate, material misrepresentations.").

### III. GM fails to adequately allege that FCA acquired an interest in the UAW through a pattern of racketeering activity in violation of Section 1962(b).

Even if GM could establish that the alleged prohibited payments had some influence on the UAW's negotiating positions, that is not enough. "A violation of § 1962(b) requires that the RICO defendant acquire or maintain an interest in, or control of, an enterprise through (or by way of) the pattern of racketeering activity." *Advocacy Org. for Patients & Providers* v. *Auto Club Ins. Ass'n*, 176 F.3d 315, 328 (6th Cir. 1999). Yet GM fails to allege (i) that FCA acquired an interest in or control of the UAW, and (ii) that GM suffered an independent "acquisition or control" injury distinct from any injury flowing from the alleged predicate acts.

### A. GM does not, and cannot, plausibly allege that FCA acquired an "interest" in or "control" of the UAW.

GM baldly asserts that FCA gained "control over the essential functions" of the UAW (Compl. ¶ 33) without providing any inkling of how that remarkable result was supposedly achieved. The UAW has more than 400,000 active members and has negotiated approximately 1,150 contracts with roughly 1,600 employers (*see* uaw.org/about), so the notion that FCA seized control of the UAW by virtue of the alleged prohibited payments is implausible on its face. Moreover, as a matter of law, GM's allegation that FCA gained some influence over certain UAW bargaining

-30-

positions does not remotely support a claim that FCA "acquire[d] or maintain[ed] an interest in or control of" the UAW.  *Advocacy Org.*, 176 F.3d at 328.

Section 1962(b) was enacted "to prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking."  *Stolow* v. *Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 246 (S.D.N.Y. 2003).  To that end, "[t]he type of 'interest' contemplated in § 1962(b) is not just any 'interest' but a proprietary one, such as the acquisition of stock, and the 'control' contemplated is the power gained over an enterprise's operations by acquiring such interest."  *Whaley* v. *Auto Club Ins. Ass'n*, 891 F. Supp. 1237, 1240 (E.D. Mich. 1995).  In other words, control requires "significant power over the functioning of the enterprise, comparable to that of a majority shareholder or someone with managerial control."  *Flood* v. *Makowski*, 2004 WL 1908221, at *28 (M.D. Pa. Aug. 24, 2004).  As explained in the leading RICO treatise, "'control' connotes domination, such as the 'kind of power that an owner of 51% or more of an entity would normally enjoy,'" and does not encompass a defendant's "mere influence[]" over an enterprise.  Hon. Jed. S. Rakoff & Howard W. Goldstein, RICO: Civ. & Crim. Law & Strategy § 1.06(2) (rev'd ed. 2019).

GM's allegation that, as a result of the alleged prohibited payments, the UAW occasionally "accede[d] to specific requests from FCA" (Compl. ¶ 33)—even if true—does not establish the level of operational control by FCA over the UAW that is required by Section 1962(b).  Courts have held that allegations that "Defendants

bribed [someone] to gain influence on [a company's] decision-making process" is not sufficient to plead that "Defendants gained any interest" in or control over the company. *Cont'l 332 Fund, LLC* v. *Albertelli*, 317 F. Supp. 3d 1124, 1144 (M.D. Fla. 2018); *see In re Am. Honda Motor Co., Inc. Dealerships Relations Litig.*, 941 F. Supp. 528, 556 (D. Md. 1996) (although "paying bribes" enabled defendants to "obtain[] some influence over discretionary activities," it does not constitute "acquiring a proprietary stake in an enterprise"); *Adams* v. *Cty. of Erie*, 2009 WL 3087214, at *10 (W.D. Pa. Sept. 23, 2009) (same).

Accordingly, GM's Section 1962(b) claim should be dismissed because GM does not—and cannot—allege that FCA "participat[ed] in the operation or management" of the UAW, *Rosemount Cogeneration Joint Venture* v. *N. States Power Co.*, 1991 WL 13729, at *7 (D. Minn. Jan. 18, 1991), or had "[a]ctual day-to-day involvement in [the UAW's] management and operations." *Griffin* v. *NBD Bank*, 43 F. Supp. 2d 780, 792 (W.D. Mich. 1999).

