# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

GENERAL MOTORS LLC,
GENERAL MOTORS COMPANY,

                        Plaintiffs,

    against

FCA US LLC, FIAT CHRYSLER
AUTOMOBILES N.V., ALPHONS
IACOBELLI, JEROME DURDEN,
MICHAEL BROWN,

                      Defendants.

No. 19-cv-13429

Honorable Paul D. Borman
District Court Judge

Honorable David R. Grand
Magistrate Judge

## PLAINTIFFS' OPPOSITION TO FCA US LLC'S MOTION TO DISMISS THE COMPLAINT

    Plaintiffs General Motors LLC and General Motors Company (collectively, "GM") submit this Opposition in Response to FCA US LLC's ("FCA") Motion to Dismiss the Complaint (Dkt. 41) and the joinders filed by Michael Brown (Dkt. 43) and Jerome Durden (Dkt. 44).[1]

---

[1]  Unless otherwise noted, all emphasis has been added, and all citations, alterations, and internal quotation marks have been omitted. References to "Br." are to the memorandum in support of FCA's Motion to Dismiss (Dkt. 41). Defendant Fiat Chrysler Automobiles N.V. is referred to herein as "FCA NV."

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

FACTUAL BACKGROUND ....................................................................4

I.    FCA Bribed UAW Leaders to Secure Significant Labor Cost Advantages and Ensure that GM Would Sustain Higher Costs. ...................4

II.    FCA Orchestrated a Negotiation of the 2015 CBA Costing GM Billions.......................................................................................6

ARGUMENT .......................................................................................7

I.    GM Has Pled RICO Causation. ........................................................7

    A.    GM Has Pled But-For Causation. ..........................................8

    B.    GM Has Pled Proximate Cause...........................................11

        1.    GM Was Not the "Third" Victim In Line; It Was Directly Harmed by Defendants' Predicate RICO Acts. ........................11

        2.    The *Holmes* Considerations Are Not Present Here. .................18

II.    GM Has Pled Predicate Racketeering Acts. .......................................21

    A.    Violations of 29 U.S.C. § 186 Are Not Preempted by the NLRA. ....................................................................21

    B.    GM Has Pled Mail and Wire Fraud Predicate Offenses. ...................24

III.    GM Has Stated a Section 1962(b) Claim. ..........................................26

    A.    GM Has Pled That Defendants Exercised Control Over the UAW....................................................................26

    B.    GM Has Pled Section 1962(b) Damages. ..........................................29

IV.    GM Has Pled a Section 1962(d) Claim. .............................................30

V.    GM's RICO Claims Are Timely. ....................................................31

i

## TABLE OF CONTENTS (CONT'D)

**Page**

A.   GM's Claims Did Not Accrue Before Defendants' Conspiracy Was Revealed. ..................................................................32

B.   Defendants' Fraudulent Concealment Tolls the Limitations Period. .........................................................................35

1.   Defendants Wrongfully Concealed Their Misconduct. ............37

2.   Defendants Prevented GM from Discovering Its Claims. ........38

3.   GM Adequately Alleges Due Diligence. ................................39

VI.   GM Has Pled Unfair Competition and Civil Conspiracy Claims. ...............42

CONCLUSION ........................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aces High Coal Sales, Inc. v. Community Bank & Trust of West Georgia*,
768 F. App'x 446 (6th Cir. 2019) ...................................................................29

*Adkins v. Mireles*,
526 F.3d 531 (9th Cir. 2008) ........................................................................21

*Advocacy Organization for Patients and Providers v. Auto Club Insurance Ass'n*,
176 F.3d 315 (6th Cir. 1999) ...................................................................28, 29

*Alix v. McKinsey & Co.*,
404 F. Supp. 3d 827 (S.D.N.Y. 2019) .............................................................9

*Álvarez-Maurás v. Banco Popular of P.R.*,
919 F.3d 617 (1st Cir. 2019)..........................................................................34

*In re American Honda Motor Co., Dealerships Relations Litig.*,
941 F. Supp. 528 (D. Md. 1996)......................................................................28

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006).....................................................................9, 13, 14, 17

*Atl. Gypsum Co. v. Lloyds Int'l Corp.*,
753 F. Supp. 505 (S.D.N.Y. 1990) ................................................................11

*In re Auto. Parts Antitrust Litig.*,
No. 12-md-02311, 2014 WL 4272772 (E.D. Mich. Aug. 29, 2014)..................36

*Baisch v. Gallina*,
346 F.3d 366 (2d Cir. 2003) ..............................................................13, 17, 20

*Baker v. IBP, Inc.*,
357 F.3d 685 (7th Cir. 2004) (Br. )..................................................................19

*Barr Labs., Inc. v. Quantum Pharmics, Inc.*,
827 F. Supp. 111 (E.D.N.Y. 1993) .................................................................19

iii

*Brennan v. Chestnut*,
    973 F.2d 644 (8th Cir. 1992) ........................................................................22, 23

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008)..........................................................................8, 14, 15

*Butchers' Union, Local No. 498, United Food & Commercial Workers*
    *v. SDC Inv., Inc.*,
    631 F. Supp. 1001 (E.D. Cal. 1986) ...........................................................22, 23

*Campbell v. Upjohn Co.*,
    676 F.2d 1122 (6th Cir. 1982) ....................................................................41, 42

*Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*,
    559 F.3d 671 (7th Cir. 2009) .............................................................................35

*Carrier Corp. v. Outokumpu Oyj*,
    673 F.3d 430 (6th Cir. 2012) ......................................................................*passim*

*In re ClassicStar Mare Lease Litig.*,
    727 F.3d 473 (6th Cir. 2013) .........................................................................8, 12

*Commercial Cleaning Servs., LLC v. Colin Serv. Sys., Inc.*,
    271 F.3d 374 (2d Cir. 2001) .............................................................................20

*Continental 332 Fund, LLC v. Albertelli*,
    317 F. Supp. 3d 1124, (M.D. Fla. 2018)..........................................................28

*Copeland v. Penske Logistics LLC*,
    675 F.3d 1040 (7th Cir. 2012) .........................................................................21

*Cox v. Adm'r U.S. Steel & Carnegie*,
    17 F.3d 1386 (11th Cir. 1994) .........................................................................16

*Crown Chevrolet v. Gen. Motors, LLC*,
    No. 13-cv-01362-TEH, 2014 WL 246500 (N.D. Cal. Jan. 22,
    2014), *aff'd*, 637 F. App'x 446 (9th Cir. 2016) ...................................................34

*D. Penguin Bros. v. City Nat. Bank*,
    587 F. App'x 663 (2d Cir. 2014) .........................................................................7

*DeShetler v. FCA US, LLC*,
    790 F. App'x 664 (6th Cir. 2019) .....................................................................34

*DeShetler v. FCA US LLC*,
No. 3:18 CV 78, 2018 WL 6257377 (N.D. Ohio Nov. 30, 2018) ....................24

*Doe v. Miami Univ.*,
882 F.3d 579 (6th Cir. 2018) ................................................................26

*Dow Chem. Co. v. Exxon Corp.*,
30 F. Supp. 2d 673 (D. Del. 1998).......................................................19

*Dura Global Tech., Inc. v. Magna Donnelly Corp.*,
No. 07-10945, 2009 WL 3032594 (E.D. Mich. Sept. 18, 2009) ........................43

*Empress Casino Joliet Corp. v. Johnston*,
763 F.3d 723 (7th Cir. 2014) ................................................17, 18

*Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*,
964 F. Supp. 2d 875 (N.D. Ohio 2013) .............................................11

*Fremont Reorganizing Corp. v. Duke*,
811 F. Supp. 2d 1323 (E.D. Mich. 2011) ..........................................33

*Gamboa v. Ford Motor Co.*,
381 F. Supp. 3d 853 (E.D. Mich. 2019) ............................................24

*Gifford v. Meda*,
No. 09-13486, 2010 WL 1875096 (E.D. Mich. May 10, 2010)........................26

*Grange Mut. Cas. Co. v. Mack*,
6:06-555-DCR, 2009 WL 1036092 (E.D. Ky. Apr. 17, 2009)...........................32

*Griffin v. NBD Bank*,
43 F. Supp. 2d 780 (W.D. Mich. 1999) ...........................................29

*Hemi Group, LLC v. City of New York, N.Y.*,
559 U.S. 1 (2010)................................................................11, 16, 17

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992)..............................................................7, 18, 20

*Ikuno v. Yip*,
912 F.2d 306 (9th Cir. 1990) .....................................................3, 26

*State of Mich. ex rel. Kelley v. McDonald Dairy Co.*,
  905 F. Supp. 447 (W.D. Mich. 1995) ...................................................41

*Kirwin v. Price Commc'ns Corp.*,
  391 F.3d 1323 (11th Cir. 2004) ..........................................................30

*Kresch v. Miller*,
  No. 18-10025, 2019 WL 3412901 (E.D. Mich. July 29, 2019).........................34

*Levy v. BASF Metals Ltd.*,
  917 F.3d 106 (2d Cir. 2019) ...............................................................35

*Lutz v. Chesapeake Appalachia, L.L.C.*,
  717 F.3d 459 (6th Cir. 2013) ........................................................31, 39

*Mahindra & Mahindra Ltd. v. FCA US, LLC*,
  No. 18-cv-12645, 2019 WL 3294114 (E.D. Mich. Apr. 2, 2019)......................42

*United States ex rel. Marlar v. BWXT Y-12, L.L.C.*,
  525 F.3d 439 (6th Cir. 2008) ..............................................................25

*Martin v. Lake Cty. Sewer Co.*,
  269 F.3d 673 (6th Cir. 2001) ..............................................................21

*Mendoza v. Zirkle Fruit Co.*,
  301 F.3d 1163 (9th Cir. 2002) ............................................................20

*MHC, Inc. v. Int'l Union, United Mine Workers of Am.*,
  685 F. Supp. 1370 (E.D. Ky. 1988) .....................................................23

*Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*,
  359 F. Supp. 3d 546 (E.D. Tenn. 2019)............................................31, 33

*Nat'l Elec. Benefit Fund v. Heary Bros. Lightning Protection Co.*,
  931 F. Supp. 169 (W.D.N.Y. 1995).......................................................23

*New Castle Cty. v. Halliburton NUS Corp.*,
  111 F.3d 1116 (3d Cir. 1997) .......................................................41, 42

*New York Dist. Council of Carpenters Pension Fund v. Forde*,
  939 F. Supp. 2d 268 (S.D.N.Y. 2013) ..................................................44

*Norton-Children's Hosps., Inc. v. James E. Smith & Sons, Inc.*,
  658 F.2d 440 (6th Cir. 1981) ........................................................................41, 42

*In re OnStar Contract Litig.*,
  600 F. Supp. 2d 861 (E.D. Mich. 2009) ............................................................31

