```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3   GENERAL MOTORS LLC,
    GENERAL MOTORS COMPANY,
4
              Plaintiffs,
5                                       HONORABLE PAUL D. BORMAN

6    v.                                 No. 19-13429

7   FCA US LLC, FIAT CHRYSLER
    AUTOMOBILES N.V., ALPHONS
8   IACOBELLI, JEROME DURDEN,
    MICHAEL BROWN,
9
              Defendants.
10  _____/

11
        REMOTE MOTION HEARING - DEFENDANTS' MOTIONS TO DISMISS
12
                    BEFORE JUDGE PAUL D. BORMAN
13                  United States District Judge
                    231 West Lafayette Boulevard
14                       Detroit, Michigan
                     Tuesday, June 23, 2020
15                         10:02 a.m.

16
    APPEARANCES:
17
       For the Plaintiffs:      JEFFREY L. WILLIAN
18                              Kirkland & Ellis
                                200 E. Randolph Drive
19                              Suite 6000
                                Chicago, Illinois  60601
20                              (312) 861-2000

21

22
       (Appearances continued)
23

24          To Obtain Certified Transcript, Contact:
         Leann S. Lizza, CSR-3746, RPR, CRR, RMR, CRC, RDR
25                         (313) 234-2608
```

```
 1   APPEARANCES (Continued):

 2        For Defendants FCA US        STEVEN L. HOLLEY
          LLC and Fiat Chrysler       Sullivan & Cromwell LLP
 3        Automobiles N.V.:           125 Broad Street
                                      New York, New York  10004
 4                                    (212) 558-4737

 5
          For Defendant Iacobelli:    MICHAEL A. NEDELMAN
 6                                    Nedelman Legal Group PLLC
                                      28580 Orchard Lake Road
 7                                    Suite 140
                                      Farmington Hills, Michigan
 8                                       48334
                                      (248) 855-8888
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**TABLE OF CONTENTS**

Defendants' Motions to Dismiss                              Page

  Argument by Mr. Holley                                     7

  Argument by Mr. Nedelman                                  25

  Argument by Mr. Willian                                   29

  Further argument by Mr. Holley                            55

  Further argument by Mr. Nedelman                          62

  Order of the Court                                        64


Exhibits:                                              Received

  (None offered.)

**DEFENDANTS' MOTIONS TO DISMISS**

4

```
 1                                           June 23, 2020

 2                                           Detroit, Michigan

 3                            -    -    -

 4        (Call to order of the Court, 10:02 a.m.)

 5           THE LAW CLERK:  The United States District Court is

 6   now in session; the Honorable Paul D. Borman presiding.  Court

 7   call -- the Court calls Case Number 19-1329.

 8           THE COURT:  No, 134 --

 9           THE COURT CLERK:  13429, GM versus FCA.

10           THE COURT:  Okay.  So just to complete, this is

11   General Motors LLC, General Motors Company, plaintiffs, versus

12   FCA US LLC, Fiat Chrysler Automobiles N.V., Alphons Iacobelli,

13   Jerome Durden and Michael Brown.

14           I'm Judge Paul Borman.  I have been assigned this

15   case.  Can the lawyers hear me?  Let's start --

16           MR. HOLLEY:  Yes, Your Honor.

17           THE COURT:  Let's start with Mr. Willian.

18           MR. WILLIAN:  Yes, Your Honor.  I can hear you fine.

19           THE COURT:  Is that the correct pronunciation, sir?

20           MR. WILLIAN:  It is, Your Honor.  Thank you.

21           THE COURT:  Okay.  Mr. Haley?  Holley, sorry.

22           MR. HOLLEY:  Good morning, Your Honor.  I can hear you

23   very well.  Thank you.

24           THE COURT:  Very good.

25           Is it pronounced Nedelman or Nedelman?
```

**GENERAL MOTORS LLC, ET AL. v. FCA US LLC, ET AL., 19-13429**

### DEFENDANTS' MOTIONS TO DISMISS

1    MR. NEDELMAN:  Nedelman, Your Honor.

2    THE COURT:  Nedelman.  Okay.  Can you hear me?

3    MR. NEDELMAN:  Yes, Your Honor.

4    THE COURT:  And Mrs. Lizza, you can hear us all?

5    THE REPORTER:  I can.

6    THE COURT:  Okay.  The Court notes that Defendants

7  Brown and Durden join in FCA's motion to dismiss.  With me on

8  this Zoom webinar are my courtroom deputy, Deborah Tofil; my

9  law clerk, Maura Allen; and my court reporter, Leann Lizza.

10    Mrs. Lizza has the toughest job, so counsel must and

11  will speak slowly and loudly.

12    So would the counsel again please identify themselves

13  for the record beginning with General Motors.

14    MR. WILLIAN:  Yes, good morning.  This is Jeff

15  Willian.  I represent the plaintiffs in this case.

16    THE COURT:  Thank you, sir.

17    FCA and FCA N.V.?

18    MR. HOLLEY:  Yes, Your Honor.  Steven Holley,

19  H-O-L-L-E-Y, from Sullivan & Cromwell for the defendants, FCA

20  US LLC and Fiat Chrysler Automobiles N.V.

21    THE COURT:  Thank you.

22    And for Mr. Iacobelli.

23    MR. NEDELMAN:  Good morning, Your Honor.  Michael

24  Nedelman appearing on behalf of Alphons Iacobelli.

25    THE COURT:  Thank you.

DEFENDANTS' MOTIONS TO DISMISS

```
 1            Before we begin, I want to make three personal
 2   disclosures.  About 20 years ago I attended a week-long seminar
 3   at which Tom Gottschalk, then GM's general counsel, now I've
 4   heard is back at Kirkland & Ellis, attended and spoke.  In
 5   subsequent years, while still serving as GM's general counsel
 6   in Detroit, I would run into him on occasion and exchange
 7   pleasantries.  I have not seen or spoken to Tom in more than
 8   ten years.
 9            Second, in 2010 when Ed Whitacre was GM's CEO, a Texas
10   district judge friend whose wife was on the Texas Tech Board
11   with Ed called to suggest that since Ed was away from home in
12   Detroit I should give him some local hospitality.  We met for
13   lunch, each paid his own check and it was very enjoyable.  I
14   have not spoken to Ed or seen him since then.
15            Finally, about three days a week I receive calls from
16   my congresswoman, Haley Stevens, who just so happens served as
17   chief of staff of the Obama administration's Auto Industry
18   Emergency Rescue Team, inviting me to attend a constituent
19   outreach meeting.  These are robo calls.  I have never had the
20   honor of meeting my congresswoman, speaking with her nor have I
21   ever contributed to her or any other political candidates
22   because I am Hatch'ed and I want to keep this wonderful
23   position.  Thank you.
24            Okay.  Then let us proceed with FCA's motion to
25   dismiss the complaint.
```

ARGUMENT BY MR. HOLLEY

1      If you mention a name of a case or an individual's

2  name that has not been mentioned so far, please spell it to

3  help Mrs. Lizza, the court reporter, who has the toughest job.

4  You must speak slowly and clearly.  And having looked at both

5  of your backgrounds, all three of you, I know that you are

6  accomplished litigators in court and that you respect court

7  reporters and the Court.

8      So please proceed on behalf of FCA.

9      MR. HOLLEY:  Good morning, Your Honor.  Again, Steven

10  Holley from Sullivan & Cromwell in New York for the defendants,

11  Fiat Chrysler Automobiles N.V. and FCA US LLC, both of which

12  have filed motions to dismiss GM's complaint.  Consistent with

13  the Court's scheduling order, I'm going to first address the

14  motion to dismiss filed by FCA US LLC, and for the sake of

15  simplicity, I will refer today to FCA US LLC as FCA and to Fiat

16  Chrysler Automobiles N.V. as FCA N.V.

17      I know the Court is familiar from the criminal cases

18  over which the Court has presided with the general

19  circumstances giving rise to this case.  Certain former

20  employees of FCA who are named as individual defendants in this

21  case facilitated payments to certain former employees of the

22  United Auto Workers from funds belonging to the FCA-UAW

23  National Training Center.  GM alleges that these payments were

24  orchestrated by FCA itself, an allegation that FCA vigorously

25  denies.  However, for purposes of this motion to dismiss only,

ARGUMENT BY MR. HOLLEY

1   FCA accepted the allegations as true in arguing that GM has

2   nonetheless failed to state a valid RICO claim.

3          Parroting paragraph 11 of the Alphons Iacobelli plea

4   agreement, and that's A-L-P-H-O-N-S --

5          THE COURT:  We have that.  He's a party to the case,

6   so in terms of those names, Mr. Holley, we have them, yeah.

7   But I appreciate.  That's better than forgetting.  Okay.  Go

8   ahead.

9          MR. HOLLEY:  Thank you, Your Honor.

10         Parroting paragraph 11 of the Iacobelli plea

11  agreement, GM claims that FCA made alleged prohibited payments

12  to the UAW in order to obtain, quote, benefits, concessions and

13  advantages for FCA in the negotiation, implementation and

14  administration of the collective bargaining agreements between

15  FCA and the UAW, closed quote.

16         GM alleges that it did not receive similar benefits,

17  concessions and advantages from the UAW with the consequence

18  that FCA's labor costs were substantially lower than GM's which

19  supposedly enabled FCA to compete more effectively against GM.

20  So collective bargaining agreements between FCA and the UAW lie

21  at the very core of GM's case.

22         In assessing the validity of GM's claims, there are

23  three points that I ask the Court to bear in mind at the outset

24  with regard to RICO.  First, in enacting RICO, Congress was

25  targeting the patterns of racketeering activity.  It was not

1    purporting to federalize state tort law so that every person

2    who claimed to have suffered some injury at the hands of

3    someone else suddenly had a claim for treble damages under

4    federal law.

5         Secondly, courts subject RICO claims to substantial

6    scrutiny at the motion to dismiss stage, and that is true both

7    because of the potential reputational harm suffered by

8    defendants who are unfairly accused of engaging in racketeering

9    activity and also because RICO cases are typically big cases

10   like antitrust cases that involve massive amounts of discovery

11   and courts do not want to put defendants to the burden and

12   expense of defending against such a large case unless the

13   claims are well founded.

14        And third, Your Honor, courts are particularly

15   skeptical of RICO claims brought by economic competitors like

16   GM's claims in this case because such claims threaten to

17   measure the line between RICO claims and antitrust claims under

18   the Sherman Act and the Clayton Act.

19        Against that background, Your Honor, the biggest flaw

20   in GM's claims in this case is a lack of causation.  GM has not

21   plausibly alleged that with what it refers to as one and a half

22   million dollars of alleged prohibited payments are the but-for

23   cause as well as the proximate cause of what GM contends are

24   billions of dollars in damages in the form of increased labor

25   costs.

ARGUMENT BY MR. HOLLEY

1    GM has two inconsistent theories about how it was

2 supposedly injured by its alleged prohibited payments, so it is

3 necessary to consider each of those theories separately with

4 regard to the issue of causation.

5    The first theory is that from the emergence of GM and

6 FCA's predecessor, which was called Chrysler Group LLC, from

7 bankruptcy in 2009 through mid-2015, FCA made prohibited

8 payments to the UAW that caused the UAW to confer various

9 benefits on FCA such as the ability to have more tier two

10 workers who are lower paid than GM had.  According to GM, this

11 resulted in GM having average hourly labor costs that were $8

12 higher than FCA's, $47 an hour in the case of FCA versus $55 an

13 hour in the case of GM.  So that's this theory number one.

14    Theory number two is that the alleged prohibited

15 payments are what caused the UAW to pick FCA as the lead among

16 The Big Three Detroit automakers in negotiating the 2015

17 collective bargaining agreement and that that put FCA in a

18 position to agree to what GM calls the most union-friendly

19 contract in history.  And according to GM, FCA knew that this

20 very rich contract it agreed to with the UAW would be pressed

21 on GM as a result of pattern bargaining thereby increasing GM's

22 labor costs.  And GM contends that FCA's goal in raising GM's

23 labor cost was to make GM more amenable to a merger with FCA

24 which is a proposal that GM's board of directors had already

25 rejected once in April of 2015.

1        So, first, Your Honor, I want to talk about but-for

2   causation as applied to these two theories.  Neither of them

3   passes muster under *Ashcroft*, A-S-H-C-R-O-F-T, *versus Iqbal*,

4   I-Q-B-A-L, in which the Supreme Court said that a claim has to

5   be plausible on its face and not be based on mere labels or

6   naked assertions.

7        Other than conclusory allegations, GM has no basis for

8   asserting that it was the alleged prohibited payments that had

9   caused FCA's labor cost to be lower than GM's in the period

10  from 2009 to 2015.  And the implausibility of that assertion is

11  underscored by the fact that it was GM not FCA that was the

12  lead in negotiating the 2011 collective bargaining agreement so

13  GM bears primary responsibility for the impact of that contract

14  and GM's labor costs.

15       And common sense dictates that a wide range of factors

16  like the relative seniority of the GM and FCA workforces or the

17  amount of overtime worked by employees at the two companies had

18  a substantial bearing on the relative hourly labor costs of GM

19  and FCA in the period from 2009 through 2015.

20       With regard to the second theory about the 2015

21  collective bargaining agreement, GM's allegations as to but-for

22  causation are even less plausible.  First, GM has not explained

23  why it would have been necessary for FCA to make the alleged

24  prohibited payments in order to persuade the UAW to make FCA

25  the lead in negotiating the 2015 collective bargaining

1  agreement if the FCA knew that FCA -- if the UAW knew, excuse

2  me, Your Honor, that FCA was prepared to enter into a very

3  union-friendly contract.  In fact, the UAW likely had a duty to

4  its members to make that choice.

5       Second, GM itself alleges, and this is in paragraph

6  134 of the complaint, Your Honor, that by 2015 both FCA and the

7  UAW knew that the federal government was investigating the

8  alleged prohibited payments.  And by the time FCA was selected

9  by the UAW as the lead in September, 2015, the supposed

10  ringleaders were already gone.  General Holiefield of the UAW

11  died of pancreatic cancer in February of 2015 and Alphons

12  Iacobelli left FCA in May of 2015.

13       Third, the notion that the 2015 collective bargaining

14  agreement between FCA and the UAW was structured to increase

15  GM's labor cost through pattern bargaining makes no sense on

16  its face when the news articles GM references in its complaint

17  point out that a major feature of that contract was to increase

18  the wages of tier two workers, a change that had the greatest

19  adverse impact on FCA because, as GM points out, FCA had a much

20  larger proportion of tier two workers than GM.

21       Your Honor, even if GM could persuade the Court that

22  alleged prohibited payments were the but-for cause of its

23  alleged injury, GM cannot escape the indirectness of that

24  alleged injury which fails RICO's strict proximate cause test.

25  Starting again with the period from 2009 to 2015 in which GM

