UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENERAL MOTORS LLC,
GENERAL MOTORS COMPANY,

Case No. 19-cv-13429

      Plaintiffs,

Paul D. Borman
United States District Judge

v.

FCA US LLC, FIAT CHRYSLER
AUTOMOBILES N.V., ALPHONS
IACOBELLI, JEROME DURDEN,
MICHAEL BROWN,

David R. Grand
United States Magistrate Judge

      Defendants.

_____/

OPINION AND ORDER GRANTING:
(1) DEFENDANT FCA US LLC'S MOTION TO DISMISS (ECF NO. 41);
(2) DEFENDANT FIAT CHRYSLER AUTOMOBILES N.V.'S MOTION TO
DISMISS (ECF NO. 42); and
(3) DEFENDANT ALPHONS IACOBELLI'S MOTION TO DISMISS (ECF NO.
50)

## I. INTRODUCTION

On November 20, 2019, General Motors LLC and its ultimate parent company, General Motors Company, (together "GM") filed a 94-page, 198-paragraph complaint alleging three violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, against FCA US LLC ("FCA US"), Fiat Chrysler Automobiles N.V. ("FCA NV"), Alphons Iacobelli, Jerome Durden, and Michael Brown. (ECF No.1.) In the Complaint, GM alleges that FCA US LLC, its parent company, FCA NV, and its predecessor companies,

Chrysler LLC, Chrysler Group LLC, and Fiat S.p.A., bribed officials of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") for years, "starting no later than July 2009." (ECF No. 1, Complaint, PgID 4–5, ¶¶ 2–3.) In return for these bribes, FCA US received benefits and concessions in the negotiation, implementation, and administration of the collective bargaining agreements ("CBAs") that govern FCA US's labor practices in the United States. (*Id.* at PgID 5, ¶ 3.) According to the Complaint, this bribery scheme was also intended to damage FCA US's rival, GM, in order to weaken it and force a merger between the two giants. (*Id.* at PgID 6–7, ¶¶ 4–5.) GM also brought two claims under Michigan law—unfair competition, and civil conspiracy—but, on June 15, 2020 this Court declined to exercise supplemental jurisdiction over them, pursuant to 28 U.S.C. § 1367. (ECF No. 71, Order, PgID 2851–52.)

FCA US, FCA NV, and Alphons Iacobelli each separately moved to dismiss GM's Complaint under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 41, FCA US MTD; ECF No. 42, FCA NV MTD; ECF No. 50, Iacobelli MTD.) Defendants Michael Brown and Jerome Durden joined in FCA US's Motion to Dismiss. (ECF No. 43, Brown Joinder; ECF No. 44, Durden Joinder.)

Although each Motion to Dismiss contains several separate grounds for dismissal, the Court discusses only one of those grounds, because it finds that GM's

alleged injuries were not proximately caused by Defendants' alleged violations of the RICO Act. (ECF Nos. 41, 42, 50.) Therefore, GM has not stated a claim for relief that can be granted and its Complaint must be dismissed.

## II.    FACTS

The parties to the suit are as follows: Plaintiff GM, which includes both General Motors LLC and its ultimate parent company, General Motors Company; Defendant FCA US, the United States-based subsidiary of FCA NV and successor corporation of the merger of Fiat and Chrysler; Defendant FCA NV, the London-based parent company of FCA US; Defendant Alphons Iacobelli, the former Vice President of Employee Relations at FCA US and Co-Chairman of the UAW-FCA US National Training Center ("NTC") until June 9, 2015; Defendant Jerome Durden, a former FCA US employee who was the Controller of the NTC and Secretary of the NTC Joint Activities Board from 2008 to 2015; and Defendant Michael Brown, the former Director for Employee Relations at FCA US and a Co-Director of the NTC from 2009 to 2016. (ECF No. 1, Complaint, PgID 10–14, ¶¶ 13–20.)

Many of the allegations in the complaint refer to "FCA Group," GM's generic term for FCA US, FCA NV, and predecessor corporations Chrysler Group LLC and Chrysler LLC. (*Id.* at PgID 11–12, ¶¶ 16–17.) There is no specific entity called "FCA Group," so where possible, based on the allegations, this account of the facts

identifies the specific entity that took the action alleged. Where it is not possible, the generic "FCA" is used.

GM's narrative begins in 2008, when the United States automotive industry—including and especially General Motors Corporation ("Old GM") and Chrysler, both of which filed for Chapter 11 bankruptcy in the spring of 2009—was in crisis. (*Id.* at PgID 23–24, ¶¶ 44–46.) European auto-makers, including Fiat, were also hit by the global financial crisis, and Fiat, like GM and Chrysler, was figuring out how to survive. (*Id.* at PgID 24, ¶ 48.) Fiat's Chief Executive Officer ("CEO"), Sergio Marchionne, determined that Fiat's survival required a partner in the U.S., and he decided to target Chrysler. (*Id.* at PgID 14, 24–25, ¶¶ 21, 48–49.)

