## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

GENERAL MOTORS LLC,
GENERAL MOTORS COMPANY,

                    Plaintiffs,

    against

FCA US LLC, FIAT CHRYSLER
AUTOMOBILES N.V., ALPHONS
IACOBELLI, JEROME DURDEN,
MICHAEL BROWN,

                  Defendants.

No. 19-cv-13429

Honorable Paul D. Borman
District Court Judge

Honorable David R. Grand
Magistrate Judge

## **PLAINTIFFS' MOTION TO ALTER OR AMEND JUDGMENT**

Plaintiffs General Motors LLC and General Motors Company (collectively, "GM"), pursuant to Federal Rule of Civil Procedure 59(e), submit this Motion to Alter or Amend the Court's Judgment and Opinion and Order in support (Dkts. 82-83) granting with prejudice FCA US LLC's Motion to Dismiss (Dkt. 41), Fiat Chrysler Automobiles N.V.'s Motion to Dismiss (Dkt. 42), and Alphons Iacobelli's Motion to Dismiss (Dkt. 50).[1]

---

[1] On August 3, 2020, GM's counsel conferred with counsel for Defendants and all oppose GM's Motion.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

      A.    Procedural History ...............................................................................3

      B.    Newly Discovered Evidence Reinforces That Defendants'
           Scheme Directly and Intentionally Targeted and Harmed GM ............5

ARGUMENT ..........................................................................................................9

      A.    The Court Misapplied the Proximate Cause Requirement.................10

      B.    The Court Should Have Provided GM Leave to Amend. ...................13

      C.    Newly Discovered Evidence Warrants Amending the Judgment
           to Permit GM to File the FAC..........................................................15

CONCLUSION .....................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. Eagle Mfg. Co., LLC*
  714 F. App'x 504 (6th Cir. 2017 ....................................................................13

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006). (*Id.* at 22.)..........................................................*passim*

*Bank v. Pitt*,
  928 F.2d 1108 (11th Cir. 1991) .....................................................................14

*Belknap v. Bank of Am. Corp.*,
  No. 14-cv-1540, 2015 WL 1423398 (N.D. Ohio Mar. 27, 2015) .....................13

*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
  342 F.3d 634 (6th Cir. 2003) .........................................................................14

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008)................................................................................10, 11

*In re ClassicStar Mare Lease Litig.*,
  727 F.3d 473 (6th Cir. 2013) ....................................................................11, 22

*Counts v. Gen. Motors, LLC*,
  No. 16-cv-12541, 2018 WL 5264194 (E.D. Mich. Oct. 23, 2018) ....................13

*Davis v. United States*,
  No. CIV. 08-184-ART, 2010 WL 5014533 (E.D. Ky. Dec. 3, 2010)................16

*In re Duramax Diesel Litig.*,
  298 F. Supp. 3d 1037 (E.D. Mich. 2018) .........................................................15

*Empress Casino Joliet Corp. v. Johnston*,
  763 F.3d 723 (7th Cir. 2014) ....................................................................12, 16

*Hemi Group, LLC v. City of New York*,
  559 U.S. 1 (2010)..........................................................................4, 5, 11, 12

*Holmes v. Sec. Inv'r Prot. Corp.*,
  503 U.S. 259 (1992)................................................................................10, 22

*Intera Corp. v. Henderson*,
    428 F.3d 605 (6th Cir. 2005) ..................................................................9

*KBT Grp., LLC v. City of Eastpointe*,
    No. 18-10409, 2019 WL 1556194 (E.D. Mich. Apr. 10, 2019) .........................13

*Mich. Dep't of Envtl. Quality v. City of Flint*,
    296 F. Supp. 3d 842 (E.D. Mich. 2017) ......................................................18, 19

*Murphy v. Vaive Wood Prod. Co.*,
    No. 2:17-CV-11513, 2019 WL 117337 (E.D. Mich. Jan. 7, 2019)..............16, 18

*Raymo v. FCA US LLC*,
    No. 2:17-CV-12168, 2020 WL 4366061 (E.D. Mich. July 30,
    2020) .........................................................................................................14

*Schwartz v. Sun Co., Inc. (R & M)*,
    276 F.3d 900 (6th Cir. 2002) ..............................................................12

*SNAPP, Inc. v. Ford Motor Co.*,
    532 F.3d 496 (6th Cir. 2008) ...............................................................9

*Trollinger v. FTyson Foods, Inc.*,
    370 F.3d 602, 615 (6th Cir. 2004) ....................................................11

