# Exhibit A

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

GENERAL MOTORS LLC,
GENERAL MOTORS COMPANY,

               Plaintiffs,

   against

FCA US LLC, FIAT CHRYSLER
AUTOMOBILES N.V.,
DENNIS WILLIAMS,
JOSEPH ASHTON,
ALPHONS IACOBELLI,
JEROME DURDEN,
MICHAEL BROWN,

               Defendants.

No. 19-cv-13429

Honorable Paul D. Borman
District Court Judge

Honorable David R. Grand
Magistrate Judge

**FIRST AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................ 1

THE PARTIES ............................................................................................ 13

      A.     FCA Group .......................................................................... 14

      B.     Corrupt FCA Officials ....................................................... 15

      C.     Dennis Williams - Corrupted Former UAW Officer and
             President ............................................................................. 18

      D.     Joseph Ashton - Corrupt Former UAW Vice President and
             UAW Trust Designated Director on GM's Board ............. 19

      E.     Significant Non-Parties and Other Entities ....................... 20

FCA-UAW CONTROL ENTERPRISE .................................................... 27

FCA-NTC ENTERPRISE ......................................................................... 29

JURISDICTION AND VENUE ................................................................ 31

DETAILED ALLEGATIONS ................................................................... 33

I.      OPERATION CHRYSLER: FIAT ACQUIRES OPERATING
       CONTROL OF CHRYSLER FOR NO CASH ........................... 33

      A.     Financial Crisis Threatens U.S. Auto Industry ................. 33

      B.     Fiat and Marchionne Seek Entry into the U.S. Market Through
             Chrysler ............................................................................. 34

      C.     FCA Obtains the Right to Purchase a Majority of Chrysler's
             Shares from the UAW ........................................................ 41

II.     FCA FUNNELS MILLIONS TO THE UAW AND CERTAIN UAW
       LEADERS. .................................................................................. 42

III.   FIAT AND ITS SUCCESSORS CORRUPTED FORMER UAW
       LEADERS TO DAMAGE GM AND ACHIEVE LABOR PEACE
       FOR FCA FOR YEARS. ...............................................................52

IV.    FCA GROUP CONSPIRED WITH UAW LEADERS TO ATTEMPT
       A TAKEOVER OF GM BY MERGER ........................................59

       A.   Marchionne Prepares on Behalf of FCA to Force a Takeover of
            GM by Merger ....................................................................60

       B.   President Williams and Defendant Ashton Are Key Players in
            the Takeover Conspiracy ..................................................64

       C.   FCA Undertakes "Operation Cylinder" .............................67

V.     CO-CONSPIRATORS ASHTON AND IACOBELLI SERVED AS
       INFORMANTS TO FCA CAUSING HARM TO GM. ...............84

VI.    FCA NV'S HISTORIC CULTURE OF CORRUPTION AND
       BRIBERY AS A BUSINESS TOOL. ........................................88

VII.   U.S. ATTORNEY IN DETROIT'S CRIMINAL INVESTIGATION
       STARTS TO REVEAL THE CORRUPTION .............................93

VIII.  FCA GROUP AND ITS CO-CONSPIRATORS CONCEALED THE
       CONSPIRACY AND RESULTING DAMAGE, PREVENTING GM
       FROM DISCOVERING ITS EARLIER INJURY. ....................94

CAUSES OF ACTION ...................................................................106

REQUESTS FOR RELIEF .............................................................124

## AMENDED COMPLAINT

General Motors LLC and General Motors Company (individually or collectively, "GM" or "Company") for their Amended Complaint, allege as follows:

### INTRODUCTION

1.      This lawsuit is categorically not against the hard-working women and men who are members of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"). The UAW and its current officials are not Defendants to this lawsuit. This lawsuit does not seek to alter or reduce in any respect the wages and other benefits of any UAW worker in the past or into the future. In fact, this lawsuit is intended to build a stronger future for GM's employees, the UAW, and the Company. That future depends on a collective bargaining process and labor relations grounded in integrity, good faith, and arm's-length negotiations, which the law requires and this lawsuit is intended to vindicate.

2.      This case is about an Italian company, Fiat Chrysler Automobiles N.V. ("FCA NV"), which managed to win the support of the U.S. government in obtaining operational control, for no cash, over an iconic U.S. auto company, Chrysler Group LLC. Shortly after this government approved acquisition, FCA Group[1] betrayed our

---

[1]   "FCA Group" means, collectively, FCA US LLC ("FCA"), its parent FCA NV, along with their predecessors, including FCA predecessors Chrysler LLC and Chrysler Group LLC ("Chrysler") and FCA NV predecessor Fiat S.p.A. ("Fiat").

government's and the U.S. auto industry's trust and embarked on a systemic and near decade-long conspiracy to bribe senior union officials to corrupt the collective bargaining process and labor relations and directly harm GM. Only recently through continued investigation during this lawsuit has GM learned, upon information and belief, that this FCA-Group-perpetrated-scheme was significantly broader, even more direct, and deeper than has been publicly revealed to date.

3.     As initially revealed starting with the first indictment in July 2017, the United States Attorney for the Eastern District of Michigan has been conducting a wide-ranging investigation into corruption by and between FCA Group and certain former union leaders. This investigation has resulted in criminal charges against fourteen individuals with three FCA officials and ten former UAW officials (and one UAW official's spouse) pleading guilty to a years-long bribery scheme. As has been repeatedly admitted, starting no later than July 2009, FCA paid millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees" and the UAW itself including through the UAW-FCA joint training center (the National Training Center or "NTC") and, in return, received "benefits, concessions, and advantages for FCA in the negotiation, implementation, and

---

"FCA Group" is not a term created by GM.  It is consistent with how these Defendants refer to themselves in public.  *See, e.g.*, fcagroup.com. Where appropriate and distinguishable, the Complaint refers to the particular entity or entities at issue.

administration of the collective bargaining agreements between FCA and the UAW."[2] During the course of this audacious bribery scheme, two collective bargaining agreements ("CBAs") were negotiated with FCA—in 2011 and 2015—both subject to corruption in those negotiations and the implementation such that they directly harmed GM.

4.    Through this lawsuit, GM seeks recourse against FCA Group and the individuals responsible for this long-running bribery scheme. While a full accounting of the damage inflicted from this scheme directly on GM is unknowable at this time without discovering additional details of the scheme, GM estimates that it has incurred massive monetary damage, on the order of billions of dollars (before trebling) that an economist can readily calculate in the form of higher costs that were unique to GM and that only GM incurred, and which it would not have incurred but for the bribery scheme. This damage is the direct, substantial, and foreseeable consequence of this bribery scheme orchestrated by FCA Group and the many acts of racketeering that fueled the scheme. As has been revealed by GM's ongoing investigations and as discussed further herein, GM was the intended and targeted victim of FCA's and FCA NV's criminal scheme.

---

[2]    7/13/18 Iacobelli Plea Agreement, at 7. The individual criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. Durden, et al.*, Case No. 2:17-cr-20406-PDB-RSW, unless specified otherwise.

5.      FCA Group did not perpetrate this long-running scheme with the intended purpose to merely gain a general edge (in the form of lower labor costs) on the market or to increase its market share. Instead, FCA Group's scheme was directed specifically at harming GM as part of FCA Group's long-term goal to force higher costs on GM causing it to be weakened and assist FCA NV in forcing a merger with GM—a long standing objective of FCA NV and its former CEO, Sergio Marchionne, since before FCA NV entered the US automobile manufacturing market. This specific targeting of GM is exemplified by FCA Group's placement (aided by corrupt UAW officials) of two individuals within GM who were positioned to obtain and share with FCA Group confidential GM information.

6.      In 2014, using his power to name the UAW Trust's designee to the GM Board, Defendant Dennis Williams selected and placed Joseph Ashton, a corrupt then-UAW Vice President for the GM Department, on GM's Board. Upon information and belief, despite Ashton owing fiduciary duties to GM, Ashton instead used his position to pass confidential GM information to the UAW and FCA Group. Upon information and belief, in return for his conspiring with FCA Group, Ashton was the beneficiary of substantial payments overseas in at least one foreign bank account in Ashton's name or a business entity controlled by Ashton.

7.      After GM rejected FCA Group's formal merger offer in April 2015, unrelenting, FCA Group doubled-down on its infiltration efforts by then

4

purposefully placing its former employee, Alphons Iacobelli, in GM's Labor Relations Department. Alphons Iacobelli, who along with Marchionne was at the center of the scheme at FCA Group, left FCA in 2015 and immediately sought employment at GM. Because of the substantial efforts by all of the Defendants to conceal their scheme, GM was unaware of FCA's role in Iacobelli's placement or of Iacobelli's crimes at the time he was hired by GM; nor was GM aware that Iacobelli was under investigation by the Department of Justice when he reached out and was hired into GM's Labor Relations Department. Upon information and belief, after his departure from FCA in June 2015 and continuing during his later employment with GM, Iacobelli continued his involvement in the scheme by receiving payoffs from FCA Group in return for sharing GM's confidential information with FCA Group to further harm GM. These actions were not done to nor did they harm the UAW; instead they were intended to and did cause harm to GM, the intended target of the FCA bribery scheme.

8.     The appointment of Ashton to GM's Board by Williams through the UAW Trust allowed FCA Group, through its bribes of UAW officials, to further tailor its scheme to directly harm GM. No other party or entity could have been directly harmed as a result of this scheme. On GM's Board, Ashton was privy to detailed highly confidential information concerning GM's view of and strategic

response to FCA Group's ongoing merger inquiries, as well as GM's approach and expectations for the 2015 CBA negotiations.

9.     Both FCA and FCA NV have failed to conduct an independent or meaningful investigation to identify, root out and discipline those involved in the bribery scheme that has been admitted to in public since January 2018. GM only recently learned the real reason for this blatant FCA and FCA NV governance failure. Upon information and belief, the FCA-UAW bribery scheme is much broader and deeper than previously suspected or revealed as it involved FCA Group apparently using various accounts in foreign countries, including Switzerland, Luxembourg, Liechtenstein, Italy, Singapore and the Cayman Islands, to control corrupt individuals by compensating and corrupting those centrally involved in the scheme to harm GM. The beneficiaries of such offshore accounts include former top UAW leaders, such as former UAW President, Treasurer and Secretary Dennis Williams (2010-2018), and former UAW Vice President Joe Ashton (2010-2014), subsequently selected by Williams and appointed by the UAW Trust to be a director on GM's Board (2014-2017), as well as other FCA Group personnel. Upon information and belief, tens of millions of dollars have been moved through these offshore accounts to help perpetrate and protect the described scheme.

10.     This bribery scheme was authorized at the highest levels of both FCA NV and FCA. According to criminal plea agreements alone by former FCA Group

executives, senior FCA Group executives "knowingly and voluntarily joined a conspiracy in which FCA US LLC and its executives agreed to pay and deliver, and willfully paid and delivered, more than $1.5 million in prohibited payments and things of value to officers and employees of the UAW."[3] But, as alleged herein, the actual amount of the bribes and the hush money paid is exponentially higher. These FCA Group bribes were authorized, at least, by its then CEO Sergio Marchionne (now deceased) to General Holiefield, the UAW Vice President and International Executive Board Member (now deceased) and to other UAW officials who oversaw the FCA business relationship. FCA executive Alphons Iacobelli has admitted (at least in part) to this scheme and currently is in prison for some of these illegal acts. Michael Brown, Director of Employee Relations at FCA and Co-Director of the NTC, likewise has admitted (at least in part) to this scheme. Marchionne authorized these bribes, and additional things of value to UAW officials, so that FCA could cause GM to be at a disadvantage by driving up GM's costs, invade its board room and labor relations team, and, as detailed below, ultimately attempt to force a merger with GM.

11.    The purpose of the scheme ultimately was to harm GM by causing it to incur higher labor costs that it otherwise would not have incurred and assist FCA

---

[3]    7/13/18 Iacobelli Plea Agreement, at 3; *see also* 5/25/18 Brown Plea Agreement, at 3; 8/8/17 Durden Plea Agreement, at 4.

Group in forcing a merger. The object of the agreement between FCA and UAW was not to reduce the absolute labor costs of FCA or deprive UAW-FCA or UAW-GM workers of higher wages or better benefits. Rather, the object of the scheme was to harm GM by causing its overall labor costs to increase as a result of the UAW purposefully denying it certain structural programs such as Global Manufacturing System ("GMS") support or the same formulary agreements, described below, that would otherwise have been granted to GM but for the bribery. While GM suffered increased labor costs, UAW members were not harmed by this scheme as FCA-UAW employees received market-based wages and GM-UAW employees received above-market wages to the direct detriment of GM.

12.     The structural changes that FCA Group bribed the UAW to deny to GM included, at least, genuine support from UAW leaders for GM's GMS program, and manipulation of certain contractual limits on Tier Two and temporary employees, and other "side letter" agreements between FCA and the UAW.

13.     Beyond denying the above structural changes to GM, the scope of the scheme between the UAW leadership and FCA Group is further demonstrated by the UAW agreeing to support FCA's "longer term business plan," which included securing UAW support of FCA NV's scheme to force a merger with GM. We now know that was the result of bribery and the racketeering scheme.

14.    In 2015, with cooperation of UAW leadership purchased through bribes, Marchionne schemed with then-UAW President Dennis Williams to use the 2015 CBA negotiations to increase the pressure on GM to merge.

15.    After years of telegraphing his desire to merge GM and FCA (including by approaching GM in 2012 about such a merger), in the spring of 2015, Marchionne formally solicited GM for a merger, on behalf of FCA NV, and was rejected.

16.    In the ensuing months, with the purchased support of certain former UAW officials including Dennis Williams, Marchionne proceeded to orchestrate a negotiation of the 2015 CBA designed, through the power of pattern bargaining, to cost GM billions of dollars and a billion dollars more than the UAW had sought from GM on its own.

17.    Williams and Marchionne were aware that the federal government was actively investigating the FCA-UAW bribery scheme, so FCA NV and FCA found a different means to convey bribes to the UAW.  FCA paid the equivalent of over a billion dollars more than the UAW's demand to GM in the 2015 CBA. The UAW had demanded under a billion dollars of increased costs for the 2015 CBA until Dennis Williams began negotiations with Marchionne.  Then, in a 48-hour period, the price tag more than doubled. FCA was giving the UAW a billion extra dollars in return for something of greater value.

18.     The one-billion-dollar bribe paid by FCA through the 2015 CBA to benefit the UAW was for the purpose of advancing the intended plan of FCA to secure the necessary support of the UAW for its attempt to takeover GM. This payment of a billion dollars was worth it to Marchionne and FCA, as they could recoup greater than that amount through cost savings and synergies as a result of an FCA-GM merger (in addition to the personal compensation Marchionne would reap from such a merger).

19.     Through a self-described "rich" FCA-UAW labor contract designed specifically to harm GM, Williams and certain corrupt UAW leaders could seek to hide their bribes from government investigators who would not have known the UAW's asking price and that FCA had paid more than double that price, while Marchionne could impose unanticipated costs on GM in order to force a merger.

20.     Through the power of pattern bargaining, which rendered GM unable to negotiate core labor cost terms, this contract was imposed upon GM at a price a billion dollars higher than the UAW's President's Demand.  This provided an easily-calculated over $1 billion direct harm from costs that GM would not have incurred but for the bribes paid by FCA.  UAW-represented workers were not harmed by GM's overpayment and instead benefited through the higher costs GM had to pay.

21.     While GM ultimately resisted the takeover scheme, in the process Marchionne and FCA Group negotiated a 2015 CBA that, as designed, directly damaged GM as a result of the pattern of racketeering and the FCA Group's control over the UAW.

22.     FCA NV took active steps to facilitate and conceal its bribery scheme rather than address these systemic corruption issues.  Those steps include FCA NV (previously an Italian company) transferring its domicile to the Netherlands, which is well known for its lax governance requirements, in 2014.  FCA NV packed its board with insiders who allowed FCA Group to falsely claim, despite having conducted no meaningful internal investigation, that it found "no evidence that any FCA US employees senior to Alphons Iacobelli were aware of or participated in any illegal activities related to the" NTC.[4]

23.     The governance structure of FCA is likewise designed to allow such corruption as its board has no independent directors and is effectively overseen by FCA and FCA NV insiders.

24.     In light of the government investigation, the UAW has recognized the need to engage in active reform to ensure it is free of corruption. UAW Acting

---

[4]     Robert Snell and Nora Naughton, The Detroit News "FCA-UAW Conspiracy Ran Deeper, Longer, Lawyer Says" (August 13, 2018) https://www.detroitnews.com/story/business/autos/chrysler/2018/08/13/fca-uaw -conspiracy-ran-deeper-longer-lawyer-says/981325002/

President Rory Gamble announced "widespread ethics reforms," designed to "make clear the UAW is committed to establishing the right mechanisms and safeguards to protect the union from corruption and malfeasance." GM agrees with the spirit of the announced reforms, which are a necessary step towards "regaining the trust of [the UAW's] members, and ensuring the misconduct that has recently come to light will never happen again."[5] President Gamble is involved in ongoing meetings with U.S. Attorney Matthew Schneider to further address UAW reforms.

25.     FCA Group, on the other hand, refuses to come to terms with this stunning pattern of racketeering directed from its highest offices. FCA Group had the NTC publicly claim that it was a "victim" rather than perpetrator of this fraud, only to have a federal court reject that claim and conclude the "NTC functioned as a willing co-conspirator with FCA."[6]

26.     As to Marchionne, who sat at the center of multiple fraudulent schemes as detailed below, FCA Group has chosen to embrace his wrongful conduct. Rather than acknowledge Marchionne's wrongdoing and that of other high-level FCA

---

[5]   UAW Press Release, *United Auto Workers Acting President Rory Gamble Enacts Immediate Nationwide Ethics Reforms* (Nov. 13, 2019), https://uaw.org/united-auto-workers-acting-president-rory-gamble-enacts-imme diate-nationwide-ethics-reforms/.

[6]   *See United States v. Iacobelli*, No. CR 17-20406, 2019 WL 1508035, at *1 (E.D. Mich. Apr. 5, 2019).

Group executives and implement necessary governance reform, in 2019 FCA Group's Chairman declared that Marchionne stood for "responsibility and openness" and that "we . . . owe" Marchionne for helping make FCA Group what it is today.[7] FCA Group has chosen to essentially ratify years of its own racketeering.