### B.     GM fails to allege a separate "acquisition or maintenance" injury.

Even if GM could allege the "interest" or "control" element, its Section 1962(b) claim fails because GM does not "allege an 'acquisition or maintenance' injury" that is "separate and apart from the injury suffered as a result of the predicate acts of racketeering activity." *Aces High Coal Sales, Inc.* v. *Cmty. Bank & Tr. of W. Ga.*, 768 F. App'x 446, 458 (6th Cir. 2019). Rather than allege that FCA's supposed

control over the UAW caused GM to incur an independent injury, GM alleges that it incurred the very same harm it purportedly incurred from the alleged predicate acts. (*Compare* Compl. ¶ 162, *with id.* ¶ 178.) As a result, GM's Section 1962(b) claim is legally defective and should be dismissed. *See Advocacy Org.*, 176 F.3d at 330 ("Plaintiffs here have alleged only injury resulting from the 'scheme to defraud' . . . (*i.e.*, the racketeering activity), rather than from the acquisition of an interest in or control of the alleged enterprise."); *Aces High*, 768 F. App'x at 458 (same).

## IV.   GM fails to state a RICO conspiracy claim.

To plead a RICO conspiracy claim, GM must "successfully allege all the elements of a RICO violation, as well as . . . 'the existence of an illicit agreement to violate the substantive RICO provision.'" *Grubbs*, 807 F.3d at 806. As in *Grubbs*, GM's "RICO conspiracy claim fails because [GM] failed to allege a substantive RICO violation in the first place." *Id.*

In addition, the only alleged co-conspirators identified by GM in the Complaint are the Individual Defendants, all of whom were employed by FCA at the relevant time. (Compl. ¶¶ 18-20.) But "an entity cannot conspire with its own agents or employees." *UFCW Local 1099* v. *City of Sidney*, 364 F.3d 738, 753 (6th Cir. 2004); *see Dimov* v. *EMC Mortg. Corp.*, 2010 WL 2506717, at *8 (E.D. Tenn. June 17, 2010) (same). GM's RICO conspiracy claim thus fails on this ground as well.

## V.     RICO's four-year statute of limitations bars GM's claims premised on conduct occurring before November 20, 2015.

"The statute of limitations for a federal RICO action is four years," which "begins to run when the plaintiff knew or should have known of his injury." *Kresch*, 2019 WL 3412901, at *11.  The Supreme Court "ha[s] been at pains to explain that discovery of the injury, *not discovery of the other elements of a claim*, is what starts the clock."  *Rotella* v. *Wood*, 528 U.S. 549, 555 (2000) (emphasis added).  A "plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim."  *Cancer Found., Inc.* v. *Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009); *see Levy* v. *BASF Metals Ltd.*, 917 F.3d 106, 108 (2d Cir. 2019) ("The relevant inquiry, however, is not whether Levy had discovered the identity of the defendants or whether she had discovered the manipulation scheme she alleges in her complaint.").

With the exception of any harm GM allegedly incurred solely as a result of its entry into the 2015 CBA—which was ratified on November 20, 2015 (Compl. ¶ 136), four years to the day before GM filed this action—all of GM's claims are time barred.  GM cannot resurrect its time-barred claims, which extend to conduct and injuries going all the way back to 2009, by seeking to rely on new predicate acts within the limitations period, or by claiming that fraudulent concealment tolled the statute of limitations.

### A.    GM knew or should have known of its injuries long before November 20, 2015.

The Complaint establishes that GM knew or should have known before November 20, 2015, of "special advantages [the UAW] conferred on FCA" and that the UAW did not provide "the same or similar advantages" to GM "despite it seeking similar programs and concessions." (Compl. ¶ 71.)  While FCA denies that any differences in the UAW's treatment of FCA and GM constitute injuries to GM that are directly attributable to the alleged prohibited payments, GM was well aware of such differences more than four years before it filed this action.