*P.M.F. Servs., Inc. v. Grady*,
  681 F. Supp. 549 (N.D. Ill. 1988)......................................................................27

*In re Packaged Ice Antitrust Litig.*,
  723 F. Supp. 2d 987 (E.D. Mich. 2010) (Borman, J.) ................................*passim*

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*,
  838 F.2d 1445 (6th Cir. 1988) ..........................................................................38

*Primary Ins. Agency Grp., LLC v. Nofar*,
  No. 320039, 2015 WL 1227767 (Mich. Ct. App. Mar. 17, 2015).....................43

*Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*,
  359 F.3d 226 (3d Cir. 2004) ......................................................................41, 42

*In re Refrigerant Compressors Antitrust Litig.*,
  92 F. Supp. 3d 652 (E.D. Mich. 2015) ........................................................38, 40

*Rosemount Cogeneration Joint Venture v. N. States Power Co.*,
  No. CIV. 4-90-279, 1991 WL 13729 (D. Minn. Jan. 18, 1991)........................28

*Rotella v. Wood*,
  528 U.S. 549 (2000)..........................................................................................32

*Royal Farms, Inc. v. Glob. Tropical Fresh Fruit Corp.*,
  No. 04-CV-4615, 2006 WL 8437472 (E.D.N.Y. Feb. 14, 2006) ......................37

*San Diego Building Trades Council v. Garmon*,
  359 U.S. 236 (1959)............................................................................21, 22, 23

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985)............................................................................................8

*Silverman v. Niswonger*,
  761 F. Supp. 464 (E.D. Mich. 1991) .................................................................26

*Sims v. Ohio Cas. Ins. Co.*,
   151 F. App'x 433 (6th Cir. 2005) ....................................................32, 33, 34, 35

*State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy*, *LLC*,
   107 F. Supp. 3d 772 (E.D. Mich. 2015) (Borman, J.) ...............................*passim*

*State Farm Mut. Auto. Ins. Co. v. Universal Health Grp., Inc.*,
   No. 14-cv-10266, 2014 WL 5427170 (E.D. Mich. Oct. 24, 2014) .............31, 35

*State of N.Y. v. Hendrickson Bros.*,
   840 F.2d 1065 (2d Cir. 1988) .............................................................................38

*Stryker Corp. v. Ridgeway*,
   No. 1:13-CV-1066; 1:14-CV-889, 2015 WL 5308038 (W.D. Mich.
   Sept. 10, 2015) ...................................................................................................44

*Sutliff, Inc. v. Donovan Cos.*,
   727 F.2d 648 (7th Cir. 1984) ............................................................................27

*Swanigan v. FCA US, LLC*,
   No. 18-cv-10319, 2018 WL 4030815 (E.D. Mich. Aug. 23, 2018) ...................24

*Talbot v. Robert Matthews Distrib. Co.*,
   961 F.2d 654 (7th Cir. 1992) ............................................................................22

*Teamsters Local 372, Detroit Mailers Union Local 2040 v. Detroit
   Newspapers*,
   956 F. Supp. 753 (E.D. Mich. 1997) ...........................................................22, 23

*Three Crown Ltd. P'ship v. Caxton Corp.*,
   817 F. Supp. 1033 (S.D.N.Y. 1993) .................................................................27

*Trollinger v. Tyson Foods, Inc.*,
   370 F.3d 602 (6th Cir. 2004) ............................................................................23

*Union Comm. Servs., Ltd. v. FCA Int'l Operations LLC*,
   No. 16-CV-10925, 2016 WL 6650399 (E.D. Mich. Nov. 10, 2016) ...................9

*United States v. Jamieson*,
   427 F.3d 394 (6th Cir. 2005) ............................................................................24

*Upton v. City of Royal Oak*,
   492 F. App'x 492 (6th Cir. 2012) ................................................................30, 44

*Venture Glob. Eng'g, LLC v. Satyam Computer Servs., Ltd.*,
    730 F.3d 580 (6th Cir. 2013) ...................................................37, 38, 39

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.*,
    714 F.3d 414 (6th Cir. 2013) ...........................................................*passim*

*Willie McCormick & Assocs., Inc. v. Lakeshore Eng'g Servs., Inc.*,
    No. 12-15460, 2013 WL 6713999 (E.D. Mich. Dec. 20, 2013)..................36, 38

*Willie McCormick & Assocs., Inc. v. Lakeshore Eng'g Servs., Inc.*,
    No. 12-15460, 2015 WL 5093785 (E.D. Mich. Aug. 28, 2015) ........................13

**Statutes**

18 U.S.C. § 1961(1) ............................................................................3, 21

18 U.S.C. § 1962 ............................................................................*passim*

18 U.S.C. § 1964(c) ..............................................................................7

29 U.S.C. § 186...........................................................................*passim*

Mich. Comp. Laws Ann. § 600.5855..................................................43

**Rules**

Fed. R. Civ. P. 8(a)................................................................................7

Fed. R. Civ. P. 8(d)(3)..........................................................................29

Fed. R. Civ. P. 9(b) ......................................................................7, 25, 26

Fed. R. Civ. P. 12(b)(6)...........................................................................7

## CONCISE STATEMENT OF ISSUES PRESENTED

1.      Plaintiff in a civil RICO action must allege injury "by reason of" a RICO violation, which means that defendant's predicate acts were both the but-for and proximate cause of those injuries. *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 487 (6th Cir. 2013); 18 U.S.C. § 1964(c). The Sixth Circuit has emphasized that "[p]roximate cause is a 'flexible concept'," including considerations such as "directness" and "foreseeability." *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 419 (6th Cir. 2013). GM alleges that but for Defendants' bribery, GM would have saved billions in additional labor-related costs. GM further alleges that Defendants' scheme directly harmed GM as intended by imposing on GM higher labor-related costs, none of which are derivative of or result from harm inflicted on others. Has GM alleged that it was injured "by reason of" a RICO violation?

**GM Answers:** Yes

**Defendants Answer:** No

2.      Violations of 29 U.S.C. § 186 are expressly defined as "racketeering activity" under the RICO Act. *See* 18 U.S.C. § 1961(1). Has GM alleged that Defendants engaged in predicate acts of racketeering activity, where its detailed allegations are based on Defendants' own admissions that they bribed UAW officials in violation of 29 U.S.C. § 186?

**GM Answers:** Yes

**Defendants Answer:** No

3.      RICO Section 1962(b) does not require a showing that the racketeer exercised formal or "proprietary" control. Has GM alleged claims under Section 1962(b), where it alleges that through bribery and related fraud, Defendants gained the ability to control the UAW's collective bargaining decisions and the UAW's implementation of collective bargaining agreements?

**GM Answers:** Yes

**Defendants Answer:** No

4.      Has GM alleged a RICO conspiracy claim, where its allegations are based on Defendants' admissions that they conspired to engage in racketeering activity?

**GM Answers:** Yes

**Defendants Answer:** No

5.      Are GM's RICO claims timely, where GM filed within the four-year RICO statute of limitations, less than two years after Defendants' scheme to corrupt the collective bargaining process was revealed, and in light of Defendants' fraudulent concealment of their scheme?

**GM Answers:** Yes

**Defendants Answer:** No

6.      Michigan unfair competition law is a "broad and flexible doctrine" addressing "the incalculable variety of illegal practices denominated as unfair competition." *Primary Ins. Agency Grp., LLC v. Nofar*, No. 320039, 2015 WL 1227767, at *5 (Mich. Ct. App. Mar. 17, 2015). Has GM alleged state law claims for unfair competition and conspiracy, where it alleges that Defendants orchestrated a years-long bribery scheme to harm their competitor?

**GM Answers:** Yes

**Defendants Answer:** No

## STATEMENT OF CONTROLLING
## OR MOST APPROPRIATE AUTHORITIES

**I.     GM Has Pled RICO Causation**

1.   *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008)

2.   *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473 (6th Cir. 2013)

3.   *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414 (6th Cir. 2013)

**II.    GM Has Pled Predicate Racketeering Acts**

4.   *Butchers' Union, Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.*, 631 F. Supp. 1001 (E.D. Cal. 1986)

5.   *Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853 (E.D. Mich. 2019)

6.   *Teamsters Local 372, Detroit Mailers Union Local 2040 v. Detroit Newspapers*, 956 F. Supp. 753 (E.D. Mich. 1997)

**III.   GM Has Stated a Section 1962(b) Claim**

7.   *Ikuno v. Yip*, 912 F.2d 306 (9th Cir. 1990)

8.   *Sutliff, Inc. v. Donovan Cos.*, 727 F.2d 648 (7th Cir. 1984)

**IV.    GM Has Pled a Section 1962(d) Claim**

9.   *Kirwin v. Price Commc'ns Corp.*, 391 F.3d 1323 (11th Cir. 2004)

**V.     GM's RICO Claims Are Timely**

10.  *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012)

11.  *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987 (E.D. Mich. 2010) (Borman, J.)

12.  *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459 (6th Cir. 2013)

13. *Sims v. Ohio Cas. Ins. Co.*, 151 F. App'x 433 (6th Cir. 2005)

14. *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy*, *LLC*, 107 F. Supp. 3d 772 (E.D. Mich. 2015) (Borman, J.)

**VI.** **GM Has Pled Unfair Competition and Civil Conspiracy Claims**

15. *Primary Ins. Agency Grp., LLC v. Nofar*, No. 320039, 2015 WL 1227767 (Mich. Ct. App. Mar. 17, 2015)

## **INTRODUCTION**

As already conclusively established through admissions, beginning in 2009 Defendants successfully bribed UAW officials to obtain "benefits, concessions, and advantages" for FCA. As intended, FCA's illegally purchased advantages were denied to GM. As a result of its bribery, by early 2015 FCA had imposed a cost structure on GM that was approximately $8 higher per hour than FCA's labor costs, resulting in billions of dollars in damages to GM.

Then, in 2015, Defendants used their bribes to ensure that FCA would be selected as the "lead" company in the 2015 Collective Bargaining Agreement ("CBA") negotiations. Defendants used FCA's "lead" position to quickly negotiate a CBA with the UAW that, through pattern bargaining, would impose significantly greater (and asymmetrical) costs upon GM. The CBA paid the UAW far more than the UAW had even sought because FCA was buying something even more valuable: support for FCA's desired merger with GM. Over a nearly decade-long period, Sergio Marchionne and Defendants directed a classic racketeering scheme (implicating numerous RICO predicate acts, including mail and wire fraud and providing items of value to union officials) with the goal of buying FCA advantages in labor costs and efficiency, while ensuring higher costs to GM.