```
 1    claims that the UAW made various concessions to FCA and, quote,
 2    without regard to the interest of UAW members, those are GM's
 3    words not mine, Your Honor, from paragraph 71 of the complaint,
 4    the complaint itself makes clear that the most direct victims
 5    of this conduct, if it occurred, were rank and file members of
 6    the UAW.  If the UAW agreed to let FCA pay its workers less
 7    money and pay less attention to worker grievances and health
 8    and safety issues, then it was plainly the UAW membership that
 9    would be most directly affected.
10         GM then goes on to allege that the individual
11    defendants failed to report the alleged improper payments to
12    the Internal Revenue Service making the federal government the
13    next most directly affected party, and that puts GM at best in
14    third place.  But the Supreme Court has made clear in cases
15    like Hemi, H-E-M-I, and Anza, A-N-Z-A, that only the most
16    directly injured party can sue under RICO and efforts to go
17    beyond the first step in the chain of causation are not
18    permitted.
19         GM fares no better under its second theory with regard
20    to proximate cause.  There are many steps in the chain of
21    causation between FCA being selected as the lead in negotiating
22    the 2015 collective bargaining agreement and the purported
23    injury to GM in the form of increased labor costs.
24         As one example, Your Honor, the original contract
25    agreed by FCA and the UAW was rejected by UAW members and had
```

```
1   to be sweetened before they would agree to it.  And obviously

2   that rejection had nothing to do with the alleged prohibited

3   payments.

4          Furthermore, the entire notion that FCA sought to

5   increase GM's labor costs in order to somehow soften GM up for

6   a merger defies economic logic.  GM has not explained why

7   having higher labor costs would make GM any more willing to

8   merge with FCA or why FCA would ever want its prospective

9   merger partner to be saddled with unfavorable collective

10  bargaining agreements for the next four years.

11         Now, GM has various arguments about why this causation

12  requirement doesn't apply, but none of them is available, Your

13  Honor.  First, foreseeability is not the test for proximate

14  cause under RICO.  GM asked the Court to embrace the notion

15  that the Sixth Circuit's decision in Wallace, W-A-L-L-A-C-E,

16  versus Midwest Financial directly contradicts controlling

17  Supreme Court precedent by holding that foreseeability is all

18  you need to establish proximate cause under RICO but that can

19  not be right, Your Honor.

20         Another court in this district has already rejected

21  the same attempt by a RICO plaintiff to use Wallace in an

22  effort to circumvent the Supreme Court's decisions in Anza and

23  Hemi.  That case, Your Honor, is Kerrigan, K-E-R-R-I-G-A-N,

24  versus Visalus, V-I-S-A-L-U-S, 112 F. Supp. 3d 580, Eastern

25  District of Michigan, 2015.
```

ARGUMENT BY MR. HOLLEY

1        And even on its own terms --

2        THE COURT:  That's a district court case, correct?

3        MR. HOLLEY:  Yes, Your Honor.  My point was that

4  another district court had already rejected the notion that the

5  Sixth Circuit was overruling the Supreme Court.

6        But even on its own terms, *Wallace* does not help GM

7  because unlike in *Wallace* it is not possible to, in the words

8  of the court, trace a straight line, end quote, between the

9  alleged prohibited payments and GM's alleged injury.  The line

10  GM is asking this court to draw is anything but straight.

11        Second, it does not matter that GM says it was the

12  intended target of an alleged scheme involving FCA and the UAW.

13  As the Sixth Circuit said in Perry, P-E-R-R-Y, against American

14  Tobacco, quote, specific intent to harm does not magically

15  create standing or cause injuries to be direct, unquote.

16        Third, the fact that GM claims it can identify an

17  injury that is distinct from injuries suffered by more directly

18  affected parties is irrelevant.  Even if GM could establish

19  that its injury is unique, it still has to show that that

20  injury was directly caused by prohibited payments and that is

21  something that GM has not and cannot do.

22        I'm not going to spend a lot of time with them, Your

23  Honor, but the Supreme Court identified three factors in

24  *Holmes*, H-O-L-M-E-S, against Securities Investor Protection

25  Corporation that underscore why GM is not a proper RICO

ARGUMENT BY MR. HOLLEY

1    [discernible].

2          First, others [discernible] of the alleged

3    prohibited --

4          THE COURT:  You're breaking up a little.  Can you

5    start that sentence again, please?  "Other," go ahead.  Sorry,

6    sir.

7          MR. HOLLEY:  Yes, Your Honor.  Other more direct

8    victims of the alleged prohibited payments can sue and have

9    already done so.  Several rank and file members of the UAW

10   brought actions challenging the alleged prohibited payments

11   long before GM brought this case.

12         Second, the notion that GM's labor costs were

13   increased as a direct result of the alleged prohibited payments

14   is inherently speculative and attempting to trace what GM's

15   labor costs would have been in the absence of the alleged

16   prohibited payments would be the opposite of straightforward

17   which is what it's supposed to be.

18         Again [discernible] does not [indiscernible] does not

19   deny that causes other than the bribery scheme, these are GM's

20   words, may have contributed to [indiscernible].

21      (The court reporter requests clarification.)

22         MR. HOLLEY:  So what I was saying is that this

23   speculative chain of causation is especially true because GM at

24   page 15 of its opposition does not deny that, quote, causes

25   other than the bribery scheme may have contributed to GM's

```
 1    higher costs, closed quote.  And third, GM alleges in
 2    paragraph 12 of the complaint that, quote, all stakeholders in
 3    the U.S. auto industry, closed quote, were affected by the
 4    prohibited payments.
 5         So concern about multiple recoveries is very real.
 6    The sheer number of potential plaintiffs in GM's contemplation
 7    would make an allocation of damages in this case incredibly
 8    complicated.  So because GM has not plausibly alleged either
 9    but-for causation or proximate cause, all of its RICO claims
10    should be dismissed, Your Honor.
11         The next problem GM faces is that it has not
12    adequately alleged the requisite pattern of racketeering
13    activity.  The alleged prohibited payments, if they occurred,
14    were an unfair labor practice under Section 302 of the National
15    Labor Relations Act.  Such a claim is subject to exclusive
16    jurisdiction of the National Labor Relations Board which has a
17    proceeding pending against FCA and the UAW relating to these
18    very same alleged prohibited payments.  It is true that
19    improper payments to union officials under the Taft-Hartley Act
20    are listed as a potential predicate act in the RICO statute,
21    but that does not mean that a private RICO plaintiff like GM
22    can assert such a claim.
23         In Trollinger, T-R-O-L-L-I-N-G-E-R, v. Tyson,
24    T-Y-S-O-N, Foods, the Sixth Circuit held that a federal court
25    can adjudicate a civil claim based on conduct prohibited by
```