Initially, Marchionne and Fiat set out to acquire a controlling stake of Chrysler's stock. (*Id.* at PgID 25, ¶ 49 (citing Jeff Israely, *Fiat to Take 35% Stake in Chrysler*, TIME (Jan. 20, 2009), http://content.time.com/time/business/article/0,8599,1872719,00.html).) Marchionne's plans, however, were complicated by the involvement of the U.S. government, which had given both GM and FCA emergency loans in 2008 on the condition that each company restructure according to a plan approved by the government. The White House, *Remarks by the President on the American Automotive Industry* (Mar. 30, 2009), https://obamawhitehouse. archives.gov/the-pressoffice/remarks-president-american-automotive-industry-33009 (cited in ECF No. 1, Complaint, PgID 26, ¶ 52). Further, reaching a deal

approved by the U. S. government would secure additional government loans up to $6 billion. *Id.*

Marchionne enlisted the help of UAW leadership to generate support for a Fiat-Chrysler partnership before negotiations with the government began. (ECF No. 1, Complaint, PgID 25–26, ¶¶ 50–51.) He befriended General Holiefield, the Vice President in charge of the UAW's Chrysler Department and a member of the UAW's Executive Board from 2007 to 2014, and met with the then-UAW President Ron Gettelfinger in early 2009, before the government negotiations. (*Id.* at PgID 15, 25–26, ¶¶ 23, 50–51.)

After the government imposed a thirty-day deadline for Chrysler to reach a partnership deal with Fiat on March 30, 2009, in order to qualify for government loans, a Fiat-Chrysler deal was finalized. (*Id.* at PgID 26, ¶ 52.) Under the deal, Fiat was not required to provide any financing. (*Id.* at PgID 4, ¶ 2.) Fiat recieved control of Chrysler in June 2009, receiving a 20 percent stake and the right to purchase 40 percent of the 55 percent stake that the UAW owned in Chrysler after it emerged from bankruptcy. (*Id.* at PgID 31, ¶¶ 60–61.) Fiat, for its part, gave the UAW's trust a $4.6 billion note with nine percent interest, and gave the UAW the right to appoint a director to Chrysler's Board. (*Id.* at PgID 31, ¶ 61.) Marchionne became the CEO of Chrysler. (*Id.* at PgID 31, ¶ 60.)

As Fiat secured control of Chrysler, Marchionne and Fiat began negotiations, on behalf of Chrysler, with the UAW on a post-bankruptcy UAW-Chrysler collective bargaining agreement ("CBA"). (*Id.* at PgID 26, ¶ 53.) Fiat's first demand was support for World Class Manufacturing ("WCM"), a program that broke down the rigid union job classification system and gave Chrysler more flexibility in assigning jobs to different workers, which made its overall labor cost structure more efficient and less costly. (*Id.* at PgID 26–27, ¶ 53.) Fiat's second ask of the UAW was permission for Chrysler to hire more temporary employees, and to lift the hiring cap of less-senior and lower-cost Tier Two workers. (*Id.* at PgID 27, ¶ 54.) The UAW agreed. (*Id.* at PgID 27, ¶ 53.)

The Complaint alleges that, as Fiat took control of Chrysler, the bribery scheme at issue began. (*Id.* at PgID 27, ¶ 55.) It started with gifts to General Holiefield—in July 2009, FCA[1] and Iacobelli began transferring "hundreds of thousands of dollars of Chrysler funds" to Holiefield and to his Leave the Light on Foundation, which he and his girlfriend (later his wife), Monica Morgan, used as personal bank account (*Id.* at PgID 28, 33 ¶¶ 57, 66), and, in February 2010, Marchionne gave Holiefield a several-thousand dollar watch. (*Id.* at PgID 29–30,

---

[1] Although FCA had not yet been formed, the term "FCA" is used to refer to the Fiat-Chrysler partnership that existed at that time.

¶ 58.) FCA, with Marchionne's approval, also paid for Holiefield's wedding to Morgan in Venice. (*Id.* at PgID 30, ¶ 59.)

The Complaint further alleges that the bribery scheme expanded and took on a specific form. The Fiat/Chrysler/FCA and UAW officials involved in the scheme used their joint National Training Center ("NTC"), a corporation formed pursuant to UAW-Chrysler CBAs to provide for the education, training, and retraining of UAW workers employed by Chrysler, and later FCA, as the entity to distribute funds under the scheme. (*Id.* at PgID 14–15, ¶ 22.) The relevant CBAs required Fiat, and later, FCA, to fund the NTC. The Complaint alleges that senior Fiat/Chrysler/FCA officials, with the knowledge and approval of Marchionne, provided funds to the NTC and then encouraged officers and employees of the UAW, such as Holiefield, to use NTC bank accounts and their NTC credit cards for personal expenses. (*Id.* at PgID 20, 31–32, ¶¶ 36, 63.) The Complaint alleges that FCA used the NTC to conceal over $1.5 million in payments and gifts to UAW officials. (*Id.* at PgID 32, ¶ 63.)