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.*,
    714 F.3d 414 (6th Cir. 2013) .........................................................4, 10, 11, 15

**STATUTES**

18 U.S.C. § 1964(c) ...............................................................................10

**RULES**

Fed. R. Civ. P. 9(b) ...............................................................................14

Fed. R. Civ. P. 15(a)...........................................................................13, 15

Fed. R. Civ. P. 59(e)..............................................................................9

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

1.     "A court may grant a Rule 59(e) motion to alter or amend if there is," *inter alia*, a clear error of law or newly discovered evidence. *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005). This Court's Order granting Defendants' motions to dismiss applied a "strict proximate cause requirement" that cannot be reconciled with the "flexible" proximate cause standard set forth in binding Supreme Court and Sixth Circuit precedent and dismissed GM's Complaint ***with prejudice*** even though leave to amend should have been freely granted. Moreover, GM has discovered new and previously unavailable facts that address every concern the Court raised in its Order. Should the Court grant GM's Motion under Rule 59(e), alter or amend its Judgment, and allow GM to file an amended complaint?

     **GM Answers:** Yes

     **Defendants Answer:** No

## <u>STATEMENT OF CONTROLLING<br>OR MOST APPROPRIATE AUTHORITIES</u>

1.      Federal Rule of Civil Procedure 59(e)

2.      *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634 (6th Cir. 2003)

3.      *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)

4.      *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473 (6th Cir. 2013)

5.      *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414 (6th Cir. 2013)

## INTRODUCTION

Since July 2017, three former officials of FCA US LLC ("FCA") and ten former officials of the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") have pleaded guilty to a years-long bribery scheme to corrupt the auto industry's collective bargaining process, enrich themselves, and—as GM later learned—harm GM, one of FCA's principal competitors and the target of FCA's scheme to skew the collective bargaining process to GM's detriment. In an understandable reaction to this confessed pattern of unlawful racketeering activity that intentionally and directly inflicted economic harm upon it, GM brought this lawsuit, alleging, *inter alia*, claims under the RICO Act. As a result of the Court's orders in this case, including but not limited to its Opinion and Order granting Defendants' motions to dismiss ("Order"), GM has not been permitted to pursue the evidence underlying its valid RICO claims and will be prevented from doing so unless and until that decision is set aside or overturned. For the extraordinarily compelling reasons set forth herein, GM respectfully submits that the Court's Judgment and Order must be set aside and vacated because: (1) the facts alleged by GM in its Complaint and set forth in the Order more than adequately state a claim against all Defendants under RICO; and (2) newly discovered evidence, outlined herein and set forth in detail in the attached proposed First Amended Complaint (Ex. A, "FAC"), further demonstrates the validity of GM's RICO claims

and amply justifies vacating or at the very least amending the Order to remove its with prejudice effect and allow GM to file the FAC.

In rendering Judgment, the Court applied a "strict proximate cause requirement" that cannot be reconciled with the "flexible" proximate cause standard set forth in binding Supreme Court and Sixth Circuit precedent. Taken as true and in the light most favorable to GM, the allegations in GM's original Complaint plainly satisfy the correct legal standard. But even if this Court's strict proximate cause standard were the appropriate legal standard, the Court committed manifest error by dismissing GM's claims ***with prejudice*** and denying GM the opportunity to file an amended complaint to address the Court's concerns. As the proposed FAC demonstrates, GM's newly discovered facts (among other new allegations), obtained without the aid of formal discovery, easily satisfy the Court's strict proximate cause standard. The proposed FAC demonstrates that Defendants' racketeering scheme intentionally, directly, and proximately targeted and harmed GM, as bribes were paid to individuals working ***within GM***, who then stashed them in secret overseas accounts. At a bare minimum, the Court should give GM an opportunity to amend its Complaint to present these new allegations and otherwise try to cure the defects the Court identified.

## BACKGROUND

### A.    Procedural History

GM filed the Complaint on November 20, 2019, on the heels of more than a dozen guilty pleas involving Defendants and their co-conspirators. (*See* Dkt. 1.) GM alleged that Defendants engaged in a years-long, unlawful conspiracy through which FCA and Fiat Chrysler Automobiles N.V. ("FCA NV") secretly bribed officials at the UAW—committing multiple violations of the Taft-Hartley Act and multiple acts of wire fraud and mail fraud along the way—to raise GM's labor costs while lowering the costs to FCA. The Complaint alleged that GM was not just an incidental victim of a scheme by FCA to enrich itself at the union's expense, but the direct and intended victim of a scheme to harm GM.