27.     Thus, as described more fully in this Amended Complaint, FCA Group and its executives have engaged in a classic pattern of racketeering for nearly a decade, including by committing multiple violations of the Labor Management Relations Act of 1947 ("Taft-Hartley Act"), wire fraud, mail fraud, and money laundering. As the targeted victim that has been directly harmed by FCA Group's scheme, GM seeks to recover its damages from Defendants for the benefit of GM and its employees.

28.     The damages that GM recovers will be used for investment in the United States to grow jobs and for the benefit of its employees.

## THE PARTIES

### Plaintiffs

29.     **General Motors LLC**: Plaintiff General Motors LLC is a Delaware limited liability company with its principal place of business located at 300

---

[7]    FCA, *Statement from FCA Chairman, John Elkann, on the One-Year Anniversary of the Loss of Sergio Marchionne* (July 24, 2019), https://www.fcagroup.com/en-US/media_center/fca_press_release/2019/july/Pages/statement_on_the_one_year_anniversary_of_the_loss_of_sergio_marchionne.aspx.

Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. General Motors LLC is a subsidiary of General Motors Holdings LLC, which is a wholly owned subsidiary of Plaintiff General Motors Company. General Motors LLC is the largest automaker in the U.S. and an iconic American brand that manufactures and sells automobiles in the U.S. under brands including Chevrolet, Cadillac, Buick, and GMC. General Motors LLC is an employer in the automotive industry, which has a substantial effect on interstate commerce.

30. **General Motors Company**: Plaintiff General Motors Company (herein referred to as "GM Company" or "New GM") is a Delaware corporation with its principal place of business in Detroit, Michigan, and the ultimate parent of General Motors LLC.

31. "GM" is used herein to refer individually or collectively to General Motors LLC and General Motors Company.

### Defendants

### A. FCA Group

32. **FCA US LLC (formerly known as Chrysler Group LLC):** Defendant FCA US LLC ("FCA") is an automotive company based in Auburn Hills, Michigan, formerly known as Chrysler Group LLC, the successor of Chrysler LLC. "Chrysler" is used herein to refer individually or collectively to Chrysler Group LLC and Chrysler LLC. FCA is a wholly owned subsidiary of FCA NV, a publicly traded

foreign entity listed on the New York Stock Exchange ("NYSE"). FCA manufactures and sells automobiles in the U.S. under brands such as Chrysler, Jeep, Dodge, and Ram. FCA is an employer in the automotive industry, which has a substantial effect on interstate commerce.

33. **Fiat Chrysler Automobiles N.V. (formerly known as Fiat):** Defendant Fiat Chrysler Automobiles N.V. ("FCA NV"), the successor of the Italian automotive company formerly known as Fiat S.p.A. ("Fiat"), is the ultimate parent company and owner of FCA US LLC. FCA NV is organized under the laws of the Netherlands, as a Naamloze Venootschap, and its principal executive offices are in London, England. Since October 2014, FCA NV's common stock has traded on the NYSE under the ticker symbol FCAU, and it regularly files with the SEC annual reports on Forms 20-F and furnishes Forms 6-K pursuant to Section 13(a) of the Exchange Act. FCA NV is an automotive group that, both directly and through its subsidiaries, designs, engineers, manufactures, distributes, and sells vehicles and components; provides retail and dealer financing, leasing, and rental services; and engages in media, publishing, and other business throughout the U.S., including in Michigan.

B. **Corrupt FCA Officials**

34. **Alphons Iacobelli:** Defendant Iacobelli is a resident of Michigan and was employed as the Vice President of Employee Relations at FCA and as the

Co-Chairman of the NTC and its Joint Activities Board from 2008 to 2015. In this role, Iacobelli was a senior official at Chrysler and FCA responsible for negotiating and implementing labor agreements with the UAW. Through his position with Chrysler and FCA, Iacobelli had the authority and acted as an agent for Chrysler and FCA to direct the financial affairs of and approve payments made by the NTC. On January 22, 2018, Iacobelli pled guilty to subscribing a false tax return, pursuant to 26 U.S.C. § 7206(1), and conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was sentenced to 66 months in prison and a $10,000 fine and ordered to pay $835,523 in restitution. At all times relevant to this Complaint, Iacobelli was an agent of Chrysler and/or FCA.

35.    Upon information and belief, Iacobelli, among others, has been secretly compensated for his participation in the scheme and to ensure that his professed cooperation with the government's investigation does not implicate top FCA Group executives or reveal the full scope of the scheme to target GM. The compensation to Iacobelli included providing him with control over apparent foreign accounts, in his name (or that of a close family member) and in the name of a business entity that he controls (Business Advisory Group, an entity created by Iacobelli), in Italy, Liechtenstein, Switzerland and Singapore. Upon information and belief, control over these accounts and possibly further compensation from FCA Group continued after

Iacobelli left FCA and later joined GM, and such funds remain available to Iacobelli to this day and are being actively managed by his wife.

36. **Jerome Durden:** Defendant Durden is an individual currently residing in Michigan and was employed as a financial analyst at Chrysler and FCA in its corporate accounting department since 1985. In 2008, he was assigned by Chrysler to act as the Controller of the NTC and as Secretary of the NTC Joint Activities Board. He served in those roles until 2015. In his capacity as the Controller of the NTC, Durden, as an agent for Chrysler and FCA, had the authority to approve and did approve payments made by the NTC. In addition, Durden was selected by Holiefield to serve as Treasurer of the Board of Trustees of the Leave the Light on Foundation ("LTLOF") from 2009 through June 2015. On August 8, 2018, Durden pled guilty to failure to file tax returns, 26 U.S.C. § 7203, and conspiracy to defraud the U.S., 18 U.S.C. § 371, and was sentenced to 15 months in prison and ordered to pay $8,811 in restitution. At all times relevant to this Complaint, Durden was an agent of Chrysler and/or FCA.

37. Upon information and belief, Durden, among others, has been secretly compensated for his participation in the scheme and to ensure that his professed cooperation with the government's investigation does not implicate top FCA Group executives or reveal the full scope of the scheme to target GM. Despite Durden's public claim to the Court that he received no compensation for his central role in the

scheme, such compensation includes providing him control over apparent foreign accounts in Liechtenstein and the Cayman Islands in his name and/or in the name of his personal business entity, JAD Enterprises, created to conceal his ownership over these accounts.

38.    **Michael Brown:** Defendant Brown is an individual currently residing in Michigan and was employed as a Director for Employee Relations at Chrysler and FCA from 2009 to 2016. During that time, Brown was personally involved in the negotiation and administration of the national CBAs between Chrysler/FCA and UAW and had authority to sign letters and agreements on behalf of Chrysler/FCA with the UAW. Brown also represented Chrysler and FCA as a Co-Director of the NTC. On May 25, 2018, Brown pled guilty to misprision of a felony, pursuant to 18 U.S.C. § 4, and was sentenced to one year and one day in prison and a $10,000 fine. At all times relevant to this Complaint, Brown was an agent of Chrysler and/or FCA.

### C.    Dennis Williams - Corrupted Former UAW Officer and President

39.    **Dennis D. Williams:** Defendant Williams is an individual currently residing in California, and he served on the UAW's Executive Board, most recently as the UAW's President (2014 to June 2018) and previously as the UAW's Secretary-Treasurer (2010–14).  Prior to 2010, Williams served on the UAW International Executive Board as the Director of Region 4 (2001 to 2010) during

which time he had direct dealings with Marchionne in connection with Marchionne's role as CEO of CNH Industrial, a maker of farm and construction equipment, which is commonly controlled by Exor NV.

40.    Upon information and belief, Williams, among others, has been secretly compensated for his participation in the scheme and to ensure that he does not implicate top FCA Group executives or reveal the full scope of the scheme to target GM.  The compensation to Williams includes providing him with apparent foreign accounts that he controls in Switzerland and Liechtenstein in his name individually and/or in the name of a business entity that he apparently controls, the so-called Williams Charity Fund.

### D.    Joseph Ashton - Corrupt Former UAW Vice President and UAW Trust Designated Director on GM's Board

41.    **Joseph Ashton**:  Defendant Joseph Ashton is an individual currently residing in New Jersey.  Ashton served on the UAW's Executive Board from 2006 to 2014, most recently as Vice President of the UAW's GM Department from 2010 to 2014, and previously as the Regional Director for Region 9 from 2006 to 2009. Following his time at the UAW, from 2014 to December 2017, Williams supported Ashton serving as the UAW Trust's designated director on the Board of Directors of GM until he abruptly resigned.   On December 4, 2019, Ashton pled guilty to conspiracy to commit honest services wire fraud, 18 U.S.C. § 1349, and conspiracy to commit money laundering, 18 U.S.C. § 1956(h).

42.     In his role as the Vice President of the UAW's GM Department, Ashton used his influence to further FCA's scheme designed to increase GM's labor costs above market and above FCA's costs and directly harm GM by not granting GM the specific structural labor concessions it should have otherwise received but for the bribes.

43.     In return, upon information and belief, Ashton, among others, has been secretly compensated for his participation in the scheme and to ensure that he does not implicate higher-level FCA Group executives or reveal the full scope of the scheme to target GM. Despite owing GM fiduciary duties in his role as a director, Ashton did not disclose the scheme to GM. Upon information and belief, in return for this cooperation, Ashton obtained control over at least one foreign account in the Cayman Islands in his individual name and/or in the name of a business entity that he apparently controls, the so-called Ashton Fund.

### E.     Significant Non-Parties and Other Entities

44.     **International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)**: The UAW is the union that exclusively represents the labor forces for both GM and FCA. From 2009-2018, the UAW represented approximately 50,000 GM employees and between 23,000 and 47,000 FCA employees. As such, the UAW has a significant degree of market power

to force labor terms on either competitor, including through the ability to call strikes, among other actions.

45.     The UAW also has an unusual and limited governance structure where only five officers of the UAW—the President, the Secretary-Treasurer, and three Vice Presidents of the International Executive Board—effectively control its central decision-making regarding the negotiation and administration of collective bargaining agreements.  These UAW officers possess particularly strong powers as well, including the power to negotiate CBAs, call special conventions, authorize strikes, and issue and revoke charters, among other powerful tools.  While these UAW officers operate in the context of an International Executive Board that includes eleven "Regional Directors," these officers effectively control the overall decision-making, policy, director and officer elections, and negotiation and administration of the CBAs.  There are minimal checks and balances on the President and the other four officers as they have no oversight board, committee or trustee that is capable of overseeing and ensuring the integrity of the UAW Executive Board and taking action to address malfeasance.  In turn, these officers, who have nearly complete control over UAW affairs, are elected only every four years and have implemented practices to exercise substantial control over elections to perpetuate their role on the International Executive Board.  If any of these officers or directors

act corruptly, they have the power and influence to inflict direct harm on any given competitor in the name, and on behalf of, the UAW.

46. **Sergio Marchionne ("Marchionne")**: Non-party Marchionne (deceased in 2018) served as the CEO of Fiat, and later FCA NV, from 2004 through his death in 2018. Marchionne also served as the Chairman and CEO of FCA from 2014–18, the Chairman (2011–14) and CEO (2009–14) of Chrysler, and the COO of FCA North America (2011–18). Marchionne also served as the CEO of CNH Industrial (2004-2018), which was commonly controlled by Exor NV, which directly and indirectly is the largest shareholder of FCA NV. At all times relevant to this Amended Complaint, and until his death, Marchionne was an agent of FCA Group. Marchionne, with the highest level of approval at FCA Group, centrally orchestrated and later attempted to conceal the fraudulent scheme as alleged herein.

47. **NTC:** Non-party the NTC is a Michigan tax-exempt corporation with its principal place of business in Detroit, Michigan. The NTC was formed under the terms of prior CBAs between the UAW and Chrysler, whose obligations were inherited by FCA following Chrysler's bankruptcy. The stated purpose of the NTC is to provide for the education, training, and retraining of UAW members employed by FCA. The governing body of the NTC was known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the UAW's Chrysler Department served as Co-Chairmen of the NTC Joint Activities

Board. The remainder of the Joint Activities Board was made up of senior officials from FCA and the UAW.

48.   **General Holiefield:** Non-party Holiefield (deceased in 2015) served as the UAW Vice President for the Chrysler Department from 2006 through 2014. As Vice President, Holiefield had primary responsibility for negotiating with Chrysler/FCA and for administering the CBAs between the UAW and Chrysler/FCA on behalf of tens of thousands of FCA employees represented by the UAW. From 2007 to 2014, Holiefield also served on the UAW Executive Board. During much of the Holiefield leadership years, executives of Chrysler/FCA violated the Labor Management Relations Act by bribing Holiefield and his staff. Millions of dollars from Chrysler/FCA were diverted through NTC and LTLOF to pay for Holiefield's personal expenses and to conceal over a million dollars in prohibited payments and things of value from Chrysler/FCA to Holiefield, his girlfriend (and later wife) Monica Morgan, and other UAW officials.

49.   **Ron Gettelfinger:**  Non-party Gettelfinger is an individual currently residing in Kentucky who served on the UAW's Executive Board from 1992 to 2010, most recently as the UAW President (2002 to 2010) and previously as a Vice President (1998 to 2002) and as Regional Director (1992 to 1998).

50.   **Norwood H. Jewell:** Non-party Jewell is an individual currently residing in Michigan and served on the UAW's Executive Board from 2011 to 2017,

most recently as the UAW's Vice President of the FCA Department (2014–17) and previously as Regional Director (2010–14). Jewell also served as Co-Chairman of the NTC. On April 2, 2019, Jewell pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371.

51. **Virdell King:** Non-party King is an individual residing in Michigan and was a senior official in the UAW Chrysler Department from 2008 until she retired in February 2016. In 2011 and 2015, King served on the UAW committee responsible for negotiating the CBAs between UAW and FCA. On August 29, 2017, King pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to prison and a $5,500 fine.

52. **Nancy Johnson:** Non-party Johnson is an individual residing in Michigan and was the top administrative assistant to Jewell, then the UAW Vice President for the Chrysler department, from 2014 through 2016. In 2015, Johnson served on the UAW committee responsible for negotiating the CBAs between UAW and FCA. On July 23, 2018, Johnson pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to one year and one day in prison and a $10,000 fine.

53. **Keith Mickens:** Non-party Mickens is an individual residing in Michigan and was a senior official in the UAW Chrysler Department from 2010 through 2015. In 2011, Mickens served on the UAW committee responsible for

negotiating the CBA between the UAW and FCA. Mickens also served as Co-Director of the NTC and served on the NTC Joint Activities Board. On April 5, 2018, Mickens pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to one year and one day in prison and a $10,000 fine.

54. **Wilson's Diversifed Products:** Upon information and belief, non-party Wilson's Diversifed Products, LLC ("Wilson's Diversifed Products") is a Michigan limited liability company with a principal place of business in Detroit, Michigan. Upon information and belief, Wilson's Diversifed Products is owned and controlled by Morgan.

55. **Monica Morgan Photography:** Upon information and belief, non-party Monica Morgan Photography, LLC is a Michigan limited liability company with a principal place of business in Detroit, Michigan. Upon information and belief, Monica Morgan Photography is owned and controlled by Morgan.

56. **Leave the Light on Foundation ("LTLOF"):** During much of the relevant time period, non-party LTLOF was a Michigan tax-exempt organization with a principal place of business in Detroit, Michigan, controlled by Holiefield. Numerous co-conspirators served as officers and directors of LTLOF, including Keith Mickens (Vice President and director), Jerome Durden (Treasurer and director), and Virdell King (director).

25

57.     **Linda Knoll**:  Non-party Knoll serves as the Chief Human Resources Officer for FCA NV a position she has held since at least 2011, and previously served concurrently in the same role at CNH Industrial N.V., another company controlled by Exor NV, where Marchionne was the Chairman of the Board until his death.  Ms. Knoll also sat on the Group Executive Counsel of FCA Group, which is the highest operational body within FCA.  In this role, Ms. Knoll is reportedly responsible for overseeing the entirety of FCA Group's human resources function, including "organizational development, talent management, compensation and benefits, employee relations, and compliance and staffing."[8]

58.     **Peter Glenn Shagena**: Non-party Shagena currently serves as the Vice President of Employee Relations at FCA, a role he took over in 2015 replacing Defendant Iacobelli.  Shagena also served on the NTC Joint Activities Board from 2015 to the present. In this role, Shagena was a senior official at Chrysler and FCA responsible for negotiating and implementing labor agreements with the UAW and resolving disputes and grievances that arose under the CBAs between Chrysler/FCA and UAW.  Shagena was Director – Group Human Resources Manufacturing at Chrysler, LLC in 2007.  In 2009, he became the Director of Human Resources, Manufacturing/World Class Manufacturing.  In that role, he headed labor relations

---

[8]     https://www.fcagroup.com/en-US/group/governance/management/Pages/linda_Knoll.aspx

efforts, including the rollout of world class manufacturing, at all of the Company's manufacturing operations and joined the NTC. In 2013, he became Director of Human Resources at FCA Mexico before returning in June 2015 to take on the Vice President, Head of Employee Relations role, for FCA Group in North America, effectively assuming the prior role of Iacobelli.

59. **Colin Lightbody**: Non-party Lightbody previously served in the labor department at FCA (and previously Chrysler) from 1998 until his retirement in 2018 and reported directly to Iacobelli for many of those years. From 2014 to 2018, Lightbody was the Director of Labor Economics for FCA, with a substantial role in directing negotiations with the UAW. Lightbody describes his role at that time as "[f]or many years, provid[ing] strategic guidance to and work[ing] directly with the late FCA Chief Executive Officer, Sergio Marchionne." Since retiring from FCA, Lightbody has started his own consulting company, while also publishing blog posts concerning various collective bargaining topics.

## FCA-UAW CONTROL ENTERPRISE
### (18 U.S.C. § 1962(b))

60. From July 2009 until at least 2017, FCA Group, through a pattern of racketeering activity, acquired and maintained an interest in and/or control of the UAW, and in particular its decisions and actions regarding CBAs and other labor arrangements, which FCA Group and the other Defendants operated as an 18 U.S.C. § 1962(b) RICO enterprise ("FCA-UAW Control Enterprise"). In particular, as early

as July 2009, FCA Group and the named Defendants, through operation of the NTC and other means, paid bribes and gave items of value as alleged herein directly to top UAW officers and officials in violation of the Taft-Hartley Act. Starting in approximately July 2009, Defendants gave these items of significant value to UAW officials with the purpose of acquiring and maintaining, directly and indirectly, an interest in and/or control of the FCA-UAW Control Enterprise, particularly with respect to the UAW's negotiation and decision-making in determining CBA terms, supplemental agreements, and the application of such terms.