For example, GM alleges that it knew the UAW had committed to FCA's "world class manufacturing" program in 2011 and again in 2014, but that "these unique advantages were not made available to GM." (Compl. ¶¶ 6, 72-75.)  In fact, GM alleges that the UAW's commitments were publicly reported in FCA's 2014 Annual Report (Compl. ¶ 91), and that GM was expressly informed "during a meeting on August 13, 2014" with "officials in the UAW's GM Department . . . that [FCA's world class manufacturing program] was a superior program," but that the UAW would not "fully embrace[]" GM's efforts to establish a similar program. (Compl. ¶ 75.)  Because the limitations period accrues upon knowledge of injury, and not knowledge of the "alleged pattern of racketeering activity," *Kresch*, 2019 WL 3412901, at *11, it does not matter that GM did not know at the time that the UAW allegedly was induced to commit to FCA's world class manufacturing

program "through bribes." (Compl. ¶ 75.) Even where "a pattern of predicate acts
[is] complex, concealed, or fraudulent, . . . its discovery is not required before the
statute [of limitations] starts running." *Rotella*, 528 U.S. at 556; *see Álvarez-Maurás*
v. *Banco Popular of P.R.*, 919 F.3d 617, 627 (1st Cir. 2019) ("Although he did not
know the criminal methods Garcia had employed in order to steal his money,
[plaintiff] knew that his funds had disappeared.").[15]

Similarly, GM alleges that FCA obtained a "wage advantage" over GM
through the use of "Tier Two" and "temporary" workers. (Compl. ¶¶ 76-83.) But
GM alleges that it was aware of this purported injury "[b]y 2015," when it learned
that "FCA slashed its labor costs to $47," which GM claims was "$8 less on average
per hour than GM ($55)." (Compl. ¶ 83.) That data, including the Center for
Automotive Research chart included in the Complaint, was public long before
November 20, 2015. (Exs. 1 at 32, 2 at 22, 3.) Likewise, GM's assertion that, "[b]y
2015, Tier Two workers made up around 42 percent of the UAW membership at
FCA—double the proportion of Tier Two workers at GM" (Compl. ¶ 78), was
widely reported beginning *in January 2015*, including in a January 28, 2015 *Detroit
Free Press* article entitled "Fiat Chrysler has most 2nd-tier workers," which reported

---

[15] The same is true for GM's claims that FCA was able to negotiate more favorable
terms with the UAW regarding prescription medicines for FCA employees. GM
alleges that FCA obtained this agreement in 2014, and that GM tried, but failed, to
get the same agreement with the UAW. (Compl. ¶ 81.)

that "more than 42% of hourly workers at Fiat Chrysler" are "tier-two." (Ex. 4.)[16]

Again, GM's assertion that it did not discover the alleged racketeering activity until 2017 when indictments were unsealed does not prevent the RICO claims from accruing when GM's alleged injuries were incurred. As GM successfully argued in a prior case, "[t]he Supreme Court has rejected the argument that the RICO statute of limitations begins to run only when a claimant discovers both an injury and the racketeering activity." *Crown Chevrolet* v. *Gen. Motors, LLC*, 637 F. App'x 446 (9th Cir. 2016). Likewise, the Sixth Circuit rejected an argument virtually identical to the one GM makes here in a case brought by FCA employees arising out of the same alleged prohibited payments, emphasizing that, "even if 'considerable enquiry and investigation may be necessary' to discover the other elements" of a claim, "'discovery of the injury, not discovery of the other elements . . . is what starts the clock.'" *DeShetler* v. *FCA US, LLC*, 2019 WL 5095761, at *4 (6th Cir. Oct. 11, 2019). After stating that "this case is simple," the Sixth Circuit held that plaintiffs'

---

[16] *See also* Ex. 5 (3/23/2015 *Automotive News* article reporting the 42% figure); Ex. 6 (3/23/2015 *Reuters* article reporting that FCA employs "almost double the percentage of [Tier Two] workers [as] Ford and GM").