Faced with these indisputable facts (first brought to light by the U.S. Attorney for the Eastern District of Michigan beginning in 2017), FCA vainly attempts to

recast GM's allegations into claims that have not been brought. FCA asserts that GM is suing for lost "market share," is a "bystander," has only been "derivative[ly]" harmed, and that GM was only the "third in line" victim of FCA's bribery scheme (behind UAW members and the IRS). None of these characterizations is remotely accurate. GM's detailed allegations establish that FCA's bribery scheme targeted and directly harmed GM for years by imposing *higher costs* on GM in at least the areas of labor costs related to workforce composition, manufacturing costs, and prescription drug costs. When binding Sixth Circuit and other instructive law is properly applied to these well-pled allegations, FCA's motion must be denied.

*First*, GM sufficiently alleges that Defendants' RICO violations were both the but-for and proximate cause of GM's injuries. Defendants' causation arguments ignore GM's express allegations that but-for Defendants' bribery, GM (1) would have had lower labor, manufacturing, and prescription drug costs in the years leading up to the 2015 CBA, and (2) would not have been saddled with more than $1 billion in additional labor costs in the 2015 CBA. (Compl. ¶¶ 6-7, 71-83, 132-38, 178.) FCA's scheme to buy itself UAW support and competitive advantages while increasing GM's costs makes perfect economic sense. While the 2015 CBA resulted in some cost increases to FCA, Marchionne made abundantly clear that from FCA's perspective, the "economics of the [2015 CBA] deal are almost irrelevant" because

they "pale in comparison given the magnitude of the potential synergies and benefits" of a merger with GM. (*Id.* ¶ 129.)

FCA's contention that GM cannot sue because it is "[a]t best" the "third" victim in line is also without merit. (Br. at 15.) GM does not allege any type of derivative harm. Instead, GM alleges a direct link between the RICO predicate acts (bribery payments to UAW officials) and the intended imposition of higher costs and other damages on GM. In any event, the Sixth and other Circuits have made clear that there can be multiple and varying "direct" victims of a RICO scheme—all of whom have standing to sue. *See e.g., Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 419, 421-22 (6th Cir. 2013) (RICO proximate cause is a "flexible concept" considering factors such as "directness" and "foreseeability"; recognizing potential for multiple and varying direct victims).

*Second*, the NLRB does not have exclusive jurisdiction over any of the alleged predicate acts or any of GM's claims. To the contrary, Congress expressly provided that violations of 29 U.S.C. § 186 constitute predicate acts under RICO and ***no case law*** suggests that § 186 violations cannot serve as RICO predicate acts. *See* 18 U.S.C. § 1961(1).

*Third*, GM has stated claims under Sections 1962(b) and 1962(d). No formal ownership or "proprietary" control is required to allege claims under § 1962(b), as FCA suggests. *See Ikuno v. Yip*, 912 F.2d 306, 310 (9th Cir. 1990) (control "does

not require formal control such as the holding of majority stock or actual designation as an officer or director."). Here, FCA successfully bribed top UAW leaders to influence critical and long-term binding decisions of the UAW. No more is required.

*Fourth*, GM's RICO claims are timely. GM "did not discover and could not have discovered the fraud scheme" or GM's resulting injuries before January 2018, when Iacobelli revealed Defendants' scheme to corrupt the collective bargaining process. *See State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy*, *LLC*, 107 F. Supp. 3d 772, 793 (E.D. Mich. 2015) (Borman, J.). Separately, and equally significant, GM alleges that Defendants fraudulently concealed their illegal scheme, preventing GM from discovering its claims. (Compl. ¶¶ 149-55.)

*Fifth*, GM has alleged state law claims for unfair competition and civil conspiracy. Michigan law makes clear that unfair competition is a broad and flexible doctrine addressing a variety of forms of unfair competition.

## FACTUAL BACKGROUND

## I.    FCA Bribed UAW Leaders to Secure Significant Labor Cost Advantages and Ensure that GM Would Sustain Higher Costs.

Starting in 2009, FCA gave millions of dollars to UAW officials to obtain advantages in negotiating and implementing CBAs. (Compl. ¶¶ 3, 57, 63-64, 71, 148.) FCA funneled this money primarily through the UAW-FCA joint training center, called the National Training Center ("NTC"). (*Id.* ¶¶ 3, 35, 63.) Marchionne,

CEO of FCA and FCA NV, authorized and participated in this scheme. (*Id*. ¶¶ 5, 21, 58, 63-64, 100, 173(a), 174.)

It was not until January 2018, when Defendant Iacobelli entered into a plea agreement, that GM became aware that FCA had bribed UAW officials to "obtain benefits, concessions, and advantages for FCA" in its relationship with the UAW. (*Id.* ¶ 154.)

After FCA embarked on its bribery scheme, it negotiated two CBAs with FCA, in 2011 and in 2015. (*Id*. ¶¶ 3, 71.) In return for its bribes, FCA obtained labor cost advantages from the UAW while ensuring that such advantages were denied to GM, causing GM to incur higher costs and other damages. (*Id*. ¶ 71.)

For example, through bribery, FCA was able to secure flexibility with respect to its workforce composition, including the elimination of limits on the hiring of less expensive Tier Two employees (*id*. ¶¶ 6, 76-78) and temporary workers (*id*. ¶ 79), while ensuring that this flexibility was denied to GM. Through their bribes, Defendants were also able to reduce FCA's manufacturing and prescription drug costs, while ensuring that such costs reductions were denied to GM. (*Id*. ¶¶ 53, 72, 75, 81.) The benefit to FCA and detriment to GM was enormous and helped FCA buy a labor cost advantage that transformed it from worst-in-class in labor costs in 2006 (when Chrysler's average hourly labor costs were $75.86) to best-in-class by 2015, when FCA's average hourly costs plummeted to *$47.00*. (*Id*. ¶¶ 82-83.)

## II.     FCA Orchestrated a Negotiation of the 2015 CBA Costing GM Billions.

In 2015, Marchionne declared that he intended to "force" a merger with GM and enlisted the support of bribed UAW leaders, including the UAW's President, Dennis Williams. (Compl. ¶¶ 7, 116.) Marchionne utilized Defendants' bribery scheme to induce the UAW to select FCA as the "lead" company with which the UAW would negotiate during 2015 bargaining so that FCA could take advantage of the UAW's longstanding practice of pattern bargaining. (*Id*. ¶¶ 7, 117-23.) Through pattern bargaining, the UAW pressures the other automakers to accept the same pattern terms as the lead or face a costly strike. (*Id*. ¶¶ 118-19, 135.)

On September 13, 2015, to the surprise of the industry and analysts, the UAW selected FCA as the lead, which selection was the product of bribery. (*Id*. ¶¶ 124-26.) With CEO Marchionne as the chief negotiator, FCA quickly reached a CBA designed, through pattern, to impose enormous costs on GM. (*Id*. ¶¶ 132, 134.) "In contrast to UAW's 'Presidential Demand' to GM during the original negotiations (under $1 billion), the pattern from the FCA-UAW agreement was forecast to cost GM more than double the entire 'Presidential Demand.'" (*Id*. ¶ 132.) The power of pattern bargaining forced GM to largely concede to FCA's agreement to avoid a costly strike. (*Id*. ¶¶ 135, 137.) The final CBA cost GM about $1 billion more than the deal GM believed it had reached with the UAW before the UAW corruptly selected FCA as the lead. (*Id*. ¶ 137.)

6

While the 2015 CBA cost FCA too, those incremental costs paled in comparison to the savings Marchionne touted could be achieved by FCA from an FCA NV-GM merger, which Marchionne estimated at "nearly *$5 billion*" annually. (*Id.* ¶ 103.) FCA needed the UAW to approve the merger. (*Id.* ¶¶ 100, 111.) As Marchionne explained post 2015 CBA, "the 'economics of the [FCA/UAW] deal are *almost irrelevant*' because the costs 'pale in comparison given the magnitude of the potential synergies and benefits' of a combination" with GM. (*Id.* ¶ 129.)

## ARGUMENT

"When reviewing a motion to dismiss under Rule 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1001-02 (E.D. Mich. 2010) (Borman, J.). This same standard applies to RICO. While fraud-based predicate acts must be pled with particularity under Rule 9(b), the "other elements of a RICO claim . . . need satisfy only the 'short and plain statement' standard of Rule 8(a)." *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 666 (2d Cir. 2014).

## I.    GM Has Pled RICO Causation.

A RICO plaintiff must show that he was "injured in his business or property by reason of" a RICO violation, 18 U.S.C. § 1964(c), meaning that the defendant's predicate acts were both the but-for and proximate cause of those injuries. *Holmes*

*v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 267-68 (1992). "The Supreme Court has emphasized that this provision, like the RICO statute generally, is to be '***liberally construed*** to effectuate the statute's remedial purposes.'" *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 487 (6th Cir. 2013) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985)). Proximate cause "is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008). As the Sixth Circuit has made clear, "proximate cause is not . . . the same thing as a sole cause." *Wallace*, 714 F.3d at 422. GM's allegations easily satisfy these standards.

### A. GM Has Pled But-For Causation.

To establish but-for causation, a plaintiff need only allege that it would not have been injured in the absence of the defendant's predicate RICO acts. That is exactly what GM has alleged. GM alleges that "through its bribery, FCA ensured that . . . special advantages were conferred on FCA" while the "same or similar advantages were not provided to" GM. (Compl. ¶ 71.) FCA acquired the lead negotiation position "through the years-long bribery scheme," then used that position and its control of the UAW to "structure[] and agree[] to . . . CBA terms to force unanticipated higher costs on GM." (*Id.* ¶¶ 125, 134.) But for FCA's predicate acts enabling FCA to accomplish this scheme, GM would not have suffered these injuries.

FCA ignores these allegations and attempts to introduce a hypothetical narrative outside the pleadings. In something akin to a closing argument, FCA claims that the UAW would have agreed to the 2015 CBA regardless of the bribes, arguing that "GM does not . . . contend that the UAW's acceptance [of the 2015 CBA] was a product of the alleged prohibited payments." (Br. at 12.) That position ignores the express allegations of the Complaint: GM specifically alleges that the 2015 CBA, from selection of the "lead" to the overly-rich terms to its consummation, was a product of bribery. (Compl. ¶¶ 7, 125, 133-34.) Given the pleadings, the Court cannot conclude the UAW would have targeted FCA and obtained an *identical* 2015 CBA irrespective of FCA's bribes. *See Packaged Ice*, 723 F. Supp. 2d at 1002 (court must accept as true plaintiff's allegations and draw all reasonable inferences in favor of the plaintiff).

FCA's miscasting of the Complaint also renders its authorities inapposite. (*See* Br. at 12 (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458-59 (2006)) (no causation where the defendant "could have lowered its prices *for any number of reasons unconnected* to the asserted pattern of fraud"), *Alix v. McKinsey & Co.*, 404 F. Supp. 3d 827, 837 (S.D.N.Y. 2019) (no causation where plaintiff "fail[ed] to allege facts plausibly suggesting a connection between Defendants' alleged pay-to-play conduct and AlixPartners' losses."), and *Union Comm. Servs., Ltd. v. FCA Int'l Operations LLC*, No. 16-CV-10925, 2016 WL 6650399, at *5 (E.D. Mich.