```
 1   federal labor laws only if, quote, the labor questions in the
 2   case amount to no more than collateral issues, closed quote.
 3          Here, of course, Your Honor, the labor questions are
 4   absolutely central making this a labor case masquerading as a
 5   RICO case.  And that's confirmed by the fact that last year the
 6   Sixth Circuit in a case called DeShelter, D-E capital
 7   S-H-E-L-T-E-R, v. FCA US dismissed claims based on these same
 8   alleged prohibited payments because they were, quote, unfair
 9   labor practice claims over which the NLRB has exclusive
10   jurisdiction, closed quote.
11          Without the alleged prohibited payments as predicate
12   acts, GM's RICO claims against FCA cannot survive.
13          The next problem, Your Honor, is that under 1962(b),
14   Section 1962(b) of the RICO statute, GM has not plausibly
15   alleged that FCA acquired an interest in or obtained control
16   over the United Auto Workers.  Now, saying that FCA used the
17   alleged prohibited payments to gain a degree of influence over
18   certain decisions made by the UAW is not enough.  GM had to
19   allege that FCA gained power over the day-to-day operations of
20   the union akin to what a majority shareholder would have over a
21   corporation.  It has to be a proprietary interest not merely
22   influence.  GM has not made such an allegation, Your Honor.
23          The added problem is that GM was supposed to allege an
24   injury by virtue of FCA's purported acquisition of control over
25   the UAW, that is, quote, separate and apart from the injuries
```

1   suffered as a result of the predicate acts of racketeering

2   activity, closed quote.  That is the Sixth Circuit case called

3   Aces, A-C-E-S, High Coal Sales Inc. against Community Bank and

4   Trust from last year.  But GM did not even attempt to allege a

5   distinct acquisition of control injury different from its

6   alleged predicate acts.

7       Finally, Your Honor, moving to the statute of

8   limitations, all of GM's claims premised on conduct that

9   occurred prior to November 20, 2015, four years before GM

10  brought this case, are barred by RICO's four-year statute of

11  limitation.  GM wants to avoid that result by arguing that the

12  statute of limitations did not begin to run until GM discovered

13  what it calls the bribery scheme involving FCA and the UAW.

14  But as the Supreme Court made clear in a case called *Rotella*,

15  R-O-T-E-L-L-A, *versus Wood*, it is the discovery of the alleged

16  injury not discovery of the other elements of a RICO claim that

17  starts the clock running.  And GM knew that its hourly labor

18  costs were substantially higher than FCA's long before

19  November 20, 2015, based on publicly available information.

20  Yet [discernible] --

21      THE COURT:  Start that again, please.  I had to move a

22  page.  Sorry.

23      MR. HOLLEY:  No problem, Your Honor.

24      THE COURT:  I will issue a warning when I have to move

25  a page or get a court decision to quote, so I apologize to

1   Mrs. Lizza and I'll do a -- I'll say "stop" and we'll go from

2   there.  So please repeat that.  Thank you.

3         MR. HOLLEY:  Yes, Your Honor.  So the point I was

4   making is that GM knew that its hourly labor costs were

5   substantially higher than FCA's long before November 20, 2015,

6   based on publically available information.  Yet GM sat on its

7   hands for more than two years after the first indictment was

8   unsealed in the criminal cases involving the alleged prohibited

9   payments deciding to bring this case only after FCA announced

10  its intention to merge with Groupe PSA in France, the maker of

11  Peugot and Citroen cars.  Your Honor, such a lack of diligence

12  and strategic behavior should not be rewarded.

13        THE COURT:  So you're saying forget about the

14  four-year statute of limitations because actions took place

15  that created a situation where they would know that they had

16  been harmed and those actions bolster your argument with regard

17  to the statute of limitations?  Is that what you're saying?

18        MR. HOLLEY:  Not exactly, Your Honor.  What we're

19  saying is that we accept the proposition that the 2015

20  collective bargaining agreement which was ratified literally,

21  you know, four years to the day before we brought their lawsuit

22  is within the statute of limitations.  We think that claim

23  should be dismissed for multiple other reasons.  But conduct

24  that occurred before, you know, November 20 of 2015 is not a

25  valid basis for a RICO claim because it's barred by the

ARGUMENT BY MR. HOLLEY

```
 1    four-year statute of limitations.

 2            THE COURT:  Thank you.

 3            MR. HOLLEY:  So, Your Honor, I would now propose to

 4    move to FCA N.V.'s motion to dismiss, if that's all right with

 5    the Court.

 6            THE COURT:  Why don't we stop on this right now and

 7    then I've allotted a separate time for the N.V.  So we're going

 8    to do the -- well, you know what?  Let's go ahead with N.V.

 9    because that's just another ten minutes on top of that.  So it

10    will assist the Court.  Go ahead.

11            MR. HOLLEY:  Yes, Your Honor.  So with regard to FCA

12    N.V.'s motion to dismiss, GM improperly seeks to shift the

13    burden to FCA N.V. but it was GM's burden to make a prima facie

14    showing that the Court can exercise personal jurisdiction over

15    FCA N.V. consistent with the dictates of the due process

16    clause.  That's not what GM did.

17            Just for starters, GM does not contend that FCA is

18    subject to a general jurisdiction nor could GM make that

19    contention because FCA N.V. is not at home in Michigan which is

20    what GM would be required to show under the Supreme Court's

21    decision in Daimler, D-A-I-M-L-E-R, versus Bauman, B-A-U-M-A-N.

22    GM does not deny that FCA N.V. is a Dutch corporation with its

23    principal executive offices in London.  Instead, GM asserts

24    that FCA N.V. is subject to specific jurisdiction.  But in its

25    95-page complaint FCA fails to plead any facts demonstrating
```

```
 1   that FCA N.V. had purposeful contacts with the State of
 2   Michigan or the United States, for that matter, and that GM's
 3   claims in this case arose from those contacts.  Nothing in the
 4   indictments, the plea agreement or the sentencing memoranda on
 5   which GM places such great reliance in its complaint even
 6   suggests that FCA N.V. had anything to do with the alleged
 7   prohibited payments much less that the parent company in the
 8   Netherlands orchestrated those payments as part of a scheme to
 9   harm GM.
10           THE COURT:  Was Mr. Marchionne -- was Mr. Marchionne
11   the head of FCA N.V. and FCA when he passed?
12           MR. HOLLEY:  Yes, Your Honor, he was the CEO of both
13   corporations.
14           THE COURT:  Thank you.
15           MR. HOLLEY:  GM tries to hide the absence of facts of
16   FCA N.V. by engaging in group pleading referring to something
17   called FCA Group throughout the complaint which GM defines to
18   include both FCA US and FCA N.V. but there is no corporate
19   entity called FCA Group.  There's FCA N.V., the parent company
20   which is a holding company, and its wholly-owned operating
21   subsidiary in the United States which is FCA US LLC.
22           Comparing the allegations in the complaint to the
23   documents that GM relies on as support for those allegations
24   makes clear that the actions attributed to FCA Group do not
25   implicate FCA N.V. at all.  For example, Your Honor, in
```

1   paragraph 70 of the complaint GM alleges that, quote, FCA Group

2   funds, closed quote, were used for lavish dinners and golf

3   outings for UAW officials.  As support for that allegation, GM

4   relies on the plea agreement of Norwood Jewell.  I think he's

5   probably someone you're familiar with.

6           THE COURT:  Quite.

7           MR. HOLLEY:  N-O-R-W-O-O-D.  But that document says

8   nothing about FCA N.V.  At pages 9 and 10 it states that the

9   funds at issue were FCA funds, and FCA in the plea agreement is

10  defined as FCA US not FCA N.V.

11          GM's allegations that the prohibited payments were

12  made, quote, with the knowledge and the approval of FCA N.V. is

13  similarly unavailing.  That allegation concerns a purely

14  passive act even if it occurred not the sort of intentional act

15  directed at the forum state which is what you need to support

16  specific jurisdiction.  And GM's conclusory allegations that

17  FCA N.V. acted through Mr. Marchionne who, as the Court pointed

18  out, was the CEO of both FCA N.V. and FCA US at the relevant

19  time is not a basis for asserting specific jurisdiction.

20          GM alleges no facts to overcome the well established

21  presumption which comes from the Supreme Court's decision in

22  *U.S. v. Bestfoods*, B-E-S-T-F-O-O-D-S, one word, that an officer

23  holding positions with both a parent company and its subsidiary

24  is acting on behalf of the subsidiary.  And that presumption

25  makes particular sense here because GM alleges that

**ARGUMENT BY MR. HOLLEY**

1   Mr. Marchionne took actions in Michigan to influence the

2   negotiation of collective bargaining agreements between FCA US

3   and the United Auto Workers, contracts to which FCA N.V. was

4   not a party and which related solely to U.S. workers in U.S.

5   factories.  Those contracts had nothing to do with the

6   Netherlands, Your Honor.

7          In sum, GM has not plausibly alleged that FCA N.V.

8   engaged in activities in Michigan that gave rise to GM's

9   claims.  Having failed to make a prima facie showing of

10  specific jurisdiction as to FCA N.V., it was not necessary for

11  FCA N.V. to introduce evidence on this motion confirming that

12  it was not subject to specific jurisdiction in the United

13  States.

14         And very briefly, Your Honor, even if the Court were

15  to conclude that it could exercise personal jurisdiction over

16  FCA N.V. and was not persuaded to dismiss the entire complaint

17  based on the deficiencies I noted earlier today with regard to

18  FCA US's motion to dismiss, the Court should nonetheless

19  dismiss the claims against FCA N.V. under Rule 12(b)(6).

20         GM was required to plausibly allege that each

21  defendant, not in a group but each defendant, was involved in

22  the performance of the requisite predicate acts of racketeering

23  activity.  But if you look at the complaint, the only

24  references to FCA N.V. are a description of FCA N.V. in

25  paragraph 17 of the complaint, a purported statement of the

ARGUMENT BY MR. NEDELMAN

1    basis of personal jurisdiction over FCA N.V. in paragraph 42 of

2    the complaint and a conclusory allegation in paragraph 64 of

3    the complaint that FCA N.V. had, quote, knowledge and approval,

4    closed quote, of the alleged prohibited payments.  Such thread

5    bare allegations are not sufficient, Your Honor, to state a

6    RICO claim against FCA N.V.

7           Thank you, Your Honor.  That's all I have on those two

8    motions to dismiss.  I would be happy to answer any questions

9    the Court may have.

10          THE COURT:  Not right now.  I may have when you

11   return.

12          Okay.  Now we're up to Mr. Nedelman.

13          MR. NEDELMAN:  Thank you, Your Honor.  Again, Michael

14   Nedelman appearing on behalf of Alphons Iacobelli.

15          I believe that Mr. Holley very capably discussed the

16   case law regarding the requirement for but-for causation, but I

17   think it's important to even take a step back.  Despite 95

18   pages by General Motors in its complaint trying to weave a

19   compelling story, General Motors never actually alleges in the

20   complaint that but for the alleged predicate acts General

21   Motors would not have suffered damages.

22          In the absence of that very simple statement, it's

23   fatal to the maintenance of General Motor's claims.  It could

24   have done it had it wanted to fulfill its pleading

25   requirements, but I think there's a -- an understandable reason

1   why it didn't.  And the reason that it didn't is because there

2   is no way for General Motors in good faith to plead that but

3   for the alleged predicate acts GM wouldn't have suffered the

4   damages that it claims to have suffered.

5          Without abject speculation, there is no way that

6   General Motors could have alleged the terms and conditions that

7   it alleges it would have reached in the UAW different than the

8   terms and conditions it ultimately reached.  What General

9   Motors is actually asking this Court to do, Your Honor, is to

10  award -- well, first, allow GM to pursue a claim and then award

11  damages based upon the speculative outcome of a hypothetical

12  set of labor negotiations that would have the Court reenact the

13  2015 labor negotiations, assume that but for the predicate acts

14  GM would have been identified as the initial target then

15  speculate further on what the ultimate terms and conditions of

16  that labor negotiation would have been, further assume that the

17  UAW would have recommended those terms and conditions to its

18  membership and then further assume that the membership would

19  have agreed to those terms and conditions.

20         That speculation, that very type of analysis is

21  speculation in the extreme and the type of speculation found

22  infirm in *Empire Merchants*, E-M-P-I-R-E, *Merchants, LLC versus*

23  *Reliable Churchill LLP*, is the type of speculation that this

24  court could never and should not engage in.

25         So even though -- even if GM had alleged but-for

1    causation which it didn't, which is fatal to its claim, the

2    nature of the speculative inquiry that this Court would have to

3    entertain bars the maintenance of this claim.

4            I agree with Mr. Holley on behalf of FCA that under

5    controlling case law the complaint fails to adequately plead

6    proximate cause and that that alone is sufficient to compel

7    dismissal of this case.  The statute of limitations argument, I

8    differ with Mr. Holley in only the following regard.  While I

9    agree that everything well prior to November 20 of 2015 is

10   barred, I think the Court's inquiry has to go a little farther

11   than that.  The Supreme Court in *Rotella* has said, well, look,

12   if there are storm warnings, if you should have been aware, if

13   you should have been on inquiry, if you had notice, the clock

14   starts running.  Well, General Motors in its complaint and, in

15   particular, if I pick the latest dates, at complaint

16   paragraph 132, General Motors itself alleges that in October of

17   2015 it conducted its own analysis of the UAW contract and

18   concluded that it would be damaged in its view by the

19   application of the pattern bargaining system as the next in

20   line to negotiate with the UAW.  And that should have been

21   sufficient to trigger at the absolute latest the running of

22   this four-year statute of limitations, and the filing of a

23   complaint on November 20 of 2019 was simply too late.

24           I would also note a significant difference between the

25   positioning of FCA and that of Mr. Iacobelli because

ARGUMENT BY MR. NEDELMAN

1  Mr. Iacobelli, as Mr. Holley noted, departed from FCA and the

2  National Training Center on June 9th of 2015.  The four-year

3  statute of limitation could not have extended to November 20 of

4  2019 which GM attempts to do.

5          And for that reason and for the reasons set forth in

6  our moving papers, we request the complaint be dismissed.

7  Thank you, Your Honor.

8          THE COURT:  Okay.  Thank you, Mr. Nedelman.

9          Before we take a break and then, Mr. Willian, as you

10  argue, we're going to take a break, but I may say "stop."  It

11  is not intended to be rude.  It is only intended to let me --

12  to grab a paper or a case and to then follow your continuing

13  argument.  So just be aware of that because Mrs. Lizza has the

14  toughest job and I did not realize that when I usually grab

15  papers that it does interfere with the argument.

16          So we'll see everybody in ten minutes.  Thank you.

17          MR. NEDELMAN:  Thank you, Your Honor.

18      (Court in recess, 10:47 a.m. to 10:54 a.m.)

19          THE LAW CLERK:  Court is back in session.

20          MR. WILLIAN:  Hello, Judge.  I could not hear you

21  there for a moment.

22          THE COURT:  Can you hear me now?

23          MR. WILLIAN:  I can, yes, sir.

24          THE COURT:  Why does it show a lock, Jason, on my

25  screen, on the right?

ARGUMENT BY MR. WILLIAN