Some of the payments funneled through the NTC between July 2009 and 2014 included: more than $386,400 transferred to Holiefield's Leave the Light on Foundation that was used by Holiefield and Morgan for personal expenses such clothes and trips to restaurants and night clubs; $13,500 paid to Morgan's photography company that she and Holiefield used to pay off a recently-installed

pool at their house; $425,000 paid to Wilson's Diversified Products, Morgan's LLC, which she and Holiefield used, in part, for the closing costs for the purchase of a house; $200,000 to another one of Morgan's shell companies; $262,219.71 to pay off Holiefield's mortgage; and thousands charged by UAW officials' on their NTC credit cards for, among other things, luxury luggage worth $1,259.17, a Beretta shotgun worth $2,182, Disney World tickets worth $2,130, Louboutin shoes worth $1,000, and other expensive electronics and personal items. (*Id.* at PgID 33–35, ¶¶ 66–69.) Other NTC payments occurred during trips that UAW officials, including then-President Dennis Williams, took to California for the UAW Region 5 Conference in the 2014-2015 winter and the 2015-2016 winter. (*Id.* at PgID 35–36, ¶ 70.) During those trips, UAW officials used their NTC credit cards, which, again, were funded by FCA US, to spend $36,809.42 on dinners and golf outings. (*Id.*)

GM contends that documents in subsequent federal criminal proceedings allege that FCA officials made these payments in order to "buy labor peace," to "buy good relationships with UAW officials," and to "obtain benefits, concessions, and advantages for FCA in its relationship with the UAW." (*Id.* at PgID 33, ¶ 64.) The bribes facilitated advantages for FCA in labor negotiations as well as the subsequent implementation and administration of the CBAs. (*Id.* at PgID 37, ¶ 71.)

GM lists five specific concessions or advantages that, over the years, FCA secured through bribery. The first involved the 25-percent-of-the-workforce limit on

cheaper Tier Two employees that was lifted during the crisis in 2009 with the understanding that it would be reinstated in 2015. (*Id.* at PgID 39–40, ¶ 77.) GM acted according to the belief that the UAW would insist on reinstating the cap in the 2015 CBA, so it kept its proportion of Tier Two workers at 20 percent. (*Id.*) FCA, however, through bribery, obtained assurance that the UAW would not insist that the cap be reinstated, so FCA US hired many Tier Two workers. (*Id.* at PgID 40, ¶ 78.) By 2015 approximately 42 percent of the UAW member-employees of FCA US were Tier Two workers. (*Id.*) The cap was not reinstated in the 2015 CBA for either FCA US or GM. (*Id.*)

Second, the UAW leadership did not enforce against FCA US the limits on hiring temporary workers, who are paid less than Tier Two workers, but did enforce those limits against GM. (*Id.* at PgID 40–41, ¶ 79.) Third, Holiefield and Norwood Jewell, the UAW executives who oversaw the UAW's labor grievance process, pursued grievances against FCA US less zealously because of bribes from Iacobelli, who oversaw grievance procedures at FCA US. (*Id.* at PgID 41, ¶ 80.) Fourth, in 2014, FCA US and the UAW agreed, outside the traditional bargaining process, to a prescription drug formulary that would increase the use of more widely-available prescriptions, thereby reducing health care costs. (*Id.* at PgID 42, ¶ 81.)

Fifth, and finally, the UAW committed to support FCA's WCM labor efficiency program. (*Id.* at PgID 37, ¶ 73.) This commitment went deep—in 2014

the UAW and FCA entered into an enforceable memorandum of understanding ("MOU"), negotiated outside of the standard collective bargaining process, in which the UAW promised to actively assist FCA to achieve its long-term business plan by, in part, using its best efforts to support FCA's WCM programs. (*Id.* at PgID 37, 46, ¶¶ 73, 91.)

GM sought some of these same advantages but did not receive them. GM sought a closer partnership with the UAW on its Global Manufacturing System ("GMS"), an efficiency program similar to FCA's WCM, and UAW officials acknowledged that GM would need more union support and buy-in to make GMS on par with WCM, but the UAW did not "fully embrace[]" GM's efforts to develop GMS. (*Id.* at PgID 38–39, ¶ 75.) The UAW also denied all of GM's requests to adopt a prescription drug formulary like FCA's, which GM estimated would save it up to $20 million a year. (*Id.* at PgID 42, ¶ 81.) The UAW did not enter a similar agreement with GM. (*Id.* at PgID 46–47, ¶ 92.) GM alleges that it was denied these advantages as a result of FCA's bribery scheme. (*Id.* at PgID 37, ¶ 71.)

GM alleges that the labor concessions secured by FCA's bribes resulted, in 2015, in average labor costs for FCA US of $47 an hour, $29 less than in 2006. (*Id.* at PgID 42, ¶¶ 82–83.) GM's labor costs in 2015 were $55 an hour, only $16 less than in 2006. (*Id.*) GM attributes this difference to its belief that "FCA directed key

UAW officials to deny similar labor advantages to GM, inflicting significant additional costs on GM." (*Id.* at PgID 42–43, ¶ 83.)