Although GM promptly served written discovery pursuant to the Court's standing order to try to obtain further evidence substantiating the allegations in the Complaint, Defendants refused to respond to GM's requests, and the Court ultimately stayed all of GM's discovery requests pending resolution of Defendants' motions to dismiss. (Dkt. 55; *see* Dkts. 41, 42, 50.) The Court heard oral argument on those motions on June 23, 2020. Two weeks later, after having already declined to exercise jurisdiction over GM's state-law claims, and after the Sixth Circuit had stayed the case for seven days while it decided GM's mandamus petition, the Court

issued its Order and Judgment dismissing GM's RICO claims with prejudice. (*See* Dkts. 82, 83.)

The Court "[a]ssum[ed] without deciding that Defendants did commit" the alleged RICO violations. (*Id.* at 18; *see* Dkt. 1 ¶¶ 156-89.) Nevertheless, it granted the motions based solely on the conclusion that "GM's alleged injuries were not proximately caused by Defendants' alleged violations of the RICO Act." (Dkt. 82 at 2-3.) In reaching that conclusion, the Court declined "to rely on the proximate cause analysis in the Sixth Circuit's decision in *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414 (6th Cir. 2013)," which post-dated all relevant Supreme Court precedent. (*Id.* at 20.) According to the Court, "the Supreme Court has never adopted th[e] proximate cause standard" the Sixth Circuit applied in *Wallace*, but rather "has made clear, time and again, that the RICO proximate cause requirement does not turn on foreseeability." (*Id.* at 21.) The Court thus not only declined to follow *Wallace*, but applied a self-described "strict proximate cause requirement" that it erroneously deemed was required by *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), and *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006). (*Id.* at 22.) Under this new "strict" standard, the Court determined that "[n]either" of GM's "two separate theories of causation" was supported by "sufficient facts." (*Id.* at 23-30.) Yet rather than permit GM an opportunity to rectify that perceived deficiency in its

pleadings by permitting it to file an amended complaint, the Court dismissed GM's Complaint with prejudice. (*Id.* at 30.)

**B.    Newly Discovered Evidence Reinforces That Defendants' Scheme Directly and Intentionally Targeted and Harmed GM**

While GM believes the facts set forth in its original Complaint are more than sufficient to state RICO claims against Defendants, GM has recently learned of reliable information that demonstrates that Defendants' racketeering scheme was directly and intentionally designed to, and did, harm GM.

Specifically, GM has discovered and alleges in the attached FAC the use by Defendants and other co-conspirators of a broad network of foreign bank accounts containing millions of dollars in countries such as Switzerland, Luxembourg, Liechtenstein, Italy, Singapore, the Cayman Islands, and others. (FAC ¶ 9.) Among the beneficiaries of these accounts and participants in the scheme to directly harm GM are former UAW Vice President Joseph Ashton, who, before joining GM's Board as the UAW Trust's designee in 2014, denied GM cost-cutting labor advantages provided to FCA; former UAW President Dennis Williams, who forced $1 billion in additional costs on GM beyond the UAW's Presidential Demand through the 2015 collective bargaining agreement; and Defendant Alphons Iacobelli, who left FCA in 2015 and subsequently joined GM. (*Id.* ¶¶ 5-9, 14-20, 35, 39-43.) The existence and use of these foreign accounts have never come to light publicly and by their very design were intended to remain secretive from criminal

investigation. (*Id.* ¶¶ 35, 37, 43, 63, 201(j).) This previously hidden network of accounts, utilized by Defendants and controlled in part by individuals purportedly acting on GM's behalf, reveals a magnitude of bribery and illegal activity specifically targeting GM that was not previously known or reasonably knowable.

First, the existence of these foreign accounts for this grouping of U.S. (and one Canadian) citizens strongly supports the conclusion that not only did FCA target GM but did so in part through having Ashton act clandestinely on FCA's behalf from inside GM's Boardroom. (*Id.* ¶¶ 6, 8, 126, 179.) As UAW Vice President for the GM Department from 2010 to 2014 and UAW Vice President General Holiefield's counterpart, Ashton negotiated the 2011 collective bargaining agreement. (*Id.* ¶ 88.) Ashton was therefore at the center of negotiations that resulted in Defendants causing the UAW to increase GM's labor costs by denying GM the same labor advantages that FCA received. (*Id.* ¶¶ 42, 126, 157, 177.) And in 2014, Ashton joined GM's Board as the UAW Trust's designee. (*Id.* ¶¶ 6, 126.)