61.   The UAW is not a for-profit business; its primary purpose is to negotiate, execute, implement, and administer CBAs for North American autoworkers, among others.  Through their racketeering acts, FCA Group and the other named Defendants gained control of and exercised control over these essential functions of the UAW.  This control manifested itself in FCA Group and the other named Defendants causing the UAW (1) to refuse certain structural changes to GM that GM otherwise would have received, (2) agreeing to name FCA as the lead in 2015, (3) structuring an agreement in 2015 designed to specifically impose asymmetric costs on GM, and (4) specifically advocating for the merger with GM. Through its acts of racketeering, Defendants took over the essential and day-to-day functions of the UAW, exercising control within the meaning of 1962(b).

62.     Through this exercise of control of the FCA-UAW Control Enterprise, direct damage was inflicted on GM, including but not limited to actions taken during the collective bargaining processes as more specifically alleged herein.

## FCA-NTC ENTERPRISE
### (18 U.S.C. § 1962(c))

63.     Through a pattern of racketeering from July 2009 to 2017, as alleged herein, Defendants also operated the NTC as an 18 U.S.C. § 1962(c) RICO enterprise ("FCA-NTC Enterprise"). The named Defendants operated the FCA-NTC Enterprise for the common purpose of directing funds from the NTC (and ultimately from FCA) to certain UAW leaders.  In particular, FCA Group and some of its top executives have admitted that they willingly, purposefully, and unlawfully used the NTC as a vehicle to bribe union officials, funneling millions of dollars through the NTC for the benefit of certain union leaders in violation of the Taft-Hartley Act. According to government prosecutors, the NTC "sits at the epicenter of a massive conspiracy to corrupt the labor management process, as the conduit of choice for illegal payments" by FCA.[9]  As further alleged herein, the bribery scheme and efforts to suppress revelations from that scheme are much deeper than has been revealed to

---

[9]  Response to the UAW-Chrysler Skill Dev. & Training Program's Mot. for Recognition of Crime Victim Status and for Restitution at 1, *In re Pet. of UAW-Chrysler Skill Dev. & Training Program, In the Matter of United States v. Iacobelli*, No. 2:18-mc-51223-PDB (E.D. Mich. Oct. 1, 2018).

date.  Upon information and belief, in order to further the operation of the NTC as an enterprise, millions of dollars in bribes have been given to individuals involved in the scheme through control of funded offshore accounts to further conceal the scope of the scheme and that the scheme specifically targeted GM.

64.    FCA funded the NTC pursuant to a formula set forth in the CBAs negotiated between FCA and the UAW. For years, FCA Group and its leaders directed and allowed certain UAW officials to misappropriate money from the NTC (with money ultimately coming from FCA Group) in return for, among other things, "benefits, concessions, and advantages" related to the negotiation, implementation, and administration of multiple CBAs.  Further, Williams and Ashton, among other UAW leaders, demanded and received money and other items of value from FCA Group in return for assisting FCA's scheme to harm and ultimately attempt to merge with GM.

65.    Each Defendant played a distinct role within the operation of the FCA-NTC Enterprise. FCA Group and its employees coordinated to knowingly and affirmatively direct funds from the NTC to certain UAW leaders, who knew it was impermissible to receive funds from FCA. As described further below, the precise role of each Defendant varied, but included encouraging certain UAW leaders to use NTC funds impermissibly, taking steps to conceal the payments to UAW leaders, and directly approving or demanding the impermissible payments. In addition,

Defendants Iacobelli, Durden, and Brown, acting within the scope of their employment at FCA Group and at the direction of senior management, made and directed these illicit payments to UAW leaders through the NTC.

66.    Through these actions, each of these Defendants made decisions on behalf of the FCA-NTC Enterprise, by determining what payment should be permitted to which UAW official, and/or carried out the decisions of the FCA-NTC Enterprise by making, approving, demanding, or receiving such payments. These payments were part of a coordinated and systematic scheme stretching back nearly a decade. These Defendants thus operated the FCA-NTC Enterprise through numerous racketeering acts, as described herein.

## JURISDICTION AND VENUE

67.    Because GM brings claims under the RICO Act, this Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331.

68.    Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this district.

69.    In addition to the reasons identified below, the Court may exercise personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b), because the ends of justice require that this conspiracy be tried in a single court. This Court is the only possible location for such a single trial given that the overwhelming

majority of actions and effects occurred in this district, and there is no other district where all Defendants would be subject to personal jurisdiction without recourse to § 1965(b).

70.     The Court has personal jurisdiction over FCA and FCA NV for several additional reasons. FCA and FCA NV design, engineer, manufacture, distribute, and sell vehicles in the U.S. and Michigan under brands such as Chrysler, Jeep, Dodge, and Ram. As described herein, FCA and FCA NV engaged in and authorized a decade-long racketeering scheme occurring principally in Michigan, directed to harm GM, which is headquartered in Michigan.  FCA NV's actions directed towards Michigan included the bribing of Michigan residents and routing bribes through the NTC, which is headquartered in Michigan.  Thus, the Court has personal jurisdiction over FCA and FCA NV (a) under MCL § 600.715, because they have transacted business within the state of Michigan, and did or caused to be done things in the state or from which consequences were felt in this state, which give rise to the cause of action in this case; and (b) under 18 U.S.C. § 1965(a), because they have transacted affairs in this district. In addition, the Court has personal jurisdiction over FCA under MCL § 600.711 because it carries on a continuous and systematic part of its general business within Michigan such that it is essentially "at home" in Michigan. Indeed, FCA is headquartered in Michigan.

71.     The Court has personal jurisdiction over Iacobelli, Durden, Brown, Williams, and Ashton for several additional reasons. First, the Court has jurisdiction over Iacobelli, Durden, Brown, Williams, and Ashton (a) under MCL § 600.705, because during the relevant time period, they transacted business within the state of Michigan, and did or caused to be done things in this state or from which consequences were felt in this state, which give rise to the causes of action in this case; (b) under 18 U.S.C. § 1965(a), because they have transacted affairs in this district; and (c) with respect to all but Williams and Ashton, under MCL § 600.701, because they are residents of Michigan.

## DETAILED ALLEGATIONS

## I.     OPERATION CHRYSLER: FIAT ACQUIRES OPERATING CONTROL OF CHRYSLER FOR NO CASH

### A.     Financial Crisis Threatens U.S. Auto Industry

72.     In or about 2008, in the midst of the worst financial crisis since the Great Depression, the automotive industry faced a major crisis. The industry had been weakened by, among other things, rising gas prices, which drove consumers away from trucks and SUVs, and competition from foreign automakers with lower labor costs using non-unionized labor. Sales dramatically declined. By 2008, the situation had turned critical as a once-in-a-generation credit crunch nearly took down the world economy and wreaked havoc on the auto industry.

73.     Suffering several consecutive quarters of losses, in late 2008, the U.S. auto manufacturers turned to the government for assistance. The U.S. Department of the Treasury injected funds in General Motors Corporation ("Old GM") and Chrysler through the Troubled Asset Relief Program ("TARP"), but it served only as a stopgap.

74.     Chrysler filed for Chapter 11 on April 30, 2009.  Old GM followed approximately a month later.

75.     Because the UAW represented 99 percent of Old GM's unionized employees and the government's provision of any additional TARP funds was conditioned on a new CBA that, in part, needed to set forth labor costs competitive to Japanese transplants (*e.g.*, Toyota, Nissan, and Honda), UAW leadership could slow down and potentially block the entire transaction.

**B.     Fiat and Marchionne Seek Entry into the U.S. Market Through Chrysler**

76.     At the same time in Europe, Fiat faced plummeting sales and a deepening economic crisis. In September 2008, Marchionne told his executive council, "Fiat needs to radically change its alliance strategy. We've done everything we can on our own. If we're going to survive this one, we need a partner."[10]

---

[10]   JENNIFER CLARK, MONDO AGNELLI: FIAT, CHRYSLER, AND THE POWER OF A DYNASTY 244 (2012) ("MONDO AGNELLI").

77.     Fiat needed an opportunity to enter the U.S. marketplace and recognized one in the financial crisis of the U.S. auto industry. Marchionne realized that the Old GM and Chrysler bankruptcies "were changing the game. All of the issues that had plagued the industry—its overcapacity, its poor use of capital, its inefficiency, the crushingly high cost of investment for new models—were now going to become unsustainable."[11] A "deal with Chrysler [could] be seen as part of a series of 'strategic partnerships' [that Fiat had] sealed with other automakers in recent years."[12] Fiat's would-be "partner" was in the U.S., and the UAW was Fiat's bridge to establish a domestic footprint given the UAW's significance in the U.S. automotive market.

78.     Marchionne, on behalf of Fiat, sought that critical connection—what appeared to outsiders as an alliance with UAW leadership—to help further Fiat's bid to acquire Chrysler. Marchionne quickly made the head of the union's Chrysler Department, Holiefield, a strategic partner and soon thereafter "a true friend."[13] Former UAW leadership, and Holiefield in particular, became Marchionne's main

_____

[11]  *Id.*

[12]  Jeff Israely, *Fiat to Take 35% Stake in Chrysler*, TIME (Jan. 20, 2009), http://content.time.com/time/business/article/0,8599,1872719,00.html.

[13]  Sergio Marchionne, *Eulogy for General Holiefield* (Mar. 17, 2015), https://media.fcanorthamerica.com/pdf.do?id=16436. ("*Eulogy for General Holiefield*").

cohorts in Fiat's business plan even while he explored a collaboration with Chrysler. "If the union would come around to the view that the Fiat-Chrysler partnership was the only way to keep the company from going bust, maybe it would throw its weight behind Fiat when it came time for talks to start at the Treasury."[14]

79.    In early 2009, Marchionne and his team met with Holiefield and then-UAW President Ron Gettelfinger in advance of any formal talks with the government.[15] This meeting laid the groundwork for a UAW-Fiat alliance.

80.    While Marchionne was in active discussions with the UAW, on March 30, 2009, the government gave Fiat and Chrysler only 30 days to reach an agreement.[16]

81.    Fiat began demanding what it needed from a new Chrysler-UAW CBA. Marchionne wanted the UAW to commit to support World Class Manufacturing ("WCM"). WCM is a manufacturing system that, according to Marchionne, "aims to ensure that the FCA Group's facilities are flexible and competitive with the best

---

[14]   MONDO AGNELLI at 247.

[15]   *Id.*

[16]   The White House, *Remarks by the President on the American Automotive Industry* (Mar. 30, 2009), https://obamawhitehouse.archives.gov/the-press-office/remarks-president-american-automotive-industry-33009.

in the world."[17] "It broke down the union's rigid job classification system with its strict hierarchy and boundaries about who could do what."[18] In Marchionne's view, it "got rid of an excessive cost structure, and it created efficiency."[19] As led by Fiat, Chrysler and Gettelfinger and Holiefield (on behalf of the UAW) agreed to Marchionne's demand to implement WCM.

82.    Marchionne also wanted to use more temporary employees in place of hourly workers. While Holiefield publicly claimed that he "would have to take [his] family and leave town if [the UAW] agreed to that," he quickly came around to Marchionne's ideas.[20] UAW leadership agreed to lift any cap or restraint on Tier Two workers until 2015. Tier Two workers are less senior employees who have a lower wage structure than Tier One workers, have a different health plan, and are provided with a 401(k) plan instead of a defined benefit pension. They are therefore a less expensive labor source.

83.    "Marchionne's goal overall was to have as few constraints as possible in his ability to operate Chrysler when it came out of bankruptcy. He wanted to save

---

[17]  FCA, *Global Quality Through World Class Manufacturing*, https://www.fcagroup.com/enUS/media_center/insights/Pages/wcm_global_quality.aspx.

[18]  MONDO AGNELLI at 259.

[19]  *Id*.

[20]  *Id*. at 258, 260.

Chrysler, take it public, pay everyone back, and move on."[21] On behalf of FCA Group, Marchionne eventually implemented a bribery scheme to achieve this goal and help revive Chrysler and then move on to harm and eventually seek to takeover GM.

84.    Holiefield thus formed a long-term "partnership with Marchionne to help revive the company."[22] As Marchionne relayed, Holiefield was a "true partner and a key force behind the transformation of [Chrysler]."[23]

85.    Starting as of July 2009, merely one month after Chrysler emerged from bankruptcy, Iacobelli and other FCA officials began to transfer hundreds of thousands of dollars of Chrysler funds to Holiefield. These payments were "viewed . . . as an investment in 'relationship building' with UAW Vice President Holiefield."[24] For example, Holiefield's charity, LTLOF, received hundreds of thousands of dollars in furtherance of FCA's anticipated "high value/high leverage

---

[21]  *Id*. at 260.

[22]  Joseph Szczesny, *Late UAW Vice President Leaves Tarnished Legacy*, WARDSAUTO          (Aug.          4,          2017), https://www.wardsauto.com/industry/late-uaw-vice-president-leaves-tarnished-legacy.

[23]  *Eulogy for General Holiefield*.

[24]  7/26/17 Iacobelli Indictment, at 13.

programs" with the UAW.[25] These bribes, well known within FCA Group and among certain former UAW leaders, helped fuel the start of a wide-ranging and long-lasting conspiracy, described in detail herein.



Marchionne and Holiefield in November 2009[26]

86.    In addition to authorizing the bribes through the NTC, Marchionne personally rewarded Holiefield for his assistance. For example, in February 2010, Marchionne, acting as an agent of FCA Group, gave Holiefield a custom-made Terra

---

[25]  *Id*. at 10.

[26]  *See* Bill Pugliano, *Sergio Marchionne Discusses the Future of the Chrysler Brand* (Nov.                    4,                    2009), https://www.gettyimages.com/detail/news-photo/sergio-marchionne-chrysler-group-llc-chief-executive-news-photo/92709619? adppopup=true.

Cielo Mare watch worth several thousand dollars in direct violation of the Taft-Hartley Act. Showing his knowledge of wrongdoing, Marchionne sought to conceal the bribe by "declar[ing] the goods at less than fifty bucks."[27] It was reported that Marchionne then lied about the gift when questioned about it by federal investigators several years later.[28]

87.     Upon information and belief, FCA paid for the Holiefield/Morgan wedding in Venice, Italy, and Marchionne approved of FCA Group's funding of the wedding.



---

[27]  7/13/18 Iacobelli Plea Agreement, at 8.

[28]  Robert Snell, *FCA Chief Failed to Disclose Gift to UAW, Sources Say*, THE DETROIT NEWS (Aug. 16, 2018), https://www.detroitnews.com/story/business/autos/chrysler/2018/08/16/sergio-marchionne-gave-expensive-watch-uaw-failed-tell-investigators-orruption/985477002/.

Morgan and Holiefield Photo Posted on Morgan's Facebook Page[29]

88.     In addition to purchasing Holiefield's cooperation, on information and belief, FCA Group and Marchionne also made substantial payments to Defendant Ashton through at least one foreign financial account in the Cayman Islands. From 2010 to 2014, Ashton served as the UAW Vice President for the GM Department. In this role, just as Holiefield was the primary negotiator between the FCA and UAW, so too was Ashton the primary point of negotiation between the UAW and GM. In putting his scheme into motion, Marchionne thus had effective control over the UAW's negotiations with FCA and GM. This allowed Marchionne and FCA Group to ensure that Ashton imposed higher costs on GM, rather than the same benefits it provided to FCA and that it otherwise would have given GM under pattern bargaining but for the racketeering scheme.

**C.     FCA Obtains the Right to Purchase a Majority of Chrysler's Shares from the UAW**

89.     In June 2009, Chrysler emerged from bankruptcy with Fiat owning 20 percent of its equity. This was a coup for Fiat as it had only contributed intellectual property and know-how, and no actual money. Fiat also obtained operating control over Chrysler, and Marchionne became its CEO.

---

[29] *See* Monica Morgan Photography, https://www.facebook.com/MonicaMorganPhotography.

90.     Through the Chrysler bankruptcy, the UAW, through the UAW Trust, emerged as the majority owner of Chrysler, owning 55 percent of the equity. Additionally, the UAW Trust received a note payable for $4.6 billion at 9 percent interest and the right to appoint a director to Chrysler's Board. Fiat was given the right to purchase 40 percent of the UAW Trust's equity interest in Chrysler.

91.     From bankruptcy, the UAW Trust also became the largest shareholder of New GM, obtaining 17.5 percent of the equity, and receiving a $2.5 billion note, 260 million shares of preferred stock, warrants to purchase 45.5 million shares of New GM stock, and the right to appoint a director to GM's Board.

## II.     FCA FUNNELS MILLIONS TO THE UAW AND CERTAIN UAW LEADERS.

92.     In July 2009, FCA began a long-running intentional scheme of improper payments to certain UAW officials, funneled through the NTC, made by FCA senior executives and agents (including with the knowledge and approval of Marchionne on behalf of FCA NV) to influence the collective bargaining process. As a starter, FCA officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited payments and things of value paid to officers and employees of the UAW."[30]

---

[30]   5/25/18 Brown Plea Agreement, at 3.

93.     Iacobelli and Durden professed that the NTC made these payments, as authorized by the FCA Group, to keep UAW officials "fat, dumb, and happy" and to "buy labor peace."[31]   As Iacobelli further professed, "FCA was making an 'investment,' by 'spending thousands here,' in the form of illegal payments to UAW officials through the NTC, in an effort to obtain benefits, concessions, and advantages for FCA in its relationship with the UAW."[32] And as Brown, FCA's Director of Employee Relations and NTC Co-Director claimed, "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials."[33] FCA Group then used that greased relationship to control the UAW and have it impose higher costs on GM.

94.     To minimize detection of the payments, FCA had the NTC provide the bribes to various UAW officials through a variety of deceptive means and methods. The bribes violated the Taft-Hartley Act, 29 U.S.C. § 186, and were concealed through acts of mail and wire fraud, all constituting predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1).

---

[31]  7/26/17 Iacobelli Indictment, at 16; 10/31/18 Durden Gov't Sentencing Mem., at 2.

[32]  8/20/18 Iacobelli Gov't Sentencing Mem., at 8.

[33]  *Id.*; 5/25/18 Brown Plea Agreement, at 4.

95.    Similarly, UAW Vice President Holiefield used his personal charity, LTLOF, as one means to conceal his receipt of FCA bribes. Between July 2009 and 2014, Holiefield and his hand-selected LTLOF board members (which included FCA executive Jerome Durden and UAW officials Keith Mickens and Virdell King) transferred "more than $386,400 in funds" from the NTC to LTLOF.[34] Holiefield and his team hid these transfers by improperly omitting them from the Form 990s the NTC and LTLOF filed with the IRS.  In turn, Holiefield, along with his girlfriend and later wife, Monica Morgan, used the purported charitable donations for personal expenditures.