Courts routinely take "judicial notice of the fact that media articles . . . were published" at the motion to dismiss stage, particularly when considering statute of limitations issues. *City of Monroe Employees Ret. Sys.* v. *Bridgestone Corp.*, 399 F.3d 651, 662 n.10 (6th Cir. 2005); *see Staehr* v. *Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (taking "judicial notice of the fact that press coverage . . . contained certain information").

labor law claims accrued at injury (*i.e.*, when the allegedly unfavorable CBA "became effective"), not when plaintiffs discovered that former UAW employees "had accepted bribes to take FCA-friendly positions during collective bargaining negotiations." *Id.* at *3, 5. The same result should obtain here.

### B. GM cannot rely on predicate acts within the limitations period to resurrect its time-barred claims.

A plaintiff cannot use "new predicate act[s] as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179, 190 (1997). Thus, GM's allegation that, in 2016, FCA allegedly "approved the use" of "NTC funds to pay [the UAW's] expenditures" cannot revive GM's time-barred claim relating to injuries allegedly incurred before November 20, 2015. (Compl. ¶ 173.) *See Clair* v. *Bank of Am., N.A.*, 2016 WL 6092715, at *5 (W.D. Tenn. Oct. 19, 2016) ("continuation of alleged predicate acts does not extend the statute of limitations").

### C. The doctrine of equitable tolling based on fraudulent concealment cannot toll GM's claims.

To establish equitable tolling based on fraudulent concealment, GM must plead "with particularity" under Rule 9(b), *Fillinger* v. *Lerner Sampson & Rothfuss*, 624 F. App'x 338, 341 (6th Cir. 2015), that (i) "defendant concealed the conduct constituting the cause of action," (ii) "defendant's concealment prevented the plaintiff from discovering the cause of action within the limitations period," and

(iii) "plaintiff exercised due diligence in discovering the cause of action." *Precious Creation, Inc.* v. *Mercantile Bank Mortg. Co.*, 731 F. App'x 498, 501 (6th Cir. 2018). "[T]olling based on fraudulent concealment is to be narrowly applied," *Hill* v. *Dep't of Labor*, 65 F.3d 1331, 1336  (6th Cir. 1995)—it should be "the exception, not the rule." *Rotella*, 528 U.S. at 561.

**FCA did not conceal the conduct constituting the cause of action (Element 1).**  As discussed above, the Complaint makes clear that GM knew FCA obtained advantageous contract terms from the UAW that were not also provided to GM, and that GM believed its labor costs were higher as a result.  Whether GM thought at the time that the UAW agreed to advantageous contract terms with FCA as a result of "illegal payments" (Compl. ¶ 154) is irrelevant:  "concealment of motive alone" is not "sufficient to extend a limitations period."  *Hill*, 65 F.3d at 1336; *see DeShetler*, 2018 WL 6257377, at *8 (equitable tolling inapplicable where "within the statute-of-limitations period, Plaintiffs were aware of all the current allegations against UAW except that UAW may have been motivated or influenced by FCA bribes").

**FCA did not prevent GM from discovering its claim (Element 2).** "Fraudulent concealment requires a showing of *affirmative concealment*"—that is, "there must be some 'trick or contrivance intended to exclude suspicion and prevent inquiry.'" *Precious Creation*, 731 F. App'x at 501 (emphasis added).  Here, GM

asserts that the "bribery scheme was inherently self-concealing" (Compl. ¶ 151), but "fail[s] to point to any statements [by FCA] that 'lulled [it] into not filing [its] claim sooner.'"   *Precious Creation*, 731 F. App'x at 501.   Contrary to what GM is contending in this action (Compl. ¶¶ 151-53), it has successfully argued in other contexts that a defendant's "failure to 'own up' to the alleged conspiracy . . . is plainly insufficient to support tolling based on fraudulent concealment."   *Groth-Hill Land Co.* v. *Gen. Motors LLC*, 2013 WL 3853160, at *7 (N.D. Cal. July 23, 2013); *see Precious Creation*, 731 F. App'x at 501 ("unwillingness to divulge wrongful activities is not sufficient").   Indeed, tolling a "limitations period until an admission of wrongdoing . . . would effectively abolish all statutes of limitations."   *Greenhill* v. *Vartanian*, 917 F.3d 984, 988 (7th Cir. 2019).