Nov. 10, 2016) (plaintiff did not offer "*any* allegations" that the bribed officials "were in a position to influence the market structure" at issue).) Unlike the plaintiffs in these cases, GM alleges a direct connection between wrongdoing and injury: FCA bribed key UAW officials specifically to buy UAW support and impose higher costs on GM. (Compl. ¶¶ 6-7, 64, 71, 83, 92, 117, 125, 132, 134, 178.) In a variation on its closing argument, FCA posits that GM's causation allegations "make no economic sense." (Br. at 13.) This, too, ignores the allegations. Before 2015, FCA bribed the UAW to lower FCA's costs to gain a competitive advantage. In the 2015 CBA, with Marchionne's knowledge of a pending federal bribery investigation, Marchionne "structured and agreed to these CBA terms *to force unanticipated higher costs on GM, which had a higher degree of more costly Tier One workers*." (Compl. ¶ 134.) Because GM had a higher number of Tier One workers—a fact well known to FCA at the time and itself the result of Defendants' bribery—GM incurred greater costs than FCA. Defendants do not grapple with these clear allegations.

FCA contends that the Complaint does not "explain[] why increased labor costs would make GM more amenable to merging with FCA." (Br. at 13.) This is also inaccurate. GM alleges that: (1) FCA engineered the 2015 CBA to weaken GM by significantly increasing its cost structure thus rendering it more amenable to a merger in order to achieve economies of scale (Compl. ¶¶ 7, 116-17, 129, 134); and

(2) Marchionne advertised that higher labor costs from the 2015 CBA would be recouped through merger synergies with GM. (*See id.* ¶¶ 103, 129.)

In this context, FCA's authorities do not hold up to scrutiny. (Br. at 13, citing *Atl. Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) and *Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp*., 964 F. Supp. 2d 875, 889 (N.D. Ohio 2013).) In *Gypsum*, plaintiffs did not allege how defendants would benefit from extending credit to cause a business to fail. In *Florida Carpenters*, plaintiffs alleged no "facts supporting a plausible inference that [defendants'] performance and future prospects were in any way tied to" defendants' conduct. 964 F. Supp. 2d at 889. GM's Complaint stands in stark contrast to these cases.

## B. GM Has Pled Proximate Cause.

### 1. GM Was Not the "Third" Victim In Line; It Was Directly Harmed by Defendants' Predicate RICO Acts.

FCA's proximate cause arguments misrepresent governing law and GM's allegations. FCA states it "would ***not matter*** if the harm allegedly suffered by GM were the 'foreseeable consequence' of FCA's alleged conduct." (Br. at 19.) Sixth Circuit law is to the contrary. As that Court explained after *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010), the Supreme Court "read RICO as incorporating the many traditional proximate-cause considerations found at common law," one of which "is ***foreseeability***—whether the plaintiff's injury was a foreseeable consequence of the conduct alleged." *Wallace*, 714 F.3d at 419; *see also*

11

*ClassicStar*, 727 F.3d at 487 (RICO plaintiffs "need only show that the defendants' wrongful conduct was a substantial and foreseeable cause of the injury and the relationship between the wrongful conduct and the injury is logical and not speculative.").

GM's proximate cause allegations do not hinge on whether the harm was merely foreseeable, however. The Complaint alleges that GM was directly victimized: (1) FCA, "through its bribery," obtained various labor cost advantages and, as part of the scheme, the UAW ensured that GM incurred higher labor costs; and (2) in the 2015 CBA, FCA imposed outsized and asymmetrical costs on GM in an attempt to force a merger with FCA NV. (Compl. ¶¶ 7, 71, 82-83, 132, 134, 178.) A direct link between the RICO predicate acts (FCA's bribes) and the harm to GM (higher costs and other damages) has been alleged in detail.

FCA constructs an artificial chain of victims harmed by the bribes that cannot be gleaned from the Complaint—first, the UAW members; second, the IRS; and then, "third in line," GM. From there, Defendants claim that GM's harm is derivative and indirect. (Br. at 15-16.) That construct fails on several fronts.

First, FCA's argument rests on the faulty premise that there can be only ***one*** direct victim of a RICO conspiracy. (Br. at 15-16.) But a RICO enterprise can have several different targets and several direct harms. Indeed, "[n]o precedent suggests that a racketeering enterprise may have only one 'target,' or that only a primary

target has standing." *Baisch v. Gallina*, 346 F.3d 366, 375 (2d Cir. 2003); *see also Wallace*, 714 F.3d at 422 (concluding that **both** lender and the borrower had direct injuries in RICO case).

Second, FCA's chain of causation is not supported by GM's allegations. GM alleges that as part of the bribery scheme, FCA not only obtained cost advantages, but also had such cost advantages expressly **denied** to GM. (Compl. ¶¶ 6, 71-72, 75, 78-81, 83, 92, 178.) The scheme directly imposed on GM higher labor-related costs, none of which are derivative or result from harm inflicted on others. *See Willie McCormick & Assocs., Inc. v. Lakeshore Eng'g Servs., Inc.*, No. 12-15460, 2015 WL 5093785, at *5 (E.D. Mich. Aug. 28, 2015) (proximate cause adequately alleged where "Plaintiff's harm from th[e] scheme was in no way contingent upon the harm suffered by" third party).

FCA avers GM's supposed derivative harm because "the second victim in the chain of causation was the IRS." (Br. at 15-16.) FCA again misreads the Complaint. GM is not suing to recover for Defendants' tax fraud on the IRS or claiming harm caused by that underpayment of taxes. Put simply, the harm to GM (higher labor costs) is separate and distinct from the harm to the IRS (tax underpayments by the co-conspirators).

*Anza*, on which FCA repeatedly relies, only demonstrates the flaw in FCA's "first, second, third" chain of causation. There, Ideal Steel Supply brought RICO

claims against its competitor National Steel Supply, alleging that National underpaid New York sales taxes, used the savings to offer lower prices, and thereby reduced Ideal's sales. 547 U.S. at 457-58. This alleged causal chain entailed multiple steps: (1) National underpaid taxes; (2) which allowed National to reduce prices; and (3) caused Ideal to lose sales when customers switched to National. In finding no proximate cause, the Supreme Court noted that National "could have lowered its prices for any number of reasons" unrelated to the tax fraud and "Ideal's lost sales could have resulted from factors other than [National's] alleged acts of fraud." *Id*. at 458-59.

By contrast, GM's claims do not require such conjecture. GM alleges that FCA's bribes were paid not only to secure lower labor costs for FCA, but also to ensure the implementation of higher costs upon GM. (Compl. ¶¶ 6-7, 71-83, 132-38, 178.) Unlike *Anza*, where the plaintiff's lost profit damages were derivative of and reliant on the tax fraud, FCA directly targeted GM and GM's cost-based injuries do not flow through any other victim. GM alleges that Defendants defrauded the government to avoid detection (Compl. ¶ 65), not to use the proceeds from that fraud to hurt GM.

FCA cites *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) to argue that there is no "direct causal chain" between Defendants' predicate acts and GM's damages. (Br. at 23-25.) But *Bridge* demonstrates exactly why GM is entitled

14

to relief. In *Bridge*, respondents were auction bidders who sued their competitor for rigging a county's bidding process to improperly receive more tax liens than the respondents. *Id*. at 642-43. Endorsing "*Holmes'* instruction that proximate cause is generally not amenable to bright-line rules," the Supreme Court found "[r]espondents' alleged injury—the loss of valuable liens [from the county auction]—[was] the direct result of petitioners' fraud . . . [and] a foreseeable and natural consequence of petitioners' scheme." *Id*. at 658-59. GM's harm here—inflated labor-related costs directly inflicted upon GM by FCA as intended by the scheme—is likewise directly attributable to FCA's bribery scheme.

The cases "brought by economic competitors" that FCA string-cites are irrelevant. (Br. at 17-18.) Each case involved a RICO plaintiff seeking to recover for lost sales, price manipulation, or lost market share. (*Id*.) Though FCA repeatedly mischaracterizes GM's allegations, GM is not seeking to recover damages from lost sales, lost business, or lost market share. (Compl. ¶¶ 4, 7, 71, 83, 132, 134, 137-38, 178.) FCA does not cite a single case dismissing a RICO claim where plaintiff alleges a direct link between the predicate acts and the plaintiff's higher costs, the imposition of which was the express purpose of the RICO enterprise. And while FCA may argue that causes other than the bribery scheme may have contributed to GM's higher costs (Br. at 23 ("[a]ny disparity in average hourly wages between FCA and GM could be due to a wide variety of reasons")), even if true, it does not sever

proximate cause. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994) (holding, in RICO case involving bribery of union officials, that although other causes may also have contributed to CBA concessions, it did not sever proximate cause).

Defendants fail to cite the Sixth Circuit's instructive *Wallace* decision demonstrating GM has pled proximate cause. 714 F.3d at 419. There, the plaintiff-homeowner received a fraudulent home appraisal. The homeowner brought a Section 1962(c) claim, alleging that defendants (the lender, the mortgage broker, and the broker's principals) inflated the appraisal to push him into a high-cost loan. *Id*. at 415-17. In reviewing the district court's grant of summary judgment for lack of proximate cause, the Sixth Circuit noted that "foreseeability" remains a "consideration" when analyzing proximate causation under RICO, even after *Hemi*, and that "proximate cause is a 'flexible concept' [that] must be assessed on a case-by-case basis." *Id*. at 419. In reversing, the court concluded that Wallace had raised a fact issue on proximate cause "under the directness standard." It reasoned that "[o]nce we accept that Wallace was an intended target of the defendants' alleged scheme to induce borrowers to agree to loans with high interest rates and other unfavorable terms—as we must at this stage in the litigation—the link between the scheme and the type of injury Wallace suffered is plain to see." *Id*. at 420. The Sixth Circuit rejected the district court's finding that Wallace could not show causation

because the falsely-inflated appraisal "harm[ed] only the lender." *Id*. at 421-22. Whatever harm to the lender, "a borrower [also] has much to lose from entering into a too-big loan." *Id.*; *see also Baisch*, 346 F.3d at 375 ("No precedent suggests that a racketeering enterprise may have only one 'target,' or that only a primary target has standing.").