```
 1            Maura, do you know why?
 2            MR. OWENS:  It has to do with the configuration of the
 3    unit itself.  It's something you can ignore.
 4            THE COURT:  Okay.  Okay.  These days it's hard to
 5    ignore technological innovations.
 6            Okay.  Mr. Willian, please.
 7            MR. WILLIAN:  Yes.  May it please the Court, my name
 8    is Jeff Willian.  I represent the plaintiffs General Motors LLC
 9    and General Motors Company.
10            With great specificity based significantly on
11    defendants' own criminal admission, GM has alleged a
12    long-running racketeering scheme designed to directly harm GM
13    and provide FCA and FCA N.V. with a competitive advantage.
14    This was a pay-to-harm scheme implemented by defendants
15    literally within weeks of entering the U.S. marketplace in
16    2009.  Year after year FCA bribed UAW leaders to provide FCA
17    with certain structural labor advantages that were expressly
18    denied to GM and then eventually --
19            THE COURT:  Are you saying that when it came out of
20    bankruptcy, wasn't there a calculus that Chrysler was saved
21    because they had to merge with someone or -- and the President
22    even said you have to merge with we'll call it FCA or you're
23    going to go under.  And so wasn't that part of the calculus in
24    creating the benefit for FCA, and GM at the same time received
25    the President's attention to the extent that there's no way
```

1   that he was going to let it go under.  So weren't those

2   benefits part of the TARP rescue program that FCA should get to

3   stay alive because of the cost structure at that time and

4   didn't those continue on?

5           MR. WILLIAN:  No.  No, sir.  So the structural

6   elements that we're talking about are labor components that had

7   nothing to do with that.  Those are advantages that were

8   purchased through a bribery scheme.  And so -- and we detail

9   those with great detail.  They relate to World Class

10  Manufacturing, tier two and tier one.  They relate to temps.

11  Those aren't derived specifically from any regulation or TARP.

12  Those were the specific subject of bribery.  Those advantages

13  were purchased through bribery and logically they could not be

14  given to GM, the same advantages.

15          And that's precisely what we allege, that this was a

16  pay-to-harm scheme.  And the key here, Your Honor, the key here

17  is the industry itself.  The industry here --

18          THE COURT:  When you say pay to harm, you're talking

19  about pay to harm GM not pay to harm UAW workers.

20          MR. WILLIAN:  That's precisely correct, Your Honor.

21          THE COURT:  Okay.  Now, you had Global Manufacturing,

22  but that was your program that was comparable to FCA's World

23  Class Manufacturing, but you're saying it wasn't comparable

24  because of your claim about pay to play.

25          MR. WILLIAN:  That's correct, Your Honor.  So with

```
1    respect to manufacturing operations, pay to play involved FCA
2    paying to get labor flexibility for their World Class
3    Manufacturing which is a program that was expressly denied to
4    GM.  GM asked for this advantage and it was denied, and it was
5    denied because of the bribes.
6              THE COURT:  It was denied because of the bribes or it
7    was denied because of the way they rolled out of bankruptcy
8    where the government had said FCA is a mess or Chrysler is a
9    mess, the last chance is for FCA to take over Chrysler and
10   we're going to give them some degree of assistance to try and
11   let them recover and keep those jobs in the Chrysler/FCA area
12   to allow the company to survive and progress.
13             MR. WILLIAN:  So we understand that Chrysler --
14   everyone wanted Chrysler to survive, but once they rolled out
15   of bankruptcy, after they rolled out of bankruptcy the question
16   is how would they operate --
17             THE COURT:  You're saying everyone wanted Chrysler to
18   survive.  Did GM want Chrysler to survive or did they want to
19   pick off -- if it went under, did they want to pick off Jeep
20   and Ram and maybe mini vans too?
21             MR. WILLIAN:  Well, certainly the government wanted
22   Chrysler to survive, but my point is, Your Honor, after
23   Chrysler rolled out of bankruptcy and starting in May of 2009,
24   it -- to make sure that it didn't crash, Mr. Marchionne and
25   Mr. Iacobelli implemented a bribery scheme.  It's well
```

1   documented, and the very fundamental purpose of that scheme, as

2   Mr. Iacobelli admits, was to purchase advantages that were to

3   be denied to GM.  That was -- GM was the intended target of the

4   scheme because Chrysler wanted or FCA wanted to outcompete GM.

5          THE COURT:  Didn't Mr. Iacobelli, when he left FCA,

6   get hired by GM?

7          MR. WILLIAN:  He did, Your Honor.  At that time, of

8   course, GM had no indication whatsoever there was any sort of

9   scheme that was going on nor was that ever disclosed to GM at

10  the time by Mr. Iacobelli.

11         THE COURT:  And GM, I presume, vetted him and knew he

12  was driving a 300 and something thousand dollar car and doing

13  all these various financial issues on his behalf personally

14  and...

15         MR. WILLIAN:  Yeah.  I understand the question, but GM

16  did vet him and had absolutely no knowledge whatsoever nor is

17  it in the complaint that Mr. Iacobelli had engaged in this

18  bribery scheme since 2009 nor could it.  Mr. Iacobelli took

19  many, many steps to hide that scheme.

20         THE COURT:  Okay.

21         MR. WILLIAN:  So if I could go to but-for cause, Your

22  Honor.  But-for cause in a nutshell is --

23         THE COURT:  Let's also use the term "proximate cause"

24  because that's pretty heavy in the Supreme Court decisions with

25  regard to the issue that we're facing.

ARGUMENT BY MR. WILLIAN

1        MR. WILLIAN:  I -- that's fine, Your Honor.  I first
2    will address but-for cause and then I'll go to proximate cause.
3        THE COURT:  Okay.  Thank you.
4        MR. WILLIAN:  They are separate.
5        So in a nutshell there should be no question that GM
6    has alleged but-for cause here.  It's alleged that FCA's
7    fraudulent scheme made perfect economic sense if one is willing
8    to commit fraud, bribe union leaders who control the labor
9    markets to harm a competitor by using their bargaining power to
10   impose higher costs on a competitor.  That is the definition of
11   but-for cause.  The bribes cause GM economic harm.
12       If you want to go to 2015, we can go to 2015.  FCA
13   makes the argument that that scheme as alleged made no economic
14   sense, that Mr. Marchionne would craft such an outsized CBA
15   with asymmetrical costs to harm GM to force a merger, but, Your
16   Honor, you need go no further than look at the words of
17   Mr. Marchionne that are alleged in the complaint at paragraph
18   116.  Mr. Marchionne states openly in June of 2015 that it
19   would be unconscionable not to force a merger.  That was his
20   goal --
21       THE COURT:  He definitely from day one I think, even
22   before he took over, had the idea of creating a merger between
23   those two entities.  The question is whether that intent to try
24   and create a merger is in play here to the extent that
25   everything that occurred was done to try and create a merger

**GENERAL MOTORS LLC, ET AL. v. FCA US LLC, ET AL., 19-13429**

```
 1   and it was done illegally.  But there's no question that he did

 2   seek a merger, then they had Operation Cylinder and he tried to

 3   proceed with those matters.  But that doesn't mean that there

 4   was a proximate cause situation here with regard to the CBA in

 5   2015 which you have said benefited Chrysler workers

 6   significantly.  So the fact that Chrysler was a target or I'll

 7   call it FCA, does that mean that, therefore, GM was a victim?

 8            MR. WILLIAN:  Well, the target was GM.  GM was the

 9   victim of this scheme and, again, we can go to Mr. Marchionne's

10   own words which we point out in our response and have never

11   been addressed by FCA, and that's at paragraph 129 of the

12   complaint where Mr. Marchionne, after the 2015 CBA had been

13   negotiated and before it was going to be pressured on GM

14   through the power of pattern bargaining, stated the economics

15   of the deal are almost irrelevant because the costs pale in

16   comparison to the magnitude of the potential synergies and

17   benefits of, as we allege, forcing a merger with GM.  He all

18   but admitted the scheme other than the bribes.  And the only

19   way he was able to accomplish that CBA which included

20   asymmetrical costs to harm GM was to secure the lead through

21   bribes and then he crafted it to harm GM and he admitted that

22   here openly.  It was a bribe-fueled negotiation with the UAW.

23            THE COURT:  When you say he admitted bribing people to

24   get a deal or you're saying that the facts played out, showed a

25   bribe?
```

35

```
 1          MR. WILLIAN:  So obviously he didn't admit.  I said he

 2   admitted to the scheme all but the bribes, I thought, and

 3   obviously eventually we learned that his dealings with the UAW

 4   in connection with the 2015 CBA was fueled by bribery.