According to GM, the bribes were not just about obtaining a competitive advantage on labor costs, but were also directed toward Marchionne's long-term goal of merging Fiat, Chrysler, and GM. (*Id.* at PgID 44, ¶¶ 85–86.) He had proposed such a merger to GM in October 2012, but after it was rejected he focused on completing the Fiat-Chrysler merger. (*Id.* at PgID 44–45, ¶¶ 86–90.) He used his influence with Holiefield and other UAW officials to convince the UAW to sell its entire stake in Chrysler to Fiat-Chrysler, which was the 41.5 percent of the company that Fiat did not already own. (*Id.* at PgID 44–45, ¶¶ 87–89.) The merger became official on October 12, 2014. (*Id.* at PgID 47, ¶ 93.) Marchionne became the CEO of the resulting company, FCA, and shifted his focus back to merging with GM. (*Id.* at PgID 47, ¶¶ 93–94.)

In early 2015, Marchionne launched a "merger-forcing" project called "Operation Cylinder." (*Id.* at PgID 49, ¶¶ 99–100.) FCA formally proposed a merger of GM and FCA NV to GM's Board and management in March 2015, which vetted the offer but ultimately rejected it on April 14, 2015. (*Id.* at PgID 50, ¶ 101.) Marchionne responded with a major publicity effort. For instance, two weeks after the rejection Marchionne published a PowerPoint that, among other things, promoted the benefits of consolidating FCA and GM and promised nearly $5 billion

in savings. (*Id.* at PgID 50, ¶¶ 103–104.) He also used his influence with the UAW, gained, at least in part, through bribery, to secure the UAW's support for the merger. (*Id.* at PgID 49–50, ¶ 100.) This support was useful because the UAW needed to approve any potential merger, and because UAW officials could, and did, pressure GM to merge with FCA during labor negotiations. (*Id.* at PgID 49–51, ¶¶ 100, 106.)

The Complaint further alleges that Marchionne used the labor negotiation process to weaken, and thereby pressure, GM. The UAW uses a practice called "pattern bargaining" in its collective bargaining with the three Detroit-based automakers, GM, FCA, and Ford. (*Id.* at PgID 55, ¶ 95.) Every four years, a few months before each automaker's CBA with the UAW is set to expire, UAW sub-committees begin preliminary negotiations with each of the companies. (*Id.* at PgID 56, ¶ 118.) As the CBA expiration date nears, the UAW selects one of the three to be the "lead," and finalizes a deal with that company. (*Id.* at PgID 56, ¶ 119.) That deal becomes the pattern on which the other two companies' CBAs are based, because it gives the UAW strong leverage to force the terms of the first adopted CBA on the other two companies. (*Id.*) The Complaint contends that the UAW usually selects the largest and most profitable company as the "lead," because it usually has the ability to provide the most concessions to UAW workers in terms of wages and signing bonuses. (*Id.* at PgID 57, ¶ 123.)

Preliminary negotiations of the 2015 CBAs for all three Detroit-based automakers began officially on July 13, 2015. (*Id.* at PgID 52, ¶ 109.) UAW President Williams and other UAW officials celebrated the start of negotiations with a dinner that cost FCA, through its funded NTC, over $8,000. (*Id.* at PgID 52–53, ¶ 110.) Marchionne took the lead for FCA in the negotiations, because Iacobelli, who normally would have been in charge of the process, had resigned in June 2015. (*Id.* at PgID 51, ¶ 105.)

After preliminary negotiations, in mid-September 2015, GM and the UAW sub-committee with which it was negotiating reached a tentative deal. (*Id.* at PgID 54, 56, ¶¶ 112–15.) GM believed that it would be selected as the lead company because it was the largest and best performing automaker, so it thought that its tentative deal would become the pattern 2015 CBA. (*Id.* at PgID 57, ¶ 124.) GM and industry analysts did not expect FCA, the smallest of the three, to be selected as the lead. (*Id.* at PgID 57–58, ¶ 124.) Nevertheless, on September 13, 2015, the UAW announced that it had chosen FCA as the "lead." (*Id.* at PgID 58, ¶ 125.) GM alleges that FCA was selected because of the past six years of bribes. (*Id.*)

Two days later, FCA and the UAW announced that they reached an agreement. (*Id.* at PgID 59, ¶ 128.) Marchionne touted the new CBA as transformational, and said that the economics of the deal were almost irrelevant because the potential synergies and benefits, which GM understood as the potential

benefits of a combination between FCA and GM, would significantly outweigh the increased costs contained in the CBA. (*Id.* at PgID 59, ¶ 129.) The UAW bargaining team celebrated with a $6,912.81 dinner provided by FCA funding through the NTC. (*Id.* at PgID 60, ¶ 130.)