Ashton's role in those negotiations and on GM's Board take on a very different meaning—and one consistent with a scheme intended not just to help FCA, but to harm GM—now that GM has come to reasonably believe and has alleged as fact that Ashton maintained at least one account in the Cayman Islands at the same time that Defendants were making unlawful payments to try to grease the skids with the UAW. (*Id.* ¶¶ 43, 88.) This newly discovered evidence gives rise to a far-more-

6

than-plausible inference that Ashton operated as a paid mole inside GM's Boardroom during 2015 collective bargaining negotiations and FCA NV's merger effort from his position as the UAW Trust nominee to GM's Board, providing Defendants confidential details about GM's labor strategy and analysis of a potential merger so Defendants could not only cause but maximize the harm to GM. (*Id.* ¶¶ 8, 126, 179-80.) On information and belief, Ashton not only protected high-level FCA and FCA NV executives but also fed FCA and FCA NV confidential information related to the collective bargaining process in order to weaken GM. (*Id.* ¶ 43.) GM's FAC therefore adds Ashton as a Defendant and explains in further detail how Defendants' scheme was intended and designed to harm GM. (*See id.* ¶¶ 41-43, 88, 126, 175-84.)

These newly discovered and pled facts also shed new light on the relationship between former UAW President Dennis Williams and Ashton. GM always knew that Williams handpicked Ashton to serve on GM's Board. (*Id.* ¶ 6.) But newly discovered and alleged facts make clear that the FCA Defendants likely provided funds to both Ashton *and* Williams via foreign accounts in furtherance of Defendants' RICO activities. (*Id.* ¶¶ 9, 40, 43, 100.) This newly discovered evidence supports additional inferences regarding Williams' decision to place Ashton on GM's Board. (*Id.* ¶¶ 8, 175-84.) Upon information and belief, FCA and FCA NV rewarded Williams with significant funds placed in bank accounts in Switzerland

and Liechtenstein in exchange for intentionally infiltrating GM, both to impose asymmetrical costs on GM through the 2015 collective bargaining agreement and to pressure GM to merge with FCA NV. (*Id.* ¶ 40.) Based on the revelation that Williams was secretly compensated for participating in the scheme, GM's FAC adds Williams as a Defendant. (*See id.* ¶¶ 39-40.)

Finally, newly discovered facts support the inference that former FCA Vice President Iacobelli, who GM had previously named as a Defendant, also furthered FCA NV's scheme to target GM for increased labor costs and a merger from inside GM. (*Id.* ¶ 7.) After Iacobelli left FCA in June 2015, he solicited employment from GM and, once employed, furthered Defendants' scheme by funneling inside information to Defendants. (*Id.* ¶¶ 7, 137, 182-83.) Upon information and belief, FCA and FCA NV secretly provided Iacobelli and a family member with millions of dollars through funds currently in accounts in Italy, Liechtenstein, Switzerland, and Singapore not only for his central and long-running role in the scheme, but also for protecting high-level FCA and FCA NV executives, which he did even after he signed up to cooperate with the criminal investigation and pleaded guilty to conspiracy to violate the Labor Management Relations Act and filing a false tax return. (*Id.* ¶ 35.) As alleged based on reasonable inference, Iacobelli curtailed his criminal plea to ensure that the true scope of the conspiracy was not revealed, which

included the plan by FCA NV to use its control of the UAW to directly target and harm GM and its use of foreign bank accounts as bribes.

In sum, GM's newly discovered facts confirm that Defendants' racketeering scheme directly targeted and harmed GM (*id.* ¶ 184):



## ARGUMENT

"A court may grant a Rule 59(e) motion to alter or amend if there is: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005); *see also SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 507 (6th Cir. 2008) ("[W]e allow a district court discretion to set aside a prior judgment under Rule 59(e) and permit an amended complaint to be filed

under such circumstances."). At least three bases for amending the judgment exist here.

### A.    The Court Misapplied the Proximate Cause Requirement.

First, the Court applied an unduly strict proximate cause standard that is inconsistent with governing Supreme Court and Sixth Circuit precedent.