96.    As the bribery scheme grew in complexity and depth, Holiefield and Morgan, with FCA Group's knowledge, used false front businesses, including Monica Morgan Photography, Wilson's Diversifed Products, and even a false hospice organization, in an attempt to launder funds from the NTC and LTLOF. Between July 2009 and 2011, LTLOF paid over $70,000 to Monica Morgan Photography, purportedly for photography lessons for underprivileged children. Yet, Morgan only taught a handful of classes, cancelled most of them, and then spent the money on fancy clothes, nightclubs, and restaurants. On another occasion in 2013, the NTC paid Monica Morgan Photography $13,500, purportedly for services

---

[34]  8/8/17 Durden Plea Agreement, at 6.

rendered, but, in fact, so that Morgan and Holiefield could pay off the last installment on their new in-ground pool. Between January 2011 and July 2012, the NTC transferred more than $425,000 to Wilson's Diversifed Products, which Morgan and Holiefield promptly used for personal expenses, including closing costs on the purchase of a house. In 2012, Morgan then created yet another shell company to receive over $200,000 in NTC funds, along with a fake hospice to allow LTLOF to "donate" over $350,000 directly to Holiefield's and Morgan's pockets.

97.     During the course of the conspiracy, the NTC at times would directly pay the personal expenses of certain UAW officials. For example, through wire transfer, the NTC paid off Holiefield's mortgage on his personal residence in the amount of $262,219.71.

98.     To further evade detection and broaden the conspiracy, in and around 2012, FCA executives began to encourage the use of credit cards, with statements sent through the U.S. mails and payments made in part using interstate wires, issued to UAW officials by the NTC so they could charge personal expenses ultimately paid for by FCA. "Iacobelli directed the NTC to follow 'liberal' credit card and expense policies to persuade union officials to take company-friendly positions."[35] Certain UAW officials used these credit cards, including Johnson, King, Mickens,

---

[35]  8/18/17 King Information, at 11.

and Jewell, charging, for example, $1,259.17 for luxury luggage; $2,182 for a Italian-made Beretta shotgun; $2,130 for Disney World theme park tickets; over $1,000 for a pair of Christian Louboutin designer shoes; and thousands of dollars in electronics and many more such personal items.

99.   UAW former-President Williams was deeply involved in the misuse of the NTC as a RICO enterprise, directing it from the UAW side. As revealed in the government's indictment of UAW official Vance Pearson, Williams rented a villa in Palm Springs, California, ostensibly for the UAW's Region 5 Conference, from on or about December 25, 2014 to January 31, 2015. During that time, upon information and belief, Williams participated in or was aware of FCA Group funds being used (via NTC credit cards) for lavish dinners and golf outings for UAW officials in Palm Springs, including: $7,569.55 on January 9, 2015 at LG's Prime Steakhouse, $1,267.79 at Indian Canyons Golf Resort, $4,587.04 on January 18, 2015 at LG's Prime Steakhouse, $3,372.74 on January 23, 2015 at Spencer's Restaurant, $6,200.05 on January 24, 2015 at Palm Springs Steak & Chop Restaurant, and $4,147.74 on January 28, 2015 at Melvyn's Restaurant.[36] Likewise, as alleged by the government, Williams rented a villa in Cathedral City, California, ostensibly for the 2016 UAW Region 5 Conference, from on or about

---

[36]   *See* 4/2/19 Jewell Plea Agreement, at 9–10.

December 17, 2015 to March 31, 2016. During that time, upon information and belief, Williams participated in or was aware of FCA Group funds being used for personal purchases in Palm Springs including: $6,081.04 on February 3, 2016 at Melvyn's Restaurant, and $3,583.47 on February 12, 2016 at Palm Springs Steak & Chop Restaurant.[37]

100.   FCA Group bought control of UAW leaders to ensure that their bribery scheme achieved its goal of targeting and harming GM.   For example, upon information and belief, FCA NV perpetuated the operation and control of the RICO Enterprises by not only bribing General Holiefield as alleged herein and as admitted in criminal pleas, but also bribing Dennis Williams (UAW officer 2010-2018), Joseph Ashton (UAW officer 2010-2014), and Ron Gettelfinger (UAW Officer 1992-2010), by granting those individuals control over foreign financial accounts with substantial funds.   Gettelfinger served as the UAW President after Fiat's purchase of Chrysler in 2009, and helped ensure that co-conspirators Holiefield and Williams held and maintained positions of leadership within the UAW in 2010 in order to preserve and progress the conspiracy to harm GM.   For Gettelfinger, upon information and belief, such accounts apparently exist in Panama and Switzerland in his name and the name of a family member; for Williams, such accounts

---

[37] *Id*. at 12.

apparently exist in Switzerland and Liechtenstein in his name and a business entity

he controls; for Ashton, such an account apparently is located in the Cayman Islands

either in his name or that of a business entity he controls.  Upon information and

belief, FCA NV enabled, funded and provided control to these individuals of these

above identified accounts.

101.   Of course, this audacious scheme to harm GM would run the risk of

FCA Group employees blowing the whistle on such a scheme.  To minimize that

risk, upon information and belief, FCA and FCA NV provided an extraordinary

amount of illicit compensation to its own current and former executives to carry out

the scheme to harm GM and ensure the successful operation and control of the RICO

Enterprises.  As with former UAW leaders, this illicit compensation was provided

to these current and former FCA and FCA NV executives in the form of control over

foreign financial accounts that have been funded by FCA NV with millions of

dollars.  Upon information and belief, FCA Group executives who accepted

compensation for purposes of executing, protecting and minimizing disclosure over

the scope and depth of the scheme including targeting GM as described herein

include:

> (a)   Alphons Iacobelli - As the former Vice President of Employee
>
> Relations at FCA (2008-June 2015) and NTC Director
>
> (2008-2015), Iacobelli executed on the scheme as directed by

Marchionne and his superiors. FCA NV compensated Iacobelli extremely well for his role in the scheme, including providing him with control over millions of dollars held in financial accounts apparently in Switzerland, Italy, Liechtenstein, and Singapore both directly, through family, and a corporate entity he controls.

(b)   Jerome Durden - As the controller of the NTC Enterprise and a Secretary of the NTC Joint Activities Board (2008-2015), who facilitated many of the direct payments to the UAW, FCA NV provided Durden with control over funds in financial accounts held in Liechtenstein and the Cayman Islands. These accounts are held in his name or the business entity that he controls. When sentenced for his presumed involvement in the scheme, Durden represented to the Court that he did not benefit from the scheme in any financial respect. That representation, made in connection with seeking a lighter prison sentence, is contrary to the compensation provided in the referenced foreign accounts.

(c)   Colin Lightbody - Lightbody was the Director of Labor Economics at FCA (2014-2018) until he retired at age 56. In that role and his predecessor roles at FCA, he reported directly to

Iacobelli and helped him carry out the scheme.  FCA NV provided Lightbody with control over a Luxembourg financial account to pay for his role in executing and covering up the scheme. To help mislead after the scheme began to come to light, on December 12, 2019, Lightbody injected himself into the lawsuit and published a misleading blog post that purported to analyze the reason that FCA had an $8-an-hour advantage over GM in labor costs.[38] In that blog, drafted and made available on the internet to help fulfill his end of the bargain for the funds provided to him in the Luxembourg account, he intentionally omitted his knowledge of the bribery scheme and the secret agreement that FCA would not be held to the reinstatement of the 2015 cap as alleged herein.

(d)     Linda Knoll - Knoll is the long-term Chief Human Resource officer for FCA NV and reported directly to Marchionne.  In that position and given her role on the Group Executive Council of FCA Group, Knoll not only had direct knowledge of the scheme

---

[38] *See* Colin Lightbody, "Why does FCA have an $8 per hour competitive labor cost advantage over GM?" (Dec. 12, 2019) https://hrandlaborguru.com/blogs/news/why-does-fca-have-an-8-per-hour-competitive-labor-cost-advantage-over-gm.

alleged herein, but also was used to minimize and prevent any employees from becoming "whistleblowers." For example, when an FCA executive came forward and publicly disclosed the FCA national fraudulent sales scheme and assisted the SEC with its investigation into that scheme as alleged herein, Knoll led the retaliation against that employee including withholding compensation from him. For her role in executing and covering up the scheme, FCA NV provided her with control over financial accounts in at least Luxembourg and Switzerland.

(e)   Peter Glenn Shagena - Shagena served as an NTC Director and Director of Labor Relations for World Class Manufacturing through much of the conspiracy period, reporting directly to Iacobelli. In that role, he was responsible for heading up labor relations efforts, including the rollout of World Class Manufacturing, at all of FCA's manufacturing operations. He also played a key role on FCA's negotiations teams. When Iacobelli retired in June 2015, Shagena replaced him as the Head of Employee Relations for North America. Upon information and belief, FCA NV compensated Shagena for his role in the conspiracy including facilitating bribery of the UAW leaders and

ensuring that he did not reveal the conspiracy. This compensation included funding one or more financial accounts for Shagena in one or more Swiss financial institutions.

## III.   FIAT AND ITS SUCCESSORS CORRUPTED FORMER UAW LEADERS TO DAMAGE GM AND ACHIEVE LABOR PEACE FOR FCA FOR YEARS.

102.   Starting in July 2009 and continuing through at least 2015, in return for FCA Group's bribes, certain corrupt members of UAW's senior leadership in place at the time, including Ashton, Williams and Holiefield began providing Chrysler with labor programs that provided it with cost advantages over GM. GM would have received these structural labor benefits as well but for the bribes—as the goal of the conspiracy was to ensure that GM had a higher cost structure than Chrysler and later FCA. This CBA favoritism purchased through the bribes ultimately inflicted, as FCA Group intended, massive direct damage on GM in the form of higher labor costs.  As a result of these bribes, GM faced substantially above-market labor costs. UAW workers were not hurt, as UAW-represented GM workers were paid above-market.   These higher labor costs resulting from the scheme are straightforward to calculate and trace as GM's (and FCA's) regular business practices require the accurate costing of such programs.

103.   For example, at the time of the 2011 CBA, Chrysler and the UAW (through Iacobelli and Holiefield) documented their joint commitment to WCM,

which was a "full fledged partnership." They agreed that it was "of critical importance that WCM be jointly implemented systematically and fully in order to operate successfully and thereby position [Chrysler] and the [UAW] firmly among the winners of the global automotive manufacturing community."[39] As directed by the FCA Group to the UAW, including Williams and Ashton, the UAW denied GM the same labor flexibility and use with respect to its manufacturing operations. The UAW's agreement to implement these more efficient labor programs at FCA did not harm any individual FCA-UAW employees—as the programs did not impact the individual wages of any given worker or curtail in any material way the benefits received.

104.   As described below, in 2014, in a Memorandum of Understanding ("MOU") negotiated outside of the collective bargaining process, the UAW again committed to support FCA's WCM program.

105.   In October 2015, in a letter attached to the CBA, FCA and the UAW (through Jewell, another recipient of FCA bribes) once again agreed that "the need for unit flexibility to address fluctuating workloads is essential," and committed to "continue to support the full implementation of [WCM], New Hire Entry Level Wages and Benefits, and significant efficiency improvements." To that end, they

---

[39] Letter from A. Iacobelli, Chrysler Group LLC, to General Holiefield, International Union, UAW, World Class Employee Participation (Oct. 12, 2011).

committed to "the flexible utilization of [the] salary workforce," including: (a) that there may exist "[i]nefficient work rules and work practices . . . within the salary bargaining units," (b) "[t]he flexible use of the salary bargaining unit workforce can perform within classifications and departments, across classifications and departments, within units, across units, and within locals," and (c) "[t]he parties agree to discuss any opportunities to assign work across locals provided there is mutual agreement between the parties and a positive business case for keeping the work in-house."[40]

106.   As FCA Group had directed through its bribery to certain corrupt UAW officials, the UAW through Williams and Ashton, among others, denied these benefits to GM, at the direction of FCA Group. GM made repeated efforts to collaborate with UAW leaders on improvements to its Global Manufacturing System ("GMS"), an efficiency improvement program that would have been on par with WCM. For example, during a meeting on August 13, 2014, officials in the UAW's GM Department acknowledged that WCM was a superior program, in part, because Chrysler management (specifically Marchionne) and the UAW worked closely to ensure it was a joint effort. UAW leadership failed to disclose that union support for FCA's WCM was, in part, purchased through bribes. Moreover, UAW leadership

---

[40]   Letter from Glenn Shagena, FCA US LLC, to Norwood H. Jewell, International Union, UAW, Salary Bargaining Unit Flexibility (Oct. 22, 2015).

and GM discussed that "[t]here needs to be an effort for the UAW and GM leadership to go through each element of GMS and together gain buy-in from the manufacturing managers and UAW members," and that "GMS cannot have the same success of WCM without the involvement of UAW members." But for FCA Group's bribery, the UAW would have granted this request to GM. Implementation of the GMS would not have harmed any UAW members; it would have allowed GM and the UAW to work collaboratively to increase the efficiency of GM's production process, ultimately benefiting GM and the UAW members (both through an increase in profit sharing payments and in the overall health of GM).

107.   Another advantage FCA Group purchased through bribery related to "Tier Two" employees. As of the 2007 CBA, Chrysler, GM, and Ford employed both "Tier One" and "Tier Two" employees. As described above, Tier Two workers are less expensive employees who have a lower wage structure than those in Tier One.

108.   FCA and GM were initially subject to a 25 percent cap on Tier Two workers under the 2007 CBA. This cap was lifted under pre-bankruptcy addendums in 2009, but in their 2009 addendums both FCA and GM agreed to reinstate the cap six years later in the 2015 CBA. GM's 2011 CBA reiterated this commitment, stating that "the parties will mutually agree to a hiring limit based on the entry level percentage as of September 14, 2015" to "be no more than 25% and no less than

20% of the total UAW-GM hourly population." In recognition and anticipation of this 2015 Tier Two cap, GM thus kept its proportion of Tier Two workers below the anticipated 25 percent cap. By 2015, Tier Two workers comprised around 20 percent of the UAW membership at GM.

109.   Through the conspiracy, upon information and belief, certain corrupt UAW leaders assured FCA that they would not insist on reinstating the Tier Two cap in 2015. Upon information and belief, FCA had reached a "side letter" agreement that the cap would not be reinstated, yet misled GM and the public by claiming in an October 2011 released summary of the 2011 CBA terms that "the cap will be reinstated at the end of" the 2011 CBA. From this private understanding purchased through the conspiracy that FCA would not be subject to a Tier Two cap, FCA hired Tier Two workers with abandon, possessing the incredibly valuable foreknowledge that it would not be penalized by any reinstatement of the cap. By 2015, Tier Two workers made up around 42 percent of the UAW membership at FCA—double the proportion of Tier Two workers at GM. This difference purchased through the bribery scheme provided FCA with a dramatic advantage with respect to average labor costs. Meanwhile, without this inside knowledge, GM managed to the cap and absorbed corresponding cost increases anticipating the 2015 cap reinstatement as required by the contract. In 2015, as FCA had been privately assured, the UAW did not insist on reinstating the Tier Two cap for FCA and, as negotiated through pattern

bargaining, the cap was not reinstated for GM either. In the end, and unbeknownst to GM in advance, ultimately there was no difference between how GM and FCA were treated in the 2015 negotiations with respect to Tier Two workers (as a result of the pattern bargaining). However, GM was harmed as a result of FCA's bribery because the UAW refused to inform GM in the time period before the expiration of the 2011 CBA that this cap would not be reinstated.  But for the bribes, the UAW would have informed GM in 2011 that it did not intend to reinstate the Tier Two cap as it privately assured FCA so that GM could have addressed hiring accordingly and thus benefited its average labor cost.

110.   FCA Group ensured that other additional advantages were denied to GM. For example, upon information and belief, in 2014, FCA and the UAW agreed to a formulary that would make better use of prescriptions that are widely available, significantly reducing FCA's health care costs. The formulary would have saved GM up to $20 million per year. Negotiators for GM repeatedly requested FCA's more cost-effective formulary during collective bargaining, but the UAW refused to agree, indicating the term would rankle UAW leadership. This request by GM would have been granted, but for FCA's bribery; the formulary did not harm any individual FCA employee as the concession merely limited the range of prescription drugs available for any particular condition, without preventing the treatment that an

individual UAW member received; to GM's knowledge, all FCA employees received, in substance, the necessary prescription drug treatment that was prescribed.

111.  Taken together, FCA Group's corruption, through operation of the FCA-UAW Control and NTC Enterprises, helped buy an average hourly wage advantage to take FCA from worst to first among the Detroit-based automakers. In 2006, Chrysler had the highest average hourly labor cost. Chrysler's employees were paid $75.86 in wages and benefits on average, and Old GM's employees were paid $70.51. Chrysler, Old GM, and Ford's labor costs exceeded non-unionized foreign automaker costs by approximately 50 to 80 percent prior to bankruptcy.

112.  Through its corruption, bribes, and operation of the RICO Enterprises, FCA was able to gain an average hourly wage advantage over GM. By 2015, FCA slashed its average hourly labor costs to $47—in the range of non-unionized foreign automakers operating in the U.S.—and $8 less on average per hour than GM ($55). FCA's average hourly wage advantage continues to this day: its labor costs are on average $8 per hour less than GM. This hourly wage disparity is not due to paying FCA employees less in wages in benefits—but rather it was due to denying GM structural labor programs that would have lowered its average hourly wage rate and that GM would have received but for the bribes.



## IV. FCA GROUP CONSPIRED WITH UAW LEADERS TO ATTEMPT A TAKEOVER OF GM BY MERGER

113. Sergio Marchionne held a longstanding view that the U.S. automotive market required consolidation to remain competitive. As he told *Automotive News* in 2008: "You need at least 5.5 million to 6 million cars (a year) to have a chance of making money. . . . Fiat is not even halfway there. And we are not alone in this. So we need to aggregate, one way or another."[41]

114. As CEO of Fiat since 2004, Marchionne had long sought a merger with GM. After failing to effect a merger in 2005, Marchionne saw another opportunity

---

[41] Gilles Castonguay, *Fiat Can't Survive Alone; Needs Partner: CEO*, REUTERS (Dec. 8, 2008), https://www.reuters.com/article/us-rb-fiat-ceo/fiat-cant-survive-alone-needs-par tner-ceo-idUSTRE4B738Z20081208.

after Fiat acquired Chrysler in 2009. "[A]fter fixing Chrysler, let's . . . take General Motors and merge them together. Once and for all, let's straighten out the car industry, creating an American giant that also allows a long-term future for Fiat."[42]

115.    As alleged, a central purpose of the bribery scheme overseen by Marchionne was to harm GM by saddling it with higher labor costs thus inducing it to merge with FCA to achieve synergies and a higher return on capital. With the scheme well underway and having a desired effect, in October 2012, when Fiat owned a significant portion of Chrysler (approximately 59 percent) and the UAW Trust owned the remainder, Marchionne wrote to GM's CEO on behalf of FCA Group proposing a "comprehensive" combination between Fiat, Chrysler, and GM. GM rebuffed this attempt at a combination.  But Marchionne remained resolute in his quest to force an FCA Group-GM combination.