**GM did not act diligently (Element 3).**  By its own admission, GM learned of the alleged "illegal payments" in "July 2017" when the "government announced indictments of Iacobelli" and others, and GM supposedly obtained definitive proof of its claims no later than January 2018, when "Iacobelli pled guilty" and his "plea agreement was released." (Compl. ¶¶ 152, 154.)  Yet GM sat on its hands for more than two years after the initial plea agreements before bringing this action.  GM's conclusory assertion that it took two years of unspecified "substantial research and analysis" to determine the "extent to which GM was injured" (Compl. ¶ 154) not only falls short of the requirements for pleading diligence, *e.g.*, *In re Refrigerant*

*Compressors Antitrust Litig.*, 795 F. Supp. 2d 647, 666 (E.D. Mich. 2011), but also is beside the point.  GM "did not need to know the extent" of its injuries "to file a claim."  *Bowerman* v. *UAW*, 646 F.3d 360, 367 (6th Cir. 2011).  "Were it otherwise, the statute [of limitations] would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief."  *Wallace* v. *Kato*, 549 U.S. 384, 391 (2007).

Moreover, GM's failure to act for more than two years after the initial plea agreements became public is not reasonable diligence as a matter of law.  *E.g.*, *Villarreal* v. *R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 972 (11th Cir. 2016) ("a plaintiff who does nothing for two years is not diligent"); *New Castle Cty.* v. *Halliburton NUS Corp.*, 111 F.3d 1116, 1126 (3d Cir. 1997) (Plaintiff "did not exercise reasonable diligence" where it "discovered NUS' alleged negligence . . . two years before [it] filed its lawsuit."); *Campbell* v. *Upjohn Co.*, 676 F.2d 1122, 1127-28 (6th Cir. 1982) (same).  In fact, FCA employees filed five separate actions against FCA and the UAW relating to the alleged prohibited payments based on the information available to GM *beginning in January 2018*—nearly two years before GM filed this action.[17]  Unlike the rank-and-file UAW members who filed suit

---

[17] *DeShetler* v. *FCA US LLC*, No. 18-cv-078, ECF#1, Compl. dated Jan. 11, 2018 (N.D. Ohio); *Sheets* v. *FCA US LLC*, No. 18-cv-085, ECF#1, Compl. dated Jan. 11, 2018 (N.D. Ohio); *Swanigan* v. *FCA US, LLC*, No. 18-cv-10319, ECF#1, Compl. dated Jan. 26, 2018 (E.D. Mich.); *UAW Local 961* v. *FCA*, No. 19-cv-10453, ECF#1,

before it, GM is a "very sophisticated company that operates a large . . . business" that competes directly with FCA, so GM had an even "greater incentive to diligently research and investigate any potential injuries it may suffer." *Prudential Ins. Co. of Am.* v. *U.S. Gypsum Co.,* 359 F.3d 226, 234 (3d Cir. 2004).

Far from diligently pursuing its claims, GM slept on its rights, waiting to file suit until after FCA publicly announced its intention to merge with Groupe PSA on October 31, 2019. Even if one could believe that GM's intention was not to disrupt that transaction, its strategic delay is inexcusable. "A plaintiff who requests the avoidance of the[] [statutes of limitations] owes the courts, the public, and his adversaries a duty of diligence in discovering and filing his lawsuit." *Campbell*, 676 F.2d at 1128. This case is not one of the "rare" and "compelling circumstances" that justifies equitable tolling. *Pletos* v. *Makower Abbate Guerra Wegner Vollmer, PLLC*, 2017 WL 3727173, at *6 (E.D. Mich. Aug. 30, 2017).

## VI. The state law claims for unfair competition and civil conspiracy should be dismissed.

Because GM's RICO claims are legally defective, the Court should "decline[] to exercise supplemental jurisdiction over the state-law claims." *Haygood* v. *Gen. Motors, LLC*, 2018 WL 3329574, at *5 (E.D. Mich. July 6, 2018) (Borman, J.). Even if the Court were to entertain them, the claims fail as a matter of law.