The harm to GM was not collateral damage from a scheme directed elsewhere. GM sat "in the center of the target of the conspiracy." *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 733 (7th Cir. 2014). In *Johnston*, another analogous case, plaintiffs-casinos alleged that defendants-racetrack operators bribed then-Governor Blagojevich to sign a bill that would redistribute 3% of casino revenues to the racetracks. *Id.* at 725, 729-733. The "heart of the matter" was whether the "alleged agreement to bribe the governor" was "sufficiently immediate to serve as a legal cause of the Casinos' injuries for purposes of RICO?" *Id.* at 733. The Seventh Circuit concluded that it was. The court distinguished *Anza* on the basis that *Anza* involved "a multi-step analysis" to get from "defendants' underpayment of taxes, to their reduced prices, to the plaintiff's loss of sales." *Id.* The Seventh Circuit also distinguished *Hemi*, where the predicate fraud was that defendants "fraudulently avoided filing certain tax reports with the State regarding cigarette sales" and thus "avoid[ed] paying taxes they owed the [plaintiff] City." *Id.* But in *Johnston*, "[t]here was no more directly injured party standing between the Casinos and the alleged

wrongdoer," because "[t]he object of the conspiracy was to bring the [Act at issue] into effect in exchange for a cash bribe; the Act harmed the Casinos to the tune of 3% of their revenue." The Casinos, like GM in this case, "thus sat in the center of the target of the conspiracy." *Id.* at 733-34.

Because GM alleges it was the "intended target" of Defendants' scheme, "the link between the scheme" (FCA's bribery) and GM's injury (higher labor costs) "is plain to see." The fact that Defendants may also have separately injured the UAW membership or the IRS does not defeat proximate cause as to GM's distinct harm.

### 2.    The *Holmes* Considerations Are Not Present Here.

In large part for reasons already discussed, FCA's extensive *Holmes* arguments are easily rejected.

**<u>No Difficulty in Ascertaining Damages</u>**. It is not difficult to determine that GM's damages are attributable to Defendants. GM has identified specific labor concessions that FCA ensured GM would not receive, resulting in higher and calculable labor costs to GM. (Compl. ¶¶ 6, 71-83, 178.) GM has alleged that as a result of Defendants' unlawful conduct, it had to accept a 2015 CBA that cost "over $1 billion more than the deal GM believed it had reached with the UAW" before FCA was selected as lead. (*Id*. ¶ 137.) Contrary to FCA's false claims that recovering market-share damages "is precisely what GM seeks to do here," GM's damages are ***not*** speculative losses of "market share" or "lost sales," but rather reflect higher costs

imposed directly on GM through the conspiracy. (Br. at 15, 23-24.) FCA avers that GM intends to prove its damages simply by identifying the "labor cost disparity" and then "contend[ing] that the *entire* difference represents damages to GM." (Br. at 22.)[2] This contention is both inappropriate at the motion to dismiss stage and inaccurate. GM intends to trace the higher costs imposed on it from the racketeering conspiracy itself, which may or may not involve a comparison of cost disparity depending on what discovery reveals. No more on "damage theory" is required at this stage of the litigation.

**No Complicated Rules Apportioning Damages**. Because GM suffered direct harm by way of higher labor costs and GM is not seeking to recover damages for others' distinct harms, there is no risk of complicated rules apportioning damages. GM's allegations are thus a far cry from FCA's authorities, which involved multiple inferential steps in the causation chain and sought lost sales.[3]

---

[2]   For this reason, FCA's reliance on *Baker v. IBP, Inc.*, 357 F.3d 685 (7th Cir. 2004) (Br. at 22), is misplaced. There, employees-plaintiffs alleged that defendant's hiring of illegal immigrants "expanded the pool of available labor and thus depressed" their wages. *Id.* at 689-90. The Seventh Circuit was skeptical, because "establishing that unlawful hiring of aliens caused a diminution in [plaintiffs'] wages" would be "very hard to attribute to particular [predicate RICO violations]." *Id.* at 692.  GM is not alleging injuries stemming from supply and demand distortions.

[3]   *See Dow Chem. Co. v. Exxon Corp.*, 30 F. Supp. 2d 673, 678, 695-96 (D. Del. 1998) (Dow alleged that Exxon filed fraudulent patents, which allegedly led the Patent Office to grant those patents, which allegedly improved Exxon's position in the polyethylene market, which in turn allegedly decreased Dow's sales); *Barr Labs., Inc. v. Quantum Pharmics, Inc.*, 827 F. Supp. 111, 113, 116 (E.D.N.Y.

**No Less Remote Plaintiffs Who Can Vindicate the Law**. This concern is also not present. FCA's arguments that the U.S. government is better positioned to address the alleged "tax fraud" and that the UAW membership is better positioned to address "allegations of unfair labor practices" (Br. at 21) are unavailing. Again, FCA incorrectly assumes there can be only *one* direct victim of any RICO conspiracy who can vindicate the law and that GM is seeking to recover damages that are a subset of Defendants' tax fraud or labor violations. *See, e.g.*, *Baisch*, 346 F.3d at 375. As explained above, that is not accurate.  GM alleges harm caused by the bribery scheme that was *designed* to inflict damages on GM *directly*. Of all the parties that FCA claims were harmed, only GM incurred the higher labor costs resulting from the conspiracy.  Defendants' actions may have also harmed the IRS and UAW members, but that fact does not mean that the federal government or UAW members are better positioned to vindicate the distinct and direct injury to GM. These damages thus do not implicate multiple-recovery concerns under *Holmes*.[4]

---

1993) (Barr alleged that its competitor Quantum filed false applications with the FDA, which allegedly caused the FDA to grant Quantum approval to market certain drugs, which in turn allegedly decreased Barr's sales).

[4] *See Commercial Cleaning Servs., LLC v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 384 (2d Cir. 2001) (*Holmes* concerns are not implicated where "a violator might be obligated to compensate *two or more different classes of plaintiffs*, each of which suffered a *different* concrete injury, proximately caused by the violation."); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1172 (9th Cir. 2002) (*Holmes* concerns are not implicated even with multiple "potential plaintiffs," unless there is a risk of "*multiple* recovery of [the same] passed-on harm.").

## II.     GM Has Pled Predicate Racketeering Acts.

### A.     Violations of 29 U.S.C. § 186 Are Not Preempted by the NLRA.

FCA argues that one set of alleged predicate acts—bribes made in violation of the Taft-Hartley Act, 29 U.S.C. § 186 (Compl. ¶ 65)—equate to claims that FCA had merely negotiated "in bad faith." (Br. at 27-28.) From that inaccurate recasting, FCA contends that the NLRB has exclusive jurisdiction over these purported "bad-faith-bargaining" claims under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959).

GM does not allege "bad faith" within the meaning of the NLRA (which the NLRB has primary responsibility to enforce). Rather, GM alleges that Defendants engaged in fraud and racketeering by bribing UAW officials in violation of 29 U.S.C. § 186. The NLRB plays no enforcement role whatsoever regarding 29 U.S.C. § 186. Unlike a bad faith bargaining claim under the NLRA, § 186 violations are expressly included in the statutory definition of RICO predicate acts. 18 U.S.C. § 1961(1) ("racketeering activity" includes "any act which is indictable under title 29, United States Code, section 186"). The cases on which FCA relies are inapposite because they involve bad-faith bargaining, not admitted § 186 violations.[5]

---

[5]    *See Martin v. Lake Cty. Sewer Co.*, 269 F.3d 673, 680 (6th Cir. 2001) (finding claim preempted "***to the extent*** that this claim alleges bad-faith bargaining"); *Copeland v. Penske Logistics LLC*, 675 F.3d 1040, 1044 (7th Cir. 2012) (claim that "a union did not bargain hard enough to obtain benefits beyond those provided in the existing [CBA]"); *Adkins v. Mireles*, 526 F.3d 531, 542 (9th Cir.

Courts have repeatedly held that *Garmon* preemption does not apply when a plaintiff alleges RICO claims based on bribes made in violation of § 186. FCA fails to acknowledge this case law.

"The *Garmon* preemption doctrine does not apply if," among other things, "Congress has expressly carved out an exception to the NLRB's jurisdiction." *Teamsters Local 372, Detroit Mailers Union Local 2040 v. Detroit Newspapers*, 956 F. Supp. 753, 759 (E.D. Mich. 1997). "Carve out" is just what Congress did when it made a violation of § 186 (and no other labor laws) a predicate RICO offense. As the seminal case on this issue explained: "[I]t is hard to imagine that Congress would have made § 186 a RICO predicate act without the intention of making violations of § 186, ***which necessarily arise in the labor context***, the basis of a RICO action . . . ." *Butchers' Union, Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.*, 631 F. Supp. 1001, 1007 (E.D. Cal. 1986); *see also Detroit Newspapers*, 956 F. Supp. at 759 (citing *Butchers' Union* as "one of the earliest and most influential opinions addressing" the "inevitable conflict" between the NLRA and RICO, and agreeing that "§ 186 violations" are not preempted when alleged as a RICO predicate act); *Brennan v. Chestnut*, 973 F.2d 644, 646-47 (8th Cir. 1992) ("[A] claimed

---

2008) (claim "rest[ed]" on [plaintiff's] allegation that the Union had bargained in bad faith"); *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 659 (7th Cir. 1992) (claim "for failure to bargain in good faith").

violation of 29 U.S.C. § 186 would not be preempted because RICO includes violations of § 186 within the definition of 'racketeering activity.'").[6]

Given that § 186 violations are expressly defined as "racketeering activity," Defendants' argument that "labor questions" are central issues is incorrect. (Br. at 26-27 (citing *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 610 (6th Cir. 2004).) The "collateral issues" exception is just one of several under *Garmon*. The applicable exception here is when "Congress has expressly carved out an exception to the NLRB's jurisdiction," as Congress did with § 186. *Detroit Newspapers*, 956 F. Supp. at 759. In cases alleging § 186 violations, the fact that "labor law questions will have to be resolved . . . is simply a consequence of Congress making § 186 violations predicate acts for RICO purposes. Given the statute, the other labor law questions **must be** viewed as collateral...." *Butchers' Union*, 631 F. Supp. at 1008.[7]

---

[6] *See also MHC, Inc. v. Int'l Union, United Mine Workers of Am.*, 685 F. Supp. 1370, 1376 (E.D. Ky. 1988) (agreeing with *Butchers' Union* that violations of § 186 are not preempted); *Nat'l Elec. Benefit Fund v. Heary Bros. Lightning Protection Co.*, 931 F. Supp. 169, 184-85 (W.D.N.Y. 1995) (agreeing with *Butchers' Union*'s "careful[]" analysis of "the competing interests served by the labor law preemption doctrine and the RICO statute").

[7] Though FCA's motion appears to target the § 186 predicate acts (*see* Br. at 28 (arguing that "claims based on the . . . prohibited payments" are preempted)), the mail and wire fraud predicates are not preempted either. RICO claims "based on allegations of mail and wire fraud as predicate acts [are] preempted [only] if the underlying conduct falls within the exclusive jurisdiction of the NLRB . . . ." *Brennan*, 973 F.2d at 646. Here, the mail and wire fraud predicates are based on Defendants' bribes in violation of § 186, over which the NLRB does not have exclusive jurisdiction. *See Butchers' Union*, 631 F. Supp. at 1007.