 5          The but-for cause, Your Honor, has easily been met,

 6   and I'll turn to proximate cause unless you have further

 7   questions on but-for cause.

 8          THE COURT:  Please proceed.

 9          MR. WILLIAN:  So with respect to proximate cause, an

10   important procedural point for the Court is this argument only

11   goes to the 1962(c) claim.  It does not go to the 1962(b)

12   claim.  I think the Court is well aware of that, but I just

13   wanted to make sure that was clear on the record.

14          So --

15          THE COURT:  The proximate cause does not go to all the

16   RICO claims?  You're saying that there's a gap in the law?

17          MR. WILLIAN:  No, I'm not, Your Honor.  So when you

18   look at all the authorities that are cited having *Anza*, *Holmes*,

19   et cetera, they are -- those cases are addressing a 1962(c)

20   proximate cause claim.  1962(b), the proximate cause is quite

21   different.  There the harm has to come from the control itself.

22   So here we've alleged that the UAW, their decision making for

23   the CBAs were controlled and that is easily met.  So here with

24   respect to the 1962(c) claim, the harm has to come from the

25   racketeering activity, the bribes themselves.  So it is a
```

ARGUMENT BY MR. WILLIAN

1   different analysis and the arguments of defendants only on

2   proximate cause, if you go back in the briefs, you'll see

3   that's confirmed, only go to 1962(c).

4          THE COURT:  Well, I think they cite the Supreme Court

5   decisions to say proximate cause within the RICO claim means

6   proximate cause, period.

7          MR. WILLIAN:  Understood.  The authority that we're

8   speaking about and the arguments that are being made go to

9   1962(c).  But regardless, the first critical point I want to

10  make to this court is that it is the nature of this industry

11  that allowed FCA to inflict racketeering harm on GM.  The UAW

12  controls the labor markets for both FCA and GM.  It exclusively

13  represents both GM and FCA workforce.  It's with this market

14  power with its principle function of negotiating a CBA and

15  administering the CBA that the scheme was able to be pulled

16  off.  So once the UAW became willing to accept bribes to impose

17  higher costs on our competitor, and did so as alleged here, the

18  direct harm is claimed.  The UAW had the power to directly harm

19  GM.  It had that position and it did accept those bribes and,

20  as alleged, it directly harmed GM.

21         Nobody else, Your Honor, nobody else suffered these

22  higher labor costs.  Nobody else has a claim for these higher

23  labor costs.  There's no issue of allocation.  There's no issue

24  of double recovery.  Only GM has suffered this harm.

25         I would ask the Court to look closely, as it will, I'm

Case 2:19-cv-13429-PDB-DRG   ECF No. 75, PageID.2896   Filed 06/25/20   Page 37 of 69

ARGUMENT BY MR. WILLIAN

37

1    sure, to the *Bridge* case and the Seventh Circuit's *Empress*
2    *Casino* case.  In both those cases, it was the nature of the
3    industry that allowed direct harm from one competitor to
4    another.  In *Bridge* it was that unique closed auction system
5    where one competitor was able to rig the auction and caused
6    direct harm on another competitor.  In the *Empress Casino* it
7    was a competitor's bribe to a governor who like the UAW had the
8    power to take action, there sign a harmful piece of legislation
9    into law and directly harm a competitor.
10         So the point is this industry is like those
11   industries.  There's the opportunity for the direct harm
12   because the UAW sits in the middle of GM.  It sits in the
13   middle of FCA and controls their labor markets.  The line --
14         THE COURT:  Didn't the UAW workers vote down a
15   contract so -- you're saying the UAW, if the workers vote down
16   a contract, they're acting independently?  Doesn't GM have the
17   ability to say no, we're not going to follow -- in other words,
18   going into bankruptcies, you're saying there was a pattern, all
19   the labor experts say there was pattern bargaining, and even
20   though when they came out there were differences between the
21   pay structures of the companies that they came out of the
22   bankruptcy situations that the government was well aware of in
23   terms of the TARP program and was going to try and was
24   recommending continuing for a while, and you're saying the
25   awhile meant stop at a certain point and then you're saying

1   everything had to be specifically pattern bargaining even

2   though GM on its own could resist a pattern, could call a

3   strike and proceed that way.

4        MR. WILLIAN:  So we have detailed allegations on

5   pattern bargaining.  It is a effective tool.  It has market

6   power because it is backed up in 2015 by the threat of strike

7   as GM recently experienced.  So you can say that GM could just

8   say no, but it can't.  It's foreseeable, it's a natural that

9   when a specific labor term is trying to be pushed onto GM that

10  the power of the UAW and the power of pattern bargaining would

11  allow that to happen.  That's what pattern bargaining is; it's

12  an effective tool.

13       THE COURT:  Was pattern bargaining something that had

14  the same control after the bankruptcies and going forward?

15  Yes, they did talk about pattern bargaining and, yes, the UAW

16  did pick FCA but does that mean that automatically GM suffers

17  because they pick FCA, they get a rich contract.  You're saying

18  the fact that the FCA bargaining created a rich contract for

19  their employees hurt GM because GM also would have to follow

20  and provide a rich contract for their employees?

21       MR. WILLIAN:  So I'm saying two things, Your Honor.

22  First, as of 2015, which is what your question goes to, the CBA

23  was agreed to and then GM had to follow pattern.  UAW used

24  their bargaining power, their power of strike to naturally push

25  that contract onto GM.  Yet the consequences of GM not agreeing

1     to pattern is a very costly strike.  That is proximate cause,

2     Your Honor, because it's foreseeable and it's natural that the

3     power of pattern bargaining could be used to force that on GM.

4     That's 2015 and pre-2015 is different.

5            So pre-2015 the pattern of power bargaining does not

6     come into play like it does in 2015, because in 2011 there was

7     no right to strike by the UAW and so pre-2015 these were

8     specific structural programs that would have saved GM money

9     that it asked for and the UAW denied because it was being

10    bribed.  FCA instructed it was not to give those programs to GM

11    and GM was denied those savings programs incurring higher

12    costs.  That is the definition of direct harm, Your Honor.

13           THE COURT:  You're saying that FCA not just got a

14    benefit but also said don't give these to GM or was the UAW

15    saying the whole structure going forward was different between

16    these companies and the fact that FCA got certain concessions

17    meant that if GM then was following, that they were a potted

18    plant, that they had to, to use Brendan Sullivan's words from

19    back many years ago, that they didn't -- they were

20    straightjacketed by this program and could not be an

21    independent thinker or an independent player within the

22    automotive industry?

23           MR. WILLIAN:  So it's obviously not what we're

24    alleging, Your Honor.  The point is the UAW has market power.

25    The UAW can say no and there's nothing GM can do about it.

```
 1    It's a controlled labor force.  Think of it as monopoly power.
 2    So when GM asked for the same labor advantage that FCA got and
 3    it's denied, it has reasons to believe that perhaps the UAW is
 4    acting in good faith, but we now know that it was part of a
 5    bribery scheme.
 6          And as to proximate cause, Your Honor, it's a very
 7    straightforward analysis.  Bribes from FCA went to UAW who had
 8    the power to harm GM by denying them those same structural
 9    labor programs, and they did it.  That is classic --
10          THE COURT:  You're saying the UAW did it but the UAW
11    is not a defendant in this case and they seem to be the one
12    that everything is aimed at, their conduct.  And yet they're
13    not a defendant in this case, correct?
14          MR. WILLIAN:  They are not a defendant in this case,
15    that's correct, Your Honor.  But as alleged, they are a
16    co-conspirator, and we've alleged that at great length
17    obviously, and here we're alleging that the UAW was used as a
18    tool essentially, they had bargaining power, they were bribes
19    and they were used as a tool to directly harm GM.  They had the
20    power to do so and they did.
21          THE COURT:  Thank you.
22          MR. WILLIAN:  Staying with proximate cause for one
23    minute, Your Honor.
24          THE COURT:  Please.
25          MR. WILLIAN:  Yes.  We would ask the Court to closely
```

1    follow *Wallace*.   *Wallace* has many helpful factors in it, but --

2            THE COURT:   Okay.   Let me just help Mrs. Lizza,

3    *Wallace v. Midwest Financial*, 714 F.3d 414, Sixth Circuit,

4    2013.

5            Let me just read a couple quotes from *Wallace* where it

6    begins and then you can go with regard to where it continues.

7    And if my paper reading impacts Mrs. Lizza, let me know and

8    we'll get it straight.

9            So in *Wallace*, the Supreme -- the Sixth Circuit says

10   "The Supreme Court has held in no uncertain terms that under

11   each provision a plaintiff must show that the predicate acts

12   not only were a but-for cause of injury but were the proximate

13   cause as well, citing *Holmes versus SIPC,*" which we talked

14   about before.

15           Proceeding further, the Sixth Circuit says "In *Holmes,*

16   the Supreme Court explained that this language requires

17   plaintiffs to plead and prove proximate causation."

18           Thereafter in the opinion, the Sixth Circuit discusses

19   Court of Appeals decisions *Perry versus American Tobacco* and

20   also see *Hemi Group* which talks about the requirement about

21   proximate cause.

22           The Sixth Circuit then goes over and talks about

23   foreseeability and then says that "while proximate cause is

24   flexible," and it then cites *Bridge*, but it doesn't cite *Hemi*

25   *Group* for that and *Hemi Group* came after *Bridge* in 2010.

ARGUMENT BY MR. WILLIAN

1    *Bridge* was in 2008.

2         The Sixth Circuit then says, "However, the Supreme

3    Court recently held," again, citing *Bridge* but not *Hemi* which

4    was more recent than *Bridge*, "that proximate cause can be a

5    little -- not axially proximate cause," and then it cites

6    Justice Thomas's dissenting and concurring opinion in *Anza*

7    which is, again, a dissenting and concurring opinion.

8         So I have a question about -- and then the impact of

9    *Wallace* as whether it really undermines Supreme Court

10   precedent, changes it or fails to recognize what the court held

11   in both *Anza* and in *Hemi* group when it says the -- because --

12   in *Hemi Group* which is 130 Supreme Court 983, "We explained,"

13   talking about prior decisions, "proximate cause is required

14   and, as we reiterated at *Holmes*, the general tendency of the

15   law in regard to damages is not to go beyond the first step."

16   And then the Supreme Court said that in this situation that

17   "our precedent", this is in *Hemi Group* again, at page 12, "Our

18   precedent made clear that in the RICO context the focus is on

19   the directness of the relationship between the conduct and the

20   harm. *Anza* and *Holmes* never even mention the concept of

21   foreseeability."

22        Okay.  Go ahead.  I'll hear your argument on *Wallace*

23   and the other cases, but I thought it important to, as I read

24   these, to at least quote the Supreme Court precedent and the

25   point within *Wallace* where it repeats the Supreme Court

GENERAL MOTORS LLC, ET AL. v. FCA US LLC, ET AL., 19-13429

1   precedent but yet goes into a further discussion of a concept

2   that I think the Supreme Court has not in any way accepted.

3           MR. WILLIAN:  So the point I would make is importantly

4   to the Court's observations.  GM's claims do not depend on

5   foreseeability.  GM's claims are direct.  Just like in *Hemi*,

6   there is one step to causation.  You have a bribe from FCA to

7   the UAW who has the power to harm GM and it does so by denying

8   it specific labor advantages.  Or in the case of the 2015 CBA,

9   pressuring GM through the power of pattern bargaining to accept

10  the CBA that it did that cost GM an extra billion dollars above

11  what the UAW initially negotiated with it.

12          These are --

13          THE COURT:  So both of those help the workers, they

14  get better deals under the CBAs, but you're saying that's

15  corrupt.

16          MR. WILLIAN:  So we have to break down the pre-2015

17  and the 2015, Your Honor.

18          THE COURT:  Okay.

19          MR. WILLIAN:  So with respect to the 2015 CBA, yeah,

20  incidentally that probably helped the FCA workers or the UAW

21  workers but it --

22          THE COURT:  And the GM workers.

23          MR. WILLIAN:  And the GM workers.  But it was corrupt

24  because FCA was able to obtain the lead through bribes and

25  then, as we allege, they crafted a CBA to asymmetrically harm

1    GM because it had a higher number of tier one workers, itself a

2    product of the prior bribery scheme.  Yes, that is direct harm.

3              But let's go back to the pre-2015 allegations, Your

4    Honor.  There the line is straight and direct.  The bribes went

5    from FCA to the UAW.  The UAW had the power to harm GM and they

6    denied those advantages to GM.  And the point I wanted to make

7    out of *Wallace* which I think the Court will agree has not been

8    in any way contradicted by *Hemi*, is the Court found in *Wallace*

9    it highly relevant that the proximate cause analysis that

10   *Wallace* was the targeted victim, highly relevant.  And as the

11   Court stated, once we accept *Wallace*'s status as the intended

12   target, the link between the scheme and the injury is plain to

13   see.  That is the same here, Your Honor.  GM has alleged that

14   it was the targeted victim.  Mr. Marchionne's own words make

15   that clear.  And, therefore, the line, the proximate cause, is

16   plain to see.

17             THE COURT:  When you say his own words, specify,

18   please.

19             MR. WILLIAN:  Yeah.  They're the same words that I

20   specified before, Your Honor, that Mr. Marchionne said it would

21   be unconscionable not to force a merger with GM and then --

22             THE COURT:  He did that goal from day one when he took

23   over -- when the government said take it over and save us, and

24   I know your complaint mention -- that, you know, they paid not

25   $1 for it, but at the same time he said I have FCA, wouldn't it

1    be great if we could merge with GM to save everybody a lot of

2    money, to help workers to get better pay and to help the auto

3    industry in the United States.

4           MR. WILLIAN:  Yes.  And that could be a completely

5    legal goal.  The only problem is, Your Honor, that he tried to

6    accomplish that goal through bribery.  That's alleged in detail

7    first to obtain a competitive advantage against GM by making

8    sure that GM had higher labor costs.  He did that through

9    bribes, then trying to force the merger in 2015.

10          So he's admitted the outline of the scheme, if you

11   will.  And we only learned about the bribery part of it much

12   later, after January of 2018.

13          THE COURT:  Thank you.

14          MR. WILLIAN:  So concluding on proximate cause, Your

15   Honor, the line from the bribe to the UAW to GM is straight and

16   simple, and the ultimate point is only GM has these -- this

17   claim for damages, nobody else does.  There's no issue of

18   apportionment; there's no issue of proximate cause.  I'm sorry,

19   there's no issue of speculative damages.  And that's why this

20   case is different than *Holmes* and *Hemi* and *Anza* --

21          THE COURT:  Well, you say there's no speculative

22   damages.  In terms of damages, was Ford damaged?

23          MR. WILLIAN:  They may very well have been damaged,

24   Your Honor.  We don't know the answer to that.  We don't know

25   their labor structure.  But it doesn't -- it's not relevant --