Despite the "transformational" nature of the deal, the UAW members working at FCA rejected the deal, forcing FCA and the UAW back to the negotiating table. (*Id.* at PgID 61, ¶ 131.) Press reports indicated that FCA's UAW workers rejected the deal because they distrusted the union's leaders. (*Id.*) A new deal was announced on October 8, and it was ratified on October 22. (*Id.* at PgID 61, ¶¶ 132–33.) UAW President Williams called it one of the "richest" deals for UAW workers ever negotiated. (*Id.* at PgID 61, ¶ 133.) The deal was certainly much richer for UAW workers than the one GM thought it was going to have—GM's analysis of the deal showed that, as a pattern for GM's CBA, the FCA-UAW CBA would cost GM around $1 billion more than GM's tentative deal. (*Id.* at PgID 61, ¶ 132.) It was especially expensive for GM because GM had many more Tier One workers than FCA. (*Id.* at PgID 62, ¶ 134.)

GM, however, was under the pressure of pattern bargaining and the expiration of the "no-strike" rule imposed in 2009. (*Id.* at PgID 56–57, ¶¶ 118–19, 122.) So, it agreed, on October 25, to a tentative CBA patterned on the new, rich FCA CBA, though GM was "able to reduce the immediate cost impact of the FCA pattern by

14

about $400 million." (*Id.* at PgID 62–63, ¶¶ 135, 137.) GM UAW members ratified the CBA on November 20, 2015 and it became effective on November 23rd. (*Id.* at PgID 63, ¶¶ 136–37.)

According to GM, FCA had two insidious motives for making so many concessions to the UAW. First, FCA and Marchionne wanted to pressure GM to agree to a merger by weakening it with unexpected labor costs. (*Id.* at PgID 55–56, 59, ¶¶ 116–17, 129.) Second, the participants in the bribery scheme knew that they were under federal investigation during the negotiations, so the UAW leadership needed to show that they were extracting concessions from FCA to throw investigators off of the scent. (*Id.* at PgID 62, ¶ 134.) FCA and the UAW officials participating in the scheme did not achieve either goal—GM resisted the forced merger, and federal investigators uncovered the bribery scheme, leading to criminal charges against thirteen former FCA/NTC, and UAW officials. (*Id.* at PgID 5, 63, ¶¶ 3, 138.)

The government began unsealing the criminal indictments related to this scheme in July 2017. (*Id.* at PgID 65, ¶ 145.) Most of the FCA and UAW officials charged have pled guilty, admitting to a "brazen scheme to enrich themselves and corrupt the collective bargaining process" by using illegal payments to get benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the FCA-UAW CBAs. (*Id.* at PgID 66, ¶¶ 147–48.) These officials

covered up their participation in the scheme through misstatements, false testimony, tax fraud, the use of shell companies, the use of purported charitable organizations, and more. (*Id.* at PgID 68–72. ¶ 151.)

GM alleges that it "diligently monitored the criminal proceedings" relating to the scheme to determine whether it was injured and whether it had a cause of action, but it relied on false statements by Marchionne, FCA, and Williams that the bribes had nothing to do with the collective bargaining process. (*Id.* at PgID 72–76, ¶¶ 152–53.) Thus, as alleged in the Complaint, GM did not know, until Iacobelli pled guilty to crimes relating to his part in the scheme, on January 22, 2018, that the scheme had impacted the CBA negotiation process and injured GM. (*Id.* at PgID 76–77, ¶ 154.) After "substantial" additional research, GM filed its Complaint in this case on November 20, 2019. (*Id.* at PgID 77, ¶ 154.)

### III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). Sixth Circuit "precedent instructs that, for a complaint to survive such motions, it must contain 'either direct or inferential

allegations respecting all material elements necessary for recovery under a viable legal theory.'" *Buck v. City of Highland Park, Michigan*, 733 F. App'x 248, 251 (6th Cir. 2018) (quoting *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir.  2013)).

"[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.'" *Casias v. Wal–Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay*, 695 F.3d at 539 (internal citations and quotation marks omitted). In other words, a plaintiff must provide more than "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56. The Sixth Circuit has reiterated that, "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint and that are central

17

to plaintiff's claims, (2) matters of which a court may take judicial notice (3) documents that are a matter of public record, and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings.").

### IV.  ANALYSIS

GM brings its three federal claims under RICO, a criminal statute that also provides, in 18 U.S.C. § 1964(c), for a civil private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." Section 1962, entitled "Prohibited activities," outlaws (a) the investment of income derived from a pattern of racketeering activity, in an enterprise engaged in interstate commerce, (b) the use of a pattern of racketeering activity to acquire or maintain control of any enterprise engaged in interstate commerce, (c) conducting an enterprise's affairs through a pattern of racketeering activity, and (d) conspiring to violate subsections (a), (b), or (c). 18 U.S.C. § 1962. GM alleges that Defendants violated subsections (b), (c), and (d). (ECF No. 1, Complaint, PgID 78–92, ¶¶ 156–89.) Assuming without deciding that Defendants did commit those violations, the

question before the Court is whether GM's alleged injuries occurred "by reason of" Defendants' violations of § 1962. 18 U.S.C. § 1964(c).