A plaintiff bringing a civil RICO claim must establish that he was "injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). "The phrase 'by reason of' in RICO's private right of action provision, requires proof that the defendant's violation of § 1962 was both the 'but for' and the 'proximate cause' of the plaintiff's injury." (Dkt. 82 at 19 (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265, 268 (1992)).) The Supreme Court has admonished, however, that "[p]roximate cause … is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 654 (2008) (quoting *Holmes*, 503 U.S. at 272 n.20). The Sixth Circuit has likewise rejected the notion that § 1964(c) demands a "[s]trict application of traditional proximate-cause considerations" such as directness. *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 419 (6th Cir. 2013).

Despite these (and other) precedents, the Court based its Opinion on the premise that the "proximate cause requirement" in civil RICO cases is "strict," and

that any kinks in an otherwise straight-line chain of direct causation mean that proximate cause is necessarily lacking. (Dkt. 82 at 22; *see id.* at 23-25.) That mistaken raising of the bar to show proximate cause alone justifies altering or amending the judgment. To be sure, "[f]oreseeability of the injury ***alone*** cannot satisfy the RICO proximate cause inquiry" (*id.* at 19 (emphasis added)), as a scheme to enrich the conspirators with only an incidental, but foreseeable effect on others may be insufficient. *See In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 487 (6th Cir. 2013). But the Sixth Circuit has been unequivocal that a civil RICO plaintiff "need only show that [1] the defendants' wrongful conduct was 'a substantial and foreseeable cause' of the injury and [2] the relationship between the wrongful conduct and the injury is '***logical and not speculative***,'" *id.* (emphasis added) (quoting *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004)), and neither *Hemi* nor *Anza* holds otherwise. Thus, a scheme that intentionally and purposefully targets another for harm causes injury that is both foreseeable and sufficient to show proximate cause. *See Wallace*, 714 F.3d at 420 ("Once we accept that Wallace was an intended target of the defendants' alleged scheme …—as we must at this stage in the litigation—the link between the scheme and the type of injury Wallace suffered is plain to see."). As the Supreme Court has underscored, "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury." *Bridge*, 553 U.S. at 657.

11

GM's Complaint, construed as it must be in the light most favorable to GM, readily satisfied those standards. (*See, e.g.*, Dkt. 1 ¶¶ 7, 71-72, 78-81, 83.) Unlike in *Anza*, where the plaintiff's damages were just an incidental byproduct of a tax fraud designed to benefit the taxpayer, and the Court needed to undertake "a multi-step analysis" to get from "defendants' underpayment of taxes, to their reduced prices, to the plaintiff's loss of sales," *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d. 723, 733 (7th Cir. 2014), GM's injuries were distinct, direct, and the whole point of the scheme. Only GM incurred the higher labor costs resulting from the conspiracy. Indeed, increased labor costs imposed on GM *benefitted* UAW workers. And unlike in *Hemi*, where the plaintiffs' theory of causation required the court to make numerous logical leaps and jump "well beyond the first step," 559 U.S. at 10, here, finding that Defendants' scheme caused GM harm requires no logical contortions or multiple-step analysis. Defendants infiltrated GM and used their insider positions and bribery scheme to impose increased costs on GM and thus benefit FCA.

Even if the UAW rank-and-file may have suffered some unidentified injuries as a result of certain aspects of how Defendants carried out their unlawful scheme —which GM does not concede—at best, GM's injuries were distinct. Put another way, the UAW rank-and-file did not suffer from increased labor costs directly and intentionally imposed on GM. That is more than enough at the 12(b)(6) stage. *See, e.g.*, *Schwartz v. Sun Co., Inc. (R & M)*, 276 F.3d 900, 904 (6th Cir. 2002) ("Where

there is evidence … that [the plaintiff's] losses were a result of [the defendant's] conduct, as well as evidence which tends to show that [the plaintiff's] losses were attributable to other factors, it is normally up to the trier of fact to decide which is the case."); *Counts v. Gen. Motors, LLC*, No. 16-cv-12541, 2018 WL 5264194, at *12 (E.D. Mich. Oct. 23, 2018) ("There is no reason why Bosch's conduct cannot have multiple 'direct victims,' including EPA, CARB, and the Plaintiffs.").