### A.    Marchionne Prepares on Behalf of FCA to Force a Takeover of GM by Merger

116.    By 2013, Chrysler had only two shareholders: (1) Fiat, which owned a controlling 58.5 percent stake; and (2) the UAW Trust, which owned the remaining 41.5 percent.

---

[42] Tommaso Ebhardt, Sergio Marchionne 63–64 (2019) (translated from Italian).

117.   In July 2012, Fiat elected to exercise its option to purchase a portion of the UAW Trust's stake in Chrysler, offering $139.7 million for 3.3 percent.  Fiat and the UAW Trust apparently disagreed over the price, and Fiat sued in Delaware Chancery Court. In October 2013, press reports indicated that "Fiat plan[ned] to urge the UAW to help it convince [the UAW Trust] to unload its [entire] 41.5% stake in Chrysler."[43]

118.   In December 2013, Fiat apparently "scripted" Holiefield at an UAW Executive Board meeting to support Fiat's goal of buying all of the UAW Trust's stake. Iacobelli emailed that Holiefield would "create a dialogue pursuant to our outline" at the meeting which, upon information and belief, involved having the UAW support a complete sale of its Chrysler interest to Fiat.[44] This scripting demonstrates the degree of Fiat's control over the UAW and its top officials.

119.   On January 1, 2014, Fiat announced an agreement to acquire the UAW Trust's entire stake in Chrysler for $4.35 billion. The transaction closed on January 21, 2014. Nearly half that amount, $1.9 billion, was financed through a

---

[43]  Clark Schultz, *Fiat Leans on the UAW for Chrysler Sale,* SEEKING ALPHA (Oct. 17,                                                                                      2013), https://seekingalpha.com/news/1334672-fiat-leans-on-the-uaw-for-chrysler-sale

[44]  7/13/18 Iacobelli Plea Agreement, at 9–10.

special distribution by Chrysler with Chrysler agreeing to pay the UAW Trust another $700 million over four years.

120. Although not a party to the foregoing transaction, the UAW itself entered an "enforceable" MOU with FCA promising to "actively assist in the achievement of FCA's long-term business plan." Upon information and belief, while the agreement does not appear to have been published, it contains no termination date. In short, this agreement was an attempt by FCA and its co-conspirators to paper over—and provide an appearance of legitimacy to—what had previously been agreed to in their long-running bribery scheme. From FCA's Annual Report:

> FCA US and UAW executed and delivered a contractually binding and legally enforceable Memorandum of Understanding ("MOU") to **supplement** FCA US's existing collective bargaining agreement. Under the MOU, the UAW committed to (i) **use the best efforts to cooperate in the continued roll-out of FCA US's World Class Manufacturing ("WCM") programs**, (ii) to actively participate in benchmarking efforts associated with implementation of WCM programs across all FCA's manufacturing sites to ensure objective competitive assessments of operational performance and provide a framework for the proper application of WCM principles, and (iii) **to actively assist in the achievement of FCA US's long-term business plan**. (Emphasis added.)[45]

---

[45] FCA, 2014 ANNUAL REPORT, AT 178, https://www.fcagroup.com/en-US/investors/financial_regulatory/financial_repo rts/files/FCA_2014_Annual_Report.pdf.

121.    Undoubtedly, this MOU conferred a competitive advantage upon FCA outside of the standard collective bargaining process. As stated by FCA in its Annual Report, the UAW's commitments under the MOU were of a "unique nature." Through its bribery, control of the UAW, and operation of the NTC, FCA ensured that UAW leadership conferred these unique advantages only on FCA and, as alleged herein, denied the same to GM to make sure that GM had higher costs.

122.    Fiat and Chrysler merged into FCA on October 12, 2014, with Marchionne at the helm of the combined entity.[46]

123.    After taking full control of Chrysler, and having secured control of the FCA-UAW Control Enterprise through bribery of its top officials, Marchionne set his sights on forcing a merger with another one of the "Big Three" North American automakers. Given the ownership structure of Ford, with the substantial share of voting power held by the Ford family, Ford would never be a target for Marchionne's merger ambitions.  GM was the only U.S. automaker target, and thus Marchionne had long focused his sights on GM.

---

[46]  GM does not allege there was a violation of any securities law or requirement in connection with the sale and purchase of the Chrysler securities. As GM understands the facts, the ultimate selling price and terms that Fiat paid for the Chrysler shares were set following a court opinion concerning the terms of the purchase and certain third parties not impacted by the bribery scrutinized and approved the securities aspect of the transaction.

## B.  President Williams and Defendant Ashton Are Key Players in the Takeover Conspiracy

124.  In 2013 and 2014, as FCA consolidated its control of Chrysler, Marchionne turned to weaponizing his bribery scheme of the UAW to pressure GM to agree to merge with FCA.

125.  By this time, the primary UAW leaders FCA Group had been bribing had either already left the UAW (Gettelfinger) or were on their way out (Holiefield announced in November 2013 he would retire the following year). Yet, knowing that ongoing control of the UAW was crucial to the scheme, FCA Group had been bribing UAW Vice President Ashton and UAW Secretary-Treasurer and President Dennis Williams (among others).  In 2014, Marchionne thus turned for support to the new UAW President, longtime friend and merger "wingman," Dennis Williams. Williams cooperated with the goals and plans of FCA and FCA NV and took affirmative steps to advance those goals as his cooperation had been purchased many times over. Marchionne and Williams had known each other since the 2000s, when Williams negotiated contracts at a Fiat-affiliated truck and tractor company. Williams has affirmed that he tries "not to second-guess Sergio," and that the pair have a "very good relationship," which was secured through the bribery of Williams.[47]

---

[47] Michael Martinez, *UAW President: Union Monitoring FCA-GM Merger Reports*, THE DETROIT NEWS (June 18, 2015),

126. In addition to Williams, FCA Group and Marchionne also turned to UAW Vice President Joe Ashton. As the Vice President for the GM Department of the UAW, Ashton had the ability to directly influence and control the labor relations between GM and the UAW. Ashton was thus important to the scheme to ensure that GM did not receive the same labor advantages as FCA and, thus, that GM incurred higher costs. By 2014, Williams, having proven his loyalty in support of the scheme, and FCA Group found an even more valuable use for Ashton—they chose him to be the UAW Trust's designee on GM's Board. At that point, Ashton was well-situated to convey to FCA Group confidential GM information relating to GM's CBA negotiations and strategy including with respect to FCA Group's merger overtures.

127. FCA's control over Williams, the President of the UAW at the time, gave FCA substantial control over the UAW. As alleged herein, the President of the UAW has substantial power over the UAW, particularly when it comes to structuring and ordering of the CBA negotiations.

128. Williams was a willing co-conspirator in Marchionne's bribery and takeover scheme, especially given the UAW's finances. In 2013, the UAW's

_____

https://www.detroitnews.com/story/business/autos/2015/06/18/uaw-monitoring-fca-gm-talks/28925955/.

financial circumstances were so dire that it sold $47 million in assets and "raid[ed] its strike fund to pay operating expenses."[48]

129. When Williams took office, he promptly encouraged further corruption. With the full support of FCA Group, Williams directed his lieutenants and other corrupt officials to use NTC funds and credit cards for travel, dining, and other illegal purposes to improve the UAW's budget (which the officials then used, in part, for their own purposes). FCA Group even had the NTC pay the salaries and benefits for high-level UAW employees to work at the NTC when they performed little or no work for the NTC and worked almost exclusively for the UAW. As Nancy Johnson admitted, "[t]his directive was issued in order to reduce costs to the UAW budget from such expenditures because the UAW's budget was under pressure."[49] Williams was not a bystander in this scheme; instead, Williams directed other UAW officials to continue the corruption.[50] Notably, the bribes from FCA to certain UAW officials continued after Williams assumed the UAW Presidency.

---

[48] Tom Krisher, Associated Press, *Detroit Automakers Worry About UAW Money Struggles,* YAHOO FINANCE (Feb. 22, 2014), https://finance.yahoo.com/news/detroit-automakers-worry-uaw-money-144156 521.html; Associated Press, *UAW Votes to Raise Dues for First Time in 47 Years,* CNBC (June 3, 2014), https://www.cnbc.com/2014/06/03/united-auto-workers-votes-to-raise-dues-for-first-time-in-47-years.html.

[49] 7/23/18 Johnson Plea Agreement, at 9.

[50] 6/3/20 Jones Plea Agreement, at 11 (referring to Williams as "UAW Official B").

130.   By the time of the 2015 CBA negotiations, Williams had long been conspiring with Marchionne, and FCA and FCA NV effectively controlled the decision-making of Williams and other top UAW officers as alleged herein.

### C.   FCA Undertakes "Operation Cylinder"

131.   By 2014, FCA Group had been rejected repeatedly by GM regarding a merger between the two companies. But in early 2015, having successfully consolidated control over Chrysler and positioned FCA NV for merger, FCA Group believed it was in a much stronger position to force a GM merger.

132.   With Marchionne as the lead, FCA Group schemed that it could effectively take over GM through a merger (code-named "Operation Cylinder"), have Marchionne remain CEO of the combined companies, and oversee the largest auto company in the world.[51] In part, for this very reason, Marchionne, on FCA Group's behalf, had authorized the bribery of UAW leaders, whose support was essential to the success of Operation Cylinder given that, among other reasons, the UAW could effectively block a merger under certain terms in the CBA. That the UAW wielded this veto potential over any merger was well known to Marchionne and Williams.

---

[51]   Tommaso Ebhardt, *The Crisis Fiat Faced As It Lost an Indispensable Leader*, BLOOMBERG      BUSINESSWEEK      (Apr.      23,      2019), https://www.bloomberg.com/news/articles/2019-04-23/the-crisis-fiat-faced-as-it-lost-an-indispensable-leader.

133. FCA Group initiated its takeover plans in March 2015, when Marchionne, on behalf of parent company FCA NV, wrote to GM's Board and management, formally proposing the merger between GM and FCA NV.

134. GM vetted the proposal with management, its advisors, and its Board, ultimately rejecting the offer on April 14, 2015. Ashton sat on GM's board when GM undertook this analysis.

135. Undeterred, two weeks later, Marchionne went public with an unusual published PowerPoint that he entitled "*Confessions of a Capital Junkie*: An insider perspective on the cure for the industry's value-destroying addiction to capital." In it, Marchionne promoted the benefits of consolidation as "too large to ignore." The deck claimed nearly $5 billion in annual savings with such a GM/FCA merger based on reduction in investments and R&D, "with no impact on number employed."[52]

136. In the spring of 2015, as the collective bargaining process ramped up, Marchionne pursued a full-court press media strategy to achieve Operation Cylinder. He geared his strategy to apply maximum pressure at key intervals in labor negotiations, which were well underway.

---

[52] FCA, *Confessions of a Capital Junkie: An Insider Perspective on the Cure for the Industry's Value-Destroying Addiction to Capital* (Apr. 29, 2015), available at https://www.autonews.com/assets/PDF/CA99316430.PDF.

137.   Unbeknownst to GM, the U.S. Attorney had commenced an investigation by at least 2015 into FCA-UAW-NTC corruption.   Marchionne strategically decided to oust Iacobelli as an employee, but not from the conspiracy. In June 2015, Iacobelli abruptly resigned from FCA.  He then aggressively sought employment with GM so that he could continue to funnel information to his former FCA co-conspirators.

138.   Marchionne then assumed a role not typically undertaken by a CEO: leading labor negotiations with the UAW and his purchased co-conspirators Williams and Jewell.

139.   On June 18, 2015, at the request of UAW President Williams, GM CEO Mary Barra, GM President Daniel Ammann, GM CFO Chuck Stevens, and GM lead labor negotiator Cathy Clegg attended a meeting with UAW President Williams and Vice President Cindy Estrada, who relayed and championed Marchionne's merger proposition despite the fact that GM had already formally rejected it by letter to FCA NV's Chairman and CEO who had made the offer. Working at Marchionne's behest as a result of the bribery scheme, Williams used his position to advocate for the merger and to encourage GM to consider the proposed merger. GM made clear to Williams that it was not interested in merging with FCA NV.

140.   The next day, the GM Board was informed of the Williams meeting. They were informed that Marchionne had been in direct talks with Williams about a

merger and apparently had tapped Williams as FCA Group's messenger and advocate. And that the day before, Williams relayed that Marchionne had told him the GM Board had not seriously considered the FCA Group merger proposal—an untrue statement.

141.   In addition to the bought and paid-for UAW officials, Marchionne enlisted hedge funds and activist investors to support pursuing Operation Cylinder. The *Wall Street Journal* reported that Marchionne viewed activist partners "as a means to force consolidation on the fragmented auto industry." [53] FCA had reportedly lined up initial commitments to finance a $60 billion cash offer for GM. Days before the ceremony that formally opened labor negotiations, Marchionne told the *Financial Post* that the company's modeling suggested an FCA NV-GM merger was "the most logical combination in the entire industry."[54]

142.   On July 13, 2015, bargaining officially commenced with the tradition of "handshakes" between UAW leadership and the three Detroit automakers.

---

[53]  Eric Sylvers & John D. Stoll, *Chrysler Boss Recruits Activists to Prod GM Into a Merger*, WALL STREET JOURNAL (June 18, 2015), https://www.wsj.com/articles/chrysler-boss-recruits-activists-to-prod-gm-into-a-merger-1433806966.

[54]  Kristine Owram, *Fiat Chrysler, GM Merger Is Most Logical Combination in the Entire Auto Industry: Sergio Marchionne*, FINANCIAL POST (July 10, 2015), https://business.financialpost.com/news/fiat-chrysler-gm-merger-is-most-logical-combination-in-the-entire-auto-industry-sergio-marchionne.

143. Hugging Williams at the FCA-UAW "handshake" ceremony, Marchionne signaled that consolidation using the UAW as the hammer was his goal in the negotiations, exclaiming that, "[w]hatever happens in terms of consolidation, it would never be done without the consent and support of the UAW. It's that simple."[55] Williams, Jewell, and other UAW officials celebrated that night with an $8,000+ meal at the London Chop House—paid for by FCA through the NTC.[56]



Marchionne Hugging Williams at "Handshake" Ceremony[57]

---

[55] Daniel Howes, *Marchionne's Merger Quest Not Over*, THE DETROIT NEWS (July 27, 2015), https://www.detroitnews.com/story/business/columnists/daniel-howes/2015/07/27/howes-marchionnes-merger-mania-lives-despite-gm/30766303/.

[56] 12/12/18 Johnson Gov't Sentencing Mem., at 4–5.

[57] *See* Alexa St. John, *Marchionne Didn't Disclose Expensive Watch Given to UAW Leader, Report Says,* AUTOMOTIVE NEWS (Aug. 16, 2018), https://www.autonews.com/article/20180816/OEM/180819869/marchionne-didn-t-disclose-expensive-watch-given-to-uaw-leader-report-says.

144.  As noted, Marchionne had purchased the support of the UAW to support a merger with GM because of the UAW's ability to object to such a merger. FCA and GM had signed documents stating that they would "not . . . partially or wholly sell, spin-off, split-off, consolidate or otherwise dispose of in any form, any . . . asset or business unit of any type, constituting a bargain unit under the Agreement."[58]

145.  Between July and mid-September 2015, GM bargained with the UAW through its subcommittees. The GM Board gave its negotiators authority to negotiate within a particular range.

146.  During these negotiations, Defendant Williams gave his list of "President's Demands" to GM. Based on GM's calculations, the Williams's "President's Demand" reflected a CBA with a total cost increase of just under a billion dollars over the 2011 CBA.

147.  Over the next couple of weeks, GM and the UAW continued to negotiate with various proposals and counter-proposals. GM made offers of increasing total cost, while the UAW was progressing down from its opening demand.

---

[58]  Letter from Glenn Shagena, FCA US LLC, to Norwood H. Jewell, International Union, UAW, Plant Closing and Sale Moratorium (Oct. 22, 2015); *see also* Letter from Catherine L. Clegg, General Motors LLC, to Cynthia Estrada, International Union, UAW, Plant Closing and Sale Moratorium (Oct. 25, 2015).

148. Prior to September 13, 2015 and before selecting the target, the UAW had made various concessions, as had GM. The total incremental costs for the new potential deal were over 20 percent less than the UAW's initial demand of nearly $1 billion. The UAW's principal negotiators, represented to GM that they could "sell it"—that is, the deal that was on the table—to the UAW's members.

149. During bargaining, Marchionne continued to agitate in the press for a merger between GM and FCA NV. Marchionne signaled that he would do what it would take to force a GM merger, telling *Automotive News* in an interview published on August 30, 2015: "***It would be unconscionable not to force a partner.***" When asked if that meant FCA NV would make a hostile bid, Marchionne explained, "Not hostile, [but] [t]here are varying degrees of hugs. I can hug you nicely, I can hug you tightly, I can hug you like a bear, I can really hug you. ***Everything starts with physical contact. Then it can degrade, but it starts with physical contact***."[59]

150. A key to Marchionne's Operation Cylinder scheme was a practice known as pattern bargaining, a strategy in which unionized workers across an industry attempt to bargain uniform terms in their contracts. The UAW describes

---

[59] Larry P. Vellequette, *Marchionne Puts the Squeeze on GM; GM's Response: 'Why Bail Out FCA?'*, AUTOMOTIVE NEWS (Aug. 30, 2015), https://www.autonews.com/article/20150830/INDUSTRY_ON_TRIAL/308319981/marchionne-puts-the-squeeze-on-gm-gm-s-response-why-bail-out-fca (emphasis added).

pattern bargaining as "a core part of [its] bargaining strategy"[60] and a "powerful
strategic tool."[61] Pattern bargaining is a potent force multiplier: through it,
Marchionne needed only certain corrupt UAW leaders' support to impose
anti-competitive conditions aimed at GM. As part of his and Marchionne's criminal
scheme, Williams weaponized pattern bargaining, not to protect the interests of the
UAW's members, but to advance FCA Group's interests by promoting
Marchionne's merger.  FCA Group sought to leverage pattern bargaining to impose
asymmetrical costs on GM, with the goal of causing harm to GM by it incurring
massive labor costs and making it more likely to favorably consider a merger with
FCA given the synergies touted by Marchionne.