---

Compl. dated Feb. 14, 2019 (E.D. Mich.); *UAW Local 961* v. *UAW & FCA*, No. 19-cv-11780, ECF#1, Compl. dated June 14, 2019 (E.D. Mich.).

*First*, unfair competition under Michigan law does not apply to the conduct GM alleges here. Instead, an unfair competition claim "enforces two theories of liability," both in the product confusion context: "(1) palming off" the goods of another; and "(2) a false designation of origin." *Mahindra & Mahindra Ltd.* v. *FCA US, LLC*, 2019 WL 3294114, at *4 (E.D. Mich. Apr. 2, 2019). Neither theory applies here. Federal courts "should be extremely cautious about adopting 'substantive innovation' in state law," and, thus, "[w]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, [the court] should choose the narrower and more reasonable path." *Combs* v. *Int'l Ins. Co.*, 354 F.3d 568, 577-78 (6th Cir. 2004).[18]

*Second*, the unfair competition claim is barred by its three-year statute of limitations, *P & M Servs., Inc.* v. *Gubb*, 2008 WL 4185903, at *7 (E.D. Mich. Sept. 8, 2008), which accrues "when the plaintiff is harmed," not when it "discover[s] the elements of a cause of action." *Trentadue* v. *Buckler Lawn Sprinkler*, 479 Mich. 378, 388, 391 (2007); *see Frank* v. *Linkner*, 500 Mich. 133, 150 (2017) (same). As discussed, GM learned that the UAW "conferred" supposedly "unfair advantages" on FCA long before November 20, 2016 (three years before GM filed this action).

---

[18] Even if an unfair competition claim could apply outside the "product confusion" context, GM has not alleged that FCA did anything to "mislead the public" about GM, let alone that GM "los[t] some trade [*i.e.*, sold fewer vehicles] by reason of the defendant's deception." *Scrappost, LLC* v. *Peony Online, Inc.*, 2017 WL 697028, at *6 (E.D. Mich. Feb. 22, 2017).

*Third*, the civil conspiracy claim fails for three reasons:

- it is "dependent upon proof of an underlying, separate actionable tort," and thus "fails to the same extent" the unfair competition claim fails, *Wiggins* v. *Argent Mortg. Co.*, 945 F. Supp. 2d 817, 824 (E.D. Mich. 2013) (Borman, J.);

- "a corporation cannot conspire with its own agents or employees," *Upton* v. *City of Royal Oak*, 492 F. App'x 492, 504 (6th Cir. 2012); and

- the claim is time-barred under the three-year limitations period applicable to the underlying tort claim. *Mekani* v. *Homecomings Fin., LLC*, 752 F. Supp. 2d 785, 789 n.2 (E.D. Mich. 2010) (Borman, J.).

*Fourth*, both claims should be dismissed because they are premised on the notion that the alleged prohibited payments "violated the integrity of the collective bargaining process" (Compl. ¶ 192), which is an "unfair labor practice claim over which the NLRB has exclusive jurisdiction." *DeShetler*, 2018 WL 6257377, at *10.

## CONCLUSION

The Court should dismiss the Complaint with prejudice.

January 24, 2020                          Respectfully submitted,

                                          */s/ Steven L. Holley*
Thomas W. Cranmer (P25252)                Steven L. Holley (N.Y. 1917830)
Matthew P. Allen (P57914)                 Matthew J. Porpora (N.Y. 4402798)
MILLER, CANFIELD, PADDOCK                  Jacob E. Cohen (N.Y. 4787271)
  & STONE, PLC                            SULLIVAN & CROMWELL LLP

*Counsel for FCA US LLC*

-44-

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all parties of record, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:  None.

Respectfully submitted,

*/s/ Steven L. Holley*
Steven L. Holley (N.Y. 1917830)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Tel:  (212) 558-4000
*holleys@sullcrom.com*

*Counsel for FCA US LLC*

January 24, 2020