FCA states that two decisions have "held that claims based on the very same alleged prohibited payments are 'unfair labor practice claims over which the NLRB has exclusive jurisdiction.'" (Br. at 28 (citing *DeShetler v. FCA US LLC*, No. 3:18 CV 78, 2018 WL 6257377, at *10 (N.D. Ohio Nov. 30, 2018) and *Swanigan v. FCA US, LLC*, No. 18-cv-10319, 2018 WL 4030815, at *4 (E.D. Mich. Aug. 23, 2018).) However, as FCA is very much aware, ***neither*** case involved RICO claims supported by § 186 violations. Those cases have no application here.

### B. GM Has Pled Mail and Wire Fraud Predicate Offenses.

FCA contends that GM has not stated predicate acts of mail and wire fraud because it has not pled any affirmative misrepresentations. (Br. at 29.) This argument ignores the fact that "[t]he Sixth Circuit has . . . repeatedly confirmed that ***concealment*** of material facts can constitute a fraudulent scheme sufficient to establish RICO liability." *Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 882 (E.D. Mich. 2019) (collecting cases). Nor must GM identify individual mail or wire transmissions that are themselves fraudulent because mail and wire fraud require only "use of the mails [or wires] ***in furtherance*** of the scheme." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005).

GM has plainly met these pleading requirements. The Complaint describes in detail how Defendants established and executed the fraudulent bribery scheme. (*See, e.g.*, Compl. ¶ 173(a) ("Beginning in July 2009, FCA began a long-running scheme

24

of improper payments to UAW officials"); *id.* ¶ 173(b)-(d), (f)-(j) (describing specific payments made to the UAW); *id.* ¶ 173(b), (d), (g), ¶ 175(a)-(e) (describing specific payments that Iacobelli authorized and directed).) The Complaint also describes how Defendants concealed this scheme, including by "us[ing] the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million" in bribes, and by Iacobelli conspiring to use charities and file fraudulent tax returns to conceal those bribes. (*Id.* ¶ 151(a)-(e).) The Complaint explains how Defendants furthered this scheme by sending bribes through mail and wires (*id.* ¶¶ 170, 173). (*See also id.* ¶¶ 69, 151(g).) Even if an affirmative misrepresentation were required (and it is not), the Complaint alleges numerous such misrepresentations, including the filing of false tax documents. (*Id.* ¶¶ 151(d)-(e), 176(c).)

Defendants also argue that GM's allegations do not satisfy Rule 9(b). (Br. at 29.) This is incorrect. "Where a complaint alleges a complex and far-reaching fraudulent scheme," the complaint must "provide examples of specific fraudulent conduct that are representative samples of the scheme." *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439 (6th Cir. 2008). The Complaint provides a litany of specific examples of Defendants' bribes and efforts to conceal their scheme. (*E.g.*, Compl. ¶¶ 151, 171, 173-77.) No more is required. "Rule 9(b) does not require omniscience"; "in a complex case, involving multiple actors and spanning a significant period of time, where there has been no opportunity for discovery, the

25

specificity requirements of Rule 9(b) [should] be applied less stringently." *State Farm Mut. Auto. Ins. Co.*, 107 F. Supp. 3d at 788. Thus, so long as there is enough "specificity to put [D]efendants on notice as to the nature of the claim," the Complaint satisfies Rule 9(b). *Id*. GM has done so in detail.

FCA argues that GM has not pled fraudulent intent. (Br. at 29.) That argument flies in the face of the Complaint's express allegations that Defendants engaged in a years-long bribery scheme, knowingly filed false tax returns, and intentionally lied and concealed the scheme to cover their tracks. Unlike *Gifford v. Meda*, where the plaintiffs were "part of the alleged scheme," GM was an intended and direct victim. No. 09-13486, 2010 WL 1875096, at *19 (E.D. Mich. May 10, 2010) (Borman, J.). The "nature and extent of the misrepresentations alleged gives rise to a strong inference of fraudulent intent," *Silverman v. Niswonger*, 761 F. Supp. 464, 470 (E.D. Mich. 1991), particularly because "all reasonable inferences must be drawn in" GM's favor. *Doe v. Miami Univ.*, 882 F.3d 579, 593 (6th Cir. 2018).

## III.    GM Has Stated a Section 1962(b) Claim.

### A.    GM Has Pled That Defendants Exercised Control Over the UAW.

The plain language of § 1962 does not require a showing that the racketeer obtained formal and "proprietary" control over the business, "such as the acquisition of stock." (Br. at 31.) *See, e.g.*, *Ikuno*, 912 F.2d at 310 ("a finding of control under § 1962(b) is best determined by the circumstances of each case and does not require

formal control such as the holding of majority stock or actual designation as an officer or director."); *Sutliff, Inc. v. Donovan Cos.*, 727 F.2d 648, 653 (7th Cir. 1984) ("control within the meaning of the statute need not be formal—need not be the kind of control that is obtained, for example, by acquiring a majority of the stock of a corporation."). Indeed, "control"—just "like the other RICO elements"—"must be read broadly." *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1045 n.26 (S.D.N.Y. 1993).

GM has alleged "control" within the meaning of § 1962. GM alleges that through bribery and related fraud, Defendants gained the ability to influence collective bargaining terms to which the UAW would agree and the implementation of those terms. (Compl. ¶¶ 6, 71-83, 148, 162.) Defendant Alphons Iacobelli directed many of these bribes on behalf of FCA and FCA NV, has admitted they were intended to influence collective bargaining terms, and even "scripted" UAW officials to do FCA's bidding. (*Id.* ¶¶ 89, 148, 154, 175.) GM alleges with specificity which terms the UAW agreed to and when. (Compl. ¶¶ 71-83.) GM also alleges the UAW would not have agreed to these various terms but for the bribery. (*Id.*) And GM alleges which UAW leaders were the subject of such control through bribery. (*Id.* ¶¶ 23-28, 57-59, 63-70, 89, 95-98.) This is a classic example of "control" under Section 1962(b). *See, e.g.*, *P.M.F. Servs., Inc. v. Grady*, 681 F. Supp. 549, 557 n. 16

(N.D. Ill. 1988) (causing an entity "to enter into many transactions it otherwise would not have. That is 'control.'. . . .").

FCA's cases are inapposite. In *Continental 332 Fund, LLC v. Albertelli*, the plaintiff ***did not even allege*** that defendants controlled the entity in question. 317 F. Supp. 3d 1124, 1144 (M.D. Fla. 2018). In *Advocacy Organization for Patients and Providers v. Auto Club Insurance Ass'n*, the complaint was "entirely silent" as to defendant's control. 176 F.3d 315, 329 (6th Cir. 1999). In *In re American Honda Motor Co., Dealerships Relations Litig.*, the plaintiff alleged that defendants' bribes gave them only "some influence over discretionary activities" (Honda's allocation decisions). 941 F. Supp. 528, 556 (D. Md. 1996). While the court found these allegations were insufficient, it ***sustained*** a Section 1962(b) claim against Honda's executives because they allegedly maintained control over a wide swath of Honda's operations. *Id.* at 550. It is this level of control—commanding "essential functions . . . by compromising certain UAW leaders and causing these leaders to accede to specific requests from FCA but not other automakers"—that GM has pled. (Compl. ¶ 33.)

FCA incorrectly relies on cases where, unlike here, plaintiffs failed to allege the defendant's control of the enterprise. (Br. at 32, citing *Rosemount Cogeneration Joint Venture v. N. States Power Co.*, No. CIV. 4-90-279, 1991 WL 13729, at *7 (D.

Minn. Jan. 18, 1991) and *Griffin v. NBD Bank*, 43 F. Supp. 2d 780, 792 (W.D. Mich. 1999).) GM alleges such control here.

### B.    GM Has Pled Section 1962(b) Damages.

FCA posits that the Complaint does not "allege that FCA's supposed control over the UAW caused GM to incur an independent injury." (Br. at 32-33.) FCA's assertion is inaccurate. GM pled that as a result of its control over the UAW, FCA was able to damage GM through "actions taken during the collective bargaining process," including "tak[ing] positions and enter[ing] into contracts and understandings that directly harmed GM." (Compl. ¶¶ 34, 162.) Even if there were pleading overlap between GM's racketeering- and control-related damages, that is of no legal moment. At this stage, GM may seek alternative, overlapping, or even inconsistent remedies. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

Dismissal is only proper where a plaintiff fails to plead ***any*** Section 1962(b) injury. In *Advocacy Org.*, the plaintiffs "fail[ed] to allege that their injury resulted from the acquisition or control of an interest by defendants." 176 F.3d at 330. Likewise, in *Aces High Coal Sales, Inc. v. Community Bank & Trust of West Georgia*, 768 F. App'x 446 (6th Cir. 2019), instead of alleging specific harm caused by defendant's control, the plaintiff argued only that the enterprise was "a vehicle for the racketeering activity." *Id.* at 458. By contrast, GM identifies injury resulting

from FCA's control of the UAW: among other things, the imposition of labor terms that were harmful to GM in the form of higher costs. (Compl. ¶¶ 7, 71, 83, 132, 134, 137-38, 178.)

## IV.    GM Has Pled a Section 1962(d) Claim.

FCA advances a half-page argument that the Section 1962(d) claim should be dismissed because (1) GM "failed to allege a substantive RICO violation"; and (2) "an entity cannot conspire with its own agents." (Br. at 33.) The brevity is understandable. As detailed above, GM has pled substantive RICO claims. And several circuits have held that the intra-corporate conspiracy rule does not apply to RICO claims. *See Kirwin v. Price Commc'ns Corp.*, 391 F.3d 1323, 1326 (11th Cir. 2004) (finding doctrine does not apply to RICO claims, in agreement with Seventh and Ninth Circuits). The Sixth Circuit has not yet weighed in, but the Court need not even reach this issue. The intra-corporate conspiracy doctrine applies only where ***all*** alleged conspirators are "members of the ***same*** collective entity." *Upton v. City of Royal Oak*, 492 F. App'x 492, 504 (6th Cir. 2012). GM has alleged a conspiracy that involves employees of different FCA entities as well as non-FCA co-conspirators. (*See, e.g.*, Compl. ¶ 23 (describing the role of General Holiefield, a non-FCA employee); *id.* ¶¶ 24-28 (same for former UAW President Williams, former UAW Vice President Jewell, and others).)

## V.      GM's RICO Claims Are Timely.

GM could not have discovered Defendants' bribery until July 2017 at the earliest, when the government's initial indictments provided the first glimpse into Defendants' years-long scheme. (Compl. ¶¶ 145, 152.) GM filed its Complaint two years later, well within RICO's four-year limitations period. *See Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 448 (6th Cir. 2012) (Sherman Act claims timely when filed one year after regulatory findings revealed conspiracy). FCA's arguments that GM should have filed its RICO claims long before knowing of any bribery are unavailing.