```
 1        THE COURT:  But with regard to the damages issue,
 2   you're saying that we're going to -- if the Court finds that
 3   you are the victim proximately, that damages then are
 4   calculated based on hourly workers, based on plant locations,
 5   based upon tier workers during particular times, based on the
 6   various.  Each category goes into that.  How speculative or how
 7   deep diving will we be going to try and assess damages in this
 8   case and how many months and months of experts and testimony
 9   and calculations will there be to try and see what -- if there
10   are damages, what the damages were, when they occurred or are
11   you saying, Judge, that's not for you to think about now, but
12   at the same time there are cases which say, look, that's why we
13   have proximate cause, so you don't have to try and go after and
14   decide about damages but here, will it be close to mega
15   litigation on damages that will be down the road if the Court
16   finds for GM?
17        MR. WILLIAN:  So unlike the damages asserted in all
18   the cases, the proximate cause cases cited by the defendants,
19   we're not seeking lost sales or market share.  We're not
20   seeking those type of speculative damages.  We are seeking
21   damages for GM's increased labor cost because of these bribes.
22   That is a cost accounting issue, Your Honor.  That's exactly
23   what these companies do all the time.  They track their labor
24   costs.  So we don't think the damages here are terribly
25   complex.  So, for example, if you take the formulary, GM asked
```

ARGUMENT BY MR. WILLIAN

1   for this formulary, it was denied.  It's easy to calculate how

2   much that would have saved GM every year.  So the damages here

3   aren't terribly complex, and they don't speak to indirectness,

4   Your Honor, at all.

5           We would refer the Court to the remand of the *Bridge*

6   case.  I'm going to give the Court a case cite.  It's *BCS*

7   *Services Inc. v. Heartwood*, 637 F.3d 750, Seventh Circuit,

8   2011.  That's the remand of the *Bridge* case, Your Honor.  And

9   in that case it turned out damages were complex once the

10  factual record was developed.  And the district court there

11  said damages are complex, therefore, no proximate cause.  And

12  the Seventh Circuit reversed and said that's not the proper

13  analysis.

14          THE COURT:  Oh, I'm not saying that because damages

15  are complex there's no proximate cause.  I'm just talking about

16  a down-the-road situation in this case.  And in terms of --

17  well, go ahead, sir.  I'm sorry.

18          MR. WILLIAN:  Well, and that's fine.  I would just ask

19  the Court to look at that with respect to the differences

20  between fact of damage and complexity in calculating damages.

21          And then to just finish off that answer, with respect

22  to the 2015 CBA, the damages are straightforward.  We know what

23  the UAW had initially agreed to with GM as far as the cost of

24  the 2015 CBA and we know what eventually was forced on us

25  through the power of pattern bargaining as a result of the

ARGUMENT BY MR. WILLIAN

1   bribe-fueled negotiations.  And that's approximately a billion

2   dollars, Your Honor, and that's easily calculable.

3        THE COURT:  And that was forced upon you, and you had

4   no ability to decide whether to accept or take a strike with

5   regard to that, correct?

6        MR. WILLIAN:  So the answer is, Your Honor, with

7   respect to power of pattern bargaining, which is alleged in

8   detail in the complaint, GM had very little choice.  It could

9   take a strike, I suppose, but the point is that would be

10  extremely costly.  And so the point is that the UAW has market

11  power, the power to carry out the wishes of FCA and force this

12  contract on us to try to force the merger and that's --

13       THE COURT:  Thank you.

14       MR. WILLIAN:  That is alleged in the complaint, and

15  obviously this is a 12(b)(6) motion and all those allegations

16  should be accepted as true.

17       I will -- I'm over my time, Your Honor, so it's --

18       THE COURT:  That's okay.  If you want to deal with FCA

19  N.V., I'm not going to stop.

20       MR. WILLIAN:  Okay.  I believed the other issues are

21  well briefed.  Would you like to hear any comments on the

22  preemption argument, Your Honor?

23       THE COURT:  This is your argument, and I'm not going

24  to stop you.  If you want to proceed shortly with regard to

25  that, because I had a lot of questions here, the extent that

ARGUMENT BY MR. WILLIAN

1    your opposing counsel I didn't have questions, so I'm giving

2    you the opportunity in fairness.

3            MR. WILLIAN:  So just briefly on the preemption

4    argument, Your Honor, that argument is contradicted by the

5    plain language of the RICO statute and the precedent of every

6    court that has ever considered the issue.  Obviously, Congress

7    included Section 186 violations in the RICO statute because

8    they intended those to be included as predicate acts in the

9    RICO claim.  There's no carve-out from that whatsoever.  The

10   legislature has spoken.  That's why every court who has

11   considered the issue of preemption when there's a 186 RICO

12   claim has said -- has denied preemption.

13           The only case that FCA cites in support, this is the

14   *Trollinger* case.  The *Trollinger* case did not consider the

15   issue of 186 being in a RICO statute though it is off point.

16   So we would ask the Court to follow the precedent of the courts

17   who have actually considered the issue and *Trollinger* did not.

18           On the issue of control, briefly, we believe we've

19   clearly met the standard of pleading control here.  I heard

20   counsel argue today.  I thought they had recognized they had

21   made an error in stating the standard in the brief that

22   proprietary control is needed.  That is not the case, Your

23   Honor.  Proprietary control does not need to be alleged.  Here

24   we've cited the cases that indicate control must be read

25   broadly, and importantly we cited the cases that indicate that

1    where a plaintiff alleges that causing an entity to enter into

2    transactions that it would not otherwise have entered

3    constitutes sufficient control.  We've alleged that in detail

4    in the complaint that the control caused the UAW to enter into

5    transactions they would not otherwise do.  I'll let the

6    complaint speak for itself on that because that's extremely

7    detailed.

8              Finally on the statute of limitations, Your Honor, FCA

9    has misapplied the standard that should govern here, as this

10   Court has recognized the standard is one of discovering --

11   learning about the possibility of fraud.  GM did not learn

12   about the possibility of fraud until Mr. Iacobelli's plea

13   agreement in January of 2018.  Before that GM had no knowledge

14   about the possibility of fraud --

15             THE COURT:  You're saying that there was lightning and

16   thunder but no rain, that they don't have a duty to act at that

17   time and so they had to wait for the rain or the monsoon to

18   occur?

19             MR. WILLIAN:  No, I'm not, Your Honor.  I'm not saying

20   there was any lightning or any thunder.  To the contrary, as

21   you recognized in the *State Farm* case, we have the right to

22   rely on the good faith presumption that the FCA and the UAW are

23   operating at arm's length, and there's nothing in the record

24   whatsoever to indicate that there were any storm warnings, to

25   use your storm analogy.  Put simply, there was no possibility

ARGUMENT BY MR. WILLIAN

1   of fraud indicated by any of the evidence.

2          THE COURT:  Even though you say the whole tradition of

3   auto bargaining forever is pattern bargaining and while this

4   was something that was contrary to the entire tradition of

5   pattern bargaining to pick the lesser pocket rather than the

6   deepest pocket and, therefore, there wasn't a storm warning

7   when that occurred?

8          MR. WILLIAN:  There was a surprise for sure, Your

9   Honor, but it's not a storm warning indicating fraud or

10  systematic bribery of this nature.  No, sir.

11         THE COURT:  Okay.  Thank you.

12         MR. WILLIAN:  So that's -- concludes my argument with

13  respect to FC US LLC's -- FCA US LLC's motions to dismiss.  We

14  would ask the Court to deny that motion for the reasons stated.

15         THE COURT:  Okay.  Do you want to speak with regard to

16  FCA N.V.?  Or is your -- or is that argument subsumed already?

17         MR. WILLIAN:  No, it has not been subsumed, Your

18  Honor.  That argument pertains to the jurisdiction of FCA N.V.

19         THE COURT:  Yep.

20         MR. WILLIAN:  And I can be brief here.

21         THE COURT:  I think so.  I think so.

22         MR. WILLIAN:  Okay.  I'll be very brief, Your Honor.

23         THE COURT:  Thank you.  You don't have to be very

24  brief, but, you know, I think it doesn't play out into a long

25  discussion, sir.