The phrase "by reason of," in RICO's private right of action provision, requires proof that the defendant's violation of § 1962 was <u>both</u> the "but for" and the "proximate cause" of the plaintiff's injury. *Holmes v. Sec. Inv'r Prot. Corp. (SIPC)*, 503 U.S. 258, 265–268 (1992). In other words, a plaintiff must allege facts that support its claim that its injury would not have occurred absent the § 1962 violation ("but for" cause), as well as facts that show a "direct relation between the injury asserted and the injurious conduct alleged" (proximate cause).[2] *Holmes*, 503 U.S. at 268 ("Proximate cause is thus required."). A "direct relation" means that the injury occurred at the first step in the causal chain. *See Hemi Group, LLC v. City of New York*, 559 U.S. 1, 10 (2010) (rejecting theory of causation that required moving "well beyond the first step").

Foreseeability of the injury alone cannot satisfy the RICO proximate cause inquiry. In *Holmes*, the Supreme Court used the term "proximate cause" as a generic label for "the judicial tools used to limit a person's responsibility for consequences

---

[2] The requirement that a civil RICO plaintiff allege facts showing both but for and proximate cause is derived from the language of § 1964(c), which says "by reason of a violation of section 1962," so this requirement applies to alleged violations of all subsections of § 1962. The only difference between the subsections is the type of conduct that must directly harm the plaintiff—under (b) it is the acquisition or maintenance of control over an enterprise, under (c) it is conducting the affairs of the enterprise through racketeering, and under (d) it is the conspiracy.

of that person's own acts," 503 U.S. at 268, but subsequent Supreme Court decisions clarified that traditional proximate-cause inquiries, such as whether the injury was a foreseeable consequence of the conduct, are not the focus of the RICO proximate cause test. In *Hemi Group*, the Supreme Court was explicit that, while "[t]he concepts of direct relationship and foreseeability are of course two of the 'many shapes [proximate cause] took at common law,' [its] precedents make clear that in the RICO context, the focus is only on the directness of the relationship between the conduct and the harm." 559 U.S. at 12. The Supreme Court also noted, in *Hemi Group*, that its decisions in *Holmes* and *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), "never even mention the concept of foreseeability." *Hemi Group*, 559 U.S. at 12. So, the fact that an injury was foreseeable, or even intended by the defendant, cannot create proximate cause if the injury was not direct. *See, e.g.*, *Anza*, 547 U.S. at 460 ("A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense.")

GM, in its briefing and at oral argument, urged the Court to rely on the proximate cause analysis in the Sixth Circuit's decision in *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414 (6th Cir. 2013). (ECF No. 65, Response to FCA US, PgID 2590; ECF No. 75, Transcript, PgID 2899–2900.) There, the Sixth Circuit began its RICO analysis citing *Holmes*: "The Supreme Court has held in no uncertain

terms that under each provision a plaintiff must show that the predicate acts alleged 'not only [were] a 'but for' causes of his injury, but [were] the *proximate cause* as well.'" *Wallace*, 714 F.3d at 419 (emphasis in original). The Sixth Circuit further recognized that "[i]t is well-settled that proximate cause is an essential ingredient of any civil RICO claim." *Id.* However, the Sixth Circuit then proceeded to discuss "the many traditional proximate-cause considerations found at common law" and described the direct injury rule from *Holmes* and its progeny as one consideration among several different proximate cause standards, including foreseeability. *Id.* at 419–20. The *Wallace* court analyzed the defendants' alleged conduct and found that it directly caused the plaintiff's injury. *Id.* at 420. It accepted that the plaintiff was "an intended target of the defendants' alleged scheme to induce borrowers to agree to loans with high interest rates and other unfavorable terms," and that allowed it to draw a direct line from the violation—provision of a falsified appraisal—to the harm—being saddled with an unfavorable loan. *Id.* It did not find that the foreseeable and intended nature of the injury transformed it from indirect to direct. *Id.* And, though the *Wallace* court did analyze foreseeability as an alternative theory of proximate cause, the Supreme Court has never adopted that proximate cause standard. Indeed, the Supreme Court has made clear, time and again, that the RICO proximate cause requirement does not turn on foreseeability. *See Hemi Group*, 559 U.S. at 12 (criticizing dissent for "hav[ing] RICO's proximate cause requirement turn

21

on foreseeability, rather than on the existence of a sufficiently 'direct relationship' between the fraud and the harm").

The Supreme Court created the direct-injury rule based on three primary concerns. First, "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269. Second, if plaintiffs are "removed at different levels of injury from the violative acts," courts would be forced to "adopt complicated rules apportioning damages . . . to obviate the risk of multiple recoveries." *Id.* Third, the directly-injured victims of a racketeering scheme, where they exist, "can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269–70. This is not so different than the traditional, common law proximate cause requirement, which "limit[s] the right to relief to the initial victims of the wrong," in order to avoid evidentiary and apportionment problems. *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 755 (7th Cir. 2011).

One example of the application of this strict proximate cause requirement is *Anza*. 457 U.S. 451. In that case, Ideal Steel Supply Corp. ("Ideal"), a steel-product retailer, alleged that its primary competitor, National Steel Supply, Inc. ("National"), failed to charge state sales taxes to cash-paying customers. *Id.* at 454. This enabled it to lower prices and attract customers away from Ideal. *Id.* at 454, 457–58. The

Supreme Court found that proximate cause was not established, because Ideal was not the direct victim—the state tax authority, which was defrauded and lost tax revenue, was the direct victim. *Id.* at 458. The connection between Ideal's harm— loss of market share—and the § 1962(c) violation—defrauding the tax authority— was too attenuated because National could have lowered its prices for reasons other than omitting the sales tax and Ideal could have lost customers and sales for reasons other than National's lower prices. *Id.* at 458–59.