## B.    The Court Should Have Provided GM Leave to Amend.

Even if this Court were correct to embrace a "strict" proximate cause standard, it should have allowed GM leave to amend, rather than dismissing GM's RICO claims **with prejudice**. "[T]he Federal Rules of Civil Procedure 'evince[] a liberal amendment policy,' by providing that the district court 'should freely give leave [to amend a complaint] when justice so requires.'" *KBT Grp., LLC v. City of Eastpointe*, No. 18-10409, 2019 WL 1556194, at *2 (E.D. Mich. Apr. 10, 2019) (quoting *Alexander v. Eagle Mfg. Co., LLC* 714 F. App'x 504 (6th Cir. 2017)); *see* Fed. R. Civ. P. 15(a). The Sixth Circuit thus "has held that 'where a more carefully crafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice'" "even if plaintiff fails to file a motion to amend" before a court decides a motion to dismiss. *Belknap v. Bank of Am. Corp.*, No. 14-cv-1540, 2015 WL 1423398, at *3 (N.D. Ohio Mar. 27, 2015) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d

634, 644 (6th Cir. 2003)). That is particularly true when a court applies a strict pleading standard in circumstances where the strictness of the standard is unclear or debatable. *See Bledsoe*, 342 F.3d at 644 (reversing decision dismissing complaint with prejudice); *Raymo v. FCA US LLC*, No. 2:17-CV-12168, 2020 WL 4366061, at *21 (E.D. Mich. July 30, 2020) (dismissing without prejudice RICO claim alleged in amended complaint and providing an opportunity to replead).

*Bledsoe* is instructive. The district court there dismissed the complaint with prejudice based on its conclusion, which was debatable under governing Circuit precedent, that Rule 9(b)'s heightened pleading requirement governed the allegations. *Bledsoe*, 342 F.3d at 644. The Sixth Circuit agreed that Rule 9(b)'s demanding pleading standard applied but reversed the decision to dismiss with prejudice rather than without prejudice. Because the plaintiff "was not definitively on notice that he had to state his allegations with the specificity required by Rule 9(b)," the proper course was to "remand the case to the district court to allow [the plaintiff] to comply with Rule 9(b) by amending his amended complaint." *Id.* at 645. The Court concluded by making clear that "where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *Id.* at 644 (quoting *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991)).

The same conclusion follows here. As this Court acknowledged, there is at least serious tension between the "strict" standard the Court deemed warranted and the foreseeability and logical relationship standard set forth in *Wallace* and other Sixth Circuit cases this Court criticized. Even if the Court was right to reject application of the Sixth Circuit's *Wallace* holding, the Court still should at least have granted GM leave to amend to satisfy the "strict" proximate cause standard the Court embraced.

Indeed, dismissal with prejudice here was inconsistent with Rule 15(a). This Court concluded that the allegations that Defendants intended to harm GM were "vague and conclusory" and lacking in "specific facts." (*E.g.*, Dkt. 82 at 27.) Plaintiffs whose complaints are deemed to lack sufficient specificity are prime candidates to be granted leave to amend under Rule 15(a)'s liberal policy, especially when the supposed lack of specificity is in a fact-intensive area like proximate cause. *Cf., e.g.*, *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1073 (E.D. Mich. 2018) ("A challenge to a RICO suit based on asserted lack of proximate causation … is often best resolved at summary judgment, not at the pleading stage.").

### C. Newly Discovered Evidence Warrants Amending the Judgment to Permit GM to File the FAC.

In all events, even if setting aside the judgment on the pre-existing record were not appropriate, GM should plainly be given leave to file its proposed FAC in light of GM's newly discovered and alleged evidence confirming GM's status as an

intended and direct victim of Defendants' unlawful scheme. The FAC addresses every concern the Court raised in its Order granting Defendants' motions to dismiss. Not only does the FAC contain new allegations tailored to the Court's "strict" proximate cause standard, but it also includes newly discovered evidence that even more plainly substantiates the direct infliction of harm upon GM. The newly discovered facts about Ashton, Williams, Iacobelli, and others provide a strong basis to conclude that GM sat "in the center of the target of the conspiracy," *Empress Casino*, 763 F.3d at 733, as Defendants' scheme infiltrated GM's Boardroom where GM's highly confidential information could be provided to FCA through a bribed Ashton in order to target and maximize harm to GM. (FAC ¶¶ 5-9, 175-84.)