151.  Approximately every four years, each Detroit-based automaker
negotiates a CBA with the UAW. To increase its leverage in the industry, the UAW
has ensured that each CBA expires at the same time, resulting in simultaneous
negotiations. The UAW begins negotiations with each automaker through
subcommittees in July.

152.  Months later, and shortly before contract expiration, the UAW selects
one of the automakers as a "lead" or "target" company, with which the UAW

---

[60]  UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

[61]  Letter from Rory Gamble, Vice President, UAW, to UAW National Ford
Department, Negotiations Update (Oct. 18, 2019).

negotiates a CBA. Then, the UAW exerts pressure on the other two companies to use the first agreement as a "pattern" for negotiations. The UAW has particularly strong leverage to do so, *i.e.*, the threat of a costly nationwide strike (as it proved to the cost of billions of dollars in 2019).

153.    Williams has publicly admitted to forcing automakers into a pattern: "We believe in pattern bargaining. The companies ought to compete on a product, quality, engineering and process and not on the backs of workers. That philosophy has been embedded for us since Walter Reuther and is embedded with Dennis Williams."[62]

154.    Because pattern bargaining is such a powerful tool, it must be premised on good faith, arm's-length negotiations. Otherwise, as here, corrupt actors can use pattern bargaining to directly harm a competitor.

155.    While the government had imposed a "no-strike" rule at the automakers beginning in 2009, by the time of the 2015 negotiations, the provision was no longer in effect, making the 2015 target position particularly significant.

156.    The UAW typically selects the largest and best performing automaker as the target. This practice allows the union to maximize gains by locking in terms, such as wages and signing bonuses, which can then be imposed on the other

---

[62] *UAW President Dennis Williams Roundtable* (June 18, 2015), available at https://www.youtube.com/watch?v=bfS3EzxDXqI.

automakers through pattern bargaining. It follows that the least profitable automaker is generally the least likely target, as low profit margins make it more difficult for the union to secure favorable precedential terms.

157. In the 2011 negotiations, GM was the lead and negotiated the first tentative agreement with the UAW. But, as reflected herein, by that time, the UAW had been thoroughly corrupted and taken over by FCA. Under ordinary circumstances with all parties negotiating in good faith, the UAW would have used its market power to force key elements of the GM deal on FCA, but under these circumstances, the implementation of the terms of the FCA 2011 CBA was, like the FCA 2015 CBA, a product of collusion between FCA and the UAW. As noted, skirting any pattern due to the bribes, FCA reached a secret deal to ensure that in 2015 the Tier Two cap would not be re-instated.

158. Moving to the 2015 negotiations, based on past practices and having conducted a detailed analysis of the negotiation dynamics, GM reasonably believed that it would be the target in 2015. Industry analysts also did not believe that FCA was a viable target. FCA was "the smallest of the three companies, with the lowest profit margins and the highest percentage of lower-paid entry-level workers seeking

higher wages," which would "make it more difficult for the UAW to win big pay raises for its workers and big signing bonuses."[63]

159.   On September 13, 2015, just two days before the CBAs were scheduled to expire, the UAW unexpectedly announced that it had chosen FCA as the "target," a position secured through the years-long bribery scheme between FCA Group and UAW leaders.

160.   Informed industry analysts were not expecting UAW's selection of FCA as the lead. According to the *Detroit Free Press*, the decision "surprised analysts and industry watchers across the nation." CBS Detroit reported that "just about every analyst said that Fiat Chrysler was the least likely to be the lead company." [64]

161.   Defendant Williams had near complete control over the selection of the lead. Williams at Marchionne's bidding chose FCA as the lead, despite being near a tentative agreement with GM through his "President's Demand." After selecting

---

[63] Alisa Priddle & Brent Snavely, *Fiat Chrysler Is Surprise Lead Company in UAW Talks*, DETROIT FREE PRESS (Sept. 13, 2015), https://www.freep.com/story/money/cars/general-motors/2015/09/13/fiat-chrysler-lead-company-uaw-contract-talks/72091592/.

[64] *Id.*; *UAW Chooses Fiat Chrysler As Target in Contract Talks*, CBS DETROIT (Sept. 13, 2015), https://detroit.cbslocal.com/2015/09/13/uaw-chooses-fiat-chrysler-as-target-in-contract-talks/.

FCA as the lead, Williams refused to explain why he had chosen FCA as the lead and instead told a GM executive that he would explain why he selected FCA when he retired. Williams never provided such an explanation. As has been revealed through the subsequent investigations, Williams chose FCA as the lead in order to use the FCA pattern agreement to harm GM and force a merger with GM. Williams made this selection at the direction of Marchionne to further the scheme alleged herein.

162.   On September 15, 2015, just two days after FCA was selected as lead, FCA and the UAW reported that an agreement had been reached that, in Marchionne's words, was a "transformational deal."[65]

163.   Marchionne explained that the "economics of the deal are almost irrelevant" because the costs "pale in comparison given the magnitude of the potential synergies and benefits" of a combination, and cemented a "philosophical approach that [FCA] wants to use going forward." Upon information and belief,

---

[65]   Alisa Priddle, *Marchionne: Deal Can Bring Workers 'Significant Benefits,'* DETROIT FREE PRESS (Sept. 16, 2015), https://www.freep.com/story/money/cars/chrysler/2015/09/16/marchionne-health-care-2-tier-wages-part-uaw-pact/32501757/.

Marchionne was referring to using the collective bargaining process to pressure a merger between FCA and GM.[66]



Marchionne Hugging Williams After Announcement of Tentative Deal[67]

164.   The UAW bargaining team, with Jewell's authorization, celebrated the deal with a $6,912.81 dinner at the London Chop House in Detroit—paid for by the NTC with funds knowingly supplied by FCA—the very entity with which Jewell,

---

[66]   *2015 UAW FCA Agreement Announcement* (Sept. 15, 2015), available at https://www.youtube.com/watch?v=YX8wWGi28rs.

[67]   *See* Editorial, *UAW, Chrysler Deal Addresses Key Issues,* THE DETROIT NEWS (Sept. 19, 2015), https://www.detroitnews.com/story/opinion/editorials/ 2015/09/19/editorial-wages-union-deal/72481834/.

Williams, and the UAW bargaining team had been negotiating.[68] The spigot of FCA payoffs to certain UAW leaders continued to flow.

165.   On September 30, 2015, the UAW's FCA workforce rejected the tentative agreement negotiated by the FCA and UAW leaders.[69] Various press reports attributed the rejection to distrust of the union's leadership by its members.

166.   On October 8, 2015, FCA and the UAW announced a new tentative agreement. Just as with the first tentative agreement, the FCA-UAW CBA deal terms were structured to force enormous costs on GM. Although the initial tentative agreement was rejected by the FCA-UAW membership, the new tentative agreement that was ultimately approved was similar to the initial tentative agreement in terms of structure and total cost.[70] As with the decision to choose FCA as the lead, and the

---

[68]   12/12/18 Johnson Gov't Sentencing Mem., at 5.

[69]   During bargaining, the UAW negotiates "tentative" agreements with each automaker. These tentative agreements are then proposed to UAW members, who vote to approve ("ratify") or reject the deal. Agreements are not legally effective until ratification by UAW membership. If a majority of UAW members vote to reject a tentative agreement, another agreement must then be negotiated and proposed to UAW membership for ratification. In voting to reject a tentative agreement, members do not provide a reason for the rejection.

[70]   As demonstrated by their actions with respect to the second tentative agreement, the UAW leadership recognized that the failure of the first tentative agreement was caused by the UAW's failure in messaging and process more than issues with the substance of the agreement. *See* Tracy Samilton, "UAW hopes second time's the charm for new contract with FCA" (October 9, 2015) https://www.michiganradio.org/post/uaw-hopes-second-times-charm-new-contract-fca.

first tentative agreement, this second tentative agreement was structured effectively as a bribe by FCA to the UAW in return for the UAW's support for FCA's hoped-for merger with GM. GM's analysis of the final FCA-UAW CBA showed that, as a pattern for a GM agreement, it would be vastly more expensive than the agreement GM had negotiated prior to FCA's selection as lead. In contrast to the UAW's "President's Demand" presented by Defendant Williams to GM during the original negotiations (under $1 billion), the pattern from the FCA-UAW agreement was forecast to cost GM more than double the entire "President's Demand," with an estimated cost of nearly $2 billion.  The difference between these amounts, which is easily calculated, is a direct harm Defendants' scheme imposed on GM through the 2015 CBA.

167.   Not only did the 2015 FCA-UAW CBA force enormous costs on GM, but the deal was structured to particularly harm and weaken GM to further Marchionne's goal of forcing a merger with GM.  Specifically, the 2015 FCA-UAW CBA contained large, unanticipated wage increases for Tier One employees.  Such an increase had a disproportionate effect on GM as opposed to FCA given GM's larger proportion of Tier One employees (as a result of FCA and the UAW conspiring to remove the cap on Tier Two employees for FCA).  In addition, despite the large wage increase for Tier One employees, after negotiating the pattern deal with FCA, the UAW demanded a substantially larger "ratification bonus" to

consummate a tentative agreement with GM. These onerous demands and conditions were specifically tailored to, and in fact did, directly harm GM through increased labor costs. UAW-represented workers greatly benefited from this rich contract.

168.   On October 22, 2015, UAW members ratified the new FCA deal with 77 percent approval. Williams bragged that the deal was one of the "richest ever negotiated," saying "the recent bargaining process that took place on behalf of our members at FCA is a testament to the UAW's democratic values and commitment to our members."[71] No one outside of FCA Group and certain UAW leaders knew that the deal was a product of a long-running, insidious fraud.

169.   At the time Williams approved of the FCA terms under which FCA was paying the UAW double their demand, UAW leaders, including Williams, and FCA Group leaders knew the federal government was actively investigating past FCA-UAW CBAs and labor agreements, and potentially other embezzlement of union funds. GM had no such knowledge. Through this "rich" FCA-UAW labor contract, Williams and corrupt UAW leaders were able to claim to the public, UAW members, and government investigators that UAW leadership had obtained

---

[71]   Christina Rogers, *UAW Ratifies a Richer Deal With Fiat Chrysler*, WALL STREET JOURNAL (Oct. 22, 2015), https://www.wsj.com/articles/uaw-workers-ratify-deal-with-fiat-chrysler-14455 26840.

significant FCA concessions that could then be used in pattern negotiation. Marchionne, in turn, structured and agreed to these CBA terms as a bribe to the UAW and to force unanticipated higher costs on GM, which had a higher degree of more costly Tier One workers, and further his takeover scheme. This rich FCA deal also was a reward to UAW leadership for allowing FCA Group to control the UAW leaders for the past many years and had the benefit of providing a windfall for UAW workers.

170.   GM, selected as the next target, reached a tentative deal with the UAW on October 25, 2015, based on the fraudulently tainted FCA-UAW pattern. Although GM tried to resist the use of the FCA agreement as a pattern and to mitigate the damage FCA had caused, the threatened risk of a strike proved too great. As Defendants had no doubt calculated in their corrupt dealings, the economic force of pattern bargaining and threat of strike forced GM to largely concede FCA's agreement as a pattern.

171.   The 2015 GM-UAW CBA was ratified by UAW membership on November 20, 2015 and was effective as of November 23, 2015.

172.   Ultimately, although GM was able to mitigate the immediate cost impact of the FCA pattern by about $400 million through negotiation and modification of non-core, non-pattern items, it could not and did not change the core, pattern-based economics of the final CBA between GM and the UAW.  The final

cost was approximately $1.9 billion in incremental labor charges over four years—over $1 billion more than the deal GM believed it had reached with the UAW before the UAW's selection of FCA as the lead.

173. Although GM was able to successfully resist the FCA-UAW leadership takeover scheme, substantial damage from the racketeering scheme had been inflicted: direct injuries to GM in the form of higher labor costs that continue to compound to this day.

174. Failing to consummate Operation Cylinder was a regret Marchionne took to the grave. An excerpt from a biography of Marchionne states that an FCA NV-GM merger was "one uncompleted project that Marchionne probably regretted to the end of his life."[72]

## V. CO-CONSPIRATORS ASHTON AND IACOBELLI SERVED AS INFORMANTS TO FCA CAUSING HARM TO GM.

175. In order to further direct the harm specifically at GM and seek to leverage the 2015 CBA into a forced merger, Defendants, led by Marchionne and Williams, placed two informants at GM with access to confidential information.

---

[72] Tommaso Ebhardt, *The Crisis Fiat Faced As It Lost an Indispensable Leader*, BLOOMBERG BUSINESSWEEK (Apr. 23, 2019), https://www.bloomberg.com/news/articles/2019-04-23/the-crisis-fiat-faced-as-it-lost-an-indispensable-leader.

176.   First, although many of the UAW leaders who received bribes from FCA were members of the FCA Department of the UAW, upon information and belief, Defendant Ashton, the former Vice President of the GM Department of the UAW, also received such payments.  As noted, upon information and belief, FCA Group provided Ashton with control over a foreign account at least in the Cayman Islands in return for his perpetrating and not revealing the scheme against GM.

177.   As described above, a key part of the scheme was granting certain cost savings programs as described herein to FCA, while denying those same programs to GM.  To carry out this scheme, Ashton's involvement, as the Vice President of the GM Department, was essential to ensure that GM did not receive the FCA structural labor programs and related advantages as described herein to impose higher costs on GM.  FCA Group bribed Ashton to carry out his role in the scheme as noted herein.

178.   In June 2014, Ashton resigned as UAW Vice President for GM when Williams chose Ashton to become the UAW Trust's nominee to the GM Board. GM carefully vetted Ashton's credentials and fitness for Board service, and took appropriate steps to prevent any conflicts of loyalty. For example, GM determined that Ashton would be ineligible to join the Board unless he retired from the UAW, which Ashton did. When he joined the Board, Ashton received an orientation on his

rights and obligations as a director and signed an agreement to comply with his
fiduciary duties to GM.

179.   Ashton, while serving on GM's Board as a fiduciary, not only failed to
disclose the ongoing scheme between FCA Group and the UAW, and the direct harm
this scheme was designed to and was continuing to cause GM, but, upon information
and belief, Ashton also proceeded to pass confidential GM information to the corrupt
UAW and FCA Group executives. This confidential information included GM's
strategies and internal positions in connection with the 2015 CBA negotiations.

180.   The specific types of information to which Ashton was privy by virtue
of his service on the board are extensive. In 2015 alone, a key period both for CBA
negotiations and GM's response to FCA Group's merger request, Ashton received
information showing detailed information on GM's actual performance and goals
for 2015; early information discussing what GM viewed as the greatest risks in the
coming CBA negotiations (specifically identifying the two-tiered wage structure);
much more detailed discussions of risks and opportunities from the coming CBA
negotiations, including specifically discussions around the tier-two wage structure;
specific discussions of FCA's merger proposal, including GM's detailed strategies
for defending against what it viewed as an unattractive proposal. Upon information
and belief, Ashton passed this information to the UAW and FCA, allowing both

entities to tailor their approaches (both in labor negotiations and in merger efforts) to inflict maximum pressure on GM.

181. In 2017, after the federal investigation came to light, GM sought to question Ashton about his knowledge of any wrongdoing. Ashton refused to speak with GM, which is contrary to the Company's policy, and instead resigned from the board.

182. In addition to Ashton, Defendants, again led by Marchionne and Williams, took steps to install another conspirator inside GM. In June 2015, Alphons Iacobelli abruptly resigned from FCA, despite having been at the center of the scheme for years. Shortly after leaving FCA, Iacobelli began reaching out to GM labor employees, seeking information about GM's 2015 bargaining. Iacobelli then spent months requesting that GM hire him in a labor position. At that time, due to the affirmative actions of Defendants to conceal their fraud, GM had no way of knowing of Iacobelli's continued involvement in the long-running scheme to harm GM. GM hired Iacobelli to work in its labor relations department in January 2016.

183. As an employee of GM's labor relations department, Iacobelli attended labor strategy meetings with GM senior leadership, which provided Iacobelli access to confidential information concerning GM's labor approaches and strategies. Upon information and belief, after joining GM, Iacobelli continued to receive or have control over illicit payments from FCA Group. In return, Iacobelli used his position

at GM to further the scheme to harm GM by passing to FCA Group the confidential labor strategy information he was provided with at GM.

184.   The placement of Ashton and Iacobelli inside GM was part of the scheme to directly target GM, causing GM to suffer direct harm from this ongoing scheme orchestrated at the highest levels of FCA Group.   FCA Group succeeded through the Racketeering Enterprises in driving up GM's labor costs for years.



## VI.   FCA NV'S HISTORIC CULTURE OF CORRUPTION AND BRIBERY AS A BUSINESS TOOL.

185.   Far from an aberration or the acts of rogue agents as FCA Group has proclaimed, the scheme described herein is completely in line with the overriding

corporate philosophy of FCA NV. This philosophy has been revealed through a variety of scandals in organizations controlled or connected to FCA NV.

186.  For instance, Fiat and its leadership were caught in a vast political corruption scandal known as Kickback City during the 1990s.  This scandal arose from the discovery that Fiat was paying billions of lire in bribes to government officials in return for public-work contracts and other political favors.  Rather than owning up to its role in the scandal, from the outset Fiat attempted to use its own economic clout to shield the company from blame or responsibility.  Just as FCA NV asserts here, during the Kickback City scandal, Fiat claimed that its upper management had no direct knowledge of the corrupt practices.  Despite these claims, substantial evidence of direct involvement by top managers of Fiat was uncovered and eventually resulted in the arrest of a Fiat Board Member, finance director, chief operating officer, and other high-ranking executives of the company.  Just as here, in Kickback City, Fiat followed the same pattern and used illicit financial accounts in banks in some of the same countries believed to be utilized in the scheme here, including Switzerland, the Bahamas, and possibly other countries.[73]

---

[73] Alan Cowell, "Kickback Scandal Convulses Italy" (May 10, 1992) https://www.nytimes.com/1992/05/10/world/kickback-scandal-convulses-italy.html (describing bribes being funneled through banks in Switzerland).