As a threshold matter, this is not an issue for this Court to decide at this stage. A motion to dismiss, "which considers only the allegations in the complaint, is an inappropriate vehicle for dismissing a claim based upon a statute of limitations." *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013). "Determining the applicable statute of limitations period is a question of fact…." *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359 F. Supp. 3d 546, 566 (E.D. Tenn. 2019). Where, as here, the "[p]laintiff contends it learned of the fraud only shortly before it filed suit," *State Farm Mut. Auto. Ins. Co. v. Universal Health Grp., Inc.*, No. 14-cv-10266, 2014 WL 5427170, at *7 (E.D. Mich. Oct. 24, 2014), and alleges fraudulent concealment, *Packaged Ice*, 723 F. Supp. 2d at 1019, a motion to dismiss on statute of limitations grounds must be denied. *See In re OnStar*

*Contract Litig.*, 600 F. Supp. 2d 861, 867 (E.D. Mich. 2009) (discovery rule and fraudulent concealment "are issues that should be determined on a motion for summary judgment following discovery, not on a motion to dismiss"). In any event, GM's claims are timely because: (1) GM did not and could not have discovered its RICO injuries before November 20, 2015; and (2) Defendants' fraudulent concealment tolls the statute of limitations.

### A.   GM's Claims Did Not Accrue Before Defendants' Conspiracy Was Revealed.

"[T]he rule in the Sixth Circuit . . . is that the statute of limitations does not begin to run until a party knew, or through exercise of reasonable diligence should have discovered, that the party was injured by a RICO violation." *Pointe Physical Therapy*, 107 F. Supp. 3d at 792. While "plaintiffs need not be aware of every minute fact underlying their RICO claims," they must be "***presented with evidence suggesting the possibility of fraud***." *Sims v. Ohio Cas. Ins. Co.*, 151 F. App'x 433, 436 (6th Cir. 2005). "[T]he injury discovery rule requires not only that the plaintiff know of his injury, but also that the plaintiff know the source of his injury." *Grange Mut. Cas. Co. v. Mack*, 6:06-555-DCR, 2009 WL 1036092, at *6 (E.D. Ky. Apr. 17, 2009) (citing *Rotella v. Wood*, 528 U.S. 549, 556-57 (2000)).  Where the parties "disagree about when plaintiff did or should have discovered its RICO cause of action against defendant and thus when plaintiff's injury occurred," the court

"cannot consider this question of fact" at the pleading stage. *Munson*, 359 F. Supp. 3d at 566.

RICO claims are timely where the plaintiff alleges it did not and could not have discovered the fraudulent scheme—the source of the plaintiff's injury—within four years of filing. *See Pointe Physical Therapy*, 107 F. Supp. 3d at 793 (denying motion to dismiss where plaintiff alleged it "did not discover and could not have discovered the fraud scheme until it reviewed hundreds of bills and documents"). Here, GM alleges facts demonstrating that it "had no way to know" of Defendants' bribery scheme until it was revealed in criminal indictments and plea agreements. (Compl. ¶¶ 150, 152, 154-55.) That alone is enough "to preclude dismissal" on statute of limitations grounds at the motion to dismiss stage. *Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1340 (E.D. Mich. 2011).

FCA concedes that GM's claims associated with the 2015 CBA are timely and does not contend that GM was "presented with evidence suggesting the possibility of fraud" before November 20, 2015. (Br. at 34.) *See Sims*, 151 F. App'x at 436. Instead, FCA argues that GM's awareness of differences in the UAW's treatment of FCA and GM started the clock running before 2015, perhaps as early as 2011. (Br. at 35.) But GM could not have discovered any injuries before Defendants' conspiracy came to light. (Compl. ¶¶ 150, 152, 154-55.) That GM may have been aware of some degree of ***disparate treatment*** by the UAW does not mean GM knew

of **RICO injuries**. Until Defendants' bribery scheme was revealed, GM "reasonably but incorrectly believed that FCA Group acted in good faith and negotiated agreements with UAW leadership at arm's length." (*Id.* ¶ 149.) *See Pointe Physical Therapy*, 107 F. Supp. 3d at 792-93 (rejecting argument that plaintiff "should have discovered" fraud earlier, where plaintiff reasonably assumed defendants were acting ethically).

FCA's cited cases point decisively to knowledge of wrongdoing outside the limitations period. *See Álvarez-Maurás v. Banco Popular of P.R.*, 919 F.3d 617, 618-19, 627-28 (1st Cir. 2019) (even though plaintiff noticed $400,000 missing from his account in 2009, the court held he did not discover his injury until 2012 when he filed a FINRA claim for the missing funds; by then, "telltale warning signs augur[ed] that fraud [was] afoot"); *Sims*, 151 F. App'x at 436 (plaintiffs had filed RICO claims in another court five years earlier "based on the same underlying facts"); *DeShetler v. FCA US, LLC*, 790 F. App'x 664, 666-69, 672 (6th Cir. 2019) (in case alleging that UAW breached duty of fair representation by acting arbitrarily, claims were not timely because "Plaintiffs' own allegations sho[wed] that they should have already known that UAW acted arbitrarily.").[8]

---

[8] FCA's remaining authorities similarly involved clear knowledge of injury outside the filing window. *See Kresch v. Miller*, No. 18-10025, 2019 WL 3412901, at *11 (E.D. Mich. July 29, 2019) (plaintiffs knew defendant had breached its obligation to repay investors); *Crown Chevrolet v. Gen. Motors, LLC*, No. 13-cv-01362-TEH, 2014 WL 246500, at *1-2 (N.D. Cal. Jan. 22, 2014), *aff'd*, 637 F.

GM could not have discovered its RICO injuries until it was "presented with evidence suggesting the possibility of fraud" that impacted it. *See Sims*, 151 F. App'x at 436. That happened no earlier than January 2018, when Iacobelli revealed Defendants' scheme to corrupt the collective bargaining process. (Compl. ¶ 154.) "Defendants' countervailing assertion is not evidence that plaintiff knew of the fraud, but instead an argument that plaintiff should have known—an argument that cannot be proved at this stage in the litigation." *Universal Health*, 2014 WL 5427170, at *7.

### B.   Defendants' Fraudulent Concealment Tolls the Limitations Period.

Even if GM's claims accrued before November 20, 2015, they would be timely because GM properly alleges facts demonstrating fraudulent concealment.

Fraudulent concealment consists of three elements: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of [its] cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Carrier*, 673

---

App'x 446 (9th Cir. 2016) (plaintiff knew that it had been forced to sell two dealerships for less than fair market value and that buyer had defaulted on his obligations to make up for the loss); *Levy v. BASF Metals Ltd.*, 917 F.3d 106, 109 (2d Cir. 2019) (plaintiff knew that the value of her securities "had dropped by over 50%," for which she asserted there was "no explanation . . . other than market distortion due to manipulation"); *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 675 (7th Cir. 2009) (plaintiffs knew that defendants had plotted to "wrest[] control of [company] and abscond[] with its assets" at least seven years before filing suit).

F.3d at 446. Supporting allegations need not be extensive, *see Packaged Ice*, 723 F. Supp. 2d at 1018, and GM's allegations clearly satisfy the required elements. First, GM's allegations detail Defendants' extraordinary efforts to conceal their misconduct. (Compl. ¶¶ 149, 151, 153.) Second, GM alleges facts demonstrating it was ignorant of the "operative facts" underlying its claim until: (1) the bribery was revealed in July 2017, and (2) Iacobelli revealed the scheme's effect on collective bargaining in his plea in January 2018. (*Id.* ¶¶ 152, 154.) Third, GM describes the steps it took following the initial indictments and alleges facts demonstrating it could not have discovered the scheme earlier. (*Id.* ¶¶ 150-55.)

The facts alleged constitute quintessential fraudulent concealment: a secret, long-running racketeering scheme uncovered only after the government investigated and revealed the scheme. *See Packaged Ice*, 723 F. Supp. 2d at 1000, 1018-19 (tolling limitations period through date "when it first became public that the DOJ had executed search warrants").[9] Defendants' scheme was "so well concealed that, other than those directly responsible, no one … knew anything about the fraud until

---

[9]   *See also, e.g.*, *Carrier*, 673 F.3d at 447-48 (tolling limitations period until after findings regarding price-fixing conspiracy were published); *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2014 WL 4272772, at *13 (E.D. Mich. Aug. 29, 2014) (tolling limitations period until "antitrust investigation became public"); *Willie McCormick & Assocs., Inc. v. Lakeshore Eng'g Servs., Inc.*, No. 12-15460, 2013 WL 6713999, at *4 (E.D. Mich. Dec. 20, 2013), *vacated in part on other grounds*, No. 12-15460, 2015 WL 5093785 (E.D. Mich. Aug. 28, 2015) (plaintiff alleged "it did not become aware of the nature or extent of the conspiracy until after the federal government released an indictment").

it was revealed….” *Venture Glob. Eng'g, LLC v. Satyam Computer Servs., Ltd.*, 730 F.3d 580, 589 (6th Cir. 2013). Regardless, the issue should not be decided on the pleadings. *See, e.g.*, *Packaged Ice*, 723 F. Supp. 2d at 1019 (“[F]raudulent concealment is a question best left to the jury if there is any question.”); *Satyam*, 730 F.3d at 589 (“Whether plaintiffs can ultimately prove their [fraudulent concealment] allegations should be determined on a motion under Rule 56 or at trial, once the facts are developed.”).

### 1.   Defendants Wrongfully Concealed Their Misconduct.

FCA does not and cannot refute that Defendants' scheme was inherently self-concealing, as secrecy was essential to its success. (Compl. ¶ 151.) Indeed, Defendants have admitted that they “used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited payments and things of value paid to officers and employees of the UAW.” (*Id.* ¶ ¶63, 151(a).) Where, as here, “the claims sound in fraud, . . . the wrongful concealment prong is satisfied by a showing that the fraud was self-concealing.” *Satyam*, 730 F.3d at 587; *Royal Farms, Inc. v. Glob. Tropical Fresh Fruit Corp.*, No. 04-CV-4615, 2006 WL 8437472, at *2 (E.D.N.Y. Feb. 14, 2006) (holding that bribery scheme was self-concealing where success of the scheme depended on concealment).

Defendants' concealment also goes well beyond an “unwillingness to divulge wrongful activities” (Br. at 40) or concealment via “mere silence.” *Carrier*, 673 F.3d

at 446. GM has pointed to dozens of admitted acts specifically designed to conceal evidence of wrongdoing, including affirmative misrepresentations, false testimony, tax fraud, and explicit instructions to hide evidence. (Compl. ¶¶ 149, 151, 153.) That is classic fraudulent concealment. Even if a showing of affirmative concealment were required—and it is not, *Satyam*, 730 F.3d at 587—the acts described in the Complaint constitute affirmative concealment. *See Carrier*, 673 F.3d at 447 (defendants took steps to prevent a paper trail, hid evidence, and made misstatements); *In re Refrigerant Compressors Antitrust Litig.*, 92 F. Supp. 3d 652, 669 (E.D. Mich. 2015) (defendants "exchanged emails with false subject lines" and made false representations); *Willie McCormick*, 2013 WL 6713999, at *3 (defendants "concealed bribes and kickbacks," "perjured themselves" and "obstructed justice"); *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1084 (2d Cir. 1988) (conspirators "agreed that [witness] would give false testimony if called before a grand jury, and he did so").