```
 1              MR. WILLIAN:  Yes.  So FCA N.V. brought this motion on
 2    the assumption that we had only alleged or the claim that GM
 3    had only alleged that FCA N.V. had the knowledge and approval
 4    of the alleged -- or the bribery payments, and on that basis
 5    they made their motion, Your Honor.  But we plainly have
 6    alleged active involvement in the bribery scheme by FCA N.V.
 7    That's detailed obviously in our briefing, so I won't go
 8    through it all in detail.  But we allege very specifically that
 9    Mr. Marchionne acted as FCA N.V. CEO and that he instructed
10    Mr. Iacobelli to engage in this bribery scheme.  That scheme
11    took place for six years.  So FCA N.V. was actively directing
12    this bribery scheme for those years.
13              We allege that Mr. Marchionne contacted GM directly to
14    try to force this merging and implementing Operation Cylinder.
15    We allege that GM turned down this proposal and then
16    Mr. Marchionne, on behalf of FCA N.V., engaged in the scheme
17    that he did with respect to the 2015 CBA.
18              So GM has alleged very specific acts by FCA N.V.  It's
19    not group pleading.  Where we can identify the specific acts by
20    FCA N.V. we did and those are active acts not passive acts,
21    ones involving instruction and making payments, sending letters
22    and the like.  So we believe this Court clearly has
23    jurisdiction over FCA N.V. as alleged in the complaint.
24    Notably, this is a relatively low burden since it's being
25    submitted to the Court on the papers.
```

```
 1              THE COURT:  Let me ask you a question.  In Anza,
 2   A-N-Z-A, Supreme Court said the element of proximate causation
 3   recognized in Holmes is meant to prevent these types of
 4   intricate uncertain inquiries from overrunning RICO litigation.
 5   It has particular resonance when applied to claims brought by
 6   economic competitors which left unchecked could blur the line
 7   between RICO and the antitrust laws.
 8              You're seeking treble damages, huge amounts of money,
 9   to -- would this be to gravely injure or destroy a competitor,
10   one of the three U.S. automakers with tens of thousands -- more
11   than tens of thousands of workers?  And is this more
12   appropriately not a RICO matter with treble damages but really
13   an antitrust claim if it applies?  And I'm not even going there
14   because that's a whole nother thing.  But isn't this what we're
15   looking at here where there's three companies, domestic, and
16   you're seeking treble damages, huge amounts of money that would
17   severely impact FCA in their ability to continue automobile
18   production?
19              MR. WILLIAN:  So, first, if I could just address,
20   Anza, it does not apply to this case, Your Honor.  Anza is not
21   a precedent that has application here because that is an
22   indirect harm case --
23              THE COURT:  I know.  I'm just talking about the
24   concept of a nuclear situation with regard to the impact going
25   forward.
```

ARGUMENT BY MR. WILLIAN

1    MR. WILLIAN:  I can't predict the impacts, Your Honor.
2  All I can say is this was a bribery scheme that lasted for
3  years, and the whole point of the bribery scheme was to target
4  GM and impose higher costs on it.  I'm not sure exactly what
5  all those costs are.  They are significant.  It's a significant
6  case.  The intent is not to destroy FCA or whatever you're
7  suggesting.  The intent is for GM to get compensated for the
8  direct harm that it incurred from this bribery scheme.
9    THE COURT:  Understand.  Okay.  Thank you,
10  Mr. Willian.
11    MR. WILLIAN:  Thank you.
12    THE COURT:  Okay.  At this point then we're going
13  to -- did you want to respond to Mr. Iacobelli's counsel,
14  Mr. Willian?
15    MR. WILLIAN:  Yes, I can briefly respond to
16  Mr. Iacobelli's counsel.  His arguments did largely mirror FCA
17  counsel.  I will say that Mr. Iacobelli, with respect to the
18  statute of limitations, makes the novel argument that's not
19  supported by law.  That's the statute should have begin to run
20  pre-November of 2017 based on the circumstances of the
21  negotiation of the 2015 CBA.  There's no law that supports
22  that.  Clearly, the clock does not run until there's injury.
23  The potential of future injury does not run the clock and we
24  cite the *Rite Aid Corp. v. AB -- American Express Travel* case,
25  708 F. Supp. 2d 257 on that.

55

FURTHER ARGUMENT BY MR. HOLLEY

```
 1          THE COURT:  That's a district court case where, sir?

 2          MR. WILLIAN:  That's in the Eastern District of New

 3  York, 2010.

 4          THE COURT:  Thank you.

 5          MR. WILLIAN:  And, therefore, that argument does not

 6  hold.  And with respect to his remaining statute of limitations

 7  argument, it is the same as FCA's and I've already addressed

 8  that.  I think that was the only unique argument I heard from

 9  Mr. Nedelman that bears responding to you at this point, Your

10  Honor.

11          THE COURT:  Okay.  We'll take a 15-minute break rather

12  than a ten-minute break.

13          Mrs. Lizza, do you need more then 15 minutes?

14          THE REPORTER:  No, 15 should be fine, Judge.

15          THE COURT:  Okay.  Then we will return in 15 minutes

16  for the replies and they can be longer than 15 minutes and they

17  probably will be.  Thank you.

18          MR. HOLLEY:  Thank you, Your Honor.

19      (Court in recess, 11:45 a.m. to 12:00 p.m.)

20          THE LAW CLERK:  Court is back in session.

21          THE COURT:  Then please proceed on behalf of FCA.

22          MR. HOLLEY:  Yes, Your Honor.

23          THE COURT:  And I'm not going to hold it to 15 because

24  I think, again, we've raised issues and there are certainly a

25  lot of complicated issues and so, you know, we're not going to
```

GENERAL MOTORS LLC, ET AL. v. FCA US LLC, ET AL., 19-13429

56

```
 1    just stop at 15 and close the --
 2            MR. HOLLEY:  Okay.
 3            THE COURT:  -- hearing.  Thank you.
 4            MR. HOLLEY:  I appreciate that, Your Honor.  I'm going
 5    to try to be brief nonetheless.
 6            In terms of but-for causation, Mr. Willian said that
 7    the defendants have made criminal admissions.  I just want to
 8    make it very clear that neither the FCA US LLC nor FCA N.V.
 9    have made any criminal admissions.  Neither corporation has
10    admitted to doing anything wrong in connection with the alleged
11    prohibited payments.
12            And Mr. Willian said I think at least three times that
13    the whole point of the alleged bribery scheme was to harm
14    General Motors by imposing higher labor costs on it.  But I
15    think we need to do a reality check with regard to that
16    assertion because GM's entire case is predicated on
17    indictments, plea agreements and sentencing memoranda in cases
18    with which the Court is familiar and there is no mention of
19    General Motors in any of those documents.  So how plausible can
20    it be that GM was the target of this behavior when nobody is
21    talking about General Motors?
22            If you look at what the Justice Department says -- and
23    I'm not agreeing with this, I'm just saying what they say --
24    they say that the point of these alleged prohibited payments
25    was to create labor peace and to grease the skids in
```

1    negotiations between the UAW and the FCA.  If that's right,

2    and, again, I don't agree with it, that has nothing to do with

3    General Motors.  That has to do with the UAW and FCA.  And if

4    GM is a proper RICO plaintiff in this case, then so is Ford and

5    so is every other automaker in North America that has unionized

6    workers.  And the reason why is because the flip side of giving

7    a sweetheart deal to FCA is that you don't give that deal to

8    everybody else.

9          So if FCA corruptly got lower labor costs, that didn't

10   just hurt General Motors; it hurt Ford, it hurt everyone.  So

11   you can't have it that only GM is affected by this.  And it's

12   pure semantics to say, oh, this didn't -- you know, this really

13   wasn't something that benefited FCA workers or hurt the FCA

14   workers.  It was all directed at General Motors.

15         THE COURT:  Well, if I may respond, might they say,

16   yeah, others could bring cases but let's focus on our case,

17   we're dealing with specifically GM?

18         MR. HOLLEY:  Yes, Your Honor.  But that just goes to

19   show that under *Holmes* they are not a proper plaintiff because

20   there are other more directly harmed people who have already

21   brought suit, namely, the rank and file members of the United

22   Auto Workers.  The NLRB has brought suit on behalf of -- you

23   know, enforcing the federal labor laws.  And in order to try to

24   allocate damages if GM is one of, I don't know, you know, tens

25   of potential plaintiffs is precisely the sort of thing that the

FURTHER ARGUMENT BY MR. HOLLEY

1    Supreme Court in *Holmes* said is the rationale for saying only
2    the most directly injured party may sue and that you're not
3    supposed to go beyond the first step in the chain of causation.
4         So I think when Mr. Willian -- I was a little
5    surprised, but when he said in response to your question that
6    Ford might have a claim, that seems to me to prove our point
7    which is that, you know, under GM's view of the world, half of
8    Detroit, frankly, Chattanooga, Tennessee and other places all
9    have claims based on these alleged prohibited payments.
10   Mr. Willian spent a lot of time talking about Mr. Marchionne's
11   comments.
12        I encourage the Court to actually look at the video
13   that is linked at paragraph 64 of the complaint on page 59.  I
14   actually think this link is broken, but I don't think
15   Mr. Willian would mind if I sent the Court a link that works.
16   But what Mr. Marchionne is talking about is two things.  First,
17   he says that the 2015 collective bargaining agreement, by
18   reducing the disparity between tier one and tier two workers,
19   has solved an issue of making it more appealing for young
20   people to come into the auto industry, solving the labor
21   problem.  And then he says that he's going to turn his
22   attention to the capital problem which is, as Your Honor
23   pointed out, has been a focus or was a focus of his for years
24   and years because he believed that there were too many car
25   companies with too many different models that were enormously

1    expensive.  And there's a whole slide presentation on the

2    internet called Confessions of a Capital Junkie from April of

3    2015 where he sets out his views.

4         The notion that that statement is an admission of a

5    scheme designed to hurt General Motors I do not understand.  I

6    mean it's a country mile from that.  He's talking about the

7    capital structure of the auto industry.

8         It's also wrong to say that the *Bridge* case and the

9    *Empress Casino* case helped General Motors on the issue of

10   proximate cause.  Those are both quite unique cases based on

11   their facts and they have no application here.  In *Bridge*,

12   there were these auctions for tax liens and there was so much

13   demand for the tax liens that they were assigned on a

14   rotational basis.  And the defendant jimmied with that

15   rotational system and unfairly got more of the tax liens than

16   it should have gotten.  And the only party injured was the

17   competing bidder who unfairly was cheated out of liens they

18   should have gotten.  The county that was selling the tax liens

19   got the same amount of money because, you know, it was just --

20   they didn't care who bought them, they just got the money.  So

21   there the disappointed bidder is the only injured party, the

22   most directly injured party, and it makes sense to say that

23   they have standing under RICO.

24        And in *Empress Casino*, the governor of Illinois was

25   bribed to create a system where the five casino owners in the

1   state had to pay a percentage of their profits into a fund for

2   the benefit of the horse racing industry.  The people who were

3   injured were easy to identify; it was the five casino owners

4   who had to pay money into this corruptly created fund.

5          This is very, very different, and I have to disagree

6   with Mr. Willian.  Trying to trace the alleged injury here

7   either before 2015 or after 2015 is not an accounting exercise.

8   You have to go -- as Mr. Nedelman pointed out, you have to go

9   through a game theory exercise to figure out what would the

10   collective bargaining agreements between the UAW and FCA and

11   the UAW and GM have looked like in the but-for world and then

12   tried to figure out what portion of the differential in that

13   hypothetical construct was attributable somehow to the alleged

14   prohibited payments.  That is a very, very complex exercise,

15   Your Honor, exactly the sort of thing that the Supreme Court in

16   *Holmes* was saying is a reason for this direct injury

17   requirement.

18          And Mr. Willian said several times, and I just want --

19   I think the Court picked up on this, but he said that what FCA

20   did was to try to gain a competitive advantage vis-a-vis

21   General Motors.  That really kind of points up the fact that

22   this is precisely the sort of case by an economic competitor

23   that the Supreme Court said courts should be cautious of

24   because they bore the distinction between RICO claims and

25   antitrust claims.  If GM thinks that they have some sort of

1   unfair competition claim against FCA that is actionable under

2   the Sherman Act, that's the case they should have brought not

3   this case.

4          So, Your Honor, turning to the FCA N.V. motion to

5   dismiss very briefly, Your Honor.  Mr. Willian said that there

6   are specific allegations in the complaint about conduct that

7   was actively engaged in by FCA N.V.  With respect, Your Honor,

8   I don't believe that's accurate.  I read the three paragraphs

9   where FCA N.V. is mentioned and they don't say they did

10  anything [indiscernible].  So that means that GM is relying on

11  the behavior engaged in by Mr. Marchionne who was, as we know,

12  the CEO of both FCA N.V. and FCA US.  But Mr. Willian didn't

13  mention and there's no answer to our point that the Supreme

14  Court's decision in the *Bestfoods* case says quite clearly that

15  the presumption is in these circumstances that Mr. Marchionne

16  was acting wearing his FCA US hat.  If he was talking to

17  Mr. Iacobelli who worked for FCA US, he was talking to him in

18  his capacity as the CEO of the U.S. operating subsidiary not in

19  his capacity as the CEO of a holding company in the

20  Netherlands.

21         So, Your Honor, those were the points I wanted to

22  make.  Obviously if Your Honor has questions, I would be happy

23  to answer them.

24         THE COURT:  No.  Thank you.

25         Okay.  Mr. Nedelman.

62