The *Anza* court further found that the attenuation between the alleged § 1962(c) violation and the injury to the plaintiff implicated two of the three concerns animating the proximate cause requirement—the difficulty in calculating damages attributable to the racketeering activity, and the presence of a directly-harmed victim better suited to vindicate the law. *Id.* at 459–60. Finally, the Court stressed that the fact that National embarked on the scheme to avoid sales taxes with the intent of increasing its market share at Ideal's expense did not create proximate cause where the scheme did not directly injure Ideal. *Id.* at 460–61.

Here, GM alleges two separate injuries, supported by two separate theories of causation. First, it alleges that Defendants' bribes to UAW officials secured "unique competitive advantages [for] FCA but denied [those advantages to] GM from July 2009 through 2015, including in connection with [FCA's] WCM, the grievance process, the proportion of Tier Two workers, and [the] limits on temporary workers."

23

(ECF No. 1, Complaint, PgID 90, ¶ 178; *see also id.* at PgID 79, ¶ 162.) These "unique competitive advantages," specifically denied to GM, lowered FCA's labor costs in relation to GM's, causing GM harm. Second, GM alleges that Defendants' bribes secured FCA's position as the lead company for the 2015 CBA negotiations, which enabled FCA to use concessions and pattern bargaining to impose "over $1 billion" in unanticipated labor costs on GM. (*Id.*) Neither theory succeeds.

### A.    GM's Unique Competitive Advantages Theory

Initially, GM's first causation theory, that Defendants engaged in a "pay-to-harm" GM scheme, has some appeal, but it fails on a closer look. (ECF No. 75, Transcript, PgID 2888–89.) Here, GM alleges that FCA and its officials bribed the UAW to obtain certain concessions for FCA in the negotiation and implementation of its CBA. (ECF No. 1, Complaint, PgID 90, ¶ 178.) These concessions cut down on FCA's labor costs, resulting in FCA having lower average per-hour labor costs than GM. (*Id.* at PgID 42, ¶¶ 82–83.) FCA's lower labor costs may have given it a competitive advantage against GM, just as National's lower prices gave it a competitive advantage against Ideal in *Anza*, but any loss of market share or other harm attributable to FCA's labor cost advantage is an indirect harm, just like Ideal's loss of market share in *Anza*. 457 U.S. 457–61.

GM also alleges, in a conclusory fashion, that Defendants directed the UAW to deny these concessions to GM, but, as illustrated below, the facts alleged indicate

24

that the UAW would not give most of the concessions at issue to any company that was not bribing its officials. So, GM would never have had access to the same "unique competitive advantages" unless it also bribed the UAW. Accordingly, GM's labor costs were not any higher than they would have been absent FCA's bribes, FCA's labor costs were just lower than they would have been. In other words, FCA's UAW workers were the direct victims of the bribes because they were paid less, and GM suffered only an indirect competitive harm.

The allegations show that the "unique competitive advantages" at issue would not have been available to a company unwilling to bribe UAW officials. First, two out of the five specific advantages that FCA allegedly obtained through bribery were concessions and advantages that a labor union would never give in the absence of bribes. Specifically, nonenforcement of the hiring cap on temporary workers and less-than-zealous advocacy for workers in the grievance process are advantages that would never be available from an uncorrupted union. (ECF No. 1, Complaint, PgID 40–41, ¶¶ 79–80.)

A third advantage, the assurance that the UAW would not insist on reinstating the Tier Two workers cap, is similar—an uncorrupted union would not tip off a company that the union would not insist on terms that protect its members' Tier One jobs. (*Id.* at PgID 40, ¶ 78). So, because these three advantages—(1) nonenforcement of the hiring cap on temporary workers, (2) poor advocacy for

workers in the grievance process, and (3) assurance regarding the Tier Two workers cap—were unavailable in the absence of bribes, GM cannot argue that it was entitled to them or that it would have gotten them if not for Defendants' bribes. Therefore, any labor costs that GM paid as a result of adhering to the terms of its CBA with the UAW regarding temporary workers, the grievance process, and the anticipated Tier Two cap, cannot be described as harm proximately caused by Defendants' bribes.