These facts were not previously available and could not have been obtained "through the exercise of reasonable diligence." *Davis v. United States*, No. CIV. 08-184-ART, 2010 WL 5014533, at *4 (E.D. Ky. Dec. 3, 2010); *see Murphy v. Vaive Wood Prod. Co.*, No. 2:17-CV-11513, 2019 WL 117337, at *7 (E.D. Mich. Jan. 7, 2019) ("Newly-discovered evidence is evidence that could not have been discovered through reasonable diligence.") (citation omitted). GM has been diligently investigating Defendants' racketeering scheme without the aid of formal discovery. (*See* Ex. B, Declaration of Hariklia Karis ("Karis Decl.") ¶¶ 5, 7; Ex. C, Declaration of Jeffrey Willian ("Willian Decl.") ¶¶ 5, 7.) Among other avenues of investigation, GM and its counsel have conducted witness interviews, reviewed relevant publicly

available information regarding criminal developments, closely monitored the criminal proceedings against Defendants and their co-conspirators, reviewed and analyzed internal GM documents and communications, engaged consultants, and scrutinized collective bargaining negotiations and related agreements among GM, FCA, and the UAW since 2009. (Karis Decl. ¶ 5; Willian Decl. ¶ 5.) After filing its Complaint and consistent with the Court's standing order governing all civil cases, GM sought formal written discovery from FCA and FCA NV, Defendants, and third parties to better understand the nature of the bribery scheme and the payments made and received. Defendants refused to respond, and on February 18, 2020, the Court stayed GM's discovery requests. (*See* Dkt. 55.)

There was no indication from ***any*** of the sources GM had available to it that Defendants had used offshore accounts to perpetuate and conceal their scheme through payouts to Ashton (while on GM's Board), Iacobelli (while a GM employee), or Williams, a UAW President with significant control and power to directly harm GM. (*See* Karis Decl. ¶ 6; Willian Decl. ¶ 6.) The payoffs through these foreign accounts to Ron Gettelfinger (UAW President 2002-2010), Ashton, and Williams further confirm the 1962(b) control that FCA exercised over the UAW. As intended, this information was concealed and affirmatively disavowed even by cooperating witnesses. Defendant Durden, for example, made representations through counsel during his sentencing that he did not benefit from the scheme. (FAC

¶¶ 37, 101(b).) To the contrary, Durden was secretly compensated through foreign accounts in Liechtenstein and the Cayman Islands as part of Defendants' scheme to harm GM.  (*Id*.) GM only recently uncovered reliable information regarding this component of Defendants' scheme—which, as explained, creates a more-than-plausible inference that Defendants had insiders working to undermine GM's position vis-à-vis FCA's. (*See* Karis Decl. ¶¶ 8, 10; Willian Decl. ¶¶ 8, 10.) GM could not have obtained this information earlier despite reasonable diligence. (Karis Decl. ¶ 11; Willian Decl. ¶ 11.); *see Murphy*, 2019 WL 117337, at *8.

New evidence "must be of such a nature as would probably produce a different result" to warrant altering or amending the judgment. *Mich. Dep't of Envtl. Quality v. City of Flint,* 296 F. Supp. 3d 842, 846 (E.D. Mich. 2017) (internal quotation marks and citation omitted). That standard is readily satisfied here, as the newly discovered evidence is directly responsive to the Court's concerns identified in its Order. As the FAC demonstrates, an amended complaint would include additional facts demonstrating how Defendants' racketeering scheme was purposely designed and implemented to (and did) directly harm GM.

For example, the Court, while recognizing the credibility of "GM's first causation theory, that Defendants engaged in a 'pay-to-harm' GM scheme," nevertheless rejected it in large part because the Complaint purportedly lacked "specific facts supporting the allegation that a condition of Defendants' payments to

18

the UAW officials was denial of concessions and benefits to GM." (Dkt. 82 at 24, 27.) The Court reasoned, "the only credible inference from the facts alleged in GM's complaint is that Defendants' bribes were intended to secure advantages and concessions for FCA," rather than harm GM. (*Id.* at 27.) GM disputes that the Complaint lacked adequate factual support. (*See, e.g.,* Dkt. 1 ¶¶ 6, 71-72, 75, 78-79, 81 (allegations that FCA was provided labor advantages that, pursuant to the bribery scheme, were denied to GM).) Even so, the newly discovered information provides additional specific facts demonstrating that the scheme was designed to harm GM "by causing its overall labor costs to increase as a result of the UAW purposefully denying it certain structural programs . . . that would otherwise have been granted to GM but for the bribery." (FAC ¶ 11.)