187.   Consistent with this culture of corruption, Marchionne was encouraged and rewarded to commit fraudulent practices to further the business interests of FCA NV and related companies.   FCA NV provided Marchionne with outsize compensation packages ($72 million in total pay in 2014 for example) despite documented scandals involving Marchionne.   For instance, at FCA, the company underwent scandals related to the payment of illegal kickbacks to the Iraqi government (leading to more than $15 million in total fines to the U.S. Government and the entry of a deferred prosecution agreement), charges of tax evasion (leading to a fine of 20-30 million Euros), and the hiding of safety data (leading to a $70 million fine in 2015).

188.   As another example, while not part of the scheme aimed at GM or the pattern of racketeering associated with the enterprises alleged herein, starting in February 2011, FCA began to systematically overstate its month-end sales figures, ultimately using the fraud to claim a record-breaking 71-month streak in year-over-year improvements.

189.   Reid Bigland, FCA's Senior Vice President of Sales and the executive in charge of the scheme, alleged that Marchionne was intimately involved with the reporting methodology: "[Bigland] reported directly to the Global Fiat Chrysler CEO, Sergio Marchionne. . . . [FCA's] most senior executive and leadership levels, including Marchionne . . . were well aware of the methodology[.]" Indeed, he alleges

that he "administered the protocol in accordance with best practices he received from . . . the Global CEO[.]"[74]

190.   In July 2016, FCA was forced to admit its inflated sales scheme, restate its sales, and acknowledge that the SEC and Department of Justice had launched investigations into its reporting. On September 27, 2019, the SEC charged FCA with misleading investors about the number of new vehicles sold each month to customers in the U.S.  FCA agreed to pay $40 million to settle the charges.[75]

191.   "The SEC's order finds that FCA US inflated new vehicle sales results by paying dealers to report fake vehicle sales and maintaining a database of actual but unreported sales, which employees often referred to as a 'cookie jar.'  In months when the growth streak would have ended or when FCA US fell short of other targets, FCA US dipped into the 'cookie jar' and reported old sales as if they had just occurred."[76]

192.   During many of these ongoing frauds, FCA Group faced tightening corporate governance requirements in Italy. In 2013, Italy put into place additional

---

[74]  First Am. Compl. at 3, 12, *Bigland v. FCA N. Am. Holdings, LLC, et al,* No. 2:19-cv-11659-GAD-SDD (E.D. Mich. June 12, 2019).

[75]  U.S. Sec. and Exchange Comm. Press Release, *Automaker to Pay $40 Million for Misleading Investors* (Sept. 27, 2019), https://www.sec.gov/news/press-release/2019-196.

[76]  *Id.*

requirements for adequate internal control and risk management systems, which were aimed at encouraging the discovery and uncovering of fraud, bribery, and other malfeasance. Rather than comply with these new requirements and risk the undoing of its corrupt business practices, in 2014, FCA NV moved its country of incorporation to the Netherlands. The move to the Netherlands accomplished two goals: (1) consolidating the power of FCA NV's controlling shareholders over the organization and (2) providing greater leeway for FCA's irregular governance practices.

193.   The Netherlands is well known for its lax taxation and corporate governance policies.  Although Dutch law provides requirements for companies that incorporate there, companies may disregard such requirements as long as they explain why they chose to ignore a specific rule of conduct—colloquially referred to as the "comply or explain" approach.  For instance, the Dutch Code contains "best practice" requirements for the number of independent directors that sit on a board. Rather than comply with this requirement, FCA NV notes in its SEC filings that it does not comply with this practice because "two of [its] nine non-executive directors are not independent[.]" The Dutch Code also requires that FCA NV's board committees be made up only of non-executive directors and, at most, one non-independent director. Contrary to this requirement, FCA NV states in its SEC

filings that its Governance and Sustainability Committee includes an executive director, and allows for the possibility of having two non-independent directors.[77]

194. FCA likewise maintains lax and insulated corporate governance, with a board that does not include a single independent director. Each member of the board of FCA is an employee of the company, with most having multiple roles throughout FCA Group.

## VII. U.S. ATTORNEY IN DETROIT'S CRIMINAL INVESTIGATION STARTS TO REVEAL THE CORRUPTION

195. In July 2017, the government began unsealing indictments showing a years-long pattern of corruption and racketeering activity between FCA Group and certain UAW leaders. As GM later learned, the government's investigation had been underway for years before the indictments were released. Defendants were therefore aware of the investigation and yet continued to carry on and conceal their criminal conduct.

196. The government has publicly charged and implicated over a dozen FCA and UAW officials, including the key officials responsible for managing FCA-UAW labor relations, administering the NTC, and 2015 collective bargaining negotiations. The charges illustrate the pervasive and deeply rooted "culture of corruption," as the

---

[77] *E.g.*, Fiat Chrysler Automobiles N.V., 2015 Annual Report, at https://www.sec.gov/Archives/edgar/data/1605484/000160548416000134/fca2015123120f.htm.

government used that description, that prevailed among FCA Group and certain UAW leaders during their criminal scheme.

197.   One by one, each of the FCA and UAW co-conspirators entered guilty pleas admitting to a brazen scheme to enrich themselves and corrupt the collective bargaining process through the FCA Control and FCA-NTC Enterprises. Every official charged to date in the corruption scheme has pled guilty.

198.   In those pleas, the co-conspirators admit to a dizzying number of racketeering acts, including millions in illegal "payments [that] were made in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW. That is exactly why they were made."[78] These acts, which have only been admitted, in part, due to the larger bribery scheme involving foreign bank accounts, were designed to and did pervert the collective bargaining process to the direct injury of GM.

## VIII. FCA GROUP AND ITS CO-CONSPIRATORS CONCEALED THE CONSPIRACY AND RESULTING DAMAGE, PREVENTING GM FROM DISCOVERING ITS EARLIER INJURY.

199.   GM reasonably, but incorrectly, believed that FCA Group acted in good faith and negotiated agreements with UAW leadership at arm's length, including in

---

[78]   8/13/18 Iacobelli Sentencing Mem., at 13 (emphasis added).

2011 and 2015, consistent with FCA and UAW leadership's obligations under the Taft-Hartley Act and the UAW Constitution. For example, Williams described the 2015 CBA as a "balanced" agreement that was "a testament to the UAW's democratic values and commitment to our members."[79] Similarly, UAW leaders held up the 2011 CBA as proof that "cooperation and collective bargaining work."[80] In fact, the UAW recognized the importance of good faith pattern bargaining— including on October 25, 2015, the day the UAW and GM reached a tentative agreement—as it "levels the playing field so that companies compete based on the quality of their product or services and not how much they pay . . . their workers." In this way, the UAW assured, "one company cannot gain a competitive advantage over other companies with wages."[81]

200.   GM had no way to know that FCA Group had conspired through bribes to key UAW officials to ensure FCA received illicit competitive advantages compared to the inflated labor costs that caused GM harm, including, as described

---

[79] Christina Rogers, *UAW Ratifies a Richer Deal With Fiat Chrysler*, WALL STREET JOURNAL (Oct. 22, 2015), https://www.wsj.com/articles/uaw-workers-ratify-deal-with-fiat-chrysler-1445526840.

[80] Joseph Szczesny, *Chrysler Agreement with UAW to Add 2,100 New Jobs*, DAILY TRIBUNE (Oct. 12, 2011), https://www.dailytribune.com/sports/chrysler-agreement-with-uaw-to-add-new-jobs/article_bc6b64af-c7b8-5518-874d-7d0a6caea35c.html.

[81] UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

herein, a private agreement dated as early as 2010 to avoid reinstating the 2015 cap on FCA Tier Two workers, a secret agreement to allow FCA to avoid the contractual limits on the number of temporary workers, and repeated commitments from UAW leadership to support FCA's "World Class Manufacturing" programs while rejecting GM's corollary programs.

201. Defendants' bribery scheme was inherently self-concealing, as secrecy was essential to perpetuate the scheme. Had Defendants' violations of the Taft-Hartley Act been exposed, Defendants would have been investigated and prosecuted criminally, bringing the scheme to an end. In addition, Defendants conspired to conceal their bribery scheme from GM (and the world), by adopting extraordinary measures to obscure the unlawful transactions, the pattern of racketeering, and the resulting injury to GM. As described herein and as admitted in the criminal plea agreements, Defendants and their co-conspirators took numerous active steps to evade suspicion and prevent inquiry into their illegal scheme, including through misstatements, false testimony, tax fraud, and other contrivances designed to suppress evidence of wrongdoing. As demonstrated by the length of the scheme, Defendants' efforts successfully concealed the scheme and precluded suspicion of Defendants' conduct. For example:

> (a) FCA officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited

payments and things of value paid to officers and employees of the UAW";[82]

(b)  The co-conspirators used false-front companies and charitable organizations run by members of the UAW to secretly funnel money to other members of the conspiracy for personal use. For example, between July 2009 and 2015, "Durden conspired and agreed with Alphons Iacobelli, General Holiefield, Monica Morgan, . . . and other individuals and entities, to defraud the United States by using two tax-exempt organizations [the NTC and the LTLOF] to improperly divert millions of dollars in unreported income to his co-conspirators, himself and others";[83]

(c)  Iacobelli, Durden, Morgan, and their co-conspirators used the LTLOF to "conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield";[84]

(d)  Iacobelli (on March 19, 2015), Durden (in February 2011, November 2011, and May 2012–15), and Morgan (on

---

[82]  5/25/18 Brown Plea Agreement, at 3.

[83]  8/8/17 Durden Plea Agreement, at 3.

[84]  7/26/17 Iacobelli Indictment, at 9.

November 3, 2014) filed false tax returns that failed to disclose hundreds of thousands of dollars in illegal payments;

(e)    Between July 2009 and 2015, Durden agreed and conspired with Iacobelli, Holiefield, Morgan, Mickens, the NTC, the LTLOF, and other individuals and entities "to impede, impair, obstruct, and defeat the Internal Revenue Service from ascertaining, computing, assessing, and collecting taxes," thereby "conceal[ing] hundreds of thousands of dollars in illegal payments made by and on behalf of FCA to UAW officers and representatives";[85]

(f)    In February 2010, Marchionne concealed his gift of a custom-made Terra Cielo Mare watch to Holiefield by "declar[ing] the goods at less than fifty bucks."[86] Marchionne then falsely denied the gift when questioned about it by federal investigators;

---

[85]  6/13/17 Durden Information, at 6.

[86]  7/13/18 Iacobelli Plea Agreement, at 8.

(g) "In May of 2011, [Iacobelli] sent an email to [Durden] cautioning Durden not to put the details of certain expenditures made for the benefit of [Holiefield] in writing";[87]

(h) On December 16, 2015, Brown "provided misleading and incomplete [grand jury] testimony in a deliberate effort to conceal the conspiracy to violate the Labor Management Relations Act by FCA, FCA executives acting in the interest of FCA, the UAW and UAW officials."[88]

(i) From 2014 to 2016, Jewell "knowingly and voluntarily joined this conspiracy to receive things of value from persons acting in the interest of FCA . . . knowing that the prohibited payments of things of value, which were delivered through and concealed by the [NTC], were willfully made with the intent to benefit" Jewell and other officials.[89] Further, Jewell entered into a "'culture of corruption' that existed between Alphons Iacobelli and other FCA officials and former UAW Vice President General

---

[87] 7/26/17 Iacobelli Indictment, at 20.

[88] 5/25/18 Brown Plea Agreement, at 5.

[89] 4/2/19 Jewell Plea Agreement, at 3–4.

Holiefield and other members of his staff," involving "corruption [that] was ongoing and intentionally concealed . . . ."[90]

(j)     The Defendants and other FCA and UAW executives hold millions of dollars in illicit funds in foreign bank accounts in countries such as Switzerland, Luxembourg, Liechtenstein, the Cayman Islands, and others.  These funds were put in these overseas accounts expressly to promote and protect the operation and control of the RICO Enterprises covertly.

202. It was not until July 2017, when the government announced indictments of Iacobelli, Morgan, and Durden, with charges following against King, Johnson, Mickens, Brown, and Jewell, that information was revealed that FCA had made illegal payments to certain UAW officials. GM diligently monitored the criminal proceedings and other sources of available information, but GM did not have sufficient information to indicate whether it might have been injured by Defendants' activity or whether it might potentially have a cause of action. At the same time, Defendants and their co-conspirators continued to take active steps to conceal their illegal scheme and its effect on GM.

---

[90]  *Id.* at 13.

203.   In 2017 and 2018, in a series of letters and public statements, FCA, Marchionne, and Williams warranted that their illegal scheme had "nothing whatsoever to do with the collective bargaining process," but rather involved other rogue and bad actors. As has now been revealed, these statements were false, and were designed to evade suspicion and prevent inquiry into Defendants' illegal conduct:

(a)   On July 26, 2017, the same day that Iacobelli and Morgan were indicted, Williams published a letter to UAW members stating: "The current UAW leadership had absolutely no knowledge of the alleged fraudulent activities detailed by this indictment until they were brought to our attention by the government. . . . *[T]he allegations in the indictment in no way call into question the collective bargaining contracts negotiated by our union during this period*."[91] In fact, Williams himself was directly involved in the corruption scheme, which was designed to and did corrupt the collective bargaining process.

(b)   On July 26, 2017, FCA published a statement claiming that it was a "victim[] of malfeasance by certain of [its] employees that

---

[91]   Dennis Williams, *Letter Regarding DOJ Investigation* (July 26, 2017), https://uaw.org/letter-regarding-doj-investigation/.

held roles at the [NTC], an independent entity. These egregious acts were neither known to nor sanctioned by FCA."[92] In fact, FCA was aware of the illegal payments made by its executives, who were implementing FCA's "corporate policy" of bribing key officials in order to corrupt the collective bargaining process. A federal court has found that FCA acted as an active co-conspirator with the NTC and others in this bribery scheme.

(c)    Following a day later in what appear to be coordinated statements, Marchionne published a letter that piggy-backed on Williams' false statements: "I join Dennis Williams, the UAW President, in expressing my disgust at the conduct alleged in the indictment which constitutes the most egregious breach of trust by the individuals involved. I also join Dennis in confirming that *this conduct had nothing whatsoever to do with the collective bargaining process, but rather involved two bad actors* . . . ."[93]

---

[92]  FCA, *Statement in Response to Department of Justice Investigation* (July 26, 2017), https://media.fcanorthamerica.com/newsrelease.do?id=18478&mid=.

[93]  Michael Martinez, *Marchionne Expresses 'Disgust' Over FCA-UAW Executive Conspiracy,* AUTOMOTIVE NEWS (July 27, 2017), https://www.autonews.com/article/20170727/OEM02/170729763/marchionne-expresses-disgust-over-fca-uaw-executive-conspiracy.

Marchionne claimed that the wrongdoing was "neither known nor sanctioned by FCA." In reality, Marchionne and Williams themselves participated in and directed the scheme to corrupt the collective bargaining process.

(d)    On August 1, 2017, Williams published a letter to UAW members stating: "You should also know that no matter what anyone says, *it was NOT possible for General Holiefield to compromise or otherwise affect the national negotiations that resulted in new collective bargaining agreements*, including the 2011 collective bargaining agreement between the UAW and Chrysler."[94]

(e)    On January 26, 2018, days after Iacobelli pled guilty, Williams published a letter to UAW members stating: "*[T]here is simply no truth to the claim that this misconduct compromised the negotiation of our collective bargaining agreement or had any impact on union funds. . . . [T]he fact is [Iacobelli's and corrupted UAW officials'] misdeeds did not affect your*

---

[94]  *Letter to UAW Members from UAW President Dennis Williams* (Aug. 1, 2017), https://uaw.org/letter-to-uaw-members/ (emphasis added).

*collective bargaining agreement and no union funds were stolen or lost.*"[95]

    (f)    On May 24, 2018, during a Press Roundtable discussion, Williams sought to distance himself and UAW leaders from the criminal investigation, stating that "a few people in the UAW is not reflective of the leadership."[96]

    (g)    On August 27, 2018, FCA released a statement that it "firmly restates that it is a victim of illegal conduct by Al Iacobelli and certain other rogue individuals who formerly held leadership roles at the [NTC] . . . *the conduct of these individuals . . . had no impact on the collective bargaining process.*"[97]

    204.  Due to the co-conspirators' concealment of and misrepresentations regarding their criminal bribery activity and its effect on the collective bargaining

---

[95] *Letter from UAW President Dennis Williams to Members Regarding DOJ Case* (Jan. 26, 2018), https://uaw.org/letter-uaw-president-dennis-williams-members-regarding-doj-case/ (emphasis added).

[96] *UAW President Dennis Williams Roundtable* (May 24, 2018), https://uaw.org/final-media-roundtable-uaw-president-dennis-williams/.

[97] *See* Tresa Baldas, *Ex-Fiat Chrysler Exec Alphons Iacobelli Gets 5 1/2 Years in UAW Scandal,* DETROIT FREE PRESS (Aug. 27, 2018), https://www.freep.com/story/money/cars/chrysler/2018/08/27/fca-alphons-iacobelli-uaw-sentencing/1108849002/ (emphasis added).

process, it was not until Iacobelli pled guilty on January 22, 2018, and his plea agreement was released thereafter, that GM uncovered some meaningful details regarding Defendants' scheme and its potential impact on GM. Iacobelli's guilty plea revealed for the first time that FCA's illegal payments to UAW officials were made "in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW."[98] Thereafter, it took substantial research and analysis to begin to discern the manner and extent to which GM was injured by Defendants' illegal conduct.

205. GM did not and could not have reasonably discovered this information earlier despite due diligence. Defendants' public statements, filings, and agreements—which GM reviewed—gave no indication of their illegal activity, much less its impact on the collective bargaining process and GM. To the contrary, as described above, Defendants concealed their scheme from detection through various artifices and outright lies to GM and the public intended to deceive GM and deter inquiry.

---

[98] 7/13/18 Iacobelli Plea Agreement, at 7. (Iacobelli pled guilty on January 22, 2018, and his plea agreement was filed the next day. Due to a scrivener's error, a corrected version was filed on July 13, 2018.)

## CAUSES OF ACTION

### First Cause of Action

Violations of the RICO Act—18 U.S.C. § 1962(b)

Against FCA NV, FCA, Iacobelli, Brown, Durden, (collectively, "Control Defendants")

206.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

207.   This claim arises under 18 U.S.C. § 1962(b), which makes it "unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

208.   At all relevant times, each Control Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3).

209.   The FCA-UAW Control Enterprise, which constitutes the UAW as a legal entity, is an enterprise within the meaning of 18 U.S.C. 1961(4).