### 2.    Defendants Prevented GM from Discovering Its Claims.

FCA argues that GM has failed to allege fraudulent concealment because GM knew of "advantageous contract terms from the UAW that were not also provided to GM" within the limitations period. (Br. at 39.) That is irrelevant. Fraudulent concealment asks when the plaintiff "discover[ed] the operative facts that are the basis of [its] cause of action…." *Carrier*, 673 F.3d at 446; *see Pinney Dock &*

*Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 (6th Cir. 1988) (plaintiff must allege defendant prevented him from "discovering the cause of action"). Because GM had no knowledge of Defendants' racketeering conspiracy until it was revealed in indictments and plea agreements, fraudulent concealment applies. *Carrier*, 673 F.3d at 447-48 (plaintiff alleged "it had no knowledge of the Defendants' conspiracy"); *Satyam*, 730 F.3d at 587 (plaintiffs alleged "they, along with the rest of the world, did not discover [defendant's] fraud until [it was] disclosed [ ] publicly").

FCA cites labor cases to argue that "concealment of motive" is not enough (Br. at 39), but that is not relevant here. Defendants concealed not just their motives but the acts underlying GM's claims: unlawful payments that furthered a bribery scheme designed to corrupt the collective bargaining process. Before this conduct was revealed in criminal indictments and plea agreements, GM "had no way to know" the basis of its cause of action. (Compl. ¶ 150.)

### 3.    GM Adequately Alleges Due Diligence.

GM sufficiently pled due diligence. There was no indication of bribery prior to July 2017. (Compl. ¶¶ 150, 152, 155.) GM alleges that it diligently reviewed Defendants' public statements, filings, and agreements, but could not discover the scheme. (*Id.* ¶ 155); *see Lutz*, 717 F.3d at 476 (fraudulent concealment adequately pled where plaintiffs alleged "that a reasonably prudent person would have had no

way of knowing about the fraud"). After learning of Defendants' criminal conduct, GM monitored the criminal proceedings and other sources of information. (*Id.* ¶ 152.) Following the revelation that Defendants' scheme was designed to "obtain benefits, concessions, and advantages for FCA," GM undertook thorough extensive investigation and analysis. (*Id.* ¶ 154.) This is more than enough. *See Carrier*, 673 F.3d at 448 (investigation included review of public statements and filings, followed by a "more thorough investigation"); *Refrigerant Compressors*, 92 F. Supp. 3d at 670 (investigation included monitoring class actions and criminal investigations).

To the extent "there is any question" regarding Defendants' concealment or GM's diligence, the matter is "best left to the jury." *Packaged Ice*, 723 F. Supp. 2d at 1019; *see also Carrier*, 673 F.3d at 448 ("[W]hen there is some question as to the depth and scope of th[e] investigation, a plaintiff should be allowed to proceed forward.").  Dismissal is proper only "when it is obvious from the complaint that the plaintiff conducted absolutely no investigation" after being alerted to wrongdoing. *Carrier*, 673 F.3d at 448. Here, what is "obvious from the complaint" is that GM began its diligent investigation as soon as it had reason to do so and filed two years from the initial indictments.

FCA does not challenge GM's diligence before Defendants' racketeering was revealed. (Br. at 40-41.) Rather, FCA strangely argues that GM did not act diligently *after* learning of the bribery in July 2017, because it then supposedly "sat on its

hands … before bringing this action." (Br. at 40.) GM did not sit on its hands; it diligently investigated before bringing these highly significant claims. (Compl. ¶¶ 152, 154.) *See Carrier*, 673 F.3d at 448-49 (claims were timely despite five-year period between notice of government investigation and filing). FCA criticizes GM for not filing sooner after Defendants' scheme was revealed in 2017/18 (Br. at 41), but the interim between GM's discovery of its claims and filing of this lawsuit is irrelevant under Sixth Circuit law. *See Norton-Children's Hosps., Inc. v. James E. Smith & Sons, Inc.*, 658 F.2d 440, 444-45 (6th Cir. 1981) (rejecting argument that the plaintiff is given only a "reasonable time in which to file" after discovery because the plaintiff has "the full four years to file"). So long as the plaintiff files within the statute of limitations, a court may not scrutinize the plaintiff's conduct after discovering the defendant's wrongdoing. *See, e.g.*, *State of Mich. ex rel. Kelley v. McDonald Dairy Co.*, 905 F. Supp. 447, 453 (W.D. Mich. 1995) (three-year delay between discovery and filing "was within the four-year limit"); *Carrier*, 673 F.3d at 446-47 (diligence is relevant only "***until*** discovery of the facts").

The cases that FCA cites—*Campbell*, *Villarreal*, *Prudential*, and *New Castle*—involved plaintiffs that failed to investigate readily available information within the limitations period. In *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1125 (6th Cir. 1982), a summary judgment decision, the court found that plaintiff needed only to read a merger agreement to discover his claims but waited six years after signing

the agreement to file suit. *Id*. at 1125-27. In *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226 (3d Cir. 2004), another summary judgment decision, discovery revealed that the plaintiff ignored "many [   ] sources of information sufficient to place it on inquiry notice"—including numerous government regulations, guidance documents and tenant complaints—that asbestos-containing materials in its buildings were hazardous. *Id*. at 238. Equally significant, *Villarreal* and *New Castle* do not apply the Sixth Circuit's fraudulent concealment standard and instead apply a general equitable tolling test not at issue here. Indeed, *New Castle* affirmed a grant of summary judgment because the plaintiff failed to bring claims "within a reasonable period" after discovery. *New Castle Cty. v. Halliburton NUS Corp.*, 111 F.3d 1116, 1126 n.11 (3d Cir. 1997). As noted, the Sixth Circuit has rejected that test. *See Norton*, 658 F.2d at 443-45.

## VI.   GM Has Pled Unfair Competition and Civil Conspiracy Claims.

FCA argues that Michigan unfair competition claims are limited to product-confusion claims, relying on a single unpublished district court decision. (Br. at 43 (quoting *Mahindra & Mahindra Ltd. v. FCA US, LLC*, No. 18-cv-12645, 2019 WL 3294114, at \*4 (E.D. Mich. Apr. 2, 2019).) That is not an accurate statement of the law.

*Mahindra* itself recognized that "the doctrine ***also*** outlaws conduct that is not fair play." 2019 WL 3294114, at \*4. Unfair competition "***[o]riginally*** . . . dealt

generally with the palming off of one's goods," but today it is "a broad and flexible doctrine" that proscribes "the incalculable variety of illegal practices denominated as unfair competition…." *Primary Ins. Agency Grp., LLC v. Nofar*, No. 320039, 2015 WL 1227767, at *5 (Mich. Ct. App. Mar. 17, 2015). "*Thus it is now said that the essence of unfair competition law is fair play.*" *Id.* (emphasis in original); *see also Dura Global Tech., Inc. v. Magna Donnelly Corp.*, No. 07-10945, 2009 WL 3032594, at *4 (E.D. Mich. Sept. 18, 2009) ("Michigan follows the general law of unfair competition, which prohibits a party from engaging in unfair and unethical trade practices that are harmful to his or her competitors or to the general public."). It should go without saying that FCA's conduct as alleged here—bribing a labor union to gain an advantage and harm GM, a key competitor—is not fair play.

FCA urges that GM's unfair competition claim is time-barred. (Br. at 43.) This is incorrect. Defendants fraudulently concealed their scheme until at least January 2018, when Iacobelli's guilty plea revealed that—contrary to Defendants' public guarantees that the bribery had "nothing whatsoever to do with the collective bargaining process"—FCA's bribes were made "to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW." (Compl. ¶¶ 153-54.) Thus, GM's unfair competition claim is timely. *See* Mich. Comp. Laws Ann. § 600.5855 (if claim is fraudulently concealed, plaintiff may sue "at any time within

43

2 years after" discovery); *New York Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 280 (S.D.N.Y. 2013) (tolling limitations period where initial indictment "di[d] not indicate [co-conspirator] influenced or took advantage of relationships with union officials in order to assist in making the CBA violations," and co-conspirators continued to conceal wrongdoing); *Carrier*, 673 F.3d at 448 (tolling limitations period until after regulatory decision "provided the first means for beginning an analysis of cartel behavior and its effect on Carrier").

Finally, FCA avers that the civil conspiracy claim fails because (1) there is no "separate actionable tort"; (2) it is "time-barred"; and (3) "a corporation cannot conspire with its own agents or employees." (Br. at 44.) But GM has pled unfair competition as a separate tort and, as set forth above, the claim is not time-barred. FCA's last argument ignores the fact that GM has named a host of co-Defendants and non-parties as co-conspirators—including FCA NV, Marchionne, NTC, and multiple other former UAW and/or NTC officers. (Compl. ¶¶ 17-31.) This case is very different from those cited by FCA, where *all* alleged conspirators were "members of the *same* collective entity." *Upton*, 492 F. App'x at 504. Because FCA does not (and cannot) show that the alleged conspiracy involved only employees of the same legal entity, its argument fails. *See, e.g.*, *Stryker Corp. v. Ridgeway*, No. 1:13-CV-1066; 1:14-CV-889, 2015 WL 5308038, at *16-17 (W.D. Mich. Sept. 10,

2015) (intra-corporate conspiracy doctrine did not apply to conspiracy between employees of "a parent corporation and a subsidiary corporation.").

## CONCLUSION

GM respectfully requests that the Court deny FCA's motion to dismiss.

Dated: March 12, 2020                          Respectfully submitted,

**KIRKLAND AND ELLIS LLP**           **HONIGMAN LLP**

By: */s/Jeffrey L. Willian, P.C.*          By: */s/ Jeffrey K. Lamb*
Hariklia Karis, P.C.                              Jeffrey K. Lamb (P76738)
Jeffrey L. Willian, P.C.                         2290 First National Building
300 North LaSalle                                660 Woodward Avenue
Chicago, IL 60654                                Detroit, MI 48226
Telephone: (312) 862-2000                 Telephone: (313) 465-7000
hariklia.karis@kirkland.com                jlamb@honigman.com
jeffrey.willian@kirkland.com

Austin Norris
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4200
austin.norris@kirkland.com

*Attorneys for Plaintiffs General*
*Motors LLC and General Motors*
*Company*

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via the

Court's CM/ECF system on March 12, 2020.


/s/ *Jeffrey K. Lamb*
Jeffrey K. Lamb