```
 1            MR. NEDELMAN:  Thank you.  Thank you, Your Honor.

 2            I will also try and keep my comments reasonably brief

 3    because we have set forth our positions I think fairly

 4    comprehensively in our papers.

 5            It appears though what GM is really upset about is

 6    that they're upset with the implementation of the UAW of a

 7    contractual relationship or two, 2011 to the 2015, that General

 8    Motors entered into voluntarily, and their remedy under those

 9    circumstances, if there was any impropriety in the course of

10    negotiations or the implementation of the contract, was to

11    seek -- to file an unfair labor practice charge before the

12    NLRB.  GM hasn't done that.  GM has gone out of its way to, in

13    its papers, to not focus on the UAW when, in fact, it's the

14    UAW's conduct that General Motors complains about.

15            General Motors also in its papers and in Mr. Willian's

16    statements to the Court tries to blur -- actually Mr. Iacobelli

17    has admitted seeking advantages for the benefit of FCA.

18    There's no question about that.  General Motors has attempted

19    throughout its complaint and its argument this morning to add

20    to Mr. Iacobelli's admissions, which addition doesn't exist,

21    that it was to harm General Motors.  And as Mr. Holley

22    indicated, there is nothing in the record that points to any

23    conduct intended to harm General Motors as opposed to conduct

24    that has admittedly been undertaken to benefit FCA.

25            There is -- when I look at General Motor's complaint,
```

```
 1   particularly paragraphs 125 to 135, those are the storm
 2   warnings.  General Motors describes the very conduct that
 3   should have under existing case law alerted it and, in
 4   particular, the allegations at complaint paragraph 132.  When
 5   the Court looks at paragraph 132, I trust the Court will see
 6   that General Motors conducted its own analysis, concluded it
 7   was going to be harmed, concluded it suffered injury and it
 8   draws its -- General Motors' reliance on the pattern bargaining
 9   concepts into clear focus.  GM --
10           THE COURT:  In what year are you directing us to in
11   terms of GM's situation right then?
12           MR. NEDELMAN:  Well, certainly the 2015 contract
13   because in paragraph 132 of the complaint General Motors
14   acknowledges that it conducted its own analysis of the FCA-UAW
15   contract and concluded that it was forecast to cost GM more
16   than double what it anticipated.
17           That analysis, that understanding dovetails into the
18   crux of General Motors' complaint which is it claims to be
19   bound by the construct of the pattern bargaining, and yet it
20   doesn't want to be bound by its own knowledge of the
21   consequence of the very thing it relies on.  And I don't think
22   General Motors can have it both ways.  If it was the
23   beneficiary of those negotiations, if it was expecting to
24   follow them, if it understood the effect.  I mean if all of
25   what General Motors alleges is true and excepting for these
```

1   purposes that it was bound to the pattern bargaining, then it
2   also knew when FCA entered into the 2015 contract in October of
3   2015 --
4        THE COURT:  Which is more than four years before the
5   complaint, that's what you're getting at.
6        MR. NEDELMAN:  Correct.  And it knew it had suffered
7   injury and the statute of limitations had expired by the time
8   it filed suit in November of 2019.  I can also take issue with
9   General Motor's assertion that the damage calculation is
10  somehow simple.  As I indicated earlier, the machinations that
11  the Court would have to go through to hypothetically engage in
12  labor negotiations and then determine what that outcome would
13  have been, determined what the membership would have agreed to,
14  it's impossible, truly impossible to measure whatever General
15  Motors believes its damages were because there is no baseline
16  against which to measure them.  Certainly can't be measured
17  against GM's expectations.  And so there is no measurement by
18  which this Court could engage in as the trier of fact and, as a
19  consequence, the damages are purely speculative.
20       With that, Your Honor, if you have any questions, I'm
21  happy to answer them.
22       THE COURT:  No, I don't.  But right now I'm going to
23  issue an order with regard to this case that will be entered
24  after I read it.
25       "I'm taking this case under advisement and,

**ORDER OF THE COURT**

1          if necessary, of course, I will be prepared

2          to rule.

3          But because today, like every day now, is

4          not an ordinary day, I'm entering this

5          order.

6          The world has changed dramatically since

7          this case was filed on November 20th, 2019.

8          This city, this state and this country need

9          healing.

10         The COVID-19 pandemic and its impact on the

11         health of this country requires our

12         attention here and now.

13         Just as important is our response to the

14         tragic death of George Floyd that has

15         brought to the forefront the long-standing

16         issues of racial discrimination and social

17         justice that require our attention and

18         solution here and now.

19         If this case goes forward, there will be

20         years of contentious litigation, motion

21         hearings, multiple-day depositions of large

22         numbers of key executives and former

23         executives at GM and FCA, as well as UAW

24         officials and other defendants and many

25         third parties and a plethora of RICO, labor

**ORDER OF THE COURT**

1        law and damages experts.

2        These legalities will not only divert and

3        consume the attention of key GM and FCA

4        executives from their day jobs, issues of

5        vehicle production, sales, worker safety,

6        rollouts, supplier issues, et cetera, but

7        also prevent them from fully providing their

8        vision in leadership on this country's most

9        pressing social justice and health issues."

10       And I mean directly not through committees

11       that they may set up.

12       "In 2008, and going forward, the federal

13       government focused on rescuing GM and

14       Chrysler by providing billions of dollars in

15       aid.  That saved GM and Chrysler, now FCA,

16       and tens and tens of thousands of UAW auto

17       workers' jobs.  Today our country needs and

18       deserves that these now-healthy great

19       companies pay us back by also focusing on

20       rescuing this country and its citizens from

21       the plagues of COVID-19, racism and

22       injustice while building the best motor

23       vehicles in the world.

24       While watching television news recently, I

25       have seen CEOs and Mary Barra of GM and

**ORDER OF THE COURT**

```
 1           Michael Manley of FCA join together, time
 2           and again, often with Bill Ford, to provide
 3           some attention, leadership and skills to
 4           solving social and economic issues for the
 5           good of their companies, their workers,
 6           their communities and our country.  So, too,
 7           I have noticed some attorneys devoting their
 8           skills to provide equal justice for all
 9           citizens, in particular, those less
10           fortunate who require representation in our
11           courts.
12           What a waste of time and resources now and
13           for the years to come in this mega
14           litigation if these automotive leaders and
15           their large teams of lawyers are required to
16           focus significant time-consuming efforts to
17           pursue this nuclear option lawsuit if it
18           goes forward.
19           I am ordering that no later than July 1st,
20           just the two CEOs, Mary Barra and Michael
21           Manley, meet in person with social
22           distancing to explore and, indeed, reach a
23           sensible resolution of this huge legal
24           distraction.  This will enable these two
25           gifted individuals and their companies to
```

**ORDER OF THE COURT**

68

```
1              fully concentrate, in addition to their day
2              jobs, on providing the leadership and vision
3              this country requires and deserves in
4              solving the aforementioned critical issues.
5              Time is of the essence.  So, I repeat; Mary
6              Barra and Michael Manley, meet face to face
7              in good faith and with goodwill to resolve
8              this huge legal diversion, to permit you and
9              your companies to also fully focus your
10             talents on healing this country as we all
11             embark on the critical road ahead.
12             I request that I hear from just both of you
13             personally on a Zoom or teleconference, no
14             need for both to again be present physically
15             in the same room, at noon, July 1st, 2020,
16             to provide me with the results of your
17             important discussions.
18             Thank you for attention to this order.
19             So ordered, Paul D. Borman, U.S. District
20             Judge, June 23rd, 2020."
21             Thank you.  We are concluded.
22             MR. WILLIAN:  Thank you, Your Honor.
23             MR. HOLLEY:  Thank you, Your Honor.
24        (Proceedings concluded, 12:23 p.m.)
25                            -   -   -
```

**ORDER OF THE COURT**

```
 1                   CERTIFICATION OF REPORTER

 2

 3      I, Leann S. Lizza, do hereby certify that the above-entitled

 4   matter was taken before me remotely at the time and place

 5   hereinbefore set forth; that the proceedings were duly recorded

 6   by me stenographically and reduced to computer transcription;

 7   that this is a true, full and correct transcript of my

 8   stenographic notes so taken; and that I am not related to, nor

 9   of counsel to either party, nor interested in the event of this

10   cause.

11

12

13   S/Leann S. Lizza                           6-25-2020____

14   Leann S. Lizza, CSR-3746, RPR, CRR, RMR, RDR     Date

15

16

17

18

19

20

21

22

23

24

25
```

**GENERAL MOTORS LLC, ET AL. v. FCA US LLC, ET AL., 19-13429**