Second, while the other two advantages, UAW commitment to WCM, and the cheaper prescription drug formulary, are not as obviously against union interests, the facts, as alleged by GM, show that Defendants' intent in making the bribes was to secure advantages for FCA that would not otherwise be available. (*Id.* at PgID 37–39, 42, ¶¶ 72–75, 81.) In paragraph 64 of the Complaint, GM quotes the criminal indictment of Defendant Iacobelli, which said that the payments to the UAW officials were made to keep them "fat, dumb, and happy." (*Id.* at PgID 32, ¶ 64.) GM also quotes the Government's Sentencing Memorandum in the criminal case against Defendant Durden and Defendant Brown's Plea Agreement, which, respectively, characterized the payments as an effort to "buy labor peace," and said that "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials." (*Id.*) Finally, GM continually refers to a section of the Government's Sentencing Memorandum in the case against Iacobelli which said that the payments were "an effort to obtain benefits, concessions, and advantages for FCA in the

26

negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW." (*Id.*; *see also id.* at PgID 37, 66, 77, ¶¶ 71, 148, 154.) These allegations support the inference that Defendants' intent was to lower FCA's labor costs by inducing UAW officials to act against the interests of workers, not the inference that Defendants wanted to increase GM's labor costs by asking the UAW to deny GM concessions that it otherwise would have given.

Further, the few paragraphs of the Complaint that even mention an intent to harm GM are vague and conclusory. (*See, e.g.*, *id.*, at PgID 7, ¶ 6 ("As part of th[e] bribery scheme . . . GM was denied similar union commitments and support."); *see also id.* at PgID 37–39, 40–43, 46–47, 90, ¶¶ 71–72, 75, 78–81, 83, 98, 172.) Paragraph 83 says "[a]s alleged herein, FCA directed key UAW officials to deny similar labor advantages to GM." (*Id.* at PgID 43, ¶ 83.) Notably absent from the Complaint, however, are any specific facts supporting the allegation that a condition of Defendants' payments to the UAW officials was denial of concessions and benefits to GM.

So, the only credible inference from the facts alleged in GM's complaint is that Defendants' bribes were intended to secure advantages and concessions for FCA from the UAW that would not otherwise be available to it. Accordingly, the direct victims of Defendants' alleged bribery scheme are FCA's workers. GM's high labor costs were not an injury proximately caused by FCA's bribes, and any competitive

injury that GM suffered as a result of FCA's advantage in labor costs is an indirect injury, like Ideal's loss of market share in *Anza*. 547 U.S. 451. GM's first causation theory—that Defendants' bribes to UAW officials secured unique competitive advantages for FCA but denied those advantages to GM—fails, so, to the extent that its RICO claims are based on this theory, those claims cannot go forward.

### B.    GM's 2015 CBA and Unanticipated Labor Costs Theory

GM's second theory of causation is based on an even-more-remote injury and therefore fares no better than the first. To state the theory is to show that the injury alleged is far beyond the first step in the causal chain—GM alleges that FCA and Defendants used bribes to secure the position of lead company in the 2015 CBA negotiations (first step), which enabled FCA to negotiate its own very generous to UAW workers CBA with the UAW, (second step) that ensured, through "the economic force of pattern bargaining and threat of strike," that the 2015 GM-UAW CBA was "vastly more expensive" then GM had planned (third step). (ECF No. 1, Complaint, PgID 58, 59, 61–63, ¶¶ 125, 128, 132–35.) This theory, which "requires [the Court] to move well beyond the first step, . . . cannot satisfy RICO's direct relationship requirement." *Hemi Group*, 559 U.S. at 10.

Further scrutiny of this theory reveals additional holes in its logic. First, factors other than FCA's desire to impose significant labor costs on GM could explain FCA's motive to negotiate an overly "rich" CBA. As alleged in the

28

Complaint, UAW and FCA officials knew that their labor agreements and the misuse of UAW funds were under investigation by the federal government, so both sides had incentives to prove to the government that they were engaging in good faith negotiations. (ECF No. 1, Complaint, PgID 62, ¶ 134.) Adding to the pressure on FCA to make concessions to the UAW was the fact that FCA's UAW workforce rejected the first tentative deal struck between FCA and UAW negotiators. (*Id.* at PgID 61, ¶ 131.) Second, GM admits, in the Complaint, that it "was able to reduce the immediate cost impact of the FCA pattern by about $400 million," which shows that the economic force of pattern bargaining was not so strong that GM was unable to deviate, at least to some degree, from the pattern CBA. (*Id.* at PgID 63, ¶ 137.)

Finally, even though some of GM's unanticipated additional labor costs may have resulted from FCA's scheme to use "weaponized" pattern bargaining to weaken GM, the difficulty of calculating the difference between the labor costs GM had to pay under its ultimate 2015 CBA and the costs it would have had to pay in the counterfactual world where it was selected as the lead is exactly the difficulty that animated the *Holmes* Court's announcement of the direct-injury rule. 503 U.S. at 269 ("[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.") Accordingly, GM's second causation theory fails.

GM's failure to plead sufficient facts showing that it was proximately harmed "by reason of" Defendants' alleged § 1962 violations means that it did not state a cognizable civil RICO claim. 18 U.S.C. § 1964.

## V.    CONCLUSION

For those reasons, the Court GRANTS all three Motions to Dismiss (ECF Nos. 41, 42, 50) and dismisses GM's Complaint with prejudice.

IT IS SO ORDERED.


Dated: July 8, 2020                                         s/Paul D. Borman
                                                           Paul D. Borman
                                                           United States District Judge