The new information reveals that from 2010 to 2014, FCA and FCA NV likely made substantial payments to Ashton—then UAW Vice President for the GM Department—who effectively controlled labor relations ***with GM***. (*Id.* ¶¶ 41-43.) These payments "allowed Marchionne and FCA Group to ensure that Ashton imposed higher costs on GM, rather than the same benefits it provided to FCA and that it otherwise would have given GM under pattern bargaining but for the racketeering scheme." (*Id.* ¶ 88.) Indeed, there would have been no need to bribe the leader of negotiations ***with GM*** if the scheme were only about benefiting FCA. These facts therefore support GM's new allegation that "Ashton used his influence to

further FCA's scheme designed to increase GM's labor costs above market and above FCA's costs and directly harm GM by not granting GM the specific labor concessions it should have otherwise received but for the bribes." (*Id.* ¶ 42.) As one example, Ashton ensured that, while the UAW committed to a "full fledged partnership" with FCA in pursuing its World Class Manufacturing program, "the UAW denied GM the same labor flexibility and use with respect to its manufacturing operations." (*Id.* ¶ 103.) Among other benefits denied to GM during Ashton's tenure, this denial directed by Ashton ensured "that GM had a higher cost structure than Chrysler and later FCA" and "faced substantially above-market labor costs." (*Id.* ¶ 102.)

Moreover, the newly discovered evidence confirms that GM was the target of Defendants' scheme, as the scheme was directed not only through the UAW, but also *from payments to individuals within GM* to maximize the direct harm to GM. In exchange for substantial sums in foreign accounts, Defendants Ashton and Iacobelli infiltrated GM, Ashton as director and Iacobelli as employee. (*Id.* ¶¶ 5-8, 35, 43, 175-84.) From their insider positions of trust, Ashton and Iacobelli could gather and funnel highly confidential information to the FCA Defendants and their co-conspirators at the UAW, including "confidential information [related to] GM's strategies and internal positions in connection with the 2015 CBA negotiations" and

other "confidential information concerning GM's labor approaches and strategies." (*Id.* ¶¶ 179, 183.)

This corporate espionage directly harmed GM—not FCA's workers or anyone else—through FCA's orchestration of the scheme from within through a Board member and high-ranking labor relations executive. The highly confidential information Ashton and Iacobelli obtained allowed the UAW and FCA "to tailor their approaches (both in labor negotiations and merger efforts) to inflict maximum pressure on GM," impose higher labor costs on GM, and ultimately attempt to force a merger which, although rejected by GM, caused GM direct harm of over a billion dollars in increased cost in the 2015 collective bargaining agreement, alone. (*Id.* ¶ 180.) None of that direct harm is contingent on other "steps" identified by the Court. Theft of GM's confidential information by Ashton and Iacobelli does not depend on "bribes to secure the position of lead company in the 2015 CBA negotiations," FCA's negotiation of a "very generous to UAW workers CBA with the UAW," or the imposition of terms on GM through pattern bargaining, and indeed led to GM being forced to overpay UAW workers. (Dkt. 82 at 28.) In short, "[t]he placement of Ashton and Iacobelli inside GM were part of the scheme to directly target GM, causing GM to suffer direct harm" even though the merger never materialized. (FAC ¶ 184.)

The new allegations and newly discovered evidence alleged in GM's proposed FAC are more than adequate to establish the "'direct relation between the injury asserted and the injurious conduct alleged'" necessary to plead a civil RICO claim. *In re ClassicStar*, 727 F.3d at 487 (quoting *Holmes*, 503 U.S. at 268). At a minimum, they provide ample ground for this Court to amend its Judgment and Order to allow GM to file the FAC.

## CONCLUSION

For the foregoing reasons, GM respectfully requests that the Court grant its Motion, and at the very least allow GM to file the attached proposed FAC.

Dated: August 3, 2020

Respectfully submitted,

**HONIGMAN LLP**

By: */s/ Jeffrey K. Lamb*
Jeffrey K. Lamb (P76738)
J. Michael Huget (P39150)
Shirin S. Goyal (P82528)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone: (313) 465-7000
jlamb@honigman.com
mhuget@honigman.com
sgoyal@honigman.com

**KIRKLAND & ELLIS LLP**

By: */s/ Hariklia Karis*
Hariklia Karis, P.C.
Jeffrey Willian, P.C.
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com

Austin Norris
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
austin.norris@kirkland.com

*Attorneys for Plaintiffs General Motors LLC
and General Motors Company*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via the

Court's CM/ECF system on August 3, 2020.


/s/ *Jeffrey K. Lamb*
Jeffrey K. Lamb

24