210.   In violation of § 1962(b), Control Defendants acquired control over the FCA-UAW Control Enterprise through a pattern of racketeering activity.

211.   Control Defendants gained control over the FCA-Control Enterprise through at least the acts of racketeering activity identified below. The multiple acts of racketeering activity that Control Defendants committed and/or conspired to, or

aided and abetted in the commission of, were related to each other, were long-running, and therefore constitute a "pattern of racketeering activity."

212. By gaining control over the FCA-UAW Control Enterprise through this pattern of racketeering activity, Control Defendants directly damaged GM by having the UAW negotiate and structure CBAs and take positions and enter into contracts and understandings that directly harmed GM as alleged herein, and by directing the implementation of various aspects of the CBAs as described above.

213. The direct harm to GM was further caused by Defendants' efforts to place two conspirators within GM—Defendants Ashton and Iacobelli—on the Board and in the Labor Relations Department of GM.  Through Ashton and Iacobelli, Defendants were able to receive confidential information about GM's labor strategies and its response to FCA Group's merger overtures. This information allowed Defendants to further execute their scheme to inflict direct and substantial harm upon GM.

214. Defendants are accordingly liable to GM for three times its actual damages as proved at trial plus interest, punitive damages, and attorney's fees.

## Second Cause of Action

### Violations of the RICO Act—18 U.S.C. § 1962(c)

### Against All Defendants

215. Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

216.    This claim arises under 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

217.    At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3), because each Defendant was "capable of holding a legal or beneficial interest in property."

218.    The FCA-NTC Enterprise was operated as an enterprise by Defendants since at least July 2009 for the common purpose of directing funds away from the NTC (and ultimately from FCA Group) and others for the benefit of certain UAW officials in return for benefits, concessions, and advantages to FCA through driving higher labor costs for GM as alleged herein. This purpose was achieved through a variety of related fraudulent schemes.

219.    Defendants conducted and participated in the affairs of the FCA-NTC Enterprise through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), consisting of numerous and repeated uses of the interstate mails, wire communications, and Taft-Hartley violations associated with the NTC, to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c), through violations of 28 U.S.C. § 186, and through violations of 18 U.S.C. § 1956.

220.   The NTC was used as a tool to carry out the elements of the illegal schemes and pattern of racketeering of Defendants. The FCA-NTC Enterprise had an ascertainable structure and purposes beyond the scope and commission of the predicate acts and conspiracy to commit such acts. The FCA-NTC Enterprise is separate and distinct from Defendants. The FCA-NTC Enterprise engaged in, and its activities affected, interstate and foreign commerce by, among other things, representing and training workers for national automakers and training workers to participate in an industry that engages in substantial interstate and international trade through its supply chains and systems of distribution.

221.   Defendants, through their agents and co-conspirators conducting the affairs of the FCA-NTC Enterprise, had the common purpose to secure funds and directly harm GM to force a merger between GM and FCA as more specifically alleged herein. Defendants, through their agents and co-conspirators, did so by, among other things: illegally manipulating the collective bargaining process, diverting funds from the NTC for the benefit of certain UAW officials, paying bribes by paying double the price of the 2015 CBA, and diverting additional FCA Group funds to involved individuals through the use of foreign bank accounts. Defendants carried out these schemes using the interstate mails and wires in violation of 18 U.S.C. §§ 1341 and 1343 and 29 U.S.C. § 186.

222.   Each Defendant participated in the operation and managed the affairs of the FCA-NTC Enterprise as described herein by making decisions on behalf of the enterprise and/or carrying out the decisions of the enterprises, including by directing, authorizing, demanding, receiving or concealing improper payments and/or by impacting the collective bargaining process. Each Defendant committed at least two acts of racketeering activity as identified below. The multiple acts of racketeering activity which Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, and were long-running, and therefore constitute a "pattern of racketeering activity."

223.   As described herein and detailed in the co-conspirators' criminal charges, guilty pleas, and sentencing memoranda, Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

224.   FCA:

(a)   Beginning in July 2009, FCA began a long-running scheme of improper payments to UAW officials, funneled through the NTC, made by FCA senior executives and agents, including with the knowledge and approval of Marchionne. All such payments were made willfully and with the intent to benefit the UAW and its officials to influence the collective bargaining process and

directly harm GM, as alleged herein. FCA and its agents used and directed the use of the mails and wires to further this fraudulent scheme in violation of 18 U.S.C. §§ 1341 and 1343. Examples of such improper payments and uses of the mails and wires made by agents acting in the interest of FCA are set forth below.

(b)   In July 2009, Durden, Iacobelli, and others caused the transfer of $15,000 in funds from NTC to the LTLOF, an entity controlled by Holiefield, in violation of 29 U.S.C. § 186.

(c)   In 2010, Marchionne provided a watch worth several thousand dollars to Holiefield with a hand-written note that stated, "Dear General, I declared the goods at less than fifty bucks. That should remove any potential conflict," in violation of 29 U.S.C. § 186.

(d)   On at least one occasion between October 2010 and September 2011, Durden, Iacobelli, and others caused the transfer of more than $421,960 in funds from NTC to Morgan for the purchase of personal items, in violation of 29 U.S.C. § 186.

(e)   In May 2011, Iacobelli sent an email to Durden cautioning Durden not to put the details of certain expenditures made for the benefit of Holiefield in writing. This email was in furtherance of

111

Defendants' fraudulent schemes and was sent via the interstate wires in violation of 18 U.S.C. § 1343.

(f)     On multiple occasions between May 2011 and October 2013, Iacobelli, Durden, and others authorized the payment of over $350,000 in personal expenses for Holiefield and Morgan, in violation of 29 U.S.C. § 186.

(g)     On at least one occasion in June 2014, Durden, Iacobelli, and others caused the transfer of more than $262,000 in funds from NTC to pay off the mortgage of Holiefield and Morgan, in violation of 29 U.S.C. § 186.

(h)     In 2014, 2015, and 2016, FCA and its agents knowingly approved the use of tens of thousands of dollars of NTC funds to pay for expenditures in Palm Springs for the benefit of the UAW and its officials, in violation of 29 U.S.C. § 186.

(i)     With FCA's knowledge and encouragement, Jewell repeatedly used a credit card and funds provided to him as Co-Chairman of the NTC to make extravagant purchases for the benefit of himself and other high-ranking UAW officials, in violation of 29 U.S.C. § 186. Such purchases included $8,926.93 for a two-month stay at a villa in Palm Springs, California in January and

February 2016; $6,681.12 for golf, golf club rentals, golf balls, meals, beer, and liquor at the Indian Canyons Golf Resort in Palm Springs; $1,259.17 for luxury luggage; $2,182 for an Italian-made Beretta shotgun; and $468.86 for cigars at Wild Bill's Tobacco store. These purchases also included $2,130 of Disney World theme park tickets for his friend and his friend's family; multiple tickets to Universal Studios theme park for his friends at a cost of $217.26 each; and numerous extravagant dinners for himself and other UAW officials (such as a $7,500 meal at LG's Prime Steakhouse in Palm Springs, California; a $6,200 meal and $6,900 meal at Palm Springs Steak and Chop Restaurant, and a $7,694 meal at London Chop House in Detroit).

(j)     FCA knowingly approved the use of FCA funds for the personal benefit of Mickens, including allowing Mickens to spend thousands of dollars at Best Buy stores purchasing items for his personal use, in violation of 29 U.S.C. § 186.

225.   FCA NV:

(a)     Beginning in July 2009, acting through its agent Marchionne, FCA NV engaged in a pattern of making and approving

payments and the provision of things of value to UAW leaders, as described above. Marchionne himself gave improper things of value to UAW leaders, such as in February 2010, when Marchionne provided a custom-made watch worth several thousand dollars to Holiefield. In addition, Marchionne, as the CEO of FCA NV, and to achieve the ultimate goal of a combination between GM and FCA NV, instructed high-ranking FCA executives, including Iacobelli, to make more than $1.5 million in prohibited payments and things of value directly and indirectly to top UAW officials. Marchionne made these payments, and approved other such payments, within the scope of his employment with and for the benefit of FCA NV. Each of these payments made and approved by Marchionne were in violation of 29 U.S.C. § 186.

(b)     Further, Marchionne aided and abetted numerous violations of 29 U.S.C. § 186 by directing Iacobelli and other FCA executives to make payments totaling over $1.5 million to UAW officials in violation of § 186. Marchionne did so within the scope of his employment with and for the benefit of FCA NV. Marchionne affirmatively assisted in these violations through this direction

and through his oversight and approval of these payments, all in violation of § 186 and with the specific intent that payments be made in violation of § 186.

(c)    FCA NV, through its agents, granted control over numerous foreign bank accounts to individual UAW and FCA co-conspirators.   Through this scheme, FCA NV, using numerous foreign financial institutions and accounts, directed funds from outside the United States to and for the benefit of United States citizens, with the intent to promote and further FCA NV's and FCA's unlawful scheme of using the NTC to direct prohibited payments to UAW officials in an effort to harm GM. These payments through the foreign bank accounts were made in violation of 18 U.S.C. § 1956.

226.   Alphons Iacobelli:

(a)    In July 2009, Iacobelli and others acting in the interest of FCA and using funds provided to NTC by FCA caused the transfer of $15,000 in funds from NTC to LTLOF, an entity controlled by Holiefield, for the benefit of Holiefield in violation of 29 U.S.C. § 186.

(b)     In May 2011, Iacobelli authorized the expenditure of more than
$2,100 of NTC funds for Morgan, for the benefit of Holiefield,
and knowing that FCA would ultimately pay for these tickets, in
violation of 29 U.S.C. § 186.

(c)     In 2011 and 2012, Iacobelli authorized and directed the
expenditure of more than $435,000 to Wilson's Diversified
Products, which was owned and/or controlled by Holiefield and
Morgan, to pay for personal purchases by UAW officials,
including Holiefield. Iacobelli authorized and directed this
payment for the benefit of Holiefield, and knowing that FCA
would ultimately pay for this expenditure, in violation of 29
U.S.C. § 186.

(d)     Between 2012 and June 2015, Iacobelli authorized the
expenditure of more than $450,000 of NTC funds to pay for
personal purchases by UAW officials, including Holiefield.
Iacobelli authorized and directed these payments for the benefit
of the UAW and its officials, and knowing that these
expenditures were ultimately paid by FCA, in violation of
29 U.S.C. § 186.

(e)     On at least one occasion in June 2014, and with the intent to benefit the UAW and its officials in order to influence the UAW in its relations with FCA, Durden, Iacobelli and others acting in the interest of FCA and using funds provided to NTC by FCA, caused the transfer of more than $262,000 in funds from NTC to pay off the mortgage of Holiefield and Morgan, in violation of 29 U.S.C. § 186.

(f)     Upon information and belief, Iacobelli received substantial amounts from FCA and FCA NV in the form of control over accounts held at financial institutions in Switzerland, Italy, Singapore, and Liechtenstein, in his own name, the name of a family member, and the name of a business entity he controls. These amounts were directed from outside the United States to and for the benefit of Iacobelli, a United States citizen, with the intent to promote and further FCA NV's and FCA's unlawful scheme of using the NTC to direct prohibited payments to UAW officials in an effort to harm GM. Iacobelli received such funds in violation of 18 U.S.C. § 1956.

227.  Jerome Durden:

(a)  In July 2009, Durden and others acting in the interest of FCA and using funds provided to NTC by FCA caused the transfer of $15,000 in funds from NTC to LTLOF, an entity controlled by Holiefield, for the benefit of Holiefield in violation of 29 U.S.C. § 186.

(b)  On at least one occasion between October 2010 and September 2011, and with the intent of benefitting the UAW in order to influence the UAW in its relations with FCA, Durden, Iacobelli, and others acting in the interest of FCA and using funds provided to NTC by FCA, caused the transfer of more than $421,960 in funds from NTC to Morgan, in violation of 29 U.S.C. § 186.

(c)  Durden signed and caused to be filed numerous false IRS Form 990s for the NTC. These filings, which failed to identify hundreds of thousands of dollars in funds being transferred to UAW officials and entities associated with them—including $195,015 in 2010, $543,960 in 2011, $335,852 in 2012, $145,054 in 2013, and $262,000 in 2014—were necessary to perpetrate the scheme and avoid its detection by GM. These

118

Form 990s were filed using either the interstate wires or mails, in violation of 18 U.S.C. § 1341 and/or § 1343 on at least February 25, 2011;     November 1, 2011;     May 15, 2012; May 14, 2013; May 13, 2014; and May 11, 2015.

(d)    Upon information and belief, Durden received substantial amounts from FCA and FCA NV in the form of control over accounts held at financial institutions in the Cayman Islands and Liechtenstein, in his own name and the name of a business entity he controls.  These amounts were directed from outside the United States to and for the benefit of Durden, a United States citizen, with the intent to promote and further FCA NV's and FCA's unlawful scheme of using the NTC to direct prohibited payments to UAW officials in an effort to harm GM.  Durden received such funds in violation of 18 U.S.C. § 1956.

228.  Michael Brown:

(a)    Brown authorized numerous payments, totaling hundreds of thousands of dollars to the UAW, in the guise of reimbursements for 100 percent of the salaries and benefits the UAW paid to individuals placed on "special assignment" status and members of the UAW International Staff, knowing that many of those

individuals did no work for the NTC. Each of these payments was approved as a gift to high-level UAW officials, each in violation of 29 U.S.C. § 186.

229. Dennis Williams

    (a)    Upon information belief, Williams received substantial amounts from FCA and FCA NV in the form of control over accounts held at financial institutions in Switzerland and Liechtenstein, in his own name and the name of a charitable entity he controls.  These amounts were directed from outside the United States to and for the benefit of Williams, a United States citizen, with the intent to promote and further FCA NV's and FCA's unlawful scheme of using the NTC to direct prohibited payments to UAW officials in an effort to harm GM.  Williams received such funds in violation of 29 U.S.C. § 186 and 18 U.S.C. § 1956.

    (b)    During various union functions, Williams partook in extravagant meals, golf-related expenses, and other luxuries, knowing that these items were being funded by FCA in violation of 29 U.S.C. § 186.

230.   Joseph Ashton:

(a)   Upon information and belief, Ashton solicited and received numerous payments, totaling hundreds of thousands of dollars, from FCA NV and FCA.  These funds are or were held in an offshore account at least in Cayman Islands.  Each of these payments to Ashton by FCA were in violation of 29 U.S.C. § 186.

(b)   In addition, the funds in these accounts were directed from outside the United States to and for the benefit of Ashton, a United States citizen, with the intent to promote and further FCA NV's and FCA's unlawful scheme of using the NTC to direct prohibited payments to UAW officials in an effort to harm GM. Ashton received such funds in violation of 18 U.S.C. § 1956.

231.   GM's injuries were directly and proximately caused by Defendants' racketeering activities. For example, as alleged herein, FCA Group's illicit payments to certain UAW officials, entailing a pattern of racketeering including Taft-Hartley violations, inflicted billions of dollars of damages on GM, including: (a) injuries resulting from unique competitive advantages provided FCA but denied to GM to drive up GM's costs from July 2009 through 2015, including in connection with WCM, the proportion of Tier Two workers, and limits on temporary workers; and

(b) over $1 billion in connection with the ratified 2015 GM-UAW CBA and all of its resulting direct harms.

232.   The direct harm to GM was further caused by Defendants' efforts to place two informants within GM—Defendants Ashton and Iacobelli—on the Board and in the Labor Relations Department of GM.   Through Ashton and Iacobelli, Defendants were able to receive confidential information about GM's labor strategies and its response to FCA Group's merger overtures. This information allowed Defendants to further execute their scheme to inflict direct and substantial harm upon GM.

233.   Defendants are accordingly liable to GM for three times its actual damages as proved at trial plus interest, punitive damages, and attorney's fees.

## Third Cause of Action

Violations of the RICO Act—18 U.S.C. § 1962(d)

Against All Defendants

234.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

235.   This claim arises under 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

236.   Defendants further conspired and agreed to violate 18 U.S.C. § 1962(c) and § 1962(b) in violation of 18 U.S.C. § 1962(d) by knowingly agreeing to adopt

the goal of further facilitating the operation of the aforementioned FCA-NTC Enterprise, and by taking and maintaining control of the FCA-UAW Control Enterprise through a pattern of racketeering and by agreeing to the commission of multiple predicate acts and overt acts.

237.   All Defendants have participated as co-conspirators in these offenses and have performed acts in furtherance of the conspiracy.

238.   Defendants agreed, whether expressly or tacitly, that some person would commit at least two predicate acts in the course of participating in the affairs or operations of these enterprises.

239.   Each Defendant and other co-conspirator was aware of the essential scope and nature of the scheme to corruptly operate the FCA-NTC Enterprise and take and maintain control of the FCA-UAW Control Enterprise.

240.   There was no plausible lawful rationale for the manner in which Defendants and their co-conspirators participated in the affairs of the NTC and the UAW.

241.   GM's injuries were directly and proximately caused by the unlawful agreement among these co-conspirators.

242.   Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorney's fees.

243. Defendants are accordingly liable to Plaintiffs for three times their actual damages as proved at trial, punitive damages, plus interest and attorney's fees.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.     Damages, under RICO, in an amount to be determined at trial, including but not limited to the billions of dollars in damages GM suffered as a result of Defendants' bribery scheme, pattern of racketeering, and other unlawful acts;

B.     An award of punitive and/or exemplary damages as Defendants have acted with malice and willful disregard for GM's rights;

C.     An award of costs and fees incurred in pursuing this litigation, including attorney's costs, fees, and the fees and costs of experts;

D.     Equitable relief, including restitution; and

E.     Any other relief the Court deems just, fair, necessary, or equitable.

Dated: August 3, 2020

Respectfully submitted,

**HONIGMAN LLP**

By: */s/ Jeffrey K. Lamb*
Jeffrey K. Lamb (P76738)
J. Michael Huget (P39150)
Shirin S. Goyal (P82528)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone:  (313) 465-7000
jlamb@honigman.com
mhuget@honigman.com
sgoyal@honigman.com

**KIRKLAND & ELLIS LLP**

By: */s/ Hariklia Karis*
Hariklia Karis, P.C.
Jeffrey Willian, P.C.
Casey R. Fronk
Casey McGushin
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com
casey.fronk@kirkland.com
casey.mcgushin@kirkland.com

Austin Norris
Maisie Allison
333 South Hope Street
Los Angeles, CA 90071
Telephone:  (213) 680-8400
austin.norris@kirkland.com
maisie.allison@kirkland.com

*Attorneys for Plaintiffs General Motors LLC
and General Motors